**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **CASE NO. 26-10678** |
| **CROSBY MARINE TRANSPORTATION,** | § | |
| **LLC,** | § | **Chapter 11** |
| | § | **COMPLEX CASE** |
| **Debtors.**[1] | § | |
| | § | **SECTION: A** |

**MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
(A) AUTHORIZING DEBTORS TO (I) OBTAIN POSTPETITION FINANCING
AND (II) USE CASH COLLATERAL, (B) GRANTING LIENS AND PROVIDING
CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
(C) GRANTING ADEQUATE PROTECTION, (D) MODIFYING AUTOMATIC
STAY, (E) SCHEDULING FINAL HEARING, AND (F) GRANTING RELATED RELIEF**

The debtors in possession in the above-captioned cases (the "**Debtors**") hereby move (this

"**Motion**") and respectfully state as follows:

**RELIEF REQUESTED**

1.      By this Motion, the Debtors seek entry of an interim order, substantially in the form

attached hereto as **Exhibit A** (the "**Interim Order**"), and a final order (the "**Final Order**"[2] and

together with the Interim Order, the "**DIP Orders**"), authorizing the Debtors to, among other

things:[3]

> (a)      obtain senior secured postpetition superpriority debtor-in-possession term
> loan facility in an aggregate principal amount of up to $60,000,000, *plus*
> applicable fees, premiums, and other amounts and obligations (the "***DIP
> Facility***"; and the commitments thereunder, the "***DIP Commitments***")
> comprising up to $30,000,000 in a new-money term loan (the "***New Money***

---

[1]      An Order directing joint administration of the Chapter 11 bankruptcy case of Crosby Marine Transportation, LLC [No. 25-10678], as lead case, with the Chapter 11 bankruptcy cases of (i) Crosby Tugs, L.L.C. [No. 26-10679], (ii) Crosby Dredging, LLC [No. 26-10680], and (iii) Bertucci Contracting Company, L.L.C. [No. 26-10681], was entered on March 24, 2026, [No. 26-10678, ECF Doc. 9; No. 26- 10679, ECF Doc. 4; No. 26-10680, ECF Doc. 4, No. 26-10681, ECF Doc. 4].

[2]      The Debtors will file the Final Order in advance of the Final Hearing (as defined below).

[3]      Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the DIP Term Sheet or the Interim Order, as applicable.

*DIP Loan*") and a dollar-for-dollar roll up of up to $30,000,000 in respect of the outstanding obligations under the Prepetition Loan Documents (the "*Roll-Up DIP Loan*" and together with the New Money DIP Loan under the DIP Facility, the "*DIP Loans*"), and pursuant to which (i) New Money DIP Loans of up to $10,000,000 and (ii) the Roll-Up DIP Loan (together, the "*Interim DIP Loans*") shall be made available upon the entry of this Interim Order, subject to and on the terms and conditions set forth therein and that certain *Debtor-in-Possession Term Loan Facility Summary of Terms and Conditions* attached as **Exhibit B** hereto (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "*DIP Term Sheet*"),[4] by and among the Debtors, the other Loan Parties, and : JMB Capital Partners Lending, LLC (the "*DIP Lender")*, and (iii) up to the full amount of the DIP Commitments *less* amount(s) drawn under the Interim DIP Loans (the "*Subsequent DIP Loans*" and, together with the Interim DIP Loans, the "*DIP Borrowings*" and, each, a "*DIP Borrowing*") shall be available upon the entry of the Final Order, in each case subject to the terms and conditions set forth in the DIP Orders and the other DIP Documents;

(b)      (i) execute, deliver, and perform under the DIP Term Sheet and the other DIP Documents, and to perform all such other and further acts as may be required in connection therewith; (ii) incur all loans, advances, extensions of credit and financial accommodations, and pay all principal, interest, premiums or similar amounts, fees (including, without limitation, the Commitment Fee, the Exit Fee, and the Work Fee (in each case in accordance with and as defined in the DIP Term Sheet)), costs, expenses, charges, indemnification and reimbursement obligations (whether contingent or absolute), and all other obligations or amounts, whether or not such obligations arose before or after the Petition Date (as defined below), whenever the same shall become due, whether at stated maturity, by mandatory prepayment, declaration, acceleration, or otherwise, in each case, in accordance with the DIP Term Sheet and the other DIP Documents (collectively, the "*DIP Obligations*"); and (iii) perform such other and further acts as may be necessary, required, or desirable to implement and effectuate the terms of this Interim Order, the DIP Term Sheet, and the transactions contemplated thereunder;

(c)      authorizing the Debtors to grant to the DIP Lender the DIP Liens (as defined below) in all DIP Collateral (as defined below), subject to the Carve Out (as defined below), and subject to the relative priorities set forth in the DIP Orders;

---

[4]    Capitalized terms used but not defined in the Final Order shall have the meanings ascribed to such terms in the DIP Term Sheet or, as applicable, the other DIP Documents.

2

(d)     authorizing the Debtors to grant to the DIP Lender, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, as well as liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code, as further described herein, on all DIP Collateral and all proceeds thereof (including, subject to entry of the Final Order, Avoidance Action Assets (as defined below)), including, without limitation, all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code (including, without limitation, all cash and cash equivalents and other amounts from time to time on deposit or maintained by the Debtors in any deposit or securities account or accounts as of the Petition Date and any cash or cash equivalents received by the Debtors after the Petition Date as proceeds of the Prepetition Collateral (as defined below)) against the Debtors in respect of all DIP Obligations, subject to the Carve Out and other priorities, as set forth in the DIP Orders;

(e)     authorizing the Debtors to use the proceeds of the DIP Facility and the DIP Collateral, including Cash Collateral (as defined below), in accordance with the terms and conditions set forth in the Interim Order and the DIP Term Sheet, and strictly in accordance with the Budget, subject to any variances expressly permitted under the DIP Term Sheet (the "**Permitted Variances**");

(f)     modifying or vacating the automatic stay imposed by section 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of the DIP Term Sheet and the DIP Documents, as set forth herein or therein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the DIP Orders, and providing for the immediate effectiveness of the DIP Orders; and

(g)     scheduling a final hearing (the "**Final Hearing**") on the Motion to consider entry of a final order (the "**Final Order**") authorizing the relief requested in the Motion on a final basis and approving the form of notice with respect to such Final Hearing, which order shall be in form and substance and on terms and conditions acceptable in all respects to the DIP Lender.

