*Execution Version*

**March 23, 2026**

**Crosby Marine Transportation, LLC, *et al.***
**$60,000,000**
**Debtor-in-Possession Term Loan Facility**
**Summary of Terms and Conditions**

**This term sheet (together with the exhibits and schedules hereto, this "Term Sheet") sets forth a summary of the terms and conditions with respect to the DIP Facility (as defined below) from and after, and subject to, the entry of the DIP Orders (as defined below). This Term Sheet shall be a binding agreement between the DIP Lender and Loan Parties from and after execution, subject to the entry of the Interim Order with respect to the DIP Facility (as defined below), but does not purport to summarize all of the terms, conditions, representations and other provisions with respect to the DIP Facility, which will be set forth in the DIP Documents (as defined below). The obligation of the DIP Lender (as defined below) to provide financing pursuant to this Term Sheet is conditioned upon the execution and delivery of signature pages to this Term Sheet by each of the parties hereto and shall be subject to the conditions precedent and other terms and conditions set forth herein. In the event of any conflict between this Term Sheet and the terms of the Interim Order or the Final Order (in each case, as defined below), the terms of the DIP Orders, as applicable, shall govern.**

**This Term Sheet is a binding and enforceable agreement to the extent provided under title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), subject to entry of the DIP Orders with respect to the Debtors, with respect to the subject matter contained herein, including an agreement to negotiate in good faith the DIP Documents by the parties hereto in a manner consistent with this Term Sheet, it being acknowledged and agreed that the funding or availability of the DIP Facility is subject to the applicable conditions precedent set forth in this Term Sheet and, as applicable, the other DIP Documents.**



| 1. | ***Borrowers and Guarantors*** | • Crosby Marine Transportation, LLC ("**Crosby Marine**"), Crosby Enterprises, L.L.C.; Crosby Dredging, LLC; Crosby Marine Repairs, LLC; Bertucci Contracting Company, L.L.C. ("**Bertucci**"), and any and all other "borrowers" under the Prepetition Loan Documents (as defined below) (Crosby Marine, Bertucci, and all other borrowers, collectively, the "**Borrowers**" and each, a "**Borrower**"). |
|---|---|---|
| | | • All obligations under the DIP Facility will be unconditionally guaranteed by each Borrower, each Borrower's direct and indirect subsidiaries and affiliates, and each guarantor and other obligor under the Prepetition Loan Documents (collectively, the "**Loan Parties**" and each a "**Loan Party**"). |
| | | • Crosby Marine, Bertucci, and certain other Borrowers are expected to be debtors and debtors-in-possession in anticipated voluntary bankruptcy cases (such cases, the "**Chapter 11 Cases**," and the Borrowers shall be referred to herein under the Chapter 11 Cases, collectively, as the "**Debtors**" and individually, as a "**Debtor**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") to be commenced in the United States Bankruptcy Court for the Eastern District of Louisiana (the "**Bankruptcy Court**") on or about March 23, 2026 (such date, the "**Petition Date**"). |
| | | • For the purposes of this Term Sheet and the DIP Facility, Crosby Marine (i) is hereby designated and appointed by each Loan Party as its authorized representative and agent to act on its behalf (the "**Borrower** |

| | | |
|---|---|---|
| | | Representative") and (ii) accepts such appointment as the Borrower Representative. |
| 2. | *DIP Lender* | • JMB Capital Partners Lending, LLC ("**JMB**") and its subsidiaries, affiliates, designees, and assignees (together with JMB, the "**DIP Lender**"). |
| 3. | *Prepetition Credit Facility* | • The Second Amended and Restated Commercial Business Loan Agreement, dated as of October 28, 2022, among certain Borrowers, JMB (assignee of, and successor to, Hancock Whitney Bank), as lender (in such capacity, and together with its affiliates, designees, and assignees, the "**Prepetition Lender**"), and the guarantors and obligors from time to time party thereto (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Prepetition Credit Agreement**" and collectively with all related and ancillary documentation, in each case as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Prepetition Loan Documents**" and the loans, credit, and accommodations thereunder, the "**Prepetition Credit Facility**"), pursuant to which existing revolving loans, term loans, and other obligations are outstanding thereunder as of the Petition Date, plus accruing postpetition interest (including default interest), fees, costs and other charges payable thereunder (the "**Prepetition Secured Obligations**"), and the liens and security interests granted in favor of the Prepetition Lender in connection with the Prepetition Loan Documents (the "**Prepetition Liens**") to secure the Prepetition Secured Obligations (such collateral, including Cash Collateral, is collectively referred to as the "**Prepetition Collateral**"). <br><br> • Pursuant to that certain Notarial Act of Transfer, dated as of March 20, 2026, Hancock Whitney Bank sold and assigned all of its right, title and interest in and to, among other things, the Prepetition Credit Facility (including its interests in the Prepetition Liens and Prepetition Collateral) to JMB in connection with, and as part of negotiation and proposal of, the DIP Facility and the refinancing of the Prepetition Secured Obligations pursuant to the Roll-Up DIP Loan. |
| 4. | *Type and Amount of the DIP Facility* | • A non-amortizing, priming, super-priority senior secured term loan facility in an aggregate principal amount not to exceed $60,000,000 in term loan commitments (the "**DIP Facility**"; the DIP Lender's commitments under the DIP Facility, the "**DIP Commitments**") comprising (a) up to $30,000,000 in a new-money term loan (the "**New Money DIP Loan**") and (b) a dollar-for-dollar roll up of $30,000,000 in respect of the outstanding obligations under the Prepetition Loan Documents (the "**Roll-Up DIP Loan**" and together with the New Money DIP Loan under the DIP Facility, the "**DIP Loans**"). <br><br> • The borrowing of DIP Loans shall permanently decrease the DIP Commitments, and DIP Loans repaid may not be reborrowed. <br><br> • The Initial Draw (as defined below) shall be funded to the Debtors, through the DIP Bank Account (as defined below), to be used solely in |

