**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **CASE NO. 26-10678** |
| **CROSBY MARINE TRANSPORTATION,** | § | |
| **LLC,** | § | **Chapter 11** |
| | § | **COMPLEX CASE** |
| Debtors.[1] | § | |
| | § | **SECTION: A** |

**DECLARATION OF GEOFFREY RICHARDS**

I, Geoffrey Richards, pursuant to 11 U.S.C. § 1726, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1. I submit this declaration (the "***Declaration***") in support of the Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing Debtors to (I) Obtain Postpetition Financing and (II) Use Cash Collateral, (B) Granting Liens And Providing Claims With Superpriority Administrative Expense Status, (C) Granting Adequate Protection, (D) Modifying Automatic Stay, (E) Scheduling Final Hearing, and (F) Granting Related Relief (the "***DIP Motion***"),[2] filed concurrently herewith, of the above-captioned debtors and debtors-in-possession, Crosby Marine Transportation, LLC ("***CMT***"); Crosby Tugs, L.L.C. ("***Crosby Tugs***"); Crosby Dredging, LLC ("***Crosby Dredging***" and together with CMT and Crosby Tugs, the "***Crosby Debtors***"); and Bertucci Contracting Company, L.L.C. ("***Bertucci***" and together with the Crosby Debtors, the "***Debtors***"), for entry of interim and final orders: (a) authorizing the Debtors to obtain postpetition

---

1 An Order directing joint administration of the Chapter 11 bankruptcy case of Crosby Marine Transportation, LLC [No. 25-10678], as lead case, with the Chapter 11 bankruptcy cases of (i) Crosby Tugs, L.L.C. [No. 26-10679], (ii) Crosby Dredging, LLC [No. 26-10680], and (iii) Bertucci Contracting Company, L.L.C. [No. 26-10681], was entered on March 24, 2026, [No. 26-10678, ECF Doc. 9; No. 26- 10679, ECF Doc. 4; No. 26-10680, ECF Doc. 4, No. 26-10681, ECF Doc. 4].

2 Capitalized terms not defined herein have the meanings ascribed to them in the definitions set forth in the Motion.

financing, (b) authorizing the Debtors' use of certain cash collateral, (c) granting liens and superpriority administrative claims, and (d) granting adequate protection to certain prepetition secured parties, among other relief.

2. Unless otherwise indicated, the statements set forth in this Declaration are based on (a) my personal knowledge or views based on my experience; (b) information I have received from the Debtors, my colleagues at Raymond James working directly with me or under my supervision, direction, or control, or other advisors of the Debtors; and/or (c) my review of relevant documents.

3. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors. I am not being specifically compensated for this testimony other than through payments received by Raymond James & Associates, Inc. ("**Raymond James**"), as proposed to be engaged by the Debtors. None of those payments are specifically payable on account of this testimony. If I were called upon to testify, I would testify competently to the facts and views set forth herein.

## I. Professional Background and Qualifications

4. I am a Senior Managing Director and Co-Head of the Capital Structure Advisory Group at Raymond James, which has its principal office at 880 Carillon Parkway, St. Petersburg, Florida 33716. The Debtors retained Raymond James as their investment banker prepetition and have filed a motion to retain Raymond James as their investment banker in these Chapter 11 Cases. Raymond James has a dedicated Capital Structure Advisory investment banking group of more than 25 members with extensive experience advising companies, creditors' committees, and other constituents in complex situations involving underperforming businesses facing difficult financing conditions, liquidity crises, out-of-court restructurings, and chapter 11 cases. Investment bankers at Raymond James have advised on, or been involved with, numerous restructuring-related or

distressed transactions, both out-of-court and in chapter 11 cases, including, without limitation, sale, restructuring, financing, financial opinion, and special advisory transactions.

5.      I have more than 25 years of investment banking and restructuring experience. During my career, I have personally led an investment banking team or otherwise been involved in advising over 125 companies, many of which had been experiencing financial distress.  I have provided investment banking expertise and distressed mergers and acquisitions and financing advice to companies, lenders, and investors in both in- and out-of-court restructurings.  Prior to joining Raymond James, I was head of North America debt finance and restructuring at Canaccord Genuity Group Inc., head of special situations and restructuring at William Blair & Company, and a partner in the Kirkland & Ellis LLP restructuring practice.  In each role, my primary responsibilities included advising companies and investors in restructuring, distressed mergers and acquisitions, distressed financing, and special situations.  Since 2001, I have taught the class Corporate Restructuring at Northwestern Pritzker School of Law as an Adjunct Professor.

