**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **CASE NO. 26-10678** |
| **CROSBY MARINE TRANSPORTATION,** | § | **(JOINTLY ADMINISTERED)** |
| **LLC,** | § | |
| | § | **Chapter 11** |
| | § | **COMPLEX CASE** |
| Debtors.[1] | § | |
| | § | **SECTION: A** |

**NON-SUBSTANTIVELY[2] AMENDED DECLARATION OF LAWRENCE PERKINS IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, Lawrence Perkins, pursuant to 11 U.S.C. § 1726, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the Chief Restructuring Officer (the "***CRO***") of the above-captioned debtors and debtors-in-possession, Crosby Marine Transportation, LLC ("***CMT***"); Crosby Tugs, L.L.C. ("***Crosby Tugs***"); Crosby Dredging, LLC ("***Crosby Dredging***" and together with CMT and Crosby Tugs, the "***Crosby Debtors***"); and Bertucci Contracting Company, L.L.C. ("***Bertucci***" and together with the Crosby Debtors, the "***Debtors***"), as well as Crosby Enterprises, LLC ("***Crosby Enterprises***") and the affiliated entities listed on the attached **Exhibit A** (all together, the "***Company***").

2. I am the founder and Chief Executive Officer of SierraConstellation Partners ("***SCP***"), an interim management and advisory firm that specializes in assisting companies like the

---

1    An Order directing joint administration of the Chapter 11 bankruptcy case of Crosby Marine Transportation, LLC [No. 25-10678], as lead case, with the Chapter 11 bankruptcy cases of (i) Crosby Tugs, L.L.C. [No. 26-10679], (ii) Crosby Dredging, LLC [No. 26-10680], and (iii) Bertucci Contracting Company, L.L.C. [No. 26-10681], was entered on March 24, 2026, [No. 26-10678, ECF Doc. 9; No. 26- 10679, ECF Doc. 4; No. 26-10680, ECF Doc. 4, No. 26-10681, ECF Doc. 4].

2    This Declaration non-substantively amends the Declaration filed at ECF Doc. 30 to correct certain typographical errors. A notice of redline highlighting changes will be filed contemporaneously with this amended Declaration.

Company in navigating business challenges. I have served as CRO of the Debtors since February 28, 2026 pursuant to an engagement between the Company and SCP.

3. On March 23, 2026 (the "*Petition Date*"), each of the Debtors commenced a voluntary case (collectively, the "*Chapter 11 Cases*") under chapter 11 of Title 11 of the United States Code (the "*Bankruptcy Code*") in the Bankruptcy Court for the Eastern District of Louisiana (the "*Court*"), and they will continue to operate their business and manage their properties as debtors in possession. To minimize any adverse effects of filing the bankruptcy petitions (the "*Petitions*") and to preserve value for the benefit of all stakeholders, the Debtors have filed a number of motions requesting various forms of "first day" relief (collectively, the "*First Day Pleadings*").

4. I am generally familiar with the Debtors' day-to-day operations, business affairs, books and records, and restructuring efforts. Except as otherwise indicated herein, the facts set forth in this declaration (this "*Declaration*") are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of or advisors to the Debtors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

5. This Declaration is intended to provide a summary overview of the Debtors' businesses and the circumstances leading to the commencement of these Chapter 11 Cases, and the evidentiary support for the relief the Debtors seek in the First Day Pleadings.

6. I am supported in my efforts as CRO by—as well as the Debtors' management and other advisors—personnel at SCP. Before founding SCP, I was a Senior Managing Director and regional leader of a national consulting firm responsible for business development, marketing,

#10631094v1<LUGENBUHL> - 15 - Non-Substantively Amended First Day Declaration of Lawrence Perkins

staffing, and general management of the firm's western region. I obtained my B.S. from the University of Southern California Marshall School of Business.

7. I have garnered over 20 years of experience in the turnaround industry, including investment banking and turnaround consulting for middle market companies across the United States at SCP and, before its founding, at other firms. Among other things, I have served as a chief restructuring officer, chief executive officer, board member turnaround advisor, and crisis manager in many industries including transportation & logistics, automotive, aerospace, consumer products, financial services, healthcare, retail, and telecommunications. Representative engagements include serving as chief restructuring officer of Avenger Flight Group, LLC; New Age, Inc.; Tricida, Inc.; Clarus Therapeutics; PhaseBio; Wave Computing, Inc.; and Quanergy Systems, Inc., among other companies.

## I. Preliminary Statement

8. Founded over 50-years ago by Vinton and Kurt Crosby, the Company is one of the largest privately owned transportation businesses in the marine industry. Crosby Tugs began in 1977 when father and son acquired the first vessel, the Paddy Crosby. Since that first acquisition, the Company has grown through a series of major acquisitions to acquire new vessels and equipment to expand its reach and capabilities.

9. The Company's fleet of vessels and marine equipment includes airboats, assist boats, barges, crew boats, dragline cranes, dredges, excavators, flatboats, a floating drydock, houseboats, and tugs. The Company's tug fleet consists of approximately 90 vessels: offshore, inshore, and assist tugs. With its diverse tug fleet, the Company is capable of serving any customer's marine transportation needs, with vessels ranging from 600 HP to 16,500 HP.



10.     More recently, the Company entered the dredging business through Crosby Dredging, specializing in coastal restoration and oilfield services. Crosby Dredging has performed dredging jobs for the U.S. Army Corps of Engineers ("*Army Corps*"), the Louisiana state government, Louisiana parish governments, and private businesses. The Company's crews have many years of experience in dredging and a deep, local knowledge of Louisiana's many inland bodies and waterways. The Company is strategically located in Golden Meadow, Louisiana, giving the Company easy access to both the Gulf of America and inland waterways.

11.     The Company maintains its fleet at peak condition through its own topside and bottom-side repair and drydock facilities in Houma, Louisiana. The Company's ability to repair vessels at its own yards creates a substantial competitive advantage for the Company, as the Company is able to refurbish aging vessels to top-of-the-line class with below market capital investment. The Company's impressive fleet and experienced crews have made Crosby a trusted name in the marine transport industry, leading to contracts from an array of local, national, and international customers, including TPC Group, Cantium, Arena Offshore, SpaceX, Heerema, and Chevron.

12. In 2021, the Company, through Bertucci, entered into a joint venture with venerated marine contractor, Luhr Bros., Inc. to create Luhr Crosby, LLC ("*Luhr Crosby*"), which is now one of the largest heavy marine construction firms in the United States. Luhr Crosby is not burdened by the Company's debt load, is not in need of restructuring, and is not and will not be a Debtor. However, the Company's equity stake in Luhr Crosby is a valuable part of the Company's asset structure and is an important piece in the Company's overall restructuring.

13. While the Company's core business remains strong and it possesses highly valuable assets, including its interest in Luhr Crosby, the Company has faced challenges, internal and external, including a high debt load and complex debt structure, the general contraction of offshore energy operations in the Gulf, and cuts to dredging projects in Louisiana. Most recently, the Company has had to contend with volatile fuel costs.

14. These challenges created a liquidity shortfall, which the Crosby Debtors addressed by using funding from merchant cash advance ("*MCA*") firms. This funding (the "*MCA Funding*") provided immediate access to cash, but the cost of the MCA Funding, sometimes nearing 100% interest, was not sustainable by the Company, and substantially worsened the Crosby Debtors' liquidity problem.

