## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE:** | **CASE NO: 26-10678**<br>**(JOINTLY ADMINISTERED)** |
| **CROSBY MARINE TRANSPORTATION, LLC,** *et al.*,[1] | **CHAPTER 11**<br>**COMPLEX CASE** |
| **Debtors.** | **SECTION: A** |

**PNC BANK, NATIONAL ASSOCIATION'S OMNIBUS OBJECTION TO DEBTOR'S MOTIONS AUTHORIZING (A) DEBTORS' POSTPETITION USE OF CASH COLLATERAL, (B) DEBTOR TO OBTAIN POSTPETITION FINANCING, AND (C) MAINTENANCE OF EXISTING BANK ACCOUNTS AND UES OF CASH <u>MANAGEMENT SYSTEM</u>**

PNC Bank, National Association, in its capacity as administrative agent, collateral agent and mortgagee under the Syndicated Credit Agreement (defined below), and in its capacity as lender under the KJC Credit Agreement (defined below), objects to Debtors' (i) *Motion for Interim Order and Hearing Date for Next Interim Order (A) Authorizing Postpetition Use of Cash Collateral, (B) Granting Adequate Protection to Lender, (C) Modifying the Automatic Stay, (D) Scheduling a Final Hearing, and (E) Granting Related Relief* (the "**Cash Collateral Motion**"), (ii) *Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing Debtors to (I) Obtain Postpetition Financing and (II) Use Cash Collateral, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (C) Granting Adequate Protection, (D) Modifying Automatic Stay, (E) Scheduling Final Hearing, and (F) Granting Related Relief* (the "**DIP Motion**"), and (iii) *Emergency Motion For Entry Of An Order Under 11 U.S.C. §§ 105, 345, 363, 364, 1107 And 1108: (I) Authorizing (A) Maintenance of Existing Bank Accounts and Use of*

---

[1] The Debtors are, in addition to Crosby Marine Transportation, LLC, Crosby Tugs, L.L.C. (Case No. 26-10679); Crosby Dredging, LLC (Case No. 26-10680); and Bertucci Contracting Company, L.L.C. (Case No. 26-10681).

131832.01482/157474025v.3

*Cash Management System and (B) Continued Use of Existing Business Forms, (II) (III) Granting Related Relief* (the "**Cash Management Motion**"; together with the Cash Collateral Motion and DIP Motion, the "**Motions**").

### PRELIMINARY STATEMENT

PNC has attempted to negotiate the terms of a consensual cash collateral order but the Debtors have refused to meaningfully engage prior to the Petition Date. PNC represents in excess of $25,0000,000 of indebtedness in connection two loan facilities described more fully below. Based on the manifold issues raised by the Motions and disputes of lien priority on certain collateral, PNC has no alternative but to object to the Motions for the following reasons:

1. **No Priming Liens.** PNC was assured by Debtors' professionals that the DIP financing would not prime the liens of any existing lenders. Yet the proposed DIP Order states the contrary and provides DIP Lender with priming liens on, at a minimum, the earnings generated from vessels that are PNC's collateral and potentially the vessels themselves.

2. **No Liens on or Cash Collateral of Non-Debtor Assets.** Through the definition of DIP Collateral in the DIP Order, which appears to cover receivables generated by Tugs based on Tugs' prepetition and postpetition chartering of vessels **on behalf of the owners of the vessels** purports to grant the DIP Lenders liens on non-Debtor assets, i.e., the receivables generated vessels owned by those non-Debtor entities. PNC holds liens on vessels and the related earnings owned by at least six non-Debtors. Those non-Debtor assets are not property of the estate and the court lacks the power to grant liens on such assets, let alone grant priming liens on such collateral. Additionally, the court should not sanction Debtors utilizing the non-Debtor revenue from PNC's non-Debtor cash collateral.

3. **No First Day Roll-Up.** PNC objects to DIP Lender receiving a full roll-up on the first day of these cases, particularly in light of the dispute between PNC and DIP Lender concerning the receivables generated by Transportation and non-Debtor vessel owners and purportedly managed by Tugs.