2.      In support of this Motion, the Debtors submit the *Declaration of Geoffrey Richards in Support of the Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing Debtors to (I) Obtain Postpetition Financing and (II) Use Cash Collateral, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (C) Granting Adequate Protection, (D) Modifying Automatic Stay, (E) Scheduling Final Hearing, and (F) Granting*

*Related Relief* (the "**Richards Declaration**") filed contemporaneously herewith. The initial budget reflecting the anticipated weekly disbursements commencing on the week beginning March 22, 2026, through and including the week beginning April 12, 2026, is attached as **Exhibit 1** to the Interim Order.

## JURISDICTION AND VENUE

3. The United States Bankruptcy Court for the Eastern District of Louisiana (this "**Court**") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *General Order of Reference* from the United States District Court for the Eastern District of Louisiana dated April 22, 2021. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

4. The statutory predicates for the relief requested herein are sections 105, 362, 363, and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Louisiana (the "**Local Rules**").

5. Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court would lack Article III jurisdiction to enter such final judgment or order absent consent of the parties.

## BACKGROUND

6. On March 23, 2026 (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been requested and no committee has been appointed in the Chapter 11 Cases.

7. The factual background regarding the Debtors, including their business operations, its capital and debt structure, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the *Declaration of Lawrence Perkins in Support of Debtors' Chapter 11 Petition and First Day Relief* filed on March 24, 2026 (the "**First Day Declaration**"), which is fully incorporated herein by reference.

## INTRODUCTION

8. The Debtors commenced the Chapter 11 Cases to obtain a breathing spell, complete their marketing and sale of certain equity interests, and reorganize their finances. As part of that effort, by this Motion, the Debtors seek authorization to access the proposed DIP Facility and to use Cash Collateral, which will, among other things, (a) ensure the Debtors have the runway necessary to sell key assets for the benefit of the Debtors' creditors, (b) pay the costs of administering the Chapter 11 Case, and (c) satisfy other needs of the Debtors. The proposed DIP Facility is the best financing option available to the Debtors and approval of the proposed DIP Facility is crucial to the Debtors' ability to ultimately reach the best outcome for all stakeholders.

## SPECIFIC BACKGROUND

9. Founded over 50 years ago by Vinton and Kurt Crosby, the Debtors are one of the largest privately owned transportation businesses in the marine industry. Debtor Crosby Tugs, L.L.C. ("**Crosby Tugs**") began in 1977 when father and son acquired the first vessel, the Paddy Crosby. Following that first acquisition, the Debtors have grown through a series of major acquisitions to acquire new vessels and equipment to expand their reach and capabilities.

10. The Debtors' fleet of vessels and marine equipment includes airboats, assist boats, barges, crew boats, dragline cranes, dredges, excavators, flatboats, a floating drydock, houseboats,

and tugs. The Debtors' tug fleet consists of approximately 90 vessels: offshore, inshore, and assist tugs. With its diverse tug fleet, the Debtors are capable of serving any customer's marine transportation needs, with vessels ranging from 600 HP to 16,500 HP.

11. In 2021, the Company, through Bertucci, entered into a joint venture with venerated marine contractor, Luhr Bros., Inc. to create Luhr Crosby, LLC ("**Luhr Crosby**"), which is now one of the largest heavy marine construction firms in the United States. Luhr Crosby is not burdened by the Company's debt load, is not in need of restructuring, and is not and will not be a Debtor. However, the Company's equity stake in Luhr Crosby is a valuable part of the Company's asset structure and is an important piece in the Company's overall restructuring.[5]

12. While Company's core business remains strong and it possesses highly valuable assets, including its interest in Luhr Crosby, the Company has faced challenges, internal and external, including a high debt load and complex debt structure, the general contraction of offshore energy operations in the Gulf, and cuts to dredging projects in Louisiana. Most recently, the Company has had to contend with volatile fuel costs.

13. These challenges created a liquidity shortfall, which the Crosby Debtors addressed by using funding from merchant cash advance ("**MCA**") firms. This funding (the "**MCA Funding**") provided immediate access to cash, but the cost of the MCA Funding, sometimes nearing 100% interest, was not sustainable by the Company, and substantially worsened the Crosby Debtors' liquidity problem.

14. To facilitate a paydown of its debt load, in late 2025, the Company retained Raymond James to explore a sale of the Company's 49.9% interest in Luhr Crosby. Raymond

---

[5] NTD: Paragraphs 11-18 were updated to mirror an updated draft of the FDD.

James is now, in coordination with the majority owner, in the midst of a targeted process for the sale of the Company's minority interest ("**Luhr Crosby Process**").

15. On February 1, 2026, the Company also retained Raymond James to advise the Company on a comprehensive recapitalization effort ("**Recapitalization Process**" and together with Luhr Crosby Process, the "**Marketing Processes**"). Since beginning the Recapitalization Process, Raymond James has worked to expedite a capital raise effort focused on refinancing the Company's outstanding debt. Raymond James has built a virtual data room ("**VDR**"), completed initial outreach and submitted teasers, obtained executed NDAs from investors, completed initial diligence rounds, and has been accepting non-binding term sheets.

16. SCP was engaged to provide restructuring advisory services in late February. Upon being hired as CRO for the Debtors, I immediately became personally and directly involved in the following efforts: (a) developing and validating a cash flow forecast for the Debtors; (b) compiling and reconciling a registry of all of the Debtors' assets; (c) developing a comprehensive financial model consisting of an income statement, balance sheet, and cash flow statement; (d) meeting with various lenders, customers, and vendors to support the ongoing operations; (e) helping the Company identify and execute the various strategic alternatives that may be available to the Company; (f) working with the Company and its investment bankers to support the potential financing solutions; and (g) various other activities in support of stabilizing the Company. All of these efforts are a work in progress.