| | | |
|---|---|---|
| | | accordance with the DIP Orders and the Budget, subject to the Permitted Variance (in each case, as defined below). |
| | | • DIP Loan proceeds shall be funded into a segregated Bank Account to be opened or otherwise designated by the Borrower Representative (the "**DIP Bank Account**") and the Loan Parties shall obtain a satisfactory control agreement in favor of the DIP Lender to be entered into within thirty (30) days after the entry of the Final Order, subject to a 30-day cure period if the Loan Parties are using commercially reasonable efforts to obtain a satisfactory control agreement; <u>provided</u> that the Carve-Out (as defined below) shall be funded as described in the order, in form and substance acceptable to the DIP Lender, approving, on an interim basis, the DIP Facility and this Term Sheet (the "**Interim Order**"). |
| 5. | *Interim Approval and Availability* | • Upon the Bankruptcy Court's entry of the Interim Order, and satisfaction of all applicable conditions precedent described in Section 16 herein, the DIP Lender shall make available an aggregate amount of DIP Loans up to $40,000,000 (the "**Interim Amount**") comprising (i) a New Money DIP Loan of up to $10,000,000 and (ii) the Roll-Up DIP Loan, and the Borrowers shall be entitled to make a draw of the DIP Loans as described in Section 7 below immediately upon entry of the Interim Order (the first draw under the DIP Facility, the "**Initial Draw**" and each draw after the Initial Draw, if any, an "**Other Draw**" and collectively, the "**Other Draws**," and together with the Initial Draw, the "**Draws**" and each a "**Draw**"). The closing of definitive DIP Documents (such date shall be referred to herein as the "**Closing Date**") shall occur as soon as reasonably possible after the entry of the Final Order, but in any event no later than two (2) business days thereafter unless the DIP Lender agrees otherwise. |
| 6. | *Final Approval* | • Upon (i) the Bankruptcy Court's entry of the Final Order and (ii) the satisfaction of all applicable conditions described in Sections 16 and 17 herein (or, as the case may be, the other applicable DIP Documents), the full amount of the DIP Facility shall be available to the Debtors, subject to compliance with the terms, conditions, and covenants described in the DIP Documents. |
| 7. | *Draws* | • Subject to satisfaction of all conditions to the Initial Draw or Other Draws set forth in Sections 16 and 17 below, as applicable, the Borrowers shall be entitled to make Draws of the DIP Loans solely in accordance with the Budget, up to the amount of the undrawn DIP Commitments. |
| | | • The Initial Draw shall be made within three (3) business days after entry of the Interim Order. Each Other Draw shall be made (in an aggregate minimum amount of $5,000,000 and, thereafter, in multiples thereof) upon three (3) business days' written notice (or such shorter period as agreed to by the DIP Lender its sole discretion), up to the aggregate amount of the available undrawn DIP Commitments at any time prior to the date that is three business days before the DIP Termination Date (as defined below). |

| 8. | *Maturity and Termination* | • All DIP Obligations (as defined below) shall be due and payable in full in cash ("**Payment in Full**"[1] or such other form of consideration as the DIP Lender and the Borrowers may mutually agree) on the earliest of the following (such earliest date, the "**DIP Termination Date**"): |
|---|---|---|
| | |     i.    September 30, 2026; |
| | |     ii.    the effective date of any chapter 11 plan with respect to the Borrowers (a "**Plan**"); |
| | |     iii.    the consummation of the sale or other disposition of all or substantially all of the assets of the Loan Parties pursuant to section 363 of the Bankruptcy Code; |
| | |     iv.    the date of the acceleration of the DIP Loans and the termination of the DIP Commitments following the occurrence and during the continuation of an Event of Default (as defined below and, as applicable, in the DIP Documents) in accordance with the DIP Documents; |
| | |     v.    dismissal of any Chapter 11 Case, conversion of any Chapter 11 Case into a case under chapter 7 of the Bankruptcy Code, or the appointment of a trustee or examiner in any Chapter 11 Case; and |
| | |     vi.    thirty-five (35) days after the Petition Date, unless the Final Order has been entered by the Bankruptcy Court on or prior to such date, unless otherwise extended in writing by the DIP Lender in its sole discretion. |
| | | • The occurrence of the DIP Termination Date shall terminate the ability of the Borrowers to borrow under the DIP Facility and use any proceeds thereof (other than the Carve-Out), including Cash Collateral (as defined in the DIP Orders) and shall terminate the DIP Commitments and any further obligation the DIP Lender has to make any DIP Loans under the DIP Documents. |
| | | • For the avoidance of doubt, any of the above conditions from (i) through (vi) automatically triggers the DIP Termination Date under the DIP Orders and the other DIP Documents. |
| 9. | *Interest Rate* | • The DIP Loans shall bear interest at a per annum rate equal to twelve percent (12.0%) payable in cash on the first business day of each month in arrears (the "**Non-Default Interest**"). |
| | | • Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default, the DIP Loans shall bear interest at an additional per annum rate of two percent (2.0%), in each case payable |

---

[1] For purposes hereof, the term "**Payment in Full**" or, as applicable, "**Paid in Full**," means, with respect to the DIP Obligations, the irrevocable and indefeasible payment in full in cash of all DIP Obligations, other than continuing indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder shall have irrevocably, permanently, and finally expired or shall have been terminated, cancelled, and discharged.

4

| | | |
|---|---|---|
| | | in cash, together with the Non-Default Interest, on the first day of each month in arrears. |
| 10. | *DIP Fees* | • **Commitment Fee**. The Loan Parties shall pay to the DIP Lender a commitment fee equal to two percent (2.0%) of the total amount of the DIP Commitments (the "**Commitment Fee**"), which Commitment Fee shall be approved on a final basis, fully earned, and allowed, non-refundable and not be subject to reduction, setoff, or recoupment for any reason upon entry of the Interim Order and shall be payable out of the proceeds of the Initial Draw. The Commitment Fee shall be paid in cash to the DIP Lender promptly after the Bankruptcy Court's entry of the Interim Order, but in no event shall the Commitment Fee be paid later than the date that is two (2) business days after the entry of the Interim Order. |
| | | • **Exit Fee**. The Loan Parties shall pay to the DIP Lender an exit fee in the amount of five percent (5.0%) of the total amount of the DIP Commitments (the "**Exit Fee**"), which Exit Fee shall be approved on a final basis, fully earned, and allowed, non-refundable and not be subject to reduction, setoff, or recoupment for any reason upon entry of the Interim Order. The Exit Fee shall be due and payable in cash upon the earliest of (i) the DIP Termination Date, (ii) Payment in Full of the DIP Obligations, and (iii) on a *pro rata* basis for any Mandatory Prepayment or Voluntary Prepayment of the DIP Obligations; provided, however, that, if the DIP Termination Date has occurred solely as a result of the occurrence and continuation of an Event of Default under the DIP Documents, then the Exit Fee shall not be payable until the DIP Obligations have been accelerated by the DIP Lender. |
| | | • **Work Fee**. The Loan Parties shall pay to the DIP Lender a work fee in the amount of $100,000 (the "**Work Fee**"), which Work Fee shall be fully earned, non-refundable, and allowed upon execution of this Term Sheet. The Interim Order shall provide that the Work Fee shall be approved on a final basis, fully earned and allowed, non-refundable and not be subject to reduction, setoff or recoupment for any reason. The Work Fee shall be paid in cash to the DIP Lender (or directly to its counsel) before the Petition Date and the DIP Lender acknowledges and agrees that the Work Fee was received on March 20, 2026. Any unused amount of the Work Fee shall be carried forward to offset legal expenses of the DIP Lender during the case. |
| | | • The Commitment Fee, the Exit Fee, and the Work Fee shall be approved on a final basis by the Bankruptcy Court as set forth above as part of the Interim Order. If such fees are not approved on a final basis by the Bankruptcy Court and paid as set forth herein, this Term Sheet and any applicable DIP Documents shall automatically terminate and be of no further force and effect. For the avoidance of doubt, the Commitment Fee and the Exit Fee, to the extent earned and payable under the DIP Documents, shall be payable even if the DIP Facility (including any portion of the DIP Commitment or the DIP Commitment) is never drawn. |
| | | • If the Interim Order is not entered by the Bankruptcy Court within five (5) business days after the Petition Date, this Term Sheet and any applicable |