## II.    General Background

6.      On March 23, 2026 (the "***Petition Date***"), each of the Debtors commenced a voluntary case (collectively, the "***Chapter 11 Cases***") under chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***") in the Bankruptcy Court for the Eastern District of Louisiana (the "***Court***"), and they will continue to operate their business and manage their properties as debtors in possession.

7.      Additional information regarding the circumstances leading to the commencement of the Chapter 11 Cases and information regarding the Debtors' business and capital structure is set forth in the *Declaration of Lawrence Perkins in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "***First Day Declaration***"), which has been filed contemporaneously herewith.

**III. Retention of Raymond James**

8. To address their liquidity challenges and facilitate a paydown of the Company's debt load, in late 2025, the Debtors and certain non-Debtor affiliate entities (the "*Non-Debtor Affiliates*" and together with the Debtors, the "*Company*") retained Raymond James to explore a sale of the Company's 49.9% interest in a marine construction business, Luhr Crosby, LLC ("*Luhr Crosby*"). Raymond James is now, in coordination with the majority owner, in the midst of a targeted process for the sale of the Company's minority interest ("*Luhr Crosby Process*").

9. On February 1, 2026, the Company also retained Raymond James to advise the Company on a comprehensive recapitalization effort ("*Recapitalization Process*" and together with Luhr Crosby Process, the "*Marketing Processes*") and to provide advice regarding obtaining financing and pursuing strategic alternatives, including preparing a contingency plan for initiating a chapter 11 case, in the midst of an increasingly difficult liquidity situation. In the short period of time prior to the Petition Date, it became increasingly clear that the Debtors would likely need to file the Chapter 11 Cases to obtain a breathing spell and pursue restructuring options to maximize value, including through the completion of the Marketing Processes.

**IV. The Debtors' Need for the Postpetition Financing**

10. As part of the preparation for the Chapter 11 Cases, Raymond James assisted the Debtors with the evaluation of their immediate financing needs and funding alternatives. Raymond James also assisted the Debtors in their assessment of the current DIP financing market. As part of the foregoing, Raymond James worked with the Debtors and their other advisors in analyzing the Debtors' immediate and long-term financing needs. Among other things, this evaluation focused on the Debtors' anticipated cash flows during the projected period, the necessary funding required to continue operations, the effect of a potential chapter 11 filing on the operations of the

business, the expenses of administration of a chapter 11 case, as well as the costs associated with the proposed DIP Facility.

11. Based on discussions with the Debtors' management teams, I understand that the Debtors presently lack sufficient liquidity and do not otherwise generate sufficient cash from operations to fund their business through this chapter 11 bankruptcy process. Accordingly, without the DIP Facility, the Debtors will not have the liquidity needed to operate its business, fund ordinary course expenditures, or pay expenses necessary to administer the Chapter 11 Cases. Absent increased funding in the form of the DIP Facility, the Debtors could be forced to terminate their businesses as a going concern to the detriment of the Debtors, their estates, creditors and all other stakeholders.

12. The Debtors also believe that the DIP Facility will provide a clear message to their customers, vendors, employees, and contract counterparties that the Debtors have sufficient liquidity to meet their current and future obligations for the expected duration of these Chapter 11 Cases. The financing will demonstrate the Debtors' ability to continue meeting the needs of their customers, provide compensation to their employees, and operate their businesses in the ordinary course.

## V. The Debtors' Efforts to Obtain Postpetition Financing

13. Recognizing the need to move quickly while also securing the best available financing under the circumstances, the Debtors sought financing from numerous third-party sources as well as from certain of the Debtors' prepetition secured lenders (the "***Prepetition Secured Parties***") beginning shortly after Raymond James was engaged last month.

14. To date, Raymond James has contacted 73 lenders. 41 lenders signed an NDA and received access to the Debtor's virtual data room ("***VDR***"). Of the lenders that signed the NDA

and reviewed the VDR, three (3) submitted a non-binding indication of interest ("*IOI*") to provide the Debtors with incremental liquidity. All three (3) term sheets were for debtor in possession ("*DIP*") financing. No lenders submitted a non-binding IOI to provide incremental liquidity on an out-of-court basis.