15. To facilitate a paydown of its debt load, in late 2025, the Company retained Raymond James to explore a sale of the Company's 49.9% interest in Luhr Crosby. Raymond James is now, in coordination with the majority owner, in the midst of a targeted process for the sale of the Company's minority interest ("*Luhr Crosby Process*").

16. On February 1, 2026, the Company also retained Raymond James to advise the Company on a comprehensive recapitalization effort ("*Recapitalization Process*" and together with Luhr Crosby Process, the "*Marketing Processes*"). Since beginning the Recapitalization

Process, Raymond James has worked to expedite a capital raise effort focused on refinancing the Company's outstanding debt. Raymond James has built a virtual data room ("**VDR**"), completed initial outreach, distributed teasers, obtained executed NDAs from investors, distributed confidential information memorandums (each a "**CIM**"), completed initial diligence rounds, and has been accepting non-binding term sheets.

17. SCP was engaged to provide restructuring advisory services in late February. Upon being hired as CRO for the Debtors, I immediately became personally and directly involved in the following efforts: (a) developing and validating a cash flow forecast for the Debtors; (b) compiling and reconciling a registry of all of the Debtors' assets; (c) developing a comprehensive financial model consisting of an income statement, balance sheet, and cash flow statement; (d) meeting with various lenders, customers, and vendors to support the ongoing operations; (e) helping the Company identify and execute the various strategic alternatives that may be available to the Company; (f) working with the Company and its investment bankers to support the potential financing solutions; and (g) various other activities in support of stabilizing the Company. All of these efforts are a work in progress.

18. In performing these functions over the past few weeks, it became clear that even as the Debtors and their advisors were making progress toward a comprehensive out of court restructuring, the Debtors needed to prepare for a contingency freefall chapter 11 filing to avoid a full-scale liquidation of the Company—which in my opinion would be a disastrous outcome for employees, both secured and unsecured creditors, and the Company's other stakeholders.

19. The Debtors were ultimately pushed to filing the Chapter 11 Cases due to a cash liquidity crisis. The Debtors' long-term cash liquidity problem became an emergency after certain MCA firms sent letters to the Company's customers in an attempt to seize the Company's

receivables, which are subject to the priming lien of Hancock Whitney. The Debtors cannot continue to operate or engage in their Marketing Processes without these receivables. In coordination with Hancock Whitney, the Debtors were able to redirect some of their customers to pay receivables to a segregated Hancock Whitney account ("**Segregated HW Account**"), to which Hancock Whitney provided the Company access to fund the Company's critical operational expenses, namely payroll. However, the confusion among customers created by the MCA firms has made filing the Chapter 11 Cases a necessity so that the Debtors can obtain a breathing spell, complete the Marketing Processes on a reasonable timeline, and reorganize.

20. To facilitate this reorganization, as of the Petition Date, the Debtors have secured a commitment for a $60 million senior secured superiority debtor in possession ("**DIP**") financing facility, which includes $30 million in new money and $30 million to "roll up" and refinance the Hancock Whitney Facility (the "**DIP Facility**") to be provided by JMB Capital Partners Lending, LLC ("**JBM**" or "**DIP Lender**") and secured by, among other things, liens on all of the Debtors' right, title, and interest in, to and under the Debtor's assets and property, whether now owned or existing or hereafter acquired ("**DIP Lien**"). The DIP Facility is designed to provide a liquidity cushion for operations and fund professional fees as the Debtors complete the Marketing Processes. As a part of the overall DIP Facility, the DIP Lender purchased Hancock Whitney's position and stepped into the position as pre-petition lender for the Hancock Whitney Facility on March 20, 2026. The DIP Facility provides the Debtors and their estates with crucial liquidity necessary for maintaining operations and completing the Marketing Processes.

21. In sum, the Debtors' decision to file these Chapter 11 Cases has been informed by the challenges they face and careful deliberation by the Company's managers, with the assistance of their advisors, and only after all other alternatives were first considered. The Debtors believe

that they have a clear path to chapter 11 exit and will work cooperatively with their lenders and other stakeholders to obtain a reorganization that is to the benefit of all parties in interest.

22. I submit, and am authorized by the Debtors to submit, this Declaration in support of the Petitions and the First Day Pleadings. The relief requested in the First Day Pleadings is necessary to preserve and maximize the value of the Debtors' estates and allow them to sustain their current operations in chapter 11.

## II. General Background

### A. Overview of Company Operations and Structure

23. Since its founding in 1977, the Company has grown from a single tug to a fleet of approximately 200 vessels and marine equipment. The Company generates revenue from two core businesses:

- **Tug Operations.** Crosby Tugs deploys its expertly crewed tug and barge fleet to satisfy all of its customers' inshore and offshore marine transport needs. As a part of its business ("*Tug Business*"), Crosby Tugs assists small freighters, container ships, aircraft carriers, Very Large Crude Carriers ("*VLCCs*"), and other vessels into and out of births; escorts oil tankers quickly and safely through shipping channels and environmentally sensitive waters; and tows ships, semi-submersible rigs, landing platforms, and other vessels. Crosby Tugs operates in extreme climates and sea conditions and is capable of responding to offshore emergencies like vessel fires and fuel spills.

- **Dredging.** As a part of its business ("*Dredge Business*") Crosby Dredging operates a fleet of dredges that include both bucket and suction dredges, allowing the Company to flexibly adapt between large and small scale dredging and coastal restoration projects for a variety of customers, including the Army Corps, state and local governments, and private enterprises. Crosby Dredging has special expertise in marsh regeneration and coastal restoration jobs. Support from Crosby Tugs reduces mobilization and demobilization prices for dredge jobs, allowing Crosby Dredging to operate more affordably and efficiently and providing Crosby Dredging a pricing advantage over competitors.

24. In addition to the Tug Business and Dredge Business, the Company, through Bertucci, owns a 49.9% interest in Luhr Crosby. Luhr Crosby's business consists of providing

turnkey top-tier rock and marine construction services to the Army Corps and private owners as a primary or sub-contractor.

25. As of the Petition Date, the Debtors employ approximately 850 full-time employees ("*Employees*") onshore and offshore.

26. A schedule of the Company's organizational structure is attached as **Exhibit A**, which lists the Debtors and non-Debtor affiliates (each a "*Non-Debtor Affiliate*", and collectively, the "*Non-Debtor Affiliates*"). The primary holding entity for the Company is a Non-Debtor Affiliate, Crosby Enterprises.

27. Crosby Tugs is the primary operating entity for the Tug Business and Crosby Dredging is the primary operating entity for the Dredge Business, although certain enterprise-wide functions, like accounting, are provided by Crosby Tugs for affiliates within the Company, including Crosby Dredging.

28. Most of the Company's fleet (approximately 80%) is owned by CMT. CMT does not keep employees. Its vessels are crewed, operated, and chartered by Crosby Tugs.

29. Crosby Tugs is the primary customer-facing entity for the Tugs Business and is the primary contract-counter party for Tug Business. Crosby Tugs also does billing and invoicing for the Tug Business and collects the resulting receivables.

30. Crosby Dredging is the primary customer-facing entity for the Dredge Business and is the primary contract-counter party for Dredge Business. Crosby Dredging also does billing and invoicing for the Dredge Business and collects the resulting receivables.