4. **No Carve Out from PNC's Collateral.** PNC objects to the Carve Out under the Cash Collateral Order. The DIP Loan proceeds are clearly sufficient to provide for the payment of postpetition fees and expenses of the Debtors' and Committee's professionals. The proposed DIP Order provides that those funds are being segregated into a Professional Fee Account for the Professionals and therefore there is no need to subordinate any of the prepetition collateral or the postpetition collateral to the Carve Out.

5. **Insufficient Adequate Protection for PNC.** The Cash Collateral Order fails to provide PNC with standard adequate protection in the form of (a) postpetition adequate protection payments of interest, fees, costs and expenses, (b) waiver of § 506(c) surcharge, and (c) waiver of marshaling. Additionally, Debtors should be require to maintain Certificates of Inspection on all vessels that it owns and/or manages, including performing required maintenance and regulatory requirements for operating the vessels. Finally, PNC should be granted adequate protection liens on DIP Collateral that are junior to the DIP Liens. In this case, there is no adequate protection the Debtors can propose because the DIP Lender is taking a first priority lien on all unencumbered assets. Consequently, PNC should receive periodic payments and its collateral should be maintained during this case to preserve the status quo as well as surcharge and marshaling waivers.

6. **Vessel Management Agreements.** The Cash Management Motion indicates that the Debtors intend to structure and enter into vessel management agreements in which Tugs and Dredging will be responsible for management of, and entering into charters for, vessels owned by Transportation and other non-Debtors. This directly affects PNC's collateral and the characterization of the receivables generated by PNC's vessel collateral. Debtors' entry into these vessel management agreements should be subject to a separate motion and opportunity for parties in interest to object in order to ensure transparency in what has been an opaque and undocumented prepetition intercompany relationship.

7. **Detailed Reporting on PNC's Collateral.** The Debtors should be required to provide PNC with regular reporting and accounting of the charters of PNC's vessel collateral as well as receivables generated from such charters.

8. **Erroneous Description of PNC and JMB Prepetition Liens and Obligations.** The description of the PNC loan facilities on Exhibit 1 to the proposed Cash Collateral Order – which is the basis of the Debtors' stipulations concerning the prepetition obligations and liens – is incorrect and must be revised. Additionally, the earliest date of perfection for the JMB liens (referenced as a UCC filed by Whitney Bank in 2017) relates, based on PNC's lien searches, to a lapsed UCC filing and, therefore, is misleading.

9. **DIP Lender should be required to Marshal Collateral.** DIP Lender should not receive a marshaling waiver because it has prepetition collateral with significant value that no other lender has – a pledge from Bertucci of its equity interests in the Luhr Crosby joint venture. DIP Lender should be required to look to the sale of those equity

interests before any other of the DIP Collateral, which will preserve any equity in the collateral for other secured and unsecured creditors.

10. **Combine Cash Collateral Order and DIP Order.** PNC objects to the Debtors' request for a separate DIP Order and Cash Collateral Order since there are inconsistencies and the relief provided the DIP Lender can be interpreted as inconsistent with the relief provided to the prepetition lenders under the Cash Collateral Order. To avoid any inconsistency, the rights of all parties should be set forth in one order.

## BACKGROUND

1. On March 23, 2026, Crosby Marine Transportation, LLC ("**Transportation**"), Crosby Dredging, LLC ("**Dredging**"), Crosby Tugs, L.L.C. ("**Tugs**"), and Bertucci Contracting Company, L.L.C., ("**Bertucci**"; together with Transportation, Dredging and Tugs, collectively, the "**Debtors**").

### The Pre-Petition Syndicated Credit Facility Secured by 38 Vessels

2. Crosby Marine Transportation, LLC ("**Transportation**") and Crosby Dredging, LLC ("**Dredging**") are borrowers under that certain Credit Agreement dated as of November 21, 2018 (the "**Syndicated Credit Agreement**"), by and among Transportation, Dredging, and various other non-Debtor affiliates as borrowers (collectively, "**Syndicated Borrowers**"), PNC Bank, N.A. (successor by merger to PNC Equipment Finance LLC), as administrative agent, collateral agent, and mortgagee ("**Syndicated Agent**"), pursuant to which the lenders party thereto ("**Syndicated Lenders**"; together with Syndicated Agent, the "**Syndicated Secured Parties**") made loans in the original principal amount of $38 million to Borrowers (collectively, the "**Syndicated Loan**"). Tugs and various other non-Debtor affiliates guaranteed the Borrowers

131832.01482/157474025v.3

obligations under the Syndicated Credit Agreement pursuant to that certain Guaranty dated as of November 21, 2018.