17. In performing these functions over the past few weeks, it became clear that even as the Debtors and their advisors were making progress toward a comprehensive out of court restructuring, the Debtors needed to prepare for a contingency freefall chapter 11 filing to avoid a

full-scale liquidation of the Company—which in my opinion would be a disastrous outcome for employees, both secured and unsecured creditors, and the Company's other stakeholders.

18.     The Debtors were ultimately pushed to filing the Chapter 11 Cases due to a cash liquidity crisis. The Debtors' long-term cash liquidity problem became an emergency after certain MCA firms sent letters to the Company's customers in an attempt to seize the Company's receivables, which are subject to the priming lien of Hancock Whitney. The Debtor cannot continue to operate or engage in its Marketing Processes without these receivables. In coordination with Hancock Whitney, the Debtors were able to redirect some of their customers to pay receivables to a segregated Hancock Whitney account ("*Segregated HW Account*"), to which Hancock Whitney provided the Company access to fund the Company's critical operational expenses, namely payroll. However, the confusion among customers created by the MCA firms has made filing the Chapter 11 Cases a necessity so that the Debtors can obtain a breathing spell, complete the Marketing Processes on a reasonable timeline, and reorganize.

19.     To facilitate this reorganization, as of the Petition Date, the Debtors have secured a commitment for a $60 million senior secured superiority debtor-in-possession financing facility, which includes up to $30 million in new money to be provided by the DIP Lender and secured by liens on, among other things, all of the Debtors' right, title, and interest in, to and under the Debtors' assets and property, whether now owned or existing or hereafter acquired, including a first-priority priming lien on the LLC Interest (collectively, the "**DIP Liens**").  The DIP Facility is designed to provide a liquidity cushion for operations and fund professional fees as the Debtors complete the Marketing Processes.  Prior to the Petition Date, the DIP Lender purchased Hancock Whitney's position and acquired all of its rights as the pre-petition lender under the Hancock Whitney Facility as of March 20, 2026.

20. By this Motion, the Debtors seek, among other things, authorization for the Debtors to enter into the DIP Facility. Specifically, the Debtors seek authority to obtain a senior secured postpetition superpriority debtor-in-possession term loan facility in an aggregate principal amount of up to $60,000,000, *plus* applicable fees, premiums, and other amounts and obligations comprising up to $30,000,000 as the New Money DIP Loan and a dollar-for-dollar roll up of up to $30,000,000 as the Roll-Up DIP Loan, and pursuant to which (i) New Money DIP Loans of up to $10,000,000 and (ii) the Roll-Up DIP Loan shall be made available upon the entry of the Interim Order. In addition, by separate motion, the Debtors seeks authorization for the use of Cash Collateral of the DIP Lender and provides adequate protection for the DIP Lender (in its capacity as Prepetition Lender) to the extent of any diminution of value of its interests in the Prepetition Collateral (including Cash Collateral).

21. The Debtors have an immediate need to access the DIP Facility to avoid immediate and irreparable harm. The Debtors will use the proposed DIP Facility to fund the Chapter 11 Cases, with the ultimate goal of effectuating the Marketing Process to sell the LLC Interest, which the Debtors believe will bring about the best outcome for all stakeholders.

## CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001

22. Pursuant to Bankruptcy Rules 4001(b), (c), and (d), the following is a concise statement and summary of the proposed material terms of the DIP Term Sheet:[6]

| Summary of Material Terms | |
| --- | --- |
| **Parties to the Proposed DIP Facility**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Borrowers**: Crosby Marine Transportation, LLC, *et al.*<br><br>**Guarantors**: Each Debtor's direct and indirect subsidiaries and affiliates, and each guarantor and other obligor under the Prepetition Loan Documents<br><br>**DIP Lender**: JMB Capital Partners Lending, LLC and/or its designees or its assignees |

---

[6] This statement is qualified in its entirety by reference to the applicable provisions of the DIP Term Sheet. To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Term Sheet, the provisions of the DIP Term Sheet shall govern. Capitalized terms used but not otherwise defined in this section have the meaning ascribed to such terms in the DIP Term Sheet.

| Summary of Material Terms | |
|---|---|
| **Purpose**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)* | A critical need exists for the Debtors to enter into the DIP Facility. Without availability under the DIP Facility, the Debtors will not have sufficient liquidity to administer and resolve the Chapter 11 Case. Under the circumstances, the Debtors' access to the DIP Loans is vital to executing and resolving the Chapter 11 Case. Without access to the DIP Loans upon the terms set forth in the DIP Orders, the Debtors and their estates will be immediately and irreparably harmed.<br><br>*See* Interim Order, Section G(b). |
| **Borrowing Limits**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)A* | In an aggregate principal amount not to exceed $60,000,000.00, of which up to $40,000,000.00 shall be available upon the entry of the Interim Order, inclusive of the Roll-Up DIP Loan, subject to certain customary terms and conditions. Upon entry of the Final Order, subject to certain customary terms and conditions, the Debtors may request loans in one or more borrowings up to the aggregate amount of the undrawn DIP Commitments.<br><br>*See* Interim Order ¶ 2; DIP Term Sheet Sections 3, 4, and 6. |
| **Approved Budget**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(iii)* | A copy of the Initial Approved Budget is attached as **Exhibit 1** to the Interim Order. |
| **Interest Rates**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP Loans shall bear interest at a per annum rate equal to 12.0% payable in cash on the first day of each month in arrears (the "***Non-Default Interest***").<br><br>After the occurrence and during the continuance of an Event of Default (as defined below), the DIP Loans shall bear interest at an additional per annum rate of 2.0%, in each case payable in cash, together with the Non-Default Interest, on the first day of each month in arrears.<br><br>*See* DIP Term Sheet Section 9. |
| **Maturity Date**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)* | All DIP Obligations shall be due and payable in full in cash ("***Payment in Full***" or such other form of consideration as the DIP Lender and the Debtors may mutually agree) on the earliest of:<br><br>   i.   September 30, 2026;<br><br>   ii.   the effective date of any chapter 11 plan with respect to the Debtors;<br><br>   iii.   the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code;<br><br>   iv.   the date of the acceleration of the DIP Loans and the termination of the DIP Commitments following the occurrence and during the continuation of an Event of Default in accordance with the DIP Documents;<br><br>   v.   dismissal of any of the Chapter 11 Case or conversion of the Chapter 11 Cases into a case under chapter 7 of the Bankruptcy Code or the appointment of a trustee or examiner in any Chapter 11 Case; and<br><br>   vi.   35 days after the Petition Date (or such later date as agreed to by the DIP Lender), unless the Final Order has been entered by the Bankruptcy Court on or prior to such date.<br><br>*See* DIP Term Sheet Section 8. |
| **Repayment Features**<br><br>*Local Rule 4001-2(a)(i)(E)* | Roll-Up DIP Loan. Upon the entry of the Interim Order, and satisfaction of all applicable conditions precedent, the DIP Lender shall make available an aggregate amount of DIP Loans up to $40,000,000 |