| | | |
|---|---|---|
| | | DIP Documents shall automatically terminate and be of no further force and effect. |
| 11. | *Use of Proceeds* | • The proceeds of the DIP Facility, the DIP Collateral (as defined below), the Prepetition Credit Facility, and/or the Prepetition Collateral shall be used only for the following purposes and, excluding payments pursuant to clauses (ii), (iii), and (iv) below, subject to the Budget and the Permitted Variance: |

      i.    working capital and other general corporate purposes of the Loan Parties;

      ii.   professional fees and expenses of the Debtors' estates in administering the Chapter 11 Cases (including fees incurred prior to the Closing Date) in accordance with the Budget (including Permitted Variances), the Bankruptcy Code, and any orders of the Bankruptcy Court, as applicable;

      iii.  fees and expenses payable under the DIP Facility, including, without limitation, the Commitment Fee, the Exit Fee, the Work Fee, and professional fees and expenses of the DIP Lender (including legal fees and expenses incurred prior to the Closing Date); and

      iv.  interest and other amounts payable under the DIP Facility and the DIP Documents, including the Roll Up DIP Loan, and/or the Prepetition Credit Facility and the Prepetition Loan Documents.

• Notwithstanding any other provision of this Term Sheet, no DIP Loans, DIP Collateral, Prepetition Collateral, or proceeds of the foregoing (including, for the avoidance of doubt, any portion of the Carve-Out), may be used directly or indirectly by any Debtor, the official committee of unsecured creditors in the Chapter 11 Cases (the "**Committee**"), any other official committee appointed in any Chapter 11 Case, any trustee or examiner appointed in any Chapter 11 Case or any successor cases (including any chapter 7 cases), or any other Person, party, or entity (each of the following, a "**Restricted Use**"):

      i.    in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings, litigation, challenge, objection, or other proceeding:

          a.  against the DIP Lender or the Prepetition Lender, or their respective predecessors-in-interest, successors, assigns, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens (as defined below), DIP Claims (as defined below), Prepetition Secured Obligations, Prepetition Liens, or any other term, condition, or aspect of the DIP Facility or the Prepetition Credit Facility; or

          b.  challenging the amount, validity, perfection, priority or enforceability of or asserting any defense,

counterclaim or offset to, the DIP Obligations or the Prepetition Secured Obligations and/or the liens, claims, rights, or security interests granted under the DIP Orders, the DIP Documents, the Prepetition Credit Agreement, or any other Prepetition Loan Documents, including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law, or otherwise; provided, that the Committee may incur up to $25,000 to investigate and notify parties of, but not to prepare, initiate, litigate, prosecute, object to, or otherwise challenge the Prepetition Credit Agreement, the Prepetition Loan Documents, the Prepetition Secured Obligations, and the Prepetition Liens;

ii. to prevent, hinder, or otherwise delay the DIP Lender's enforcement or realization on the DIP Obligations, DIP Collateral, and the liens, claims, and rights granted to such parties under the DIP Orders, each in accordance with the DIP Documents and the DIP Orders, as applicable; provided, however, that this shall not apply to a challenge to whether a DIP Termination Event has occurred or is continuing in accordance with the DIP Orders and/or the propriety of the DIP Lender's termination and/or acceleration of the DIP Obligations or calculation of the amounts owed thereunder;

iii. to use or seek to use Prepetition Collateral and DIP Collateral or sell or otherwise dispose of the Prepetition Collateral or DIP Collateral without the consent of the DIP Lender and the Prepetition Lender;

iv. to seek to modify any of the rights and remedies granted to the DIP Lender or the Prepetition Lender under the DIP Orders (other than with the consents contemplated thereunder), the DIP Documents, the Prepetition Loan Documents, or applicable law; or

v. to apply to the Bankruptcy Court for authority to approve claims or grant liens (other than the Carve-Out) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Claims, unless permitted under the DIP Documents or unless all DIP Obligations and claims granted to the DIP Lender under the DIP Orders have been refinanced with the DIP Lender's consent or Paid in Full in cash or otherwise agreed to in writing by the DIP Lender in its sole discretion.

- For the avoidance of doubt, notwithstanding anything herein to the contrary, neither the DIP Facility (including any proceeds thereof) nor any DIP Collateral (including any proceeds thereof) shall be paid or turned over to or for the benefit of any lenders under the

7

| | | |
|---|---|---|
| | | Prepetition Term Loans until the DIP Obligations have been Paid in Full. |
| 12. | ***Voluntary and Mandatory Prepayments*** | • **Voluntary Prepayments**. Optional prepayments of the DIP Loans shall be permitted at any time, subject to (i) allocation of such payment to the ratable portion of the Exit Fee due thereon (which, for the avoidance of doubt, shall be deemed to be due and payable on the date of such voluntary prepayment), (ii) accrued interest on the amount prepaid, and (iii) in minimum amounts of at least $1,000,000 of principal. <br><br> • **Mandatory Prepayments**. <br><br>    i. **Dispositions**. Within one (1) business day of the date of receipt by any Loan Party of the Net Cash Proceeds[2] of any disposition (whether through a voluntary or involuntary sale, the loss, destruction, or damage thereof or any actual condemnation, confiscation, requisition, seizure, or taking thereof or otherwise) of DIP Senior Collateral (which, for the avoidance of doubt, shall exclude the disposition of other DIP Collateral in the ordinary course of business), such Loan Party shall prepay such portion of the outstanding amount of the DIP Obligations in accordance with the applicable DIP Documents in an amount equal to 100% of the Net Cash Proceeds (including applicable insurance proceeds, condemnation awards, and payments in lieu thereof) received in connection with such sales or dispositions. Such Net Cash Proceeds shall be applied to the repayment of principal, accrued interest, and the allocable portion of the Exit Fee. <br><br>    ii. **Indebtedness**. Within one (1) business day of the date on which a Loan Party receives proceeds of any indebtedness (other than permitted indebtedness set forth in the applicable DIP Documents), such Loan Party shall prepay the outstanding principal amount of the DIP Obligations in accordance with the applicable DIP Documents in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with the incurrence of such indebtedness, plus the accrued interest and Exit Fee as applied to the principal amount of such prepayment. |