15.     Ahead of the Petition Date, the Debtors and their advisors engaged in ongoing, active, and arms-length negotiations with prospective financing parties, including existing lenders and third parties, regarding the terms of potential financing.

16.     In particular, the Debtors and their advisors initiated discussions with JMB Capital Partners Lending, LLC ("*JMB*") on or about March 2, 2026, and continued negotiations over the following weeks. On March 19, 2026, JMB submitted to the Debtors a non-binding IOI for a DIP facility. As detailed in the First Day Declaration, on or about March 20, 2026, JMB informed the Debtors and their advisors that it had acquired the Debtor's debt owed Hancock Whitney ("*Hancock Whitney Facility*"), which is secured by, among other things, a first priority lien on the Crosby Debtors' receivables. On March 21, 2026, JMB submitted a revised DIP term sheet to the Debtors, which reflected its acquisition of the Hancock Whitney Facility. Upon receipt of the revised DIP term sheet, the Debtors and their advisors continued arms-length negotiations with JMB through the Petition Date, culminating in the DIP Facility terms proposed in the DIP Motion.

## VI.     The Proposed DIP Facility[3]

17.     The Debtors are now seeking secured post-petition financing and to grant adequate protection to JMB, subject to the terms and conditions of the Interim Order.

---

[3] The terms of the proposed DIP Facility are set forth in detail in the DIP Motion. For the avoidance of doubt, any description of the proposed terms of the DIP Facility herein or in the DIP Motion is qualified in its entirety by reference to the proposed Interim Order approving the borrowing contemplated by the DIP Facility.

#10592652v1<LUGENBUHL> - 17 - Declaration of Geoffrey Richards

18. The DIP Facility includes a dollar-for-dollar roll up of $30,000,000 in respect of the outstanding obligations under the Prepetition Loan Documents (the "***Roll-Up DIP Loan***"). Based on my observations, the Roll-Up DIP Loan is a necessary condition to obtain JMB's consent to the DIP Facility.

19. I believe that the economic terms proposed under the DIP Facility as described in the DIP Motion, including the contemplated pricing, fees, interest rate, and default rate, are appropriate, especially in light of the particular circumstances of these Chapter 11 Cases. The DIP Facility terms were negotiated at arm's length, and, based on my knowledge of the Debtors' circumstances and my experience regarding these negotiations, reflect the best terms available to the Debtors. It is my belief that JMB would not have agreed to provide the DIP Facility on more favorable terms.

20. The proposed DIP term sheet from JMB represents the best actionable financing alternative available to the Debtors under the circumstances. Based on the extensive marketing efforts in a compressed timeframe and feedback from the market, alternative post-petition financing options are not available without the security requested by JMB for the DIP Facility. Moreover, given the Debtors' liquidity constraints, complex capital structure, and ongoing lender actions, the Debtors' have been unable to secure sufficient liquidity outside of a court-supervised process. As such, the JMB DIP facility provides the necessary liquidity to stabilize operations and pursue a value-maximizing restructuring or sale transaction(s).

**VII. The DIP Financing Is the Best Postpetition Financing Arrangement Available to the Debtors**

21. Based on my experience as a restructuring professional and involvement in the process described above, I believe the DIP Facility represents the best available and most expedient

#10592652v1<LUGENBUHL> - 17 - Declaration of Geoffrey Richards

postpetition financing under the circumstances. As noted above, no party that Raymond James is aware of was interested in providing, or willing to provide, DIP financing to the Debtors on an unsecured or junior basis. The Debtors and JMB have agreed to terms that will provide the Debtors with access to much-needed liquidity and an opportunity to maximize value during the pendency of the Chapter 11 Cases.

**VIII.    Conclusion**

22.    Given the financing efforts and process described above and based on my experience as a restructuring professional and involvement in other financing transactions, I believe that the DIP Facility is the best financing option presently available to the Debtors and that the terms of the DIP Facility are in the best interests of these estates.

23.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: March 24, 2026

/s/ Geoffrey Richards
Geoffrey Richards

#10592652v1<LUGENBUHL> - 17 - Declaration of Geoffrey Richards