31. A summary of the Company's fleet is provided in **Table 1:**

| Asset Type | Units |
|---|---|
| Tugs | 94 |

| Dredges + Support | 5 |
|---|---|
| Barges + Support | 48 |
| Floating Drydock | 1 |
| All Other | 57 |
| **Total Fleet** | **205** |

32. The Company's fleet is maintained, repaired, and refurbished at drydock and topside and bottom-side repair yards owned and operated by a Company affiliate, Crosby Marine Repair, L.L.C. ("*CMR*").

**B. Cash Management**

33. Based on information reviewed as part of SCP's engagement, the Debtors had approximately $1,475,000 in available cash as of the Petition Date. This cash is managed through a system of accounts ("*Accounts*") identified on the attached **Exhibit B** ("*Bank Accounts Schedule*") in the ordinary course of business (the "*Pre-Petition Cash Management System*").

34. The majority of the cash receipts for the Tug Business are generated through, or related to, the charter of vessels, which are deposited into the Tugs Receipts Account (as defined in the Bank Accounts Schedule). The majority of the cash receipts for the Dredge Business are generated through, or related to, contracts for dredging projects, which are deposited into the Dredge Receipts Account (as defined in the Bank Accounts Schedule) .

35. On an as-needed basis, the Debtors move such cash from and between the Tugs Receipts Account and the Dredge Receipts Account. The Debtors used the Pre-Petition Cash Management System in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting. The Pre-Petition Cash Management System allowed the Debtors to control funds, ensure cash

availability for each operating entity, and reduce administrative costs by facilitating the movement of funds among multiple entities.

36.     The Debtors engage in intercompany transactions with each other and Non-Debtor Affiliates in the ordinary course of their business (the "*Intercompany Transactions*"). The Intercompany Transactions cover a number of different categories, including, but not limited to: (a) intercompany services and goods provided in exchange for market or below-market services fees and expense reimbursements; (b) intercompany chartering arrangements, whereby a vessel-owning entity charters a vessel to the customer-facing entity, who in turn contracts with the third-party end customer; (c) intercompany loans to address funding needs on an ad hoc basis; and (d) intercompany accounts receivable and accounts payable when one Debtor entity pays for goods and services provided by another entity.

37.     Under the Pre-Petition Cash Management System, cash does not flow for the majority of Intercompany Transactions. For example, when Crosby Dredging receives mobilization support from Crosby Tugs for dredging projects, the Company has historically settled by booking year-end revenue adjustments by reducing Crosby Dredging's revenue and booking corresponding revenue to Crosby Tugs, using a "due to / due from."

38.     Crosby Tugs, which provides the accounting function for the Company, has recorded journal entries allocating hard costs to vessels. Intercompany charters and loans have not historically been documented by written contracts or notes.

39.     The Debtors, with assistance of their advisors, are implementing an iteration of the Pre-Petition Cash Management System modified to allow for superior tracking and monitoring of the Intercompany Transactions (the "*Post-Petition Cash Management System*"). As a part of the Post-Petition Cash Management System, the Crosby Debtors and any vessel-owning Non-Debtor

Affiliates whose vessels are operated by Crosby Tugs or Crosby Dredging ("***Non-Debtor Vessel Owners***") will enter into written master vessel management agreements ("***VMAs***"). Pursuant to the terms of the VMAs, Crosby Tugs and Crosby Dredging will pay, on a billing cycle authorized in the VMAs, a vessel use fee resulting from charter hire for the use of CMT and the Non-Debtor Vessel Owners' vessels, net of operational costs specified in the VMAs, including but not limited to, costs for fuel, labor, hard costs attributable to vessels, and the allocable portions of shared expenses ("***Net Charter Hire***").

40.     The Debtors are in the process of opening DIP accounts for each Debtor.

41.     An illustrative diagram of the Post-Petition Cash Management System is provided below:



## III. Capital Structure

42. As of the Petition Date, the Debtors had approximately $162,758,685 in aggregate funded debt. These obligations arise under the Debtors' facility with Hancock Whitney secured by the Crosby Debtors' accounts receivable and Bertucci's interest in Luhr Crosby and 14 collateral-based facilities each secured by liens attaching to a different portion of the Company fleet of vessels and equipment ("*Fleet Facilities*"). The Fleet Facilities are primarily secured by preferred ship mortgages. Some of the secured lenders for the Fleet Facilities ("*Other Secured Lenders*") have filed UCC-1 Financing Statements ("*UCC-1s*") that may give rise to lien on the Crosby Debtors' inventory and receivables.

### A. The Hancock Whitney Facility

43. Bertucci acquired its stake through, among other things, a capital contribution comprised of valuable and necessary equipment (the "*Bertucci Equipment*") for the joint venture. At the time the joint venture was formed, the Bertucci Equipment was financed and subject to a lien in favor of Hancock Whitney, Bertucci's lender at the time. To contribute the Bertucci Equipment to Luhr Crosby free and clear of all liens, Bertucci needed to obtain a release of Hancock Whitney's lien. To facilitate this, the Crosby Debtors, as well as certain non-Debtor affiliates of the Crosby Debtors, assumed Bertucci's indebtedness to Hancock Whitney (the "*Hancock Whitney Facility*") and agreed to secure the Hancock Whitney Facility with, inter alia, a first-priority lien on the Crosby Debtors' accounts receivable in favor of Hancock Whitney. In conjunction with this series of transactions, Bertucci also guaranteed the Crosby Debtors' obligation to Hancock Whitney and, as additional security for the Hancock Whitney Facility, pledged its 49.9% stake in Luhr Crosby.

44. The Crosby Debtors had provided services to Bertucci before the joint venture. After Luhr Crosby was formed, Bertucci's accounts receivable balance in favor of the Crosby Debtors reached $30 million. The Crosby Debtors exchanged this right to payment for two demand notes executed by Bertucci in favor of Crosby Tugs ("***Demand Notes***").

## B. Other Secured Facilities

45. **Table 2** summarizes the Debtors' prepetition secured debt structure:

| | Lender Name | Approximate Pre-Petition Balance Outstanding |
|---|---|---|
| 1 | Hancock Whitney | $29,240,625 |
| 2 | PNC Bank | $25,376,543 |
| 3 | City National Bank | $18,022,087 |
| 4 | Regions Bank | $18,988,872 |
| 5 | ARBA (Truist) | $11,445,066 |
| 6 | MC Bank | $9,706,275 |
| 7 | Kompass Kapital Funding | $9,907,373 |
| 8 | JJ Astor | $10,800,000 |
| 9 | Atlantic Union | $7,154,331 |
| 10 | Banc of America | $6,279,192 |
| 11 | South Lafourche Bank | $7,579,796 |
| 12 | Citizens Bank | $2,820,233 |
| 13 | State Bank | $2,395,659 |
| 14 | ELGA | $2,162,053 |
| 15 | Post Road (Encina) | $880,581 |
| | | **$162,758,685** |

46. The Company's real property, subject to mortgages, is held in two Non-Debtor Affiliates, CMR, which owns the Company's drydock and shipyards, and Tala Real Estate, L.L.C. ("***TRE***"), which owns the office building containing Company headquarters and a warehouse facility. Bank Plus is the lender for both mortgage loans—as of the Petition Date, the approximate balances owed by these Non-Debtor Affiliates were $3,010,376 for TRE and $8,560,560 for CMR.