3. Syndicated Borrowers' obligations under the Syndicated Loan Agreement were originally secured by 38 vessels[2] and related collateral owned by the Borrowers and pledged to Syndicated Agent, for the benefit of itself and the Syndicated Lenders. Debtor Transportation executed several vessel mortgages, including (a) that certain First Preferred Fleet Mortgage by Crosby Marine Transportation, LLC dated November 21, 2018 (with respect to 18 vessels) (the "**18 Vessel Fleet Mortgage**"), (b) that certain First Preferred Fleet Mortgage by Crosby Marine Transportation, LLC dated November 21, 2018 (with respect to 12 vessels) (the "**12 Vessel Fleet Mortgage**"), (c) that certain First Preferred Ship Mortgage by Crosby Marine Transportation, LLC dated as of November 21, 2018, with respect to the M/V CROSBY CLIPPER, as amended by that certain Amendment No. 1 to First Preferred Ship Mortgage dated May 20, 2022 (collectively, the "**Crosby Clipper Mortgage**"). The Syndicated Borrowers' obligations under the Syndicated Loan Agreement were subsequently cross-collateralized with the KJC Borrowers' obligations under the KJC Credit Agreement (each defined below), pursuant to which Transportation executed that certain First Preferred Ship Mortgage by Crosby Marine Transportation, LLC dated as of May 20, 2022, with respect to the M/V KURT J. CROSBY (the "**Cross-Collateralization KJC Mortgage**"; together with the 18 Vessel Fleet Mortgage, the 12 Vessel Fleet Mortgage and the Crosby Clipper Mortgage, the "**Syndicated Vessel Mortgages**").

---

[2] Debtor Transportation owned thirty-one of the vessels that compromised the collateral securing the Obligations under, and as defined in, the Syndicated Credit Agreement. As of the Petition Date, PNC is aware of ten vessels owned by Transportation that have been sold or scrapped since closing of the Syndicated Loan, which reduces to twenty-one the current number of vessels owned by Transportation that secure the Obligations under the Syndicated Credit Agreement. Importantly, PNC asserts that Debtors did not turnover to Syndicated Agent any proceeds from three of the vessels that were sold for scrap and PNC did not release its lien on those three vessels.

4.      As additional security for the Syndicated Loan, Debtor Transportation assigned to Syndicated Agent, for the benefit of itself and the Syndicated Lenders, the charter hire generated by the vessels it owns pursuant to (a) that certain Assignment of Charter Hire and Earnings by Crosby Marine Transportation, LLC dated November 21, 2018 (with respect to 18 vessels), as amended by that certain First Amendment to Assignment of Charter Hire dated June 7, 2019) (collectively, the "**18 Vessel Charter Hire Assignment**"), (b) that certain Assignment of Charter Hire and Earnings by Crosby Marine Transportation, LLC dated November 21, 2018 (with respect to 12 vessels) (the "**12 Vessel Charter Hire Assignment**"), and (c) that certain Assignment of Charter Hire and Earnings by Crosby Marine Transportation, LLC dated May 20, 2022, with respect to the M/V KURT J. CROSBY (the "**KJC Charter Hire Assignment**"; together with the 18 Vessel Charter Hire Assignment and the 12 Vessel Charter Hire Assignment, the "**Syndicated Charter Hire Assignments**").