| Summary of Material Terms | |
|---|---|
| *& (O)* | comprising (i) a New Money DIP Loan of up to $10,000,000 and (ii) the Roll-Up DIP Loan (in an amount of up to $30,000,000). Pursuant to that certain Notarial Act of Transfer, dated as of March 20, 2026, Hancock Whitney Bank sold and assigned all of its right, title and interest in and to, among other things, the Prepetition Credit Facility (including its interests in the Prepetition Liens and Prepetition Collateral) to JMB in connection with, and as part of negotiation and proposal of, the DIP Facility and the refinancing of the Prepetition Secured Obligations pursuant to the Roll-Up DIP Loan.<br><br>Prepayments. The DIP Facility contains customary provisions regarding voluntary and mandatory prepayments.<br><br>*See* DIP Term Sheet Sections 3-5, 12. |
| **Conditions Precedent & Subsequent**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E)* | The Interim DIP Loans and the Subsequent DIP Loans are subject to the satisfaction, or waiver by the DIP Lender, of conditions precedent customary for financings of this type.<br><br>*See* DIP Term Sheet Sections 15 and 16. |
| **Events of Default**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)(M)* | The DIP Term Sheet contains customary events of default for financings of this type.<br><br>*See* DIP Term Sheet Section 25. |
| **Carve Out**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)(F)* | The liens and security interests in the DIP Collateral, and the superpriority administrative claims shall be subject in all respects to the Carve-Out.<br>As used herein, the "***Carve-Out***" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses incurred by Persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "***Debtor Professionals***") or the Committee, pursuant to section 328 or 1103 of the Bankruptcy Code (the "***Committee Professionals***" and, together with the Debtor Professionals, the "***Professional Persons***") at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, and subject to the fees and expenses set forth in the Budget (subject to the Permitted Variance), applicable transaction fees, and any other limits set forth in the DIP Orders; and (iv) allowed fees and expenses of Professional Persons in an aggregate amount not to exceed $2,500,000 incurred after the first business day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "***Post-Carve-Out Trigger Notice Cap***" and, together with the amounts set forth in clause (iii) above, the "***Professional Fee Carve-Out Cap***"); <u>provided</u> that nothing herein shall be construed to impair the ability of any party to the DIP Documents to object to the fees, expenses, reimbursement or compensation described above on any grounds.<br><br>*See* DIP Term Sheet Section 25; Interim Order ¶ 23. |
| **Priority of Claims and Liens; Collateral**<br><br>*Fed. R. Bankr. P.* | <u>**Priority**</u>: Subject to only the Carve-Out, all DIP Obligations shall be entitled to, as applicable, (i) a priming first-priority lien, (ii) a senior first-priority lien on unencumbered assets and property, (iii) junior liens to the extent required, and (iv) superpriority claim status pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, with senior (or junior, as applicable) priority over any and all liens and |

11

| Summary of Material Terms | |
|---|---|
| *4001(c)(1)(B)(i)* | secured claims, administrative-expense claims, other priority claims, and other unsecured claims, of any kind or nature whatsoever, now existing or hereafter arising under the Bankruptcy Code (such superpriority claims, the "***DIP Claims***").<br><br>Subject to only the Carve-Out, all DIP Obligations in respect of the DIP Facility shall be at a minimum:<br><br>i. entitled to superpriority claim status in the Chapter 11 Cases pursuant to section 364(c)(1) of the Bankruptcy Code (which claims shall be payable from and have recourse to all DIP Collateral);<br><br>ii. secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first-priority lien on all DIP Collateral that is not subject to a valid, perfected, non-avoidable lien or security interest (including any such lien or security interest that is perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code);<br><br>iii. secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic junior lien on all DIP Collateral that is subject to a Permitted Priority Lien[7] (all such DIP Collateral, the "***DIP Junior Collateral***," all DIP Collateral that is not DIP Junior Collateral, collectively, the "***DIP Senior Collateral***") secured, pursuant to section 364(c)(3) of the Bankruptcy Code; and<br><br>iv. secured, pursuant to section 364(d)(1) of the Bankruptcy Code, by an automatically perfected priming first-priority lien on all DIP Collateral (including, without limitation, all Prepetition Collateral and the LLC Interest) that is subject to a valid, perfected, non-avoidable lien (including, for the avoidance of doubt, the Prepetition Liens) or security interest (including any such liens or security interests that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code):<br><br>The DIP Liens shall, to the fullest extent permitted by applicable law, be automatically effected and perfected upon entry of the Interim Order and without the necessity of the execution or filing of mortgages, landlord agreements, security agreements, pledge agreements, control agreements, financing statements, or other agreements.<br><br>*See* Interim Order ¶ 6, DIP Term Sheet Section 14.<br><br>**Collateral**: All of the Debtors' (and the non-Debtor obligors') right, title and interest in, to and under all of the Debtors' (and the non-Debtor obligors') assets and properties, including, but not limited to the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located: all assets and property of the Debtors and their estates (and the non-Debtor obligors'), real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including the Prepetition Collateral and the LLC Interest, all proceeds, products, accessions, rents and profits of or in respect of any Collateral and (i) effective upon entry of the Interim Order, all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof and (ii) effective upon entry of the Final Order, all other Avoidance Actions and the proceeds thereof (collectively, the "***Avoidance Action Assets***").<br><br>*See* Interim Order ¶ 6, DIP Term Sheet Section 12. |
| **Adequate Protection / Identity of Each Entity with Interest in Cash Collateral** | The DIP Lender is entitled to adequate protection against any post-petition diminution in value of the its liens and interests in the Prepetition Collateral (including Cash Collateral) resulting from, any diminution in the value of its liens or interests in the Prepetition Collateral.. The DIP Lender has consented to the Debtors' use of Prepetition Collateral (including Cash Collateral), in accordance with and subject to the terms and conditions set forth in tthe DIP Term Sheet. The Debtors' use of the DIP |