---

[2] For purposes hereof, the term "**Net Cash Proceeds**" means, with respect to any sale or disposition of the DIP Collateral, in whole or in part, by any Person, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Person, in connection therewith, after deducting therefrom only (a) estimated fees, commissions, and expenses related thereto and required to be paid in connection with such sale or disposition, (b) estimated taxes paid or payable to any taxing authorities in connection with such sale or disposition, in each case, only to the extent, that the amounts so deducted are properly attributable to such transaction and (c) any escrow or reserve for any adjustment in respect of the sale price of such asset or assets and indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of the applicable sale or disposition or other liabilities in connection with such sale or disposition (provided that upon release of any such escrow or reserve, the amount released shall be considered Net Cash Proceeds). Moreover, for the purposes hereof, the term "**Person**" means any natural person, corporation, limited liability company, limited partnership, general partnership, limited liability partnership, joint venture, trust, land trust, business or statutory trust, or other organization, irrespective of whether constituting a separate legal entity, and governments and agencies and political subdivisions thereof.

| | | |
|---|---|---|
| | | • No reinvestment of the net proceeds of any asset sales or other proceeds described above shall be permitted without the prior written consent of the DIP Lender in its sole discretion. |
| 13. | *Security* | • As security for the DIP Obligations, and effective upon entry of the Interim Order as to the Debtors and upon execution of this DIP Term Sheet as to non-Debtor Loan Parties, each Loan Party and its estate shall grant to the DIP Lender, subject to the priorities set forth in Section 14 below and the DIP Orders (as applicable), liens on all of such Loan Party's and its estate's right, title, and interest in, to and under such Loan Party's and its estate's assets and property, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located, including, but not limited to, the following (all such assets and property collectively referred to as the "**DIP Collateral**"): (i) all Prepetition Collateral, all Cash Collateral, all contracts, contract rights, licenses, general intangibles (including, without limitation, all payment intangibles), instruments (including, without limitation, promissory notes), equipment (including, without limitation, documents of title), accounts, documents, goods, vehicles, inventory, furniture, fixtures, documents, commercial tort claims, cash, cash equivalents, accounts receivables, chattel paper, letters of credit and letter of credit rights, securities (whether or not marketable), limited liability company interests (including, without limitation, Bertucci's 49.9% interest in Luhr Crosby, LLC (the "**LLC Interest**")), and investment property (including, without limitation, all of the issued and outstanding capital stock of each Loan Party's current and future subsidiaries, all securities accounts and security entitlements related thereto, and financial assets carried therein, and all commodity accounts and commodity contracts), guarantees, arbitration awards, money, rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), insurance, receivables, receivables records, securities accounts, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, service marks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), and all substitutions, indemnification rights, all present and future intercompany debt, fee interests in real property owned by a Loan Party, books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks, and other electronic storage media and related data processing software related to the foregoing, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing, including insurance proceeds or other proceeds (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of New York); (ii) all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof; and (iii) all Avoidance Actions[3] and |

---

[3]  The term "**Avoidance Actions**" means any and all avoidance, recovery, subordination or other claims, actions or remedies that may be brought by or on behalf of any Debtor or its estate or other authorized parties in interest under the Bankruptcy Code or other applicable law, including, without limitation, actions or remedies under

| | | |
|---|---|---|
| | | any proceeds thereof, recoveries related thereto, and property received or recovered on account thereof. |
| | | • The Loan Parties represent and warrant to the DIP Lender that, subject to Bankruptcy Court approval (as applicable), the Loan Parties have full right and power to grant to the DIP Lender perfected, priming security interest and liens, on their respective interests in the DIP Collateral (including, without limitation, the LLC Interest). |
| | | • Negative pledge on all assets of the Loan Parties subject to the Carve-Out, under the DIP Documents. |
| | | • In addition to appropriate orders of the Bankruptcy Court granting and perfecting such liens, the Loan Parties shall take all other commercially reasonable steps regarding the execution and filing of UCC financing statements, requested by DIP Lender. |
| 14. | *Priority and Security* | • Subject to only the Carve-Out, all obligations of the Loan Parties under the DIP Documents, including, without limitation, all principal, accrued interest, costs, fees and premiums provided for therein, and all obligations of the Loan Parties under the DIP Facility (the "**DIP Obligations**") shall be entitled to, as applicable, (i) a priming first-priority lien, (ii) a senior first-priority lien on unencumbered assets and property, (iii) junior liens to the extent required, and (iv) superpriority claim status pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, with senior (or junior, as applicable) priority over any and all liens and secured claims, administrative-expense claims, other priority claims, and other unsecured claims, of any kind or nature whatsoever, now existing or hereafter arising under the Bankruptcy Code (such superpriority claims, the "**DIP Claims**"). |
| | | • Subject to the Carve-Out, all DIP Obligations in respect of the DIP Facility shall be, at a minimum: |
| | |  i. entitled to superpriority claim status in the Chapter 11 Cases pursuant to section 364(c)(1) of the Bankruptcy Code (which claims shall be payable from and have recourse to all DIP Collateral); |
| | |  ii. secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first-priority lien on all DIP Collateral that is not subject to a valid, perfected, non-avoidable lien or security interest (including any such lien or security interest that is perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code); |
| | |  iii. secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic junior lien on all DIP Collateral that is subject to a Permitted |

---

sections 544, 545, 547, 548, and 550 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including, without limitation, fraudulent transfer laws.