## C. The MCAs

47.     To address cash liquidity stress in the short-term, the Crosby Debtors entered into a number of MCA agreements to obtain funding from the firms identified on the list ("*MCA Parties List*") attached as **Exhibit C** (the "*MCA Parties*"). The MCA Parties assert either ownership of certain receivables of the Debtors and/or have filed UCC-1s purporting to perfect a security interest in the Debtors' receivables. Any liens in favor of the MCA Parties in receivables and inventory is inferior to the lien against the Crosby Debtors' receivables securing the Hancock Whitney Facility. To the extent the MCA lenders claim ownership of the Debtors' receivables, the ownership is subject to the lien securing the Hancock Whitney Facility.

## IV.     Circumstances Leading to These Chapter 11 Cases

48.     A number of forces combined to weaken Crosby's financial condition.

49.     Crosby Tugs, like other marine transportation firms, has been affected by contracting offshore operations in the Gulf of America. Crosby Tugs' customers have had their own restructurings, with consequences cascading to Crosby Tugs' operations and collections. Likewise, Crosby Dredging's operations have slowed due to cuts to coastal restoration and dredging projects in Louisiana.

50.     The Crosby Debtors have also suffered from a complex debt structure and high debt load. The Crosby Debtors' ability to service its debt load was further challenged after a collateral valuation triggered a technical default on the PNC Vessel Facility triggered default interest rates. And the Crosby Debtors' assumption of the Hancock Whitney Facility, plus the exchange of valuable accounts receivable for the Demand Notes, simultaneously increased the Crosby Debtors' debt load while reducing the ability of the Crosby Debtors to service that debt.

51.     In light of the foregoing, as well as various restructurings of customers, industry slowdowns affecting the Tug Business and the Dredge Business, and other factors impacting the Debtors, the Company turned to the MCA Parties to support the cash flow needs of the Company.

52.     This created a negative feedback loop. As cash liquidity worsened, the Crosby Debtors began relying further upon the MCA Funding for access to short-term liquidity. While the MCA Funding provided short term liquidity, the cost of the MCA Funding was exorbitant and dramatically impacted the Crosby Debtors' ability to operate.

53.     Prior to February 24, 2026, some or all of the MCA Parties made daily draws of funds out of the Tugs Receipts Account and the Dredge Receipts Accounts. Prior to my retention in late February of 2026, the MCA Parties, in aggregate, collected the amount of the MCA Funding advanced to the Crosby Debtors, plus more than $20 million in additional cash. Around this same time, the weekly ACH payments initiated by the MCA Parties was approaching $900,000 per week, far more than the Crosby Debtors could afford to pay.

54.     In order to conserve cash and preserve the Debtors as going concerns for the benefit of all creditors, the Debtors withdrew the ability of the MCA Parties to draft on the Debtors' accounts. Soon after, certain of the MCA Parties sent confusing letters to the Debtors' customers demanding that the Debtors' accounts receivable be paid directly to them. Further, the MCA Parties, in an effort to intimidate the Crosby Debtors, damage the Crosby Debtors' customer, vendor, employee, and lender relationships, and generally disrupt operations, sent representatives or associates to the Crosby Debtors' physical offices to attempt to collect debt in-person, contacted and made demands on the Company's customers, vendors, and lenders, and solicited on behalf of affiliated law firms and debt work-out companies. The MCA Parties' communications caused the

Debtors' customers to withhold payment of the receivables, causing an emergency liquidity crisis for the Debtors, which necessitated the Debtors filing the Chapter 11 Cases.

55.    In coordination with each other, the Debtors and Hancock Whitney sent the Debtors' customers letters directing the customers to pay the receivables owed to the Debtors into the Segregated HW Account. Hancock Whitney gave the Crosby Debtors access to receipts in the Segregated HW Account so that the Debtors had necessary liquidity to pay critical operations costs while the Debtors prepared to file the Chapter 11 Cases.

## V.    Debtors' Prepetition Restructuring Efforts

### A. SCP's Efforts

56.    SCP has worked closely with the Company to prepare a daily and weekly liquidity forecast, marshaled control of the bank accounts and any disbursements, reviewed receivables, payables, MCA contracts, historical bank transactions, and rapidly identified the cash position of the Company. It became readily apparent that the cash balances did not satisfy the payroll or other operational expenses of the Company on a very short term basis.

57.    SCP prioritized the payment of critical expenses, including payroll, to preserve the value of the Company as a going concern, and worked with counsel and the investment bankers to identify other potential financing sources to provide liquidity. Specifically, SCP, the Company, and its other advisors met with Hancock Whitney to describe the situation and request an incremental advance to support the Company's operations. While various lenders, including Hancock Whitney, were interested in financing the Company, given the confusion in the marketplace around the MCA issues, as well as the lack of quality financial information, the lenders were only comfortable lending through debtor-in possession financing in a chapter 11

context. To that end, SCP prepared a DIP budget to support the financing effort, and spoke with many of the lenders related to the business operations and financial condition of the Company.

### B. The Marketing Processes

58.    As set forth in more detail in the *Declaration of Geoffrey Richards* filed contemporaneously with this Declaration, as a part of the Marketing Processes Raymond James has contacted approximately 123 prospective parties, including 73 lenders, 31 equity investors, and 19 strategic buyers and an additional 80 prospective buyers in connection with the Luhr Crosby Process.

59.    Of the 123 prospect parties contacted, 60 parties signed an NDA and received access to the Debtor's VDR. Of the parties that signed the NDA and reviewed the VDR, three (3) submitted a non-binding indication of interest ("*IOI*") to provide the Debtors with incremental liquidity. All three (3) term sheets were for debtor in possession DIP financing. No parties submitted a non-binding IOI to provide incremental liquidity on an out-of-court basis.

60.    As a result of the Recapitalization Process, the Debtors obtained a term sheet for the DIP Facility, which will provide necessary liquidity for the Debtors' operations during the chapter 11 bankruptcy processes. The Debtors seek approval of the DIP Facility, and other essential relief, in the First Day Pleadings discussed below.

### VI.    Relief Sought in the Debtors' First Day Motions

### A. Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration and (II) Granting Related Relief ("Joint Administration Motion")

61.    Pursuant to the Joint Administration Motion, the Debtors requested entry of an order: (a) directing procedural consolidation and joint administration of these chapter 11 cases and (b) granting related relief. Given the integrated nature of the Debtors' operations, joint

administration of these Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.

62. Joint administration of the cases will obviate the need for duplicative notices, motions, applications, and orders, and thereby save considerable time and expense for the Debtors and their estates. This Court also will be relieved of the burden of entering duplicative orders and maintaining duplicative files. Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity. For example, virtually all of the relief sought by the Debtors in the First Day Motions is sought on behalf of all of the Debtors.

63. The rights of the respective creditors of the Debtors will not be adversely affected by joint administration of these cases because this Motion requests only administrative consolidation of the estates and the Debtors are not by this Motion seeking substantive consolidation. Notwithstanding the entry of an order granting the relief requested by this Motion, each creditor shall file a proof of claim against a particular Debtor's estate. Thus, the rights of all creditors will be enhanced by the reduced costs resulting from joint administration.