5.      Debtor Transportation provided additional security for the Syndicated Loan in the form of assignments of insurance for the vessels. Specifically, Transportation executed the following assignments of insurance in favor of PNC: (a) that certain Assignment of Insurances by Crosby Transportation, LLC dated November 21, 2018 (with respect to 18 vessels) (as amended by that certain First Amendment dated June 7, 2019 and that certain Second Amendment dated May 20, 2022, the "**18 Vessel Insurance Assignment**"), (b) that certain Assignment of Insurances by Crosby Transportation, LLC dated November 21, 2018 (with respect to 12 vessels) (as amended by that certain First Amendment dated June 7, 2019, the "**12 Vessel Insurance Assignment**"), (c) that certain Assignment of Insurances by Crosby Transportation, LLC dated November 21, 2018 (with respect to the M/V CROSBY CLIPPER) (as amended by that certain First Amendment Dated May 20, 2022, (the "**Clipper Insurance Assignment**"), and (d) that certain Assignment of

131832.01482/157474025v.3

Insurances by Crosby Transportation, LLC dated May 20, 2022 (with respect to the M/V KURT J. CROSBY) (the "**Cross-Collateralization KJC Insurance Assignment**"; together with the 18 Vessel Insurance Assignment, the 12 Vessel Insurance Assignment and the Clipper Insurance Assignment, the "**Syndicated Loan Insurance Assignments**"; together with the Syndicated Vessel Mortgages, the Syndicated Charter Hire Assignments, and all other related security agreements, instruments and other documents, collectively, the "**Syndicated Security Agreements**").

6.      Syndicated Agent filed UCC-1 financing statements against Transportation on November 28, 2018, with respect to (a) the 30 vessels owed by Transportation and pledged as security to Syndicated Agent under the 18 Vessel Fleet Mortgage, 12 Vessel Fleet Mortgage and related Syndicated Security Agreements, and (b) the M/V CROSBY CLIPPER. Syndicated Agent amended its UCC-1 financing statement to add the M/V KURT J. CROSBY as collateral under the Syndicated Credit Agreement on March 17, 2025 (collectively, the "**Syndicated Financing Statements**").

**The Pre-Petition PNC Loan Secured by the KURT J. CROSBY**

7.      Each Debtor is also a borrower under that certain Loan and Security Agreement dated as of June 28, 2018 (the "**KJC Loan Agreement**"), by and among Transportation, Dredging, Tugs, and Crosby Enterprises, L.L.C. as borrowers (the "**KJC Borrowers**" and together with the Syndicated Borrowers, collectively, the "**Borrowers**"), and PNC Bank, N.A., as lender (the "**KJC Lender**"; together with the Syndicated Secured Parties, the "**Secured Parties**"), pursuant to which KJC Lender loaned the KJC Borrowers $9.4 million (the "**KJC Loan**").

8.      The KJC Borrowers' obligations under the KJC Loan Agreement are secured by the M/V KURT J. CROSBY and related collateral owned by Transportation and pledged to KJC

131832.01482/157474025v.3

Lender pursuant to, *inter alia*, at certain First Preferred Ship Mortgage by Crosby Marine Transportation, LLC dated June 2018 (the "**KJC Mortgage**"), the KJC Charter Hire Assignment, and that certain Assignment of Insurances by Crosby Marine Transportation, LLC dated June 2018 (the "**KJC Insurance Assignment**"; together with the KJC Mortgage and the KJC Charter Hire Assignment and all other related security agreements, instruments and other documents, collectively, the "**KJC Security Agreements**").

9.      KJC Lender filed a UCC-1 financing statement against Transportation on June 29, 2018, and another UCC-1 financing statement against Transportation on March 17, 2025 (collectively, the "**KJC Financing Statements**"; together with the Syndicated Financing Statements, the "**Filed Financing Statements**".

10.     Upon information and belief, prior to the Petition Date, Debtor Tugs has entered into contracts and other written or oral arrangements with charter parties for the use of vessels owned by Transportation and other Borrowers. Secured Parties have requested but has never been provided copies of any written agreement between Tugs and Borrowers describing the terms on which Tugs has authority to charter Borrowers' vessels.[3] Accordingly, Secured Parties are aware of no written contract between Tugs and Transportation authorizing Tugs to charter vessels owned by Transportation and other Borrowers.

## **OBJECTION**

11.     Secured Parties object to the Motions because they seek to prejudice their rights in its collateral and do not provide sufficient adequate protection in exchange for the use of their Cash Collateral. The major issue that underlies Secured Parties concerns with the Motions relate to

---

[3] Secured Parties have also requested and never been provided copies of any written agreement between Tugs and third parties evidencing the chartering of Borrowers' vessels.