---

[7] For purposes hereof, the term "**Permitted Priority Lien**" means

| Summary of Material Terms | |
|---|---|
| *Fed. R. Bankr. P. 4001(c)(1)(B)(ii); (b)(1)(B)(i), (iv); Local Rule 4001-2(a)(i)(K) & (P)* | Lender's Cash Collateral is the subject of a separate motion.<br><br>*See* Interim Order ¶ G. |
| **Debtors' Stipulations**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii); Local Rule 4001-2(a)(i)(B)* | Subject to a "challenge" period of (i) seventy (75) days from the entry of an order approving the Debtors' use of the DIP Lender's Cash Collateral, and (ii) solely with respect to the Committee, sixty (60) days from the date of the formation of the Committee, the Debtors will provide in the order approving the use of the DIP Lender's Cash Collateral customary stipulations for transactions of this type, including customary debtor admissions and stipulations with regard to the aggregate amount of the Prepetition Secured Obligations and the validity, enforceability and priority of the liens in the Prepetition Collateral securing the Prepetition Secured Obligations under the Prepetition Loan Documents, and the absence and waiver of claims or causes of action against the Prepetition Lender under the Prepetition Loan Documents.<br><br>DIP Term Sheet Section 23. |
| **Waiver or Modification of Automatic Stay**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby vacated and modified, without further notice to or order of this Court, to permit: (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Lender may request to assure the perfection and priority of the DIP Liens; (b) the Debtors to incur all liabilities and obligations, including all of the DIP Obligations, to the DIP Lender as contemplated under the Interim Order and the DIP Term Sheet; (c) the Debtors to grant the Adequate Protection Liens and the Adequate Protection Claims, and to perform such acts as the Prepetition Secured Lender may request to assure the perfection and priority of the Adequate Protection Liens; (d) the Debtors to incur all liabilities and obligations, including all Adequate Protection Obligations, to the Prepetition Secured Lender as contemplated under the Interim Order and the applicable Prepetition Loan Documents; (e) the Debtors to pay all amounts required hereunder and under the DIP Term Sheet; (f) the Debtors to retain and apply payments made in accordance with the terms of the Interim Order and the DIP Term Sheet; (g) subject to paragraph [20(b)] of the Interim Order, the DIP Lender to exercise, upon the occurrence and during the continuance of any DIP Termination Event (as defined below), all rights and remedies provided for in the Interim Order, the DIP Term Sheet or applicable law; (h) to perform under the Interim Order and the DIP Term Sheet, and to take any and all other actions that may be required, necessary, or desirable for the performance by the Debtors under the Interim Order and the DIP Term Sheet and the implementation of the transactions contemplated hereunder and thereunder; and (i) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of the Interim Order and the DIP Term Sheet.<br><br>*See* Interim Order ¶ 14. |
| **Milestones**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(vi); Local Rule 4001-2(i)(a)(H)* | N/A |
| **Indemnification**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ix)* | The DIP Documents shall contain customary indemnification provisions for the benefit of the DIP Lender, and its related parties, including, without limitation, indemnification against losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated by the DIP Documents or the use or the proposed use of proceeds thereof.<br><br>*See* DIP Term Sheet Section 26. |
| **Section 506(c) and** | Section 506(c). Except to the extent of the Carve Out or as provided in the Interim Order, no costs or expenses of administration of the Chapter 11 Case or any Successor Case at any time, including, without |