<table>
<tr><td></td><td></td><td>Priority Lien[4] (all such DIP Collateral, the "**DIP Junior Collateral**," all DIP Collateral that is not DIP Junior Collateral, collectively, the "**DIP Senior Collateral**") secured, pursuant to section 364(c)(3) of the Bankruptcy Code; and</td></tr>
</table>

| | | |
|---|---|---|
| | | iv. secured, pursuant to section 364(d)(1) of the Bankruptcy Code, by an automatically perfected priming first-priority lien on all DIP Collateral (including, without limitation, all Prepetition Collateral and the LLC Interest) that is subject to a valid, perfected, non-avoidable lien (including, for the avoidance of doubt, the Prepetition Liens) or security interest (including any such liens or security interests that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code). |
| | | • The liens securing the DIP Facility (the "**DIP Liens**") shall mean the liens described above and with the priority set forth in the DIP Orders. The DIP Liens described herein shall, to the fullest extent permitted by applicable law, be automatically effected and perfected upon entry of the Interim Order and without the necessity of the execution or filing of mortgages, landlord agreements, security agreements, pledge agreements, control agreements, financing statements, or other agreements. |
| 15. | *Remedies and Waiting Period Procedures* | • Upon the occurrence and during the continuation of an Event of Default under this Term Sheet or any other DIP Document, the DIP Lender shall be entitled to exercise any and all remedies customarily available in the Chapter 11 Cases, including, without limitation, those remedies customarily available to a senior secured, administrative expense claim of a debtor-in-possession lender, which shall include, without limitation, the right to (subject to the Carve-Out):<br><br>i. declare that the DIP Commitments are terminated, reduced or restricted, whereupon the DIP Commitments shall be terminated, reduced, or restricted on account of any further Draws;<br><br>ii. declare the unpaid amount of the DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;<br><br>iii. charge interest at the default rate under the DIP Documents;<br><br>iv. subject to the Carve-Out, declare the termination, restriction, or revocation of the ability of the Debtors to use Cash Collateral; or<br><br>v. take any other action or exercise any other right or remedy (including, without limitation, with respect to the DIP Liens) permitted under the DIP Documents or applicable law. |

---

[4] For purposes hereof, the term "**Permitted Priority Lien**" means [TO COME].

|  | | Any exercise of remedies by the DIP Lender shall be subject in all respects to the terms of the DIP Orders, including the following procedures (the "**Waiting Period Procedures**"): |
|--|--|--|
|  | | i. Upon the occurrence of a DIP Termination Event (as defined in the DIP Orders), of which written notice (including via email) of the occurrence of such DIP Termination Event is delivered by the DIP Lender to counsel for the Debtors, the U.S. Trustee, and counsel for the Committee (the "**Remedies Notice**" and such date, the "**DIP Termination Declaration Date**"), without further notice to, hearing of, application to, or order from the Bankruptcy Court, subject to the expiration of the Waiting Period (as defined below), the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to, among other things, (a) deliver a Carve-Out Trigger Notice; (b) declare the termination of the DIP Commitments; (c) declare all DIP Obligations to be immediately due and payable; and (d) charge default interest at the default rate set forth in the DIP Term Sheet or the other DIP Documents, as applicable. |
|  | | ii. The Debtors may seek an emergency hearing solely during the period beginning on the DIP Termination Declaration Date and through the date that is five (5) business days after the DIP Termination Declaration Date (such period, the "**Waiting Period**"). If, notwithstanding the foregoing, a hearing cannot be scheduled prior to the expiration of the Waiting Period, the Waiting Period shall be deemed automatically extended until such time as the matter can be heard by the Bankruptcy Court. At any hearing regarding a Remedies Notice, the Court may only consider whether an Event of Default has occurred or is continuing (other than, for the avoidance of doubt, the occurrence of the Maturity Date under the DIP Term Sheet). During the Waiting Period, the Debtors shall continue to have the right to use DIP Collateral (including, without limitation, Cash Collateral) in accordance with the terms of the Interim Order and the Approved Budget (subject to the Permitted Variance), solely to pay any expenses necessary to (i) preserve the Debtors' going-concern value or (ii) contest, in good faith, the occurrence of the Event of Default (other than, for the avoidance of doubt, the occurrence of the Maturity Date under the DIP Term Sheet). |
| 16. | *Conditions Precedent to Initial Draw* | • Entry of the Interim Order on or before five (5) business days after the Petition Date, and no order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner the Interim Order.<br><br>• Delivery of a 13-week cash flow budget containing line items of sufficient detail to reflect the consolidated operating cash flow of the Debtors for such period and in form and substance acceptable to the |

| | | DIP Lender in its sole discretion (such budget, the "**Initial Budget**" and, as updated from time to time in accordance with this Term Sheet, the "**Budget**"), it being understood that the budget attached to **Exhibit A** of this Term Sheet is acceptable to the DIP Lender. |
|---|---|---|
| | | • All out-of-pocket costs, fees and expenses required to be paid to the DIP Lender pursuant to this Term Sheet (including the Commitment Fee), the DIP Documents, or the DIP Orders shall have been paid in accordance with this Term Sheet or the applicable DIP Documents, <u>provided</u> that the Commitment Fee and the DIP Lender's legal fees and expenses incurred as of the date of the Initial Draw (other than the Work Fee, which shall have been paid before the Petition Date) shall be paid out of the proceeds of the Initial Draw. |
| | | • The representations and warranties of the Loan Parties under this Term Sheet and any other DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects). |
| | | • No Material Adverse Effect (as defined below) shall have occurred and be continuing. |
| | | • The Debtors shall be in compliance in all material respects with the applicable DIP Documents (including the DIP Orders). |
| | | • No Event of Default shall have occurred and be continuing under this Term Sheet or the DIP Documents. |
| | | • The Borrower Representative shall have delivered to the DIP Lender a customary borrowing notice in form and substance acceptable to the DIP Lender. |
| 17. | *Conditions Precedent to Other Draws* | • The DIP Documents shall contain conditions precedent as are usual and customary in loan documents for similar debtor-in-possession financings and other conditions precedent deemed by the DIP Lender appropriate to the specific transaction, including, without limitation, that each Other Draw shall be subject the following conditions: |
| | |     i.     no DIP Order, or any provision thereof, shall have been reversed, amended, stayed, vacated, terminated or otherwise modified in any manner without the DIP Lender's prior written consent in its sole discretion; |
| | |     ii.     delivery of, as applicable, any Budget or Updated Budget, acceptable to the DIP Lender in its reasonable discretion; |
| | |     iii.     no trustee, examiner, or receiver shall have been appointed or designated with respect to any Loan Party or any Loan Party's business, properties, or assets; |
| | |     iv.     the representations and warranties of the Loan Parties under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects); |