64. For these reasons, the relief requested in the Joint Administration Motion is warranted.

**B. Debtors' Emergency Motion to Limit Notice ("<u>Limited-Service Motion</u>")**

65. The Debtors anticipate that there will be thousands of persons and entities to be noticed in these chapter 11 cases. Due to the number of parties in interest and the anticipated number and size of filings due to the size and the complexity of the Debtors' businesses, notice by physical mail presents a substantial logistical hurdle and expense in these chapter 11 cases. Printing and mailing costs for noticing are administrative expenses that will be borne by the Debtors' estates, at the expense of the Debtors' creditors.

66.     Consistent with the Court's Complex Procedures, pursuant to the Limited-Service Motion, Debtors have requested that an order ("*Limited-Service Order*") be entered and served on all parties in interest providing that notice of all docket filings and pleadings, including those docket filings and pleadings listed in Local Rule 2002-1C, filed in these chapter 11 cases may be limited to: (1) the Office of the United States Trustee for the Eastern District of Louisiana; (2) the Debtors; (3) counsel for the Debtors; (4) counsel for any official committees; (5) the Debtors' prepetition and post-petition secured lenders, including any other party asserting a security interest in assets of the debtor or their counsel who has appeared in the case; (6) the Debtors' twenty (20) largest unsecured creditors (or, if authorized, the jointly-administered Debtors' thirty (30) largest unsecured creditors); (7) those persons who have formally appeared in the Chapter 11 case and requested service pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure, provided however, the elimination of any such entities on account of their having been terminated as interested parties or otherwise having concluded their interest will be left to the noticing entity, subject to due process considerations; (8) all applicable governmental agencies to the extent required by the Bankruptcy Rules and the Local Rules; (9) any known counsel for (5)–(8); and (10) all creditors who sign-up to participate in free electronic bankruptcy noticing (all together, the "*Limited-Service List*").

67.     Unless the Bankruptcy or Local Rules permit service on fewer parties in interest, any person filing a pleading in a Complex Case shall serve such pleading on (a) all parties-in-interest listed on the most recent Limited-Service List and (b) any creditor or other party-in-interest whose interests are likely to be affected directly by the pleadings or proceeding.

68.     In my opinion, the request to limit notice as permitted by the Complex Procedures is standard and appropriate for chapter 11 cases of this magnitude and in the best interest of parties in interest. For these reasons, I believe that the Limited-Service Motion should be approved.

## C. Debtors' Emergency Application for Entry of an Order (A) Authorizing the Retention and Appointment of Stretto, Inc. as Claims, Noticing, and Solicitation Agent and (B) Granting Related Relief ("<u>Claims and Notice Agent Application</u>")

69.     For the same reasons the Debtors filed the Limited Service Motion, the Debtors have, pursuant to the Claims and Notice Agent Application, sought entry of an order appointing Stretto, Inc. ("*Stretto*") as Claims and Noticing Agent in the Chapter 11 Cases effective *nunc pro tunc* to the Petition Date to, among other tasks, (i) serve as the noticing agent to mail notices to the estates' creditors, equity security holders, and parties in interest; (ii) provide computerized claims, objection, solicitation, and balloting database services; and (iii) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to the Debtors' Chapter 11 Cases pursuant to the provisions of the engagement agreement appended to the Claims and Notice Agent Application.

70.     I understand that the Debtors' selection of Stretto to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best interest of the estates. Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that Stretto's rates are competitive and reasonable given Stretto's quality of services and expertise.

71.     The Debtors anticipate that there will be thousands of persons and entities to be noticed in the Chapter 11 Cases. In light of the number of parties in interest and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a Claims and Noticing Agent will provide an effective and efficient means of providing notice and should be approved.

**D. Debtors' Emergency Motion for Entry of a Final Order Authorizing the Debtors to Pay Employees' Pre-Petition Wages, Related Expenses, Benefits and Taxes ("_Employee Wage Motion_")**

72.     Pursuant to the Employee Wage Motion, the Debtors have requested entry of an order authorizing the Debtors to pay their employees certain prepetition claims for, among other items, wages (including, but not limited to, salaries and other compensation), federal and state withholding taxes, payroll taxes, health insurance, dental insurance, and insurance premiums under the workers' compensation program (collectively, the "_Employee Obligations_"), as well as Reimbursable Expenses (as defined below) for the Pre-Petition Wage Period (as defined below).

73.     Crosby Tugs and Crosby Dredging are the Company's primary employers. Prior to the filing, Debtors employed, on average, 850 full-time Employees to manage, oversee, and operate the businesses on a day-to-day basis.

74.     The Employees perform a wide variety of functions critical to the administration of these Chapter 11 Cases and the Debtors' restructuring. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many instances, the Employees include highly-trained personnel who are not easily replaced. Without the continued, uninterrupted services of their employees, the Debtors' business operations will be halted. Many of the Debtors' Employees are employed offshore and are involved in the day-to-day operation of the Debtors' vessels ("_Offshore Employees_"). The Offshore Employees generally are highly trained individuals responsible for the safe operation of the Debtors' tugs, barges, and other vessels, or the Debtors' equipment, such as cranes and dredging equipment, and are not easily replaced. The Debtors also employ workers onshore ("_Onshore Employees_") to support the vessels, as well as the Debtors' enterprise-wide operations.

75. Crosby Tugs' Employees are paid in arrears, and the payroll checks are distributed bi-weekly on Friday.[3] Crosby Tugs' Employees received their last Pre-Petition Date paychecks on March 20, 2026, for the period through March 15, 2026, as the period ends on Sunday.

76. Crosby Dredging's Employees are also paid in arrears, and the payroll checks are distributed on Fridays, but payroll is made on a weekly basis. Crosby Dredging's Employees received their Pre-Petition Date paychecks on March 20, 2026, for the period through March 15, 2026, as the period ends on Sunday.

77. Payroll is processed internally for both Crosby Tugs and Crosby Dredging. Pursuant to the Employee Wage Motion, the Debtors seek authority to pay the Employee Obligations incurred for the "*Prepetition Wage Period*" provided in the below **Table 3**:

| | **Tugs** | **Dredging** |
|---|---|---|
| Payroll Recurrence | Bi-Weekly | Weekly |
| Payroll Day | Every Other Friday | Every Friday |
| Pay Period End | Every Other Sunday | Every Sunday |
| Pre-Petition Wage Period | March 16 - 23 | March 16 - 23 |

78. The Employee Obligations incurred for the Pre-Petition Wage Period include net pay accrued ("*Net Pay*"); payroll and withholdings taxes mandated by federal, state and/or local authorities ("*Payroll Taxes*"); paid personal, vacation, sick and other time ("*Leave Obligations*"), the Employee withholding portion for the Debtors' group health insurance plan, dental plan, vision plan, and Employee life insurance policy ("*Trust Benefits*"); and the Employee wages withheld by the Debtors due to a lien or garnishment for child support or other basis under applicable law ("*Garnishment Obligation*").

---

[3] Except, one employee is paid weekly.

79.     The Employee Obligations constitute priority claims pursuant to 11 U.S.C. § 507(a)(4).  No single Employee's share of the Employee Obligations exceeds the $17,150.00 cap priority status provided by 11 U.S.C. § 507.