Secured Parties' liens on and rights to receive the earnings generated by the vessels on which they hold a first priority vessel mortgage and assignment of charter hire. Debtors assert that that the accounts receivable generated by Tugs from its chartering of the vessels owned by Transportation and other non-Debtors constitute DIP Lender's priority collateral and should secure the DIP Financing. However, Syndicated Agent and KJC Lender, respectively, hold a prior, perfected lien on all charter hire generated by the vessels owned by the applicable Borrowers under their respective credit facilities, i.e., the earnings Tugs obtains from charters entered into with third parties for the use of the Borrowers' vessels.

12. The undocumented relationship between Tugs and Borrowers is presumably an oral contract in which Tugs has acted as agent for Borrowers and enters into charters with third parties on behalf of Borrowers. Accordingly, Tugs is required to turnover to Borrowers (and in turn Secured Parties) all net amounts received under the third-party charters.

13. Tugs clearly cannot charter the Borrowers' vessels, retain all of the charter hire received from third parties, and secure its debt obligations to DIP Lender with the receivables generated from third parties' use of the vessels. Doing so would not only constitute conversion of Borrowers' property but also would constitute a subordination of Syndicated Agent's and KJC Lender's respective liens on the charter hire generated by the use of Borrowers' vessels without Syndicated Agent's and KJC Lender's consent.

14. Secured Parties can only consent to the use of their respective cash collateral during the Interim Period to the extent Debtors agree to the following:

   a. DIP Lender is not provided any priming liens on accounts, or vessels and any other collateral which Syndicated Agent and KJC Lender, respectively, holds a validly perfected lien. Secured Parties proposed language on this to Debtors and DIP Lender but have not yet received a response.
   b. Debtors segregate proceeds generated from Secured Parties' vessel collateral and provide weekly reporting to Secured Parties of earnings on a vessel-by-vessel basis.

DIP Lender does not sweep charter hire for Secured Parties' vessels into DIP Account.

c. Debtors' professionals rely solely on weekly funded Professional Fee Account and remove carve out for professional fees ahead of Secured Parties on prepetition assets or post petition adequate protection liens and claims.

d. DIP Lender should be required to marshal assets and be paid first from proceeds of sale of Bertucci's equity in the Luhr Crosby joint venture.

e. Debtors should be required to comply with appropriate sale milestones to avoid a long, drawn-out and expensive case.

f. Debtors' proposed entry into vessel management agreements is filed by separate motion with opportunities for parties in interest to object.

g. Adequate protection in the form of first priority senior replacement liens on collateral in which Secured Parties already holds first priority liens such as accounts, charter hire revenues relating to vessels and other assets, and junior liens on DIP Collateral (as defined in the DIP Order); maintenance of COIs and other regulatory requirements for Secured Parties' vessel collateral including timely completion of repairs, etc.

h. Secured Parties receive standard waivers including, a surcharge waiver (§ 506(c), § 552, marshaling)

i. Debtors stipulate to amount of Secured Parties' debt and liens, without setoff, recoupment, subordination or counterclaim.

j. Debtors' agree to a second interim Cash Management Order to be heard next week to allow the parties to negotiate a consensual order.

k. Debtors agree to negotiate in good faith for adequate payments to be made to Secured Parties in connection with a final cash collateral order.

l. Debtors agree to provide Secured Parties with copies of the Charter Hire Agreements related to PNC collateral.

15. For these reasons, and based on the objections raised in the Preliminary Statement, PNC respectfully requests that Secured Parties, Debtors, and the DIP Lender be given a one week continuance to negotiate the issues raised herein and attempt to obtain an agreement on the consensual use of Secured Parties' cash collateral and the treatment of their liens and claims vis-à-vis the DIP Lender and the DIP Obligations.

**RESERVATION OF RIGHTS**

16. Secured Parties reserve their respective rights to raise any and all objections at the hearing concerning approval of the DIP Financing to the extent it is unable to resolve its outstanding issues through continued negotiation with the Debtors. Secured Parties also

specifically reserve their rights with respect to the priority of the liens granted to Syndicated Agent and KJC Lender under the Syndicated Security Agreements and KJC Security Agreements, respectively, and the priority of liens and claims granted to DIP Lender in connection with the DIP Financing in relation to the adequate protection liens and claims granted to Syndicated Agent and KJC Lender.