| Summary of Material Terms | |
|---|---|
| **Marshaling Waivers**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(x); Local Rule 4001-2(a)(i)(C)* | limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the DIP Lender or the Prepetition Secured Lender, respectively, upon the DIP Collateral or the Prepetition Collateral, respectively, shall be charged against or recovered from the DIP Collateral as to the DIP Lender, or the Prepetition Collateral as to the Prepetition Secured Lender, whether pursuant to section 506(c) of the Bankruptcy Code, any other legal or equitable doctrine (including unjust enrichment) or otherwise, without the prior written consent of the DIP Lender with respect to the DIP Collateral, or the Prepetition Secured Lender under the Prepetition Loan Documents with respect to the Prepetition Collateral, each in their sole discretion, and no such consent shall be implied, directly or indirectly, from anything contained in the Interim Order (including, without limitation, consent to the Carve Out or the approval of any budget hereunder) or from any other action, inaction, or acquiescence by the DIP Lender, or the Prepetition Secured Lender; provided, however, that the foregoing shall be subject to the terms of the Final Order granting such relief.<br><br>*See* Interim Order ¶ 26.<br><br><u>No Marshaling; Section 552(b) Waiver</u>. In no event shall (a) the DIP Lender or Prepetition Secured Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Collateral, or the Prepetition Obligations, and all proceeds of the DIP Collateral shall be received and applied in accordance with this Interim Order and the DIP Term Sheet, or (b) the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Obligations (including, without limitation, the Prepetition Liens and the Prepetition Secured Claims) arising under the Prepetition Loan Documents; provided, however, that the foregoing shall be subject to the terms of the Final Order granting such relief.<br><br>*See* Interim Order ¶ 27. |
| **Liens on Avoidance Actions**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(xi)* | Subject to entry of the Interim Order, all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof. Subject to entry of the Final Order, all avoidance actions, including any claims and causes of actions arising under sections 544, 545, 547, 548, and 550 of the Bankruptcy Code and similar such claims and causes of action under applicable non-bankruptcy law, and the proceeds thereof<br><br>*See* Interim Order ¶ 6. |
| **Fees**<br><br>*Fed. R. Bankr. P. 4001(c)(1); Local Rule 4001-2(a)(i)(B)* | **Commitment Fee**. The Loan Parties shall pay to the DIP Lender a commitment fee equal to two percent (2.0%) of the total amount of the DIP Commitments (the "*Commitment Fee*"), which Commitment Fee shall be approved on a final basis, fully earned, and allowed, nonrefundable and not be subject to reduction, setoff, or recoupment for any reason upon entry of the Interim Order and shall be payable out of the proceeds of the Initial Draw.<br><br>**Exit Fee**. The Loan Parties shall pay to the DIP Lender an exit fee in the amount of five percent (5.0%) of the total amount of the DIP Commitments (the "*Exit Fee*"), which Exit Fee shall be approved on a final basis, fully earned, and allowed, non-refundable and not be subject to reduction, setoff, or recoupment for any reason upon entry of the Interim Order..<br><br>**Work Fee**. The Loan Parties shall pay to the DIP Lender a work fee in the amount of $100,000 (the "*Work Fee*"), which Work Fee shall be fully earned, non-refundable, and allowed upon execution of the DIP Term Sheet. The DIP Lender acknowledges and agrees that the Work Fee was received on March 20, 2026.<br><br>The Commitment Fee, the Exit Fee, and the Work Fee shall be approved on a final basis by the Bankruptcy Court as part of the Interim Order. If such fees are not approved on a final basis by the Bankruptcy Court, the DIP Term Sheet and any applicable DIP Documents shall automatically terminate and be of no further force and effect.<br><br>*See* Term Sheet Section 10. |

| Summary of Material Terms | |
|---|---|
| **Cross-Collateralization**<br>*Local Rule 4001-2(a)(i)(N)* | N/A |

## PREPETITION CAPITAL STRUCTURE

23.     As of the Petition Date, the Debtors had approximately $162,758,685.05 in aggregate funded debt. These obligations arise under the Hancock Whitney Facility and 14 collateral-based facilities each secured by liens attaching to a different portion of the Company fleet of vessels and equipment ("**Fleet Facilities**"). The Fleet Facilities are primarily secured by preferred ship mortgages.  Some of the secured lenders for the Fleet Facilities ("**Other Secured Lenders**") have filed UCC-1 Financing Statements ("**UCC-1s**") that may give rise to lien on the Debtors' inventory and receivables.

24.     *Secured Facilities*.  The table below summarizes the Debtors' prepetition secured debt structure:

| | Lender Name | Approximate Pre-Petition Balance Outstanding |
|---|---|---|
| 1 | JMB (as successor to Hancock Whitney) | $29,240,625.12 |
| 2 | PNC Bank | $25,376,543.00 |
| 3 | City National Bank | $18,022,086.80 |
| 4 | Regions Bank | $18,988,872.44 |
| 5 | ARBA (Truist) | $11,445,065.57 |
| 6 | MC Bank | $9,706,275.05 |
| 7 | Kompass Kapital Funding | $9,907,373.24 |
| 8 | JJ Astor | $10,800,000.00 |
| 9 | Atlantic Union | $7,154,330.80 |
| 10 | Banc of America | $6,279,191.50 |
| 11 | South Lafourche Bank | $7,579,795.90 |
| 12 | Citizens Bank | $2,820,233.00 |
| 13 | State Bank | $2,395,658.78 |
| 14 | ELGA | $2,162,053.00 |
| 15 | Post Road (Encina) | $880,580.85 |
| | | **$162,758,685.05** |

25.     *Real Property*. The Company's real property, subject to mortgages, is held in two Non-Debtor Affiliates, Crosby Marine Repair, Inc, which owns the Company's drydock and shipyards, and Tala Real Estate, L.L.C., which owns the office building containing Company headquarters and a warehouse facility. Bank Plus is the lender for both mortgage loans—as of the Petition Date, the approximate balances owed by these Non-Debtor Affiliates were $3,020,040.57 for Tala Real Estate, L.L.C., and $8,600,296.27 for Crosby Marine Repair, Inc.

26.     *Merchant Cash Advance Lenders*. To address cash liquidity stress in the short-term, the Crosby Debtors entered into a number of MCA agreements to obtain funding from a number of firms (the "**MCA Parties**"). The MCA Parties assert either ownership of certain receivables of the Debtors and/or have filed UCC-1s purporting to perfect a security interest in the Debtors' receivables. Any liens of in favor of the MCA Parties in receivables and inventory is inferior to the lien against the Debtors' receivables securing the Hancock Whitney Facility.  To the extent the MCA lenders claim ownership of the Debtors' receivables, the ownership is subject to the lien securing the Hancock Whitney Facility.

27.     *Unsecured Debt.*  The Debtors also have customary unsecured debt, including amounts owed to trade vendors and landlords.  The Debtors routinely incur fixed, liquidated, and undisputed payment obligations in the ordinary course of business to various third-party providers of goods and services.  These include obligations owed to providers of manufacturing and related inputs, equipment, and related goods and services.  In addition, prior to the Petition Date, the Debtors were responsible for rent and certain other obligations under the terms of its various leases.

## **BUDGET AND NEED FOR ADDITIONAL LIQUIDITY**

28.     The Debtors and the DIP Lender have agreed on an initial cash flow budget, which is attached to the Interim Order as **Exhibit 1** (the "**Initial Approved Budget**").  The budget will be updated every fourth Wednesday following the issuance of a budget to the DIP Lender, or more

frequently at the discretion of the Debtors and the DIP Lender. The budget incorporating any budget updates that is not rejected by the DIP Lender in accordance with the DIP Term Sheet Agreement shall become the approved "Budget" for purposes of the DIP Orders.