|  | | v. | the Borrowers shall have delivered to the DIP Lender a customary borrowing notice in accordance with the DIP Documents; |
|  | | vi. | the Loan Parties shall be in compliance in all material respects with the DIP Orders; |
|  | | vii. | no default or event of default shall have occurred and be continuing under the DIP Documents; |
|  | | viii. | no order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner any DIP Order or any provision thereof unless otherwise consented to in writing by the DIP Lender in its sole discretion; |
|  | | ix. | since the date hereof, other than the pending Chapter 11 Cases, there shall not have occurred or there shall not exist any event, condition, or circumstance that, individually, or in the aggregate, (a) has had or could reasonably be expected to have a material adverse effect on the business, operations, properties, assets, performance or financial condition of the Loan Parties taken as a whole, (b) has resulted in, or could reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to the DIP Lender, or (c) has had or could reasonably be expected to have, a material adverse effect on the ability of the Loan Parties to perform their obligations under any DIP Document (each of the foregoing being a "**Material Adverse Effect**"); |
|  | | x. | all costs, fees, expenses (including, without limitation, legal fees and expenses) set forth in the DIP Documents or otherwise required to be paid to the DIP Lender shall have been paid when due; and |
|  | | xi. | a granting to the DIP Lender of DIP Claims and DIP Liens to secure all DIP Obligations pursuant to the applicable provisions in sections 364(c) and 364(d) of the Bankruptcy Code shall have occurred and been approved by the Bankruptcy Court. |
| 18. | ***Documentation*** | | • Definitive financing documentation with respect to the DIP Loans, including, without limitation, this Term Sheet, the DIP Orders, a credit agreement (the "**DIP Credit Agreement**"), and all definitive guaranties, security agreements, and other documents executed pursuant hereto or thereto (collectively, the "**DIP Documents**"), shall be mutually agreed upon by the Loan Parties, and in form and substance acceptable to the DIP Lender. |
| 19. | ***Representations and Warranties*** | | • The DIP Documents shall contain representations and warranties with respect to the Loan Parties as are usual and customary in loan documents for similar debtor-in-possession financings and as acceptable to the DIP Lender and the Loan Parties, including without limitation, due organization and authorization, enforceability, financial condition, no |

| | | |
|---|---|---|
| | | material adverse changes or effects, title to properties, liens, litigation, payment of taxes, compliance with laws and regulations, employee benefit liabilities, environmental liabilities, and perfection and priority of liens securing the DIP Facility. |
| | | • Each Loan Party represents and warrants that none of its assets and properties are subject to any valid, perfected liens, security interests or encumbrances as of the Petition Date, other than the Existing Liens set forth in **Exhibit B**.  No liens, security interests, or encumbrances will be created on or after the Petition Date except, in each case, the Carve-Out and as expressly permitted under the DIP Documents. |
| 20. | *Affirmative Covenants* | • The DIP Documents shall contain affirmative covenants as are usual and customary with respect to the Loan Parties in loan documents for similar debtor-in-possession financings and as are acceptable to the DIP Lender and the Loan Parties. |
| 21. | *Negative Covenants* | • The DIP Documents shall contain negative covenants with respect to the Loan Parties as are usual and customary in loan documents for debtor-in-possession financings and as are acceptable to the DIP Lender and the Loan Parties. |
| 22. | *DIP Budget / Variance Reporting* | • The Budget may from time to time (and, on the fifth Thursday following the prior Budget's approval and every fifth Thursday thereafter shall) be updated and provided to the DIP Lender , with such updated Budget extending the term thereof (the "**Updated Budget**") and the DIP Lender shall have the right to reject, in its reasonable discretion, each Updated Budget by providing the Borrowers specific notice thereof within three (3) business days after the delivery by the Borrowers of any such Updated Budget and, to the extent the DIP Lender (in its reasonable discretion) provides written notice rejecting the updates (or any amendments), the then existing Budget shall continue to constitute the applicable Budget until such time as an update or amendment is approved by the DIP Lender (in its reasonable discretion).  In the event the DIP Lender does not provide written notice of its rejection of the proposed Updated Budget within such three-business-day period, such Updated Budget shall become effective as the Budget. |
| | | • On a weekly basis after the delivery of the first Budget, the Borrowers shall deliver to the DIP Lender, with a copy provided to the Committee, a variance report for the four-week period ending the prior Thursday comparing the difference/variance, expressed as a percentage (each, a "**Budget Variance**"), between actual net operating disbursements for such period to projected net operating disbursements for such period as set forth in the Budget on a cumulative four-week rolling basis (each a "**Measuring Period**") and explaining in reasonable detail all material variances, it being understood that any Net Operating Disbursement Variance (as defined below) solely with respect to net operating disbursements that exceeds twenty-five percent (25.0%) in the aggregate in the Measuring Period shall be material and shall constitute and Event of Default under this Term Sheet and the other DIP Documents (each such report, a "**Variance Report**," which shall be in a form reasonably acceptable to the DIP Lender).  For the avoidance of doubt, net operating |

15

| | | |
|---|---|---|
| | | disbursements shall include those line items listed in the Budget as "Operating Disbursements" and shall not include professional fees and restructuring charges (including United States Trustee fees) and non-operating expenses related to the Chapter 11 Cases and included in the Budget as "Non-Operating Disbursements." |
| | | • For purposes of each Measuring Period, the Borrowers shall calculate: the numerical difference between "net operating disbursements" (such terms reflecting those line items illustrated in the Budget) for such period to "net operating disbursements" for such period as set forth in the Budget on a cumulative four-week rolling basis, and to the extent the difference is a positive number, the percentage such difference is of the cumulative budgeted amount for such period (the "**Net Operating Disbursement Variance**"). For purposes herein, a "**Permitted Variance**" shall be limited to not greater than twenty-five percent (25.0%) for Budget Variances in the aggregate in the Measuring Period with respect to the Net Operating Disbursement Variance, each as set forth in the applicable Variance Report. |
| 23. | *Debtors' Stipulations and Adequate Protection* | • **Debtors' Stipulations**. Subject to entry of the Interim Order, and subject to a "challenge" period of (i) seventy (75) days from the entry of the Interim Order, and (ii) solely with respect to the Committee, sixty (60) days from the date of the formation of the Committee, the Debtors will provide in the DIP Orders customary stipulations for debtor-in-possession facilities and transactions of this type, including customary debtor admissions and stipulations with regard to the aggregate amount of the Prepetition Secured Obligations and the validity, enforceability and priority of the liens in the Prepetition Collateral securing the Prepetition Secured Obligations under the Prepetition Loan Documents, and the absence and waiver of claims or causes of action against the Prepetition Lender under the Prepetition Loan Documents.<br><br>• **Adequate Protection**. To the extent that some or all of the Prepetition Secured Obligations shall not have been refinanced and become DIP Loans, as a result of the use by the Debtors of the Prepetition Collateral, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the Debtors' incurrence of the DIP Facility, the granting of the priming liens and claims with respect thereto, the subordination of the Prepetition Collateral to the Carve-Out, and the use of Cash Collateral pursuant to the DIP Orders, the Prepetition Lender shall be granted adequate protection of its interest in the Prepetition Collateral as of the Petition Date in an amount equal to the diminution in value, if any, of such interests from and after the Petition Date (such diminution in value, the "**JMB Adequate Protection Obligations**"), including, at a minimum, (i) liens pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code ("**Adequate Protection Liens**"); (ii) first-ranking superpriority administrative expense claims pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, first ranking allowed superpriority administrative expense claims (the "**Adequate Protection Claims**").<br><br>The DIP Orders shall include provisions for the Adequate Protection Liens, the Adequate Protection Claims, and any other JMB Adequate |