80.     Some of the Employees ordinarily and necessarily incur business-related expenses in connection with their service to the Debtors, including, but not limited to, expenses relating to travel and the purchase of supplies and parts (collectively "**Reimbursable Expenses**"). By the Employee Wage Motion, the Debtors also request authority to pay the Reimbursable Expenses.

81.     Immediately prior to the bankruptcy filings, the total estimated accrued and unpaid Employee Obligations and Reimbursable Expenses for the Debtors was as shown in the below **Table 4:**

|  | Tugs | Dredging |
|---|---|---|
| Net Pay | $595,300.48 | $109,066.59 |
| Payroll Taxes | $295,307.98 | $34,254.06 |
| Trust Benefit | $103,040.85 | $17,286.97 |
| Garnishment Obligation | $4,157.74 | $1,230.38 |
| **Total Est. Employee Obligations** | **$997,807.05** | **$161,838.00** |

82.     The Debtors provide, to the extent applicable, workers' compensation coverage, coverage in compliance with the Jones Act, and coverage in compliance with the Longshore and Harbor Workers' Compensation Act.  The premiums are financed and paid by the Debtors and to the extent premiums need to be paid, the Debtors will seek approval from this Court.

83.     As a result of filing the Chapter 11 Cases, in the absence of an order of this Court, the Debtors cannot pay the Employee Obligations or reimburse the Reimbursable Expenses for the Pre-Petition Wage Period. Based on the information provided to me, I believe that the Employees provide the Debtors with services necessary to conduct the Debtors' business, and that absent the

payment of the Employee Obligations and the Reimbursable Expenses owed to the Employees, the Debtors may experience significant employee turnover and instability. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant cost and efforts, which the Debtors cannot spare. I therefore believe, based upon information provided to me by members of the Debtors' management team, that payment the Employee Obligations and the Reimbursable Expenses is a necessary and critical element of the Debtors' efforts to preserve value and will increase the likelihood of retaining the Employees as the Debtors seek to operate their business in these chapter 11 cases. For these reasons, I believe the relief requested in the Employee Wage Motion should be approved.

**E. Debtors' Emergency Motion for Entry of a Final Order: (A) Prohibiting Utilities from Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtors on Account of Amounts Due, and (B) Establishing Procedures for Determining Requests for Adequate Assurance ("Utilities Motion")**

84.     Pursuant to the Utilities Motion, the Debtors seek entry of a final order: (a) prohibiting those utility companies currently providing services, or that will provide services, to the Debtors (collectively, the "*Utility Companies*" and each, individually, a "*Utility Company*") from altering, refusing or discontinuing services to, or discriminating against, the Debtors on account of amounts due, pending entry of final order granting the relief sought herein; (b) determining that the Utility Companies are adequately assured of payment for future utility services, pending entry of the final order; (c) establishing certain procedures for determining requests for additional assurance;  and (d) permitting Utility Companies to opt out of the procedures established herein.

85.     In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, water and sewage, telephone, internet,

satellite communication, and other similar services (collectively, the "*Utility Services*") from a number of utility companies or brokers (collectively, the "*Utility Companies*"). A schedule of the Debtors' Utility Companies is appended to the Utility Motion. It is my understanding based on discussions with the Debtors' management that, to the best of the Debtors' knowledge, they are not in default of any undisputed invoices for prepetition Utility Services.

86.     The Debtors intend to pay postpetition obligations owed to the Utility Companies in the ordinary course of business and in a timely manner. The Debtors believe that cash held on hand by the Debtors and generated in the ordinary course of business will provide sufficient liquidity to pay the Utility Companies for Utility Services in accordance with prepetition practice during the pendency of their Chapter 11 Cases.

87.     Pursuant to the Utilities Motion, the Debtors propose to pay to each Utility Company that does not have any deposits and/or bonds, an amount equal to the Debtors' calculation of the cost of one month's worth of utility service, based on the historical average over the past twelve (12) months as calculated by the Debtors (each, an "*Adequate Assurance Deposit*").  Any Utility Company that is not satisfied with the Proposed Adequate Assurance may make a request for additional or different adequate assurance of future payment pursuant to the adequate assurance procedures set forth in the proposed order. Some of the Utility Providers may have deposits. Existing deposits and/or bonds shall be deemed to be an Adequate Assurance Deposit for purposes of the Utilities Motion.

88.     In my experience, preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization. Indeed, any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue operations. I believe this disruption would adversely impact customer

relationships and result in a decline in the Debtors' revenues and profits. For these reasons, the relief requested in the Utilities Motion should be approved.

**F. Debtors' Emergency Motion for Entry of an Order Under 11 U.S.C. §§ 105, 363, 364, 1107 and 1108: (I) Authorizing (A) Maintenance of Existing Bank Accounts, (B) Continued Use of Existing Business Forms, and (C) Continued Use of Existing Business Forms, and (II) Granting Related Relief ("Cash Management Motion")**

89.     Pursuant to the Cash Management Motion, the Debtors seek entry of an order authorizing the Debtors to maintain their existing Accounts and to continue using their existing business forms, approving the use of the Post-Petition Cash Management System, and granting related relief.

90.     As explained above, the Debtors use the Tugs Receipt Account and Dredge Receipts Account to collect receivables from customers. Any disruption of receipts would have an immediate impact on the Debtors' businesses and operations. Accordingly, to attempt to minimize the disruption caused by these Chapter 11 Cases and to maximize the value of the Debtors' estates, the Debtors request authority to continue to utilize the proposed Post-Petition Cash Management System during the pendency of these Chapter 11 Cases. As part of the Pre-Petition Cash Management System, the Debtors use a variety of preprinted business forms (including checks, letterhead, correspondence forms, invoices, and other business forms) in the ordinary course of business (collectively, the "*Business Forms*"). The Debtors also maintain books and records to document their financial results and a wide array of operating information (collectively, the "*Books and Records*"). To avoid a disruption to their business operations and to minimize administrative expense to their estates, the Debtors have requested authorization to continue using all of the Business Forms and Books and Records in a manner consistent with prepetition practice, without reference to the Debtors' status as chapter 11 debtors in possession.

91. The Debtors will work to open authorized DIP accounts. To the extent deemed necessary, Crosby Tugs and Crosby Dredging will sweep, no more often than on a weekly basis, the funds from their respective Tugs Receipts Account and Dredging Receipts Account into the Tugs DIP Account and Dredging DIP Account.

92. The proposed Post-Petition Cash Management system achieves the goal of transparency in documenting the Intercompany Transactions, while remaining feasible for these Debtors and without disrupting the Debtors' operations. For these reasons, the relief requested in the Cash Management Motion should be approved.

**G. Motion for Interim Order and Hearing Date for Next Interim Order (A) Authorizing Postpetition Use of Cash Collateral, (B) Granting Adequate Protection to Lender, (C) Modifying the Automatic Stay, (D) Scheduling A Final Hearing, and (E) Granting Related Relief ("<u>Cash Collateral Motion</u>")[4]**

93. Pursuant to the Cash Collateral Motion, the Debtors request entry of an interim order, substantially (a) authorizing the Debtors' use of Cash Collateral (as such term is defined in section 363 of the Bankruptcy Code) of the Existing Secured Parties; (b) providing adequate protection to the Existing Secured Parties, pursuant to sections 361, 362, and 363(e) of the Bankruptcy Code, for any diminution in value in the Existing Secured Party Collateral; (c) approving certain stipulations regarding the Existing Secured Facilities and the Existing Secured Obligations; (d) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary; (e), waiving the Debtors' ability to surcharge against the Existing Secured Party Collateral pursuant to section 506(c) of the Bankruptcy Code, waiving the applicability of

---

[4] For this Part VI(F), all terms capitalized and not defined in this Declaration are to be given the meaning ascribed in the Cash Collateral Motion.

the "equities of the case" exception under 552(b) of the Bankruptcy Code, and waiving the equitable doctrine of "marshalling" or any similar doctrine; and (f) granting related relief.