Respectfully submitted,

**ADAMS & REESE LLP**

*/s Richard A. Aguilar/*
Richard A. Aguilar
Mark J. Chaney, III
701 Poydras Street, Suite 4500
New Orleans, LA 70139
Telephone: (504) 585-0239
Email:  richard.aguilar@arlaw.com
           mark.chaney@arlaw.com

-and-

**BLANK ROME LLP**
Regina Stango Kelbon (*pro hac vice* forthcoming)
Lawrence R. Thomas III
1201 N. Market Street, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 425-6400
Email:  regina.kelbon@blankrome.com
           lorenzo.thomas@blankrome.com
-and-

Gregory F. Vizza (*pro hac vice* forthcoming)
One Logan Square
130 N. 18th Street
Philadelphia, PA 19103
Telephone: (215) 569-5702
Email:  gregory.vizza@blankrome.com

*Counsel to PNC Bank, National Association, as administrative agent, collateral agent, mortgagee, and as a lender.*

131832.01482/157474025v.3

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing pleading was this 25th day of March served via email through the

Court's electronic CM/ECF filing system on the parties participating in the Court's CM/ECF

system in this case as follows.

Richard A. Aguilar on behalf of Creditor PNC Bank, National Association
richard.aguilar@arlaw.com, annie.parish@arlaw.com

A. Brooke Watford Altazan on behalf of Creditor Michael Warner
baltazan@stewartrobbins.com,
baltazan@ecf.courtdrive.com;kheard@stewartrobbins.com;kheard@ecf.courtdrive.com

Edward H. Arnold, III on behalf of Creditor MC Bank & Trust Company
harnold@bakerdonelson.com, stannehill@bakerdonelson.com

Mark J. Chaney, III on behalf of Creditor PNC Bank, National Association
mark.chaney@arlaw.com, annie.parish@arlaw.com

Amanda Burnette George on behalf of U.S. Trustee Office of the U.S. Trustee
Amanda.B.George@usdoj.gov

Benjamin Kadden on behalf of Debtor Bertucci Contracting Company, L.L.C.
bkadden@lawla.com, mnguyen@lawla.com;ijohnson@lawla.com

Benjamin Kadden on behalf of Debtor Crosby Dredging, LLC
bkadden@lawla.com, mnguyen@lawla.com;ijohnson@lawla.com

Benjamin Kadden on behalf of Debtor Crosby Marine Transportation, LLC
bkadden@lawla.com, mnguyen@lawla.com;ijohnson@lawla.com

Benjamin Kadden on behalf of Debtor Crosby Tugs, L.L.C.
bkadden@lawla.com, mnguyen@lawla.com;ijohnson@lawla.com

Fernand L. Laudumiey, IV on behalf of Creditor J.J. Astor & Co.
laudumiey@chaffe.com, bankruptcy@chaffe.com;messina@chaffe.com

131832.01482/157474025v.3

David J. Messina on behalf of Creditor J.J. Astor & Co.
messina@chaffe.com, bankruptcy@chaffe.com;laudumiey@chaffe.com

Mark Mintz on behalf of Creditor JMB Capital Partners Lending, LLC
mmintz@joneswalker.com, mark-mintz-4822@ecf.pacerpro.com

Abigail Wood Mock on behalf of Creditor Michael Warner
amock@stewartrobbins.com

Michael D. Rubenstein on behalf of Debtor Crosby Marine Transportation, LLC
mdrubenstein@liskow.com, lschnabel@Liskow.com

Patrick M. Shelby on behalf of Creditor Citizens Asset Finance, a division of Citizens Bank, N.A.
rick.shelby@kellyhart.com, june.alcantara-davis@kellyhart.com

Office of the U.S. Trustee
USTPRegion05.NR.ECF@usdoj.gov

/s/ Richard A. Aguilar
Richard A. Aguilar

131832.01482/157474025v.3