29.     As set forth in the First Day Declaration, on the Petition Date, the Debtors' available cash was limited to approximately $1.475 million, and without access to the DIP Facility, it would not be possible to administer the Chapter 11 Case, run the Marketing Process, and reorganize the Debtors' businesses, which would be to the detriment of the creditors, the Debtors and their estates. *See* First Day Declaration, Part VI(G). Further, based on the current expectations and timeline of the Chapter 11 Case, the DIP Facility provides the Debtors with the necessary funding to execute its chapter 11 strategy for the benefit of the Debtors' stakeholders. *See* First Day Declaration, Part VI(G).

## BASIS FOR RELIEF

**A.      The Debtors Should Be Authorized to Enter Into the DIP Facility.**

**i.      The Debtors' Entry Into the DIP Facility Is an Exercise of Its Sound Business Judgment.**

30.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below, and such a decision to obtain financing is governed by the business judgment standard. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment" and were "reasonable under the circumstances and in the best interests of TWA and its creditors"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain

terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); *Group of Institutional Holdings vs. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943) (deferring to the debtor's business judgment); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

31.     Bankruptcy courts typically defer to a debtor's business judgment on the decision to borrow money unless such decision is arbitrary and capricious. *See Trans World Airlines*, 163 B.R. 964 at 974; *see also, e.g., In re N Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re Latam Airlines Grp. S.A.*, 2020 WL 5506407 at *27 (Bankr. S.D.N.Y. Sept. 10, 2020) ("Generally, in evaluating the merits of proposed post-petition financing, courts will defer to a debtor's business judgment provided that the financing does not unduly benefit a party in interest at the expense of the estate.").  In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

32.     Moreover, a debtor is permitted to use assets belonging to the estate outside the ordinary course of business after proper notice and hearing.  11 U.S.C. § 363(b).  Courts evaluate a debtor's decision with respect to the use of assets outside the ordinary course of business also using the business judgment standard. *See In re Cont'l Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986).  Specifically, for a debtor "to satisfy its fiduciary duty . . . there must be some

18

articulated business justification for . . . selling . . . the property outside the ordinary course of business." The application of this standard is made on a case-by-case basis and encourages flexibility and discretion. *In re ASARCO, LLC*, 650 F.3d 593, 601 (5th Cir. 2011).

33. For the reasons discussed herein, the Debtors submits that their entry into the DIP Facility is a sound exercise of its business judgment and therefore an appropriate use of estate assets under applicable case law. The Debtors require access to additional liquidity to fund and administer the Chapter 11 Cases, run the Marketing Process, and reorganize their businesses. Without access to the DIP Facility, the Debtors would be unable to achieve the goals of the Chapter 11 Case to the detriment of their estates and their creditors.

34. The Debtors also submit that, as set forth in the First Day Declaration, the terms of the DIP Facility, (a) were subject to arms'-length and good faith negotiations between the Debtors and the DIP Lender, and each of their respective and independent advisors, and (b) are fair and reasonable under the circumstances. *See* Richards Declaration, Part V.

**ii.        The Debtors Cannot Obtain Postpetition Financing on More Favorable Terms.**

35. In demonstrating that credit is not available without the protections afforded by section 364(c) or 364(d) of the Bankruptcy Code, a debtor need only make a good faith effort. *See, e.g., Ames Dep't Stores, Inc.*, 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) of the Bankruptcy Code to obtain less onerous terms where debtor approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (holding "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *In re Phoenix Steel Corp.*, 39 B.R. 218, 222 (D. Del. 1984) (holding the debtor satisfied its burden to show an

inability to obtain credit on other terms through its time and effort spent trying to obtain credit on alternative terms and conditions).

36.     As set forth in the First Day Declaration, Raymond James canvassed the marketplace in search of DIP financing on the best terms available to the Debtors.  *See* Richard Declaration, Part V.  Raymond James' and the Debtors' efforts in procuring the DIP Facility on the terms set forth  in the Summary of Material terms above are the best terms available to the Debtors and no other lender was willing to lend on terms equal to or better than the terms offered by the DIP Lender.  *See* Richards Declaration, VI-VII.  No lender, including the DIP Lender, ultimately agreed to provide postpetition financing on an unsecured or junior-lien basis.  *See id.*

37.     Accordingly, the Debtors believe that, given the Debtors' circumstances, the proposed DIP Facility with the DIP Lender is (i) the Debtors' best source for the liquidity they need to navigate the chapter 11 process and position itself to run a value-maximizing transaction process, and (ii) in the best interest of the Debtors' estate, creditors, and all parties in interest.

**iii.       The Proposed DIP Facility is Necessary to Preserve Value.**

38.     As a debtor in possession, a debtor has a fiduciary duty to protect and maximize the value of its estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004).  The DIP Facility, if approved, will provide the Debtors capital critical to funding the Debtors' Marketing Process and the Chapter 11 Case, providing a path for the Debtors to market and sell assets pursuant to section 363 of the Bankruptcy Code for the benefit of all parties.  Without access to the proposed DIP Facility, immediate and irreparable harm to Debtors would occur since the Debtors would also be unable to administer the Chapter 11 Case, execute its wind down plan, and seek a value maximizing transaction.  Because the Debtors' available and projected Cash Collateral is insufficient to preserve and maximize the value of its assets, the credit to be provided

under the proposed DIP Facility is necessary to preserve the value of the Debtors' estates for the benefit of all stakeholders.