16

| | | |
|---|---|---|
| | | Protection Obligations acceptable to the Prepetition Lender and the DIP Lender in their respective sole discretion. For the avoidance of doubt, the Prepetition Lender's and the DIP Lender's consent to use of Cash Collateral on the terms contemplated herein is contingent on the Bankruptcy Court's approval, and the parties' consummation, of the DIP Facility and the DIP Documents, including, without limitation, the refinancing of the Prepetition Secured Obligations through the Roll-Up DIP Loan. |
| 24. | *DIP Orders* | • The Interim Order and the order approving, on a final basis, the DIP Facility (the "**Final Order**" and together with the Interim Order, the "**DIP Orders**"), which, in each case, shall be in form and substance acceptable to the DIP Lender in its sole discretion, shall, among other things, authorize and approve: |

    i.     the DIP Facility;

    ii.    the making of the DIP Loans, including the Roll Up DIP Loan, in accordance with the DIP Documents;

    iii.   the Debtors' stipulations, in form and substance acceptable to the DIP Lender and the Prepetition Lender, in respect of the Prepetition Loan Documents, the Prepetition Collateral, and the Prepetition Secured Obligations;

    iv.   the granting of the superpriority claims and liens against the Loan Parties, their estates, and their assets in accordance with this Term Sheet and the DIP Documents with respect to the DIP Collateral, including, without limitation, first-priority priming liens on the LLC Interest;

    v.    the payment of all fees and expenses (including the fees and expenses of outside counsel and any financial advisors) required to be paid to the DIP Lender as described in Section 26 of this Term Sheet (provided that the DIP Lender's legal fees and expenses incurred as of the date of the Initial Draw (other than the Work Fee) shall be paid out of the proceeds of the Initial Draw);

    vi.   the payment of the Exit Fee as set forth in Section 10, which Exit Fee payment shall not be subject to reduction, setoff or recoupment for any reason, and shall be fully earned, and allowed upon entry of the DIP Orders as set forth above; and

    vii.   the Debtors' waiver of (a) any right to surcharge the DIP Collateral and the Prepetition Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, (b) the equities of the case exception under section 552(b) of the Bankruptcy Code, and (c) the equitable doctrine of marshaling and other similar doctrines, in each case, with respect to the DIP Collateral, the DIP Obligations, the Prepetition Collateral, and the Prepetition Secured Obligations.

| 25. | *Carve-Out* | • The DIP Liens and the DIP Claims shall be subject and subordinated only to the Carve-Out. |
|---|---|---|
| | | • As used herein, the "**Carve-Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses incurred by Persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") or the Committee, pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, and subject to the fees and expenses set forth in the Budget (subject to the Permitted Variance), applicable transaction fees, and any other limits set forth in the DIP Orders; and (iv) allowed fees and expenses of Professional Persons in an aggregate amount not to exceed $2,500,000 incurred after the first business day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**" and, together with the amounts set forth in clause (iii) above, the "**Professional Fee Carve-Out Cap**"); provided that nothing herein shall be construed to impair the ability of any party to the DIP Documents to object to the fees, expenses, reimbursement or compensation described above on any grounds. |
| | | The Debtors shall maintain a separate account not subject to control of the DIP Lender (the "**Carve-Out Account**") and may deposit cash weekly into the Carve-Out Account in an amount equal the estimated fees of Professional Persons for the next unfunded week as set forth in the Budget. Immediately upon the delivery of a Carve-Out Trigger Notice (as defined below), and prior to the payment of any DIP Obligations, the Loan Parties shall be required to deposit into the Carve-Out Account cash (which disbursement shall be deemed approved under the DIP Documents) in an amount up to the difference between the Professional Fee Carve-Out Cap and the balance held in the Carve-Out Account as of the date on which a Carve-Out Trigger Notice is received by the Debtors (provided that if the available cash on hand at such time in not sufficient to fund the Professional Fee Carve-Out Cap in full, the Debtors shall be permitted to transfer additional funds to the Carve-Out Account at later dates as needed to fully fund the Carve-Out Account as and when such cash becomes available). The amounts in the Carve-Out Account shall be available only to satisfy allowed fees and expenses of the Professional Persons until such amounts are paid in full. The amount in the Carve-Out Account shall be reduced on a dollar-for-dollar basis for allowed fees and expenses of the Professional Person that are accrued and paid after the delivery of the Carve-Out Trigger Notice, and the Carve-Out Account |

18



| | | shall not be replenished for such amounts so paid. The failure of the Carve-Out Account to satisfy in full the amount set forth in the Carve-Out shall not affect the priority of the Carve-Out. The DIP Lender shall have a reversionary interest, up to the Payment in Full of the DIP Obligations, in the funds held in the Carve-Out Accounts, if any, after all amounts included in the Carve-Out have been funded into the applicable Carve-Out Accounts and all allowed Professional Fees have been paid in full pursuant to a final order of the Bankruptcy Court. |
| | | • For purposes of the foregoing, "**Carve-Out Trigger Notice**" shall mean a written notice delivered by mail, courier, or email (or other electronic means) by the DIP Lender or its counsel to the Debtors, their lead restructuring counsel, the United States Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve-Out Trigger Notice Cap has been invoked. |
| | | • The Carve-Out shall not include, apply to, or be available for any Person or party in connection with any Restricted Use. |
| 26. | *Events of Default* | • The DIP Documents shall contain events of default (collectively, "**Events of Default**") consistent with this Term Sheet and customary for debtor-in-possession financing facilities of this type, including, without limitation: |
| | | i. non-payment, non-compliance with covenants set forth in the DIP Documents, judgments in excess of $2,000,000, impairment of security interest in the DIP Collateral and other customary defaults, subject to any applicable grace and/or cure periods to be agreed for non-payment defaults only and as are customary for transactions of this nature; |
| | | ii. the entry of the Interim Order shall have not occurred on or before the date that is five (5) business days after the Petition Date, or the Interim Order or any provision thereof shall have been stayed, amended, modified, reversed, vacated, or in any way altered, in each case, to the extent not consented to by the DIP Lender; |
| | | iii. the entry of the Final Order shall have not occurred on or before the date that is thirty-five (35) days after the Petition Date, or the Final Order or any provision thereof shall have been stayed, amended, modified, reversed, vacated, or in any way altered, in each case, to the extent not consented to by the DIP Lender; |
| | | iv. the occurrence of a "Default," "Event of Default," or "Termination Declaration Date" under any interim or final order approving the use of cash collateral (collectively, the "**Cash Collateral Orders**"); |