94. The Debtors require immediate access to liquidity to ensure that they are able to continue operating their businesses during these Chapter 11 Cases, preserve the value of their estates for the benefit of all parties in interest, and administer a value-maximizing chapter 11 process. However, substantially all of the Debtors' cash is Cash Collateral, and, without prompt access to such Cash Collateral (and, as discussed below, the DIP Facility), the Debtors would be unable to satisfy employee compensation obligations and vendor payables incurred in the ordinary course of business, preserve and maximize the value of their estates through pursuing a sale of some of the Debtors' assets, and fund the administration of these Chapter 11 Cases, which would cause immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.

95. For the foregoing reasons, the Debtors' continued use of Cash Collateral is necessary to preserve the value of their estates and maximize value for the benefit of all stakeholders.

96. The Debtors have discussed the consensual use of Cash Collateral with some of the Existing Secured Parties, but hope to continue discussions with those and others as the Debtors transition into the Chapter 11 Cases. As set forth in the Cash Collateral Order, the Debtors will provide an adequate protection package consisting of automatically perfected replacement liens and superpriority claims under section 507(b) of the Bankruptcy Code. In my opinion, the proposed adequate protection will sufficiently protect the Existing Secured Parties from any diminution in value of the Existing Secured Party Collateral during the pendency of these Chapter 11 Cases.

**H. Motion of Debtors for Entry of Interim and Final Orders Authorizing Debtors to (I) Obtain Postpetition Financing and (II) Use Cash Collateral, (B) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (C) Granting Adequate Protection, (D) Modifying Automatic Stay, (E) Scheduling Final Hearing, and (F) Granting Related Relief ("DIP Motion")**

97. Pursuant to the DIP Motion, the Debtors seek authority to, among other things, (i) obtain a secured postpetition financing facility, in an aggregate amount of no less than $60 million, plus interest, costs, fees and other expenses and amounts provided for under the terms and conditions set forth in that certain term sheet, attached as Exhibit 1 to the DIP Motion (the "*DIP Term Sheet*"), by and between the Debtors, their applicable Non-Debtor Affiliates, and the DIP Lender; (ii) draw on the DIP Facility, as needed (a) on an interim basis up to $40 million, comprising approximately $10 million in new-money loans and an approximately $30 million roll-up loan to refinance the Hancock Whitney Facility and, (b) on a final basis of no less than an additional $20 million in new-money loans, subject to the conditions precedent set forth in the DIP Term Sheet, where the proceeds of the DIP Facility will be used to pay for the Debtors' working capital needs and other administrative expenses necessary for the administration of these Chapter 11 Cases; (iii) grant the DIP Lender automatically perfected first-priority security interests in and priming liens on substantially all of the Debtors' assets to secure the DIP Facility and the obligations thereunder; (iv) grant the DIP Lender superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code; (v) modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to provide JMB, in its capacities as the DIP Lender and prepetition lender as successor to Hancock Whitney, with the relief necessary to implement and effectuate the terms and provisions of the DIP Term Sheet; (vi) use cash collateral in accordance with the DIP documents and orders; and (vii) grant certain adequate protection under sections 361, 363(e), and 507(b) of the Bankruptcy Code.

98. Postpetition financing is necessary to fund the Debtors' ongoing operations and the administration of these Chapter 11 Cases as well as the Marketing Processes. As described above, failure to secure postpetition financing could jeopardize the Debtors' ability to operate as a going concern and its transition into the Chapter 11 Cases. I understand that the proposed DIP Facility provides the Debtors with adequate financing to continue their operations, uninterrupted, and to administer these Chapter 11 Cases.

99. Moreover, I understand that Raymond James ran a comprehensive marketing process for proposals for DIP financing and that none of the other potential lenders could provide a funding commitment on comparable terms as those offered by the DIP Facility. Further, the Debtors were not able to obtain postpetition financing in the form of unsecured credit as an administrative claim pursuant to section 503(b)(1) of the Bankruptcy Code.

100. I understand the Debtors have concluded that JMB's proposal is the best alternative available for postpetition financing and that credit cannot be obtained from another party on more favorable terms. And in consultation with the Debtors and other advisors, I believe the terms of the DIP Facility are fair, reasonable, and adequate under the circumstances. Moreover, immediate and irreparable harm would result if the DIP Facility is not approved on an interim basis. The Debtors need immediate access to the DIP Facility for the necessary liquidity to implement and ensure the success of these Chapter 11 Cases and the Debtors' asset sale or other restructuring efforts.

101. Accordingly, I believe it is appropriate for the Court to approve and authorize the Debtors to draw on the DIP Facility on an interim basis to avoid immediate and irreparable harm pending a final hearing on the DIP Motion.

**I.  Emergency Motion for Entry of an Order Authorizing the Debtors to (A) File a Consolidated List of Creditors, and (B) File a Consolidated List of the 30 Largest Unsecured Creditors ("Consolidated Matrix and Top 30 Motion")**

102.     Pursuant to the Consolidated Matrix and Top 30 Motion, the Debtors seek authority to (i) file a consolidated creditor matrix in lieu of submitting separate mailing matrices for each Debtor, (ii) file a consolidated list of their 30 largest unsecured creditors, and related relief.

103.     Although the list of creditors usually is filed on a debtor-by-debtor basis, in a complex chapter 11 bankruptcy case involving more than one debtor, the debtors may file a consolidated creditor matrix. Here, the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, administratively burdensome, and of little incremental benefit. Further, because a large number of creditors may be shared among the Debtors, the Debtors request authority to file a single, consolidated list of their 30 largest general unsecured creditors. The top 30 list will help alleviate administrative burdens, costs, and the possibility of duplicative service, and is consistent with the Complex Procedures, which contemplate a Limited-Service List consisting of, among other things, the jointly-administered debtors' top 30 creditors.