**iv.      The Proposed Adequate Protection is Appropriate.**

39.      To the extent a secured creditor's interests in the collateral constitute valid and perfected security interests and liens as of the Petition Date, section 364(d)(1)(B) of the Bankruptcy Code requires that adequate protection be provided where the liens of such secured creditor are being primed to secure the obligations under a postpetition lending facility.  Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief. What constitutes adequate protection must be decided on a case-by-case basis.  *See In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985).  The focus of the requirement is to protect a secured creditor from the diminution in the value of its interest in the particular collateral during the period of use.  *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

40.      The proposed adequate protection provided to the DIP Lender (and subject to the terms and conditions set forth in the DIP Term Sheet) is consensual and appropriately safeguards the DIP Lender from the diminution in the value (if any) of its interests in the Prepetition Collateral. The provision of adequate protection to the DIP Lender is fair and reasonable and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

**v.      The Roll-Up is Appropriate and Should Be Approved.**

41.      Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  Courts in the Fifth

Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. See, e.g., *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions "critical to the survival of the business of the debtor" are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation). The business judgment rule shields a debtor's management from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

42. Repayment of prepetition debt (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements. The importance of "roll-up" features in DIP facilities has been repeatedly recognized by courts in this district and others, and such courts have granted relief similar to the relief requested herein. See, e.g., *In re Maverick Casinos*, No. 25-90191 (ARP) (Bankr. S.D. Tex. July 16, 2025) [Docket No. 65] (authorizing a 2:1 roll-up, with approximately $17 million in prepetition term loans rolled up on an interim basis); *In re Everstream Sols. LLC*, No. 25-90144 (CML) (Bankr. S.D. Tex. May 29, 2025) [Docket No. 67] (authorizing a 2:1 roll-up, with approximately $20 million in prepetition term loans rolled up on an interim basis); *In re Vertex Energy, Inc.*, No. 24-90507 (CML) (Bankr. S.D. Tex. Sept. 25, 2024) [Docket No 53] (authorizing a 2.5:1 roll-up, with approximately $200 million in prepetition debt rolled up on an interim basis).

43. As set forth above, the DIP Orders provide for a "dollar-for-dollar roll up of up to $30,000,000 in respect of the outstanding obligations under the Prepetition Loan Documents." Interim Order ¶ (a). The Roll-Up DIP Loan is subject to Challenge during the Challenge Period, a sound exercise of the Debtors' business judgment, and a material component of the structure of the DIP Facility, which was required by the DIP Lender as a condition to its commitment to provide postpetition financing. Indeed, JMB agreed to acquire the Hancock Whitney Facility only in connection with, and as part of negotiation and proposal of, the DIP Facility; as a result, the refinancing of the Prepetition Secured Obligations pursuant to the Roll-Up DIP Loan is a critical component of the overall bargain and the DIP Facility itself. Without access to the DIP Facility to fund the administration of these Chapter 11 Cases and the orderly sale the Debtors' assets, the Debtors' business would cease and they would likely be forced to liquidate—a value destructive alternative for all stakeholders.

44. The simple economic reality is that a restructuring of the Debtors' business comes at a price, which in this case includes the proposed Roll-Up DIP Loan. The Debtors believe that price to be not only reasonable, but beneficial for their estates. The DIP Lender was unlikely to provide a proposal for the DIP Facility on these terms without some assurance regarding the ultimate treatment of the Prepetition Secured Obligations. Given these circumstances, the Roll-Up DIP Loan is reasonable, appropriate, reflective of the current market for debtor-in-possession financing under these circumstances, and a sound exercise of the Debtors' business judgment.

**B. Approval of the Use of Cash Collateral is Appropriate.**

45. Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell, or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."

23

46.     The Debtors have an urgent need for the immediate use of the Prepetition Collateral and the DIP Collateral, including Cash Collateral, and seek to use the DIP Collateral and the Prepetition Collateral pursuant to the terms of the DIP Term Sheet and the DIP Orders, as applicable.  The Debtors need the Prepetition Collateral and the DIP Collateral to pay their operating expenses in furtherance of the Marketing Process, as well as fund the Chapter 11 Cases so they can pursue a value-maximizing chapter 11 process.  Indeed, absent such relief, the Debtors' sale process will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors.  The Debtors believe that the terms and conditions of its use of the Prepetition Collateral and the DIP Collateral (including the provision of adequate protection) are appropriate and reasonable.  Furthermore, the DIP Lender consented to the Debtors' use of the Prepetition Collateral subject to the terms and conditions of the DIP Term Sheet and the DIP Orders.  Therefore, the Debtors submit that they should be authorized to use the Prepetition Collateral and the DIP Collateral on the terms set forth in the DIP Term Sheet and the DIP Orders.

**C.      The Automatic Stay Should Be Modified on a Limited Basis.**

47.     The DIP Orders shall provide that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the Debtors and the DIP Lender to commit all acts and take all actions necessary to implement the DIP Term Sheet and all acts, actions, and transfers contemplated therein.  Stay modifications of this kind are typical and customary features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances.

**D.      Request for Final Hearing.**

48.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than

30 days following the Petition Date, and fix the time and date before the Final Hearing for parties to file objections to this Motion.

### WAIVER OF BANKRUPTCY RULES 6004(A) AND 6004(H)

49.     To the extent that any aspect of the relief sought herein constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors request in this Motion is immediately necessary given the Debtors' lack of liquidity and exigent circumstances.  The Debtors respectfully request that this Court waive the notice requirements imposed by Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

### NOTICE

50.     Notice of this Motion has been provided to the Limit Notice Parties on the Limited-Service List as provided under the Complex Procedures.

**WHEREFORE**, the Debtors respectfully request that this Court enter the proposed Order, substantially in the form attached hereto as **Exhibit A**, and grant the relief requested in this Motion and such other and further relief as may be just and proper.

Dated: March 24, 2026

Respectfully Submitted,

/s/ *Benjamin Kadden*

Benjamin W. Kadden, La. Bar No. 29927
bkadden@lawla.com
Stewart F. Peck, La. Bar No. 10403
speck@lawla.com
Douglas S. Draper, La. Bar No. 5073
ddraper@lawla.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@lawla.com
Coleman L. Torrans, La Bar No. 38917
ctorrans@lawla.com
**Lugenbuhl, Wheaton, Peck, Rankin & Hubbard (A Law Corporation)**
601 Poydras Street, Suite 2755
New Orleans, LA 70130
Telephone: (504) 568-1990
Fax: (504) 310-9195

***Proposed Counsel for Debtors and Debtors in Possession***