19

| | | v. | the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; |
| --- | --- | --- | --- |
| | | vi. | non-compliance, subject to any applicable grace and/or cure periods, by any Loan Party with the terms of the DIP Orders; |
| | | vii. | the entry of an order appointing a receiver, trustee, responsible officer, or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1104 of the Bankruptcy Code (other than a fee examiner) in any of the Chapter 11 Cases, or the Bankruptcy Court or other court shall have entered an order providing for such appointment; |
| | | viii. | the entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure or other enforcement against any assets of the Loan Parties the aggregate fair market value of which exceeds $2,000,000; |
| | | ix. | the entry of an order (a) surcharging any of the DIP Collateral or Prepetition Collateral under sections 105, 506(c), or any other section of the Bankruptcy Code, (b) applying the equities of the case exception under section 552(b) of the Bankruptcy Code, (c) allowing any administrative-expense claim having priority over or ranking in parity with the DIP Claims or the rights of the DIP Lender (subject to the Carve-Out), or (d) otherwise adversely impacting the DIP Lender's liens, claims, or priority in the DIP Collateral as set forth in this Term Sheet or the DIP Documents; |
| | | x. | any direct or indirect action by any Debtor to (a) challenge the rights and remedies of the DIP Lender under the DIP Facility in any of the Chapter 11 Cases or acting in a manner inconsistent with the DIP Documents or (b) avoid or require disgorgement by the DIP Lender of any amounts received in respect of the obligations under the DIP Facility; |
| | | xi. | entry of an order without the express written consent of the DIP Lender obtaining additional financing from a party other than the DIP Lender under section 364 of the Bankruptcy Code except if such financing provides for the Payment in Full of the DIP Obligations and the DIP Obligations are Paid in Full upon the closing or initial funding under such financing; |
| | | xii. | the making of any material payments in respect of prepetition obligations after entry of the Interim Order other than (a) as permitted by the DIP Orders, (b) as permitted by any "first day" or "second day" orders of the Bankruptcy Court acceptable to the DIP Lender, (c) as permitted by any other order of the Bankruptcy Court acceptable to the DIP Lender, |

20

|  |  | (d) as permitted under the DIP Documents in accordance with the Budget (subject to the Permitted Variance), or (e) as otherwise agreed to by the DIP Lender; |
| --- | --- | --- |
|  | xiii. | entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file or solicit a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Lender; |
|  | xiv. | any Loan Party shall, directly or indirectly, seek to, or support any other Person's motion to, (a) disallow in whole or in part the DIP Obligations, (b) challenge the validity and enforceability of the DIP Liens, DIP Claims, the Prepetition Claims, or the Prepetition Liens, or (c) contest any provision of any DIP Document or Prepetition Loan Document having an adverse effect on the DIP Lender or the Prepetition Lender, as applicable; |
|  | xv. | any Debtor files a Plan that is not in form and substance acceptable to the DIP Lender, it being understood that a Plan will be acceptable to the DIP Lender if it provides for the Payment in Full of the DIP Obligations on or before the effective date of such Plan pursuant to a signed commitment to lend acceptable to the DIP Lender from a recognized lender, balance sheet cash, or another source of funding acceptable to the DIP Lender sufficient to allow for the indefeasible Payment in Full of the outstanding DIP Obligations; |
|  | xvi. | the occurrence and continuance of a Material Adverse Effect; |
|  | xvii. | any Loan Party files a motion seeking to settle a controversy or claim that could be reasonably expected to have a material adverse effect on the DIP Collateral or the Prepetition Collateral without the prior written consent of the DIP Lender or the Prepetition Lender, as applicable and in their respective sole discretion; or |
|  | xviii. | the Debtors shall fail to execute and deliver to the DIP Lender any agreement, financing statement, trademark filing, copyright filing, notices of lien or similar instruments or other documents that the DIP Lender may request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens created in favor of the DIP Lender, subject to the time periods and terms set forth in the applicable DIP Documents. |
| 27. | *Indemnification and Reimbursement of Expenses* | • The DIP Documents (including the Interim Order) shall contain customary indemnification provisions for the benefit of the DIP Lender, and its related parties (the "**Indemnitees**"), including, without limitation, indemnification against losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated by the DIP Documents or the use or the proposed use of proceeds thereof. |

|   |   |   |
|---|---|---|
|   |   | • Subject to the DIP Documents, all reasonable, documented out-of-pocket accrued and unpaid fees, costs, disbursements, and expenses of the DIP Lender, including the documented fees and expenses of Norton Rose Fulbright US LLP, as counsel to the DIP Lender, incurred in connection with the DIP Facility and the Chapter 11 Cases shall be paid on a current basis. |
| 28. | *Release* | • The DIP Orders shall include a customary release of the DIP Lender and the Prepetition Lender in their respective capacities as such, with respect to any and all claims and causes of action arising from or related to the DIP Facility, the DIP Documents, the Prepetition Credit Facility, and the Prepetition Loan Documents. |
| 29. | *Waivers* | • The DIP Orders shall include terms and conditions customary for interim and final DIP financing orders, as applicable, and shall be acceptable to the DIP Lender and the Prepetition Lender, in their respective sole discretion, including, without limitation, waiver of the automatic stay, credit-bidding rights, "no marshaling" provisions and other similar doctrines, and waivers of the "equities of the case" exception and the imposition of costs or right to surcharge the DIP Collateral and the Prepetition Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, in each case, to the extent applicable. |
| 30. | *Counterparts and Electronic Transmission* | • This Term Sheet may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered, shall be deemed an original, and all of which, when taken together, shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Term Sheet by facsimile, "PDF" or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Term Sheet. |
| 31. | *Governing Law* | • The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern this Term Sheet.<br><br>• The Debtors and the DIP Lender shall submit to the exclusive jurisdiction of the Bankruptcy Court and shall waive any right to trial by jury. |

[*Signatures on following pages.*]

IN WITNESS WHEREOF, the parties hereto have caused this Term Sheet to be executed as of the date first set forth above.

CROSBY MARINE TRANSPORTATION, LLC,
as Borrower and Borrower Representative, for and on behalf of itself and the Loan Parties

By: _____
    Name:  Lawrence Perkins
    Title:   Chief Restructuring Officer

**JMB CAPITAL PARTNERS LENDING, LLC**,
as DIP Lender

By: _____
     Name: Vikas Tandon
     Title: Chief Investment Officer

[*Signature Page to Term Sheet*]

**<u>Exhibit A</u>**

Initial Budget

**Exhibit B**

Existing Liens


For purposes of this Term Sheet, the term "**Existing Liens**" means the following:

[TO COME]