104.     Accordingly, the Consolidated and Top 30 Motion should be approved.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: March 25, 2026


/s/ Lawrence Perkins
Lawrence Perkins
Chief Restructuring Officer

## EXHIBIT A

## <u>Organizational Schedule</u>

## EXHIBIT A

### THE COMPANY

| CROSBY ENTERPRISES, LLC'S SUBSIDIARIES | NON-SUBSIDIARY AFFILIATES OF CROSBY ENTERPRISES, LLC |
|---|---|
| A & C Barges, LLC | Crosby Dredging, LLC* |
| Aaron Joseph, LLC | Allie T., L.L.C. |
| Crosby Boat Co., LLC | Bertucci Contracting Co., Inc.* |
| Crosby Boat Rentals, LLC | Crosby Holdings, L.L.C. |
| Crosby Inland Marine, LLC | Crosby Marine Repair, L.L.C. |
| Crosby Inshore Marine Service, LLC | Crosby Machinery, L.L.C. |
| Crosby Marine Towing, LLC | Crosby Real Estate, L.L.C. |
| Crosby Marine Transportation, LLC* | Crosby Group, L. L. C. |
| Crosby Offshore Marine Service, LLC | Crosby Marine Mexico |
| Crosby Towboats, LLC | Crosby Investors, L.L.C. |
| Crosby Tugs, LLC* | Crosby Investors, II, L.L.C. |
| Crosby & Son Towing, LLC | Offshore Rig Moving, L. L. C. |
| Kurt Crosby, LLC | Tala Barge Co., L.L.C. |
| Nine Mi Mooring Service, LLC | Tala Real Estate, L.L.C. |
| Paddy Crosby, LLC | Tala Solutions, L.L.C. |
| Susan Marie, LLC | Tala Marine, L.L.C. |
| Tara Crosby, LLC | Tala Air Logistics, L.L.C. |
| Vinton Crosby, LLC | |
| Webb Crosby, LLC | |

\* Denotes Chapter 11 Debtors in Jointly-Administered Chapter 11 Cases

**EXHIBIT B**

**Bank Accounts Schedule**

| Account Provider | Account Holder | Type | Identifier in FDD | Last 4 Digits of Acct. No. |
|---|---|---|---|---|
| South Lafourche Bank and Trust | Crosby Tugs L.L.C. | Check | ("*Tugs Receipts Account*") | 4911 |
| South Lafourche Bank and Trust | Crosby Dredging LLC | Check | ("*Dredging Receipts Account*") | 4997 |
| South Lafourche Bank and Trust | Crosby Marine Transportation LLC | Check | | 6817 |
| South Lafourche Bank and Trust | Bertucci Contracting Company, L.L.C. | Check | | 6868 |
| Chase | Crosby Tugs L.L.C. | Check | | 6053 |
| Hancock Whitney | Crosby Tugs L.L.C. | Check | | 0676 |
| Hancock Whitney | Crosby Dredging LLC | Check | | 1748 |
| Hancock Whitney | Bertucci Contracting Company, L.L.C. | Check | | 8505 |
| State Bank and Trust | Crosby Tugs L.L.C. | Check | | 9543 |
| Regions | Crosby Dredging LLC | Check | | 0120 |
| Bank Plus | Crosby Dredging LLC | Check | | 7418 |
| B1 Bank | Crosby Tugs L.L.C. | Check | | 5701 |
| Mississippi River Bank | Crosby Dredging LLC | Check | | 7835 |
| MC Bank | Crosby Marine Transportation, LLC | Check | | 5730 |
| TBD | Crosby Tugs L.L.C. | Check / DIP | ("*Tugs DIP Account*") | TBD |
| TBD | Crosby Dredging LLC | Check / DIP | ("*Dredging DIP Account*") | TBD |
| TBD | Crosby Marine Transportation LLC | Check / DIP | ("*CMT DIP Account*") | TBD |
| TBD | Bertucci Contracting Company, L.L.C. | Check / DIP | ("*Bertucci DIP Account*") | TBD |

**EXHIBIT C**

**MCA Parties List**

| No. | MCA Party | | Mailing Address | City | State | Zip |
|---|---|---|---|---|---|---|
| 1 | Aqua Capital, LLC | | 600 Summer St., Ste. 204 | Stamford | CT | 06901 |
| 2 | Breeze Funding | | 163 Avenida Del Mar | San Clemente | CA | 92672 |
| 3 | Celtic Advance | | 251 Little Falls Drive | Wilmington | DE | 19808 |
| 4 | EN OD Capital | | 1202 Avenue U, Ste 115 | Brooklyn | NY | 11229 |
| 5 | ALO Advance | | 100 Biscayne Blvd. Ste 2303 | Miami | FL | 33132 |
| 6 | Cedar Advance LLC | | 5401 Collins Avenue CU-9A | Miami Beach | FL | 33140 |
| 7 | ClearFund Solutions, LLC | | 99 Wall Street, 2613 | New York | NY | 10005 |
| 8 | Coldwater Capital, LLC | | 109 South Spring Street, Floor 1 | Brooklyn | NY | 11249 |
| 9 | Cooper Investments, LLC | | 600 Summer St., Ste. 204 | Stamford | CT | 06901 |
| 10 | Dependence Platinum | | Corporation Cretions Network Inc 801 US Highway 1 | North Palm Beach | FL | 33408 |
| 11 | Forever Funding LLC | | Registered Agents Inc. 2839 Main St., Suite 100 | Glastonbury | CT | 06033 |
| 12 | Freedom Funding LLC | | 600 Summer St., Ste. 204 | Stamford | CT | 06901 |
| 13 | GALT Funding Co | | 600 Summer St., Ste. 204 | Stamford | CT | 06901 |

| 14 | Insight Capital LLC | | Corporation Service Company 251 Little Falls Drivw | Wilmington | DE | 19808 |
|---|---|---|---|---|---|---|
| 15 | Libertas Funding, LLC | | 411 West Putnam Avenue, Suite 220 | Greenwich | CT | 06830 |
| 16 | Meged Funding Group | | Vcorp. Services, LLC 108 W. 13th Street, Ste 100 | Brick | NY | 19801 |
| 17 | Moby Cap LLC | | Corporation Service Company 251 Little Falls Drive | Wilmington | DE | 19808 |
| 18 | Mynt Advance | | 7901 4th Street N, Ste 300 | St. Petersburg | FL | 33702 |
| 19 | NOVAC Equities LLC | | United States Corporation Agents, Inc. 500 Post Road East, 2nd Floor | Westport | CT | 06880 |
| 20 | ON Deck | | 4700 W. Daybreak Pkwy., Suite 200 | South Jordan | UT | 84009 |
| 21 | ORACAP LLC | | Harvard Business Services, Inc. 16192 Coastal Hwy. | Lewes | DE | 19958 |
| 22 | Overtime Capital | | One World Trade Center; 285 Fulton St., Suite 850 | New York | NY | 10007 |
| 23 | Parkview Advance | | 600 Summer St. | Stamford | CT | 06901 |
| 24 | Pinnacle Business Funding LLC | | 1202 Avenue U, Ste. 1115 | Brooklyn | NY | 11229 |
| 25 | Reliance Financial FL, LLC | | Corporation Cretions Network Inc. 801 US Highway 1 | North Palm Beach | FL | 33408 |
| 26 | Rocket Capital NY, LLC | | 1250 E. Hallandale Beach Blvd., Suite 505 | Hallandale Beach | FL | 33009 |
| 27 | SQ Advance | | Registered Agents Inc. 7901 4th St.N, Ste 300 | St. Petersburg | FL | 33702 |
| 28 | Surge Funding LLC | | HYS Tax and Accounting Firm Inc. 103 Chester Ave. | Brooklyn | NY | 11218 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 29 | True Business Funding | | Interstate Agent Services, LLC 8 Carroll Dr. | Suffern | NY | 10901 |
| 30 | Web Bank c/o Libertas Funding, LLC | | 411 West Putnam Avenue, Suite 220 | Greenwich | CT | 06830 |
| 31 | Wynwood Capital Group | | 20200 W. Dixie Highway | Miami | FL | 33180 |