**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In re:** | § | **CASE NO. 26-10678** |
| | § | **(JOINTLY ADMINISTERED)** |
| **CROSBY MARINE TRANSPORTATION,** | § | |
| **LLC,** | § | **CHAPTER 11** |
| | § | **COMPLEX CASE** |
| **Debtors.[1]** | § | |
| | § | **SECTION: A** |

**DEBTORS' APPLICATION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE EMPLOYMENT AND RETENTION OF RAYMOND JAMES & ASSOCIATES, INC. AS INVESTMENT BANKER FOR THE DEBTORS, EFFECTIVE AS OF THE PETITION DATE, (II) WAIVING CERTAIN REPORTING REQUIREMENTS, AND (III) <u>GRANTING RELATED RELIEF</u>**

> A HEARING WILL BE CONDUCTED ON THIS MATTER ON MAY 7, 2026, AT 9:30 A.M. AT THE UNITED STATES BANKRUPTCY COURT, 500 POYDRAS ST., COURTROOM B- 709, NEW ORLEANS, LOUISIANA 70130. PARTIES IN INTEREST MAY PARTICIPATE IN THE HEARING (I) IN PERSON; (II) BY TELEPHONE ONLY (DIAL IN: 504.517.1385, ACCESS CODE: 129611); OR (III) BY TELEPHONE USING THE DIAL-IN NUMBER AND VIDEO USING HTTPS://GOTOMEET.ME/JUDGEGRABILL (MEETING CODE: "JUDGEGRABILL"). IF YOU OBJECT TO THE RELIEF REQUESTED IN THIS PLEADING, YOU MUST RESPOND IN WRITING. UNLESS DIRECTED OTHERWISE BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT NO LATER THAN SEVEN (7) DAYS BEFORE THE HEARING DATE. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.

Crosby Marine Transportation, LLC ("<u>Transport</u>"), Crosby Tugs, LLC ("<u>Tugs</u>"), Crosby Dredging, LLC ("<u>Dredging</u>"), and Bertucci Contracting Co., L.L.C. ("<u>Bertucci</u>") as debtors and debtors-in-possession, (collectively, "<u>Debtors</u>"), hereby submit this application (this

---

[1] An Order directing joint administration of the Chapter 11 bankruptcy case of Crosby Marine Transportation, LLC [No. 26-10678], as lead case, with the Chapter 11 bankruptcy cases of (i) Crosby Tugs, L.L.C. [No. 26-10679], (ii) Crosby Dredging, LLC [No. 26-10680], and (iii) Bertucci Contracting Company, L.L.C. [No. 26-10681], was entered on March 24, 2026, [No. 26-10678, ECF Doc. 9; No. 26- 10679, ECF Doc. 4; No. 26-10680, ECF Doc. 4, No. 26-10681, ECF Doc. 4].

"Application") for an order, substantially in the form of the proposed order attached hereto as **Exhibit A** ("Proposed Order"), (a) authorizing the employment and retention of Raymond James & Associates, Inc. ("Raymond James") to provide investment banking services, effective as of the Petition Date (as defined herein) in accordance with the terms and conditions set forth in that certain restated engagement letter agreement, dated as of February 1, 2026 (the "Engagement Letter Agreement")[2], (b) approving the terms of Raymond James' employment and retention by the Debtors in these Chapter 11 Cases, including the fee and expense structure and the indemnification, contribution, reimbursement, and related provisions set forth in the Engagement Letter Agreement, (c) modifying certain time-keeping requirements in connection with such employment and retention, and (d) granting related relief. In support of the Application, the Debtors rely upon the terms of the Engagement Letter Agreement, attached as **Exhibit A1** to the Proposed Order, and the declaration of Geoffrey Richards, (the "Richards Declaration"), which is attached hereto as **Exhibit B** and incorporated by reference herein and respectfully state as follows:

### JURISDICTION

1.      The United States Bankruptcy Court for the Eastern District of Louisiana (the "Court") has jurisdiction over these Chapter 11 Cases, the Debtors, their estates, and this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and legal predicates for the relief requested herein are sections 105(a), 327, and 328(a) and 1107 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the

---

[2]      Capitalized terms used, but not otherwise defined herein, shall have the meaning given to them in the Engagement Letter Agreement.

"Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 2014-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Louisiana (the "Local Rules"), and the Procedures for Complex Chapter 11 Cases Filed in the United States Bankruptcy Court for the Eastern District of Louisiana (the "Complex Case Procedures").

## BACKGROUND

4.    On March 23, 2026, (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing chapter 11 bankruptcy cases (the "Bankruptcy Cases"). *See* 11 U.S.C. § 301.

5.    The Debtors continue to operate their businesses and manage their properties as debtors in possession, pursuant to sections 1107 and 1108 of title 11 of the Bankruptcy Code.

6.    On March 24, 2026, the Court entered an order [ECF Doc. 9] providing that the Bankruptcy Cases are to be consolidated for procedural purposes only and shall be jointly administered by the Court under, *In re Crosby Marine Transportation, LLC*, Case No. 26-10678.

7.    On March 24, 2026, the Court entered an order [ECF Doc. 6] that the Complex Case Procedures shall apply to this case. The Complex Case Procedures are posted on the Court's website, https://www.laeb.uscourts.gov/.

8.    Additional information regarding the circumstances leading to the commencement of the Bankruptcy Cases and information regarding the Debtors' business and capital structure is set forth in the *Non-Substantively Amended Declaration of Lawrence Perkins in Support of Debtors' Chapter 11 Petitions and First Day Relief* [ECF Doc. 45] (the "First Day Declaration").

3

**RELIEF REQUESTED**

9.      Pursuant to sections 105, 327 and 328 of the Bankruptcy Code, Bankruptcy Rule 2014 and Local Rule 2014-1, the Debtors hereby file Application for entry of the Proposed Order authorizing the employment and retention of Raymond James for the purpose of providing investment banking services as of the Petition Date, all in accordance with the terms and conditions set forth in the Engagement Letter Agreement.

**APPLICATION**

A. **Raymond James' Qualifications**

10.     Due to the size of the Debtors' business operations and the complexity of their financial arrangements, the Debtors have determined that they require the assistance of an investment banker with Raymond James's resources, capabilities, and experience to assist them in pursuing the transaction(s) that are crucial to the success of these Cases. Accordingly, the Debtors seek authority to employ Raymond James as their investment banker because, among other things, Raymond James has considerable expertise and experience and an excellent reputation in providing high quality financial advice and investment banking services to financially distressed companies and to creditors, purchasers, bondholders, and other constituencies in chapter 11 as well as in out-of-court proceedings.

11.     Raymond James is a subsidiary of Raymond James Financial, Inc. ("RJF"), a publicly traded (NYSE:RJF) full-service global investment banking firm offering investment banking, equity research, wealth management, institutional and private brokerage, and other service offerings to individual and institutional clients. RJF and its subsidiaries employ over 17,000 individuals in the United States alone, of which over 650 provide investment banking advisory services to firm clients. Since 2019, Raymond James has participated in over 1,555 capital

raises for its corporate clients and completed more than 965 M&A buy-side or sell-side advisory assignments.

12. Raymond James has a dedicated restructuring investment banking group of approximately 25 professionals with extensive experience advising companies, creditors' committees, and other constituents in complex situations involving underperforming or unsuitably capitalized businesses facing difficult financing conditions, liquidity crises, out-of-court restructurings, or bankruptcy proceedings. Investment bankers at Raymond James have advised on, or been involved with, numerous restructuring-related or distressed transactions, both out-of-court and in chapter 11 cases, including, without limitation, sale, restructuring, reorganization, financing, financial opinion, and special advisory transactions. Some representative engagements that investment bankers at Raymond James have led in prior chapter 11 cases and restructurings in this Court and elsewhere include: *American Eagle Energy Corporation*, Case No. 15-15073 (KHT) (Bankr. D. Colo.); *American IronHorse Motorcycles, Inc*. Case No. 08- 40926 (RFN) (Bankr. N.D. Tex.); *ATLS Acquisition, LLC*, Case No. 13-10262 (LSS) (Bankr. D. Del.); *BI-LO, LLC,* Case No. 09-02140 (HB) (Bankr. D.S.C.); *Bluestem Brands, Inc.,* Case No. 20-10566 (MFW) (Bankr. D. Del.); *Buccaneer Energy*, Case No. 14-60041 (CML) (Bankr. S.D. Tex.); *Calpine Corporation,* Case No. 05-60200 (CGM) (Bankr. S.D.N.Y.); *CB Holding Corp.*, Case No. 10-13683 (MFW) (Bankr. D. Del.); *CCNG Energy Partners, LP,* Case No. 15-70136 (TMD) (Bankr. W.D. Tex.); *Clarus Therapeutics Holdings, Inc.*, Case No. 22-10845 (MFW) (Bankr. D. Del.); *Color Spot Holdings, Inc.,* Case No. 18-11272 (LSS) (Bankr. D. Del.); *Dakota Plains Holdings, Inc.,* Case No. 16-43711 (MER) (Bankr. D. Minn.); *Diamond Glass Companies, Inc.,* Case No. 08-10601 (CSS) (Bankr. D. Del.); *Gateway Ethanol, L.L.C.*, Case No. 08-22579 (DLS) (Bankr. D. Kan.); *GIORDANO'S LLC*, Case No. 11-06146 (ERW) (Bankr. N.D. Ill.); *Gulf Fleet Holdings,*

*Inc.,* Case No. 10-50713 (JWK) (Bankr. W.D. La.); *Halt Medical, Inc.*, Case No. 17-10810 (LSS) (Bankr. D. Del.); *Hipcricket, Inc.,* Case No. 15-10104 (LSS) (Bankr. D. Del.); *HMX Acquisition Corp.*, Case No. 12-14300 (MEW) (Bankr. S.D.N.Y.); *Hooper Holmes, Inc.,* Case No. 18-23302 (RDD) (Bankr. S.D.N.Y.); *International Garden Products, Inc.*, Case No. 10- 13207 (KJC) (Bankr. D. Del.); *Just One More Restaurant Corp.*, Case No. 19-01947 (FMD) (Bankr. M.D. Fla.); *KeyLime Cove Waterpark, Inc.*, Case No. 09-14418 (KJC) (Bankr. D. Del.); *Landmark Holdings of Florida, LLC,* Case No. 2:25-bk-0039 (Bankr. M.D. Fla.); *Loehmann's, Inc.*, Case No. 99-01138 (JHW) (Bankr. D. Del.); *LVI Intermediate Holdings, Inc.*, Case No. 20-11413 (KBO) (Bankr. D. Del.); *Max & Erma's, Inc.*, Case No. 09-27807 (JAD) (Bankr. W.D. Pa.); *National Envelope Corporation*, Case No. 10-11891 (BLS) (Bankr. D. Del.); *Personal Communication Devices, LLC*, Case No. 13-74303 (AST) (Bankr. E.D.N.Y.); *Phoenix Payment Systems, Inc.*, Case No. 14-11848 (MFW) (Bankr. D. Del.); *PLx Pharma, Inc.*, Case No. 23-10456 (MFW) (Bankr. D. Del.); *Proteus Digital Health, Inc.*, Case No. 20-11580 (BLS) (Bankr. D. Del.); *Quanergy Systems, Inc.*, Case No. 22-11305 (CTG) (Bankr. D. Del.); *Renew Energy, LLC*, Case No. 09-10491 (RDM) (Bankr. W.D. Wis.); *Response Genetics, Inc.*, Case No. 15-11663 (LSS) (Bankr. D. Del.); *Robbins Bros. Corporation*, Case No. 09-10708 (PJW) (Bankr. D. Del.); *Santa Fe Gold Corporation*, Case No. 15-11761 (MFW) (Bankr. D. Del.); *SynCardia Systems, Inc.,* Case No. 16-11599 (MFW) (Bankr. D. Del.); *SP Newsprint Holding LLC,* Case No. 11-13649 (CSS) (Bankr. D. Del.); *and Teligent, Inc.,* Case No. 21-11332 (BLS) (Bankr. D. Del.).

13. Raymond James also has a dedicated transportation investment banking group (the "Transportation Group") that provides a full range of advisory and capital raising solutions to companies and investors in the transportation sector. Investment bankers in the Transportation Group at Raymond James have led more than 200 completed equity, debt, M&A, and restructuring

6

transactions covering various subsectors, including, without limitation, aviation, logistics, trucking, rail, marine, transportation leasing, and infrastructure. The Group has formed deep ties with senior executives and private equity firms in the marine sector while showing an understanding of the business challenges and opportunities that clients' companies face and is well-positioned to provide expert advisory services to the Debtors in these Cases.

14. The Debtors believe they require the services of a capable and experienced investment banking firm such as Raymond James and that Raymond James is crucial to the Debtors' success in these Cases. Raymond James has developed relevant experience and expertise regarding the Debtors that (a) make Raymond James a natural selection as the Debtors' investment banker and (b) will assist Raymond James in providing effective and efficient services in these Cases.

15. Should the Court approve the Debtors' retention of Raymond James as their investment banker, Raymond James will continue, without interruption, to perform the services for the Debtors described more fully in the Engagement Letter Agreement and summarized herein. On the other hand, if the Debtors were required to retain an investment banker other than Raymond James as part of these Cases, the Debtors, their estates, and all parties in interest would be unduly prejudiced by the time and expenses necessary to familiarize another professional with the intricacies of the Debtors and their business operations.

16. Accordingly, the Debtors submit that the retention of Raymond James on the terms and conditions set forth herein (a) is necessary, appropriate, and in the best interests of the Debtors' estates, creditors, and all other parties in interest and (b) should be granted in all respects.

**B.  Scope of Services**

17.  Prior to the Petition Date, the Debtors and Raymond James entered into the Engagement Letter Agreement, which governs their relationship. The terms and conditions of the Engagement Letter Agreement were negotiated at arm's-length and reflect the parties' mutual agreement as to the substantial efforts and resources that have been and will continue to be required under this engagement.[3]

18.  Subject to further order of the Court, and as more fully set forth in this Application and the Engagement Letter Agreement, Raymond James has performed and will continue to perform a broad range of necessary investment banking services to the Debtors, in each case as the Debtors shall request, and as Raymond James and the Debtors shall deem appropriate and feasible, in order to advise the Debtors in the course of these Cases, in consideration for the compensation contemplated therein. A summary of the services the Raymond James personnel expect to perform during the course of their retention in these Cases (collectively, the "Services")[4] is set forth below:

    i.    review and analyze the business, operations, properties and financial condition of, respectively, the Crosby Group and Luhr Crosby Enterprises, LLC ("Luhr Crosby");

    ii.    as and if applicable, evaluate each Debtor's debt capacity and advise such Debtor generally on the following in connection with any potential Financing Transaction for such Debtor: (A) appropriate investment structuring alternatives, (B) an appropriate capital structure, and (C) available financings that meet the foregoing parameters;

---

[3] The summaries contained in this Application are provided for convenience only.  The Engagement Letter Agreement controls in the event of any inconsistency between the summaries contained in this Application and the terms of the Engagement Letter Agreement.

[4] In the event additional services are needed from Raymond James, the parties will negotiate an addendum to the Engagement Letter Agreement and seek additional approval from this Court.

iii.   assist each Debtor in identifying Prospective Counterparties to a given Transaction that Raymond James, after consultation with such Debtor's management, believes meet certain industry, financial, and strategic criteria;

iv.   provide marketing and drafting input on Client Materials being prepared by each Debtor;

v.   within its area of expertise, advise on the business components of Transaction Documentation for each given Transaction;

vi.   with the prior written consent by each Debtor, contact Prospective Counterparties on such Debtor's behalf;

vii.   advise Crosby as to a potential Crosby Sale;

viii.   advise Bertucci as to potential Luhr-Crosby JV-Interest Transactions;

ix.   as and if applicable, advise each Debtor on tactics and strategies for negotiating with holders of securities, debt, and/or other interests and/or claims of such Debtor in connection with any potential Restructuring Transaction (collectively, "Client Stakeholders");

x.   advise each Debtor on the timing, nature and terms of any new Client securities, other considerations or other inducements to be offered to its Client Stakeholders in connection with any Restructuring Transaction;

xi.   assist and advise each Debtor generally on potential alternatives and strategies for any given Transaction;

xii.   participate in the meetings of each Debtor's Governing Authority as determined by such Debtor to be appropriate, and, upon request, provide periodic status reports and advice to such Governing Authority with respect to matters falling within the scope of Raymond James's engagement hereunder; and

xiii.   assist each Debtor in negotiating and structuring any given Transaction.

19.   Raymond James will not provide any legal, regulatory, accounting, appraisal, or tax advice, or develop any tax strategies, or provide any opinion, for the Debtors. If the Debtors request that Raymond James provide any services other than those services expressly set out in Section 1(a) of the Engagement Letter Agreement, the Debtors and Raymond James will enter into an additional agreement that will set forth the nature and scope of such services, appropriate compensation and other customary matters, as mutually agreed between the Debtors and Raymond

9

James. To the extent that the parties amend the Engagement Letter Agreement, any such amendments will be subject to the Court's approval upon proper application by the Debtors.

20. It is necessary for the Debtors to employ an investment banker to render the foregoing professional services. The resources, capabilities, and experience of Raymond James in advising the Debtors are important to the Debtors' chapter 11 efforts. A highly qualified investment banker, such as Raymond James, fulfills a critical need that complements the services offered by the Debtors' other restructuring professionals. Raymond James has stated its desire and willingness to render the necessary professional services as an investment banker for the Debtors, and the Debtors believe that the retention and employment of Raymond James to provide the services described above is warranted.

## C. **Compensation**

21. Investment bankers such as Raymond James are customarily compensated, at least in part, by a contingent fee incurred upon the occurrence of a specified type of transaction. As set forth more fully in the Richards Declaration and the Engagement Letter Agreement, the Debtors and Raymond James have agreed on the following terms of compensation and expense reimbursement (the "Fee Structure"):

(a) ***Monthly Advisory Fees and Database Expense Amount***: Commencing upon the Effective Date and on the first business day of every month thereafter through the end of the Term for such Debtor, the Debtors will pay Raymond James a non-refundable cash retainer of $100,000 (each a "Monthly Advisory Fee"). Fifty percent (50%) of the amount of the fourth and subsequent Monthly Advisory Fee payments received by Raymond James shall be credited (once, without duplication) against any *Transaction Fee* (as defined below) that is payable under the Engagement Letter Agreement. Additionally, the Debtors will pay Raymond James a flat expense charge of $1,000 on the Effective Date for Raymond James's access to electronic financial databases pertinent to the engagement.

(b) ***Transaction Fees***: Subject to the qualifications and limitations of Section 2(c) below, if, during the Term or the Tail Period, either: (i) any Transaction Closes, or (ii) any Transaction Agreement is executed and delivered and the Transaction referred to

10

therein subsequently Closes (regardless of when such Closing occurs), or (iii) in the case of a Restructuring Transaction, any amendment to or other changes in the instruments or terms pursuant to which any Existing Obligations were issued or entered into become effective, then the Debtors will, subject to any applicable order by the Bankruptcy Court, pay Raymond James a non-refundable cash transaction fee, as a cost of such Transaction (a "Transaction Fee"), as follows, depending on the type of Transaction. For clarity, each Debtor and Raymond James acknowledge and agree that, in consideration of Raymond James's agreement to provide the Services for Transaction Fees that are contingent upon Closings or, in the case of a Restructuring Transaction, contractual alterations in Existing Obligations, Raymond James will be paid in accordance with and subject to the terms and conditions of Section 2 of the Engagement Letter Agreement regardless of whether a Debtor or Raymond James actually procured the Counterparty or any Transaction Documentation. During the Term and thereafter, each Debtor will promptly inform Raymond James of (as applicable) the signing of any Transaction Agreement with respect to which a Transaction Fee could be payable upon a Closing and the scheduling of any Closing at which a Transaction Fee would be payable.

**Financing Fee(s)**: Subject to the parameters set forth in the introductory paragraph of Section 2(b) of the Engagement Letter Agreement, the Transaction Fee for a Financing Transaction for a given Debtor (each a "Financing Fee") will be as follows, in each case payable (i) upon any funding date, and (ii) in the case of a Financing Transaction that includes an uncommitted accordion or similar credit feature, upon the *earlier* of such Debtor's receipt of the Commitment for such credit facility *or* its funding, in all cases where the timing of each Financing Fee payment is '*of the essence*':

- Re-Financing Transactions: For any given Re-Financing Transaction for a given Debtor, the Financing Fee (a "Re-Financing Fee") shall be the *greater* of (A) $500,000 for the first such Re-Financing Transaction with an existing lender to such Debtor and $250,000 for any Re-Financing Transaction with each additional existing lender to such Debtor (each alternatively "Minimum Re-Financing Fee") *or* (B) the *sum* of (1) two percent (2.0%) of the Financing Proceeds of any Debt Instruments in such Re-Financing Transaction, and (2) five percent (5.0%) of the Financing Proceeds of any Debtor Equity in such Re-Financing Transaction (each a "Proceeds Percentage Re-Financing Fee"); *provided*, *however*, that, if there are multiple fundings and/or delivered Commitments for any given Re-Financing Transaction with an individual existing lender, the Minimum Financing Fee shall apply only to the first of such fundings and/or delivered Commitments with such existing lender, with the Re-Financing Fee for any subsequent fundings and/or delivered Commitments with such existing lender being calculated as the *difference* (but never less than zero) between (i) a Proceeds Percentage Re-Financing Fee calculated as if all fundings and/or delivered Commitments with such existing lender to such date were for a single funding and/or delivered Commitment *less* (ii) all Re-Financing Fees previously paid in connection with the re-financing of such existing lender to such Debtor (for clarity and the avoidance of doubt, each Re-Financing Transaction with an individual existing lender to such Debtor shall be considered a distinct and separate '*Re-Financing Transaction*' generating a

11

separate Re-Financing Transaction Fee in connection therewith as provided above); and

- New Capital Financing Transactions: For any given New Capital Financing Transaction for a given Debtor, the Financing Fee (a "New Capital Financing Fee") shall be the *greater* of (A) $500,000 (the "Minimum New Capital Financing Fee") *or* (B) the *sum* of (1) two percent (2.0%) of the Financing Proceeds of any Debt Instruments in such New Capital Financing Transaction, *plus* (2) five percent (5.0%) of the Financing Proceeds of any Debtor Equity in such New Capital Financing Transaction (each a "Proceeds Percentage New Capital Financing Fee"); *provided* that, if there are multiple funding dates and/or delivered Commitments for one or more New Capital Financing Transactions for such Debtor, the Minimum New Capital Financing Fee shall apply only to the first of such fundings and/or delivered Commitments, with the New Capital Financing Fee for any subsequent funding and/or delivered Commitment being calculated as the *difference* (but never less than zero) between (i) a Proceeds Percentage New Capital Financing Fee calculated as if all fundings and/or delivered Commitments to such date were for a single funding and/or delivered Commitment *less* (ii) all New Capital Financing Fees previously paid for such Debtor.

**Restructuring Fee**: Subject to the parameters set forth in the introductory paragraph of Section 2(b) of the Engagement Letter Agreement, the Transaction Fee for one or more Restructuring Transactions (a "Restructuring Fee") will be equal to $2,500,000 payable to Raymond James upon the *earlier* of (i) the Closing of such Restructuring Transaction or (ii) the date on which any amendment to or other changes in the instruments or terms pursuant to which any Existing Obligations were issued or entered into became effective (in each case, time being '*of the essence*').

**Crosby Sale Fee**: Subject to the parameters set forth in the introductory paragraph of Section 2(b) of the Engagement Letter Agreement, the Transaction Fee for a Crosby Sale (a "Crosby Sale Fee") will be the greater of (i) $3,000,000 or (ii) an amount based upon the *Transaction Enterprise Value* of Crosby reflected by the financial terms of such Crosby Sale (as defined in Addendum C thereto, aka "TEV"), pursuant to the following schedule (a "Crosby Sale Formula Transaction Fee"), in either case, payable upon the Closing of such Crosby Sale, time being '*of the essence*':

| Transaction Enterprise Value | Crosby Sale Formula Transaction Fee |
| --- | --- |
| equal to or less than $275 million | 1.5% of TEV the "Tier 1 Fee") |
| greater than $275 million and less than or equal to $325 million | sum of (a) Tier 1 Fee plus (b) 3.0% of the incremental TEV in excess of $275 million and less than or equal to $325 million (such sum, the "Tier 2 Fee") |
| greater than $325 million | sum of (a) Tier 2 Fee plus (b) 5.0% of the incremental TEV in excess of $325 million |

12

**Luhr-Crosby JV-Interest Transaction Fee**: Subject to the parameters set forth in the introductory paragraph of Section 2(b) of the Engagement Letter Agreement, the Transaction Fee for a Luhr-Crosby JV-Interest Transaction (an "LC JV Transaction Fee" and alternatively with a Crosby Sale Fee and a Crosby MT Fee, an "M&A Transaction Fee") will be an amount based upon the Transaction Enterprise Value of Luhr Crosby reflected by the financial terms of such Transaction, pursuant to the following schedule, payable upon the Closing thereof, time being '*of the essence*':

| Transaction Enterprise Value | LC JV Transaction Fee |
| --- | --- |
| equal to or less than $950 million | 1.0% of TEV the "Tier 1 Fee") |
| greater than $950 million and less than or equal to $1.1 billion | sum of (a) Tier 1 Fee plus (b) 3.0% of the incremental TEV in excess of $950 million and less than or equal to $1.1 billion (such sum, the "Tier 2 Fee") |
| greater than $1.1 billion | sum of (a) Tier 2 Fee plus (b) 3.75% of the incremental TEV in excess of $1.1 billion |

**Crosby Minority Transaction Fee**: Subject to the parameters set forth in the introductory paragraph of Section 2(b) of the Engagement Letter Agreement, the Transaction Fee for a Crosby Minority Transaction (a "Crosby MT Fee") will be the *greater* of (i) $2,500,000 *or* (ii) such amount as is customarily charged by bulge bracket U.S.-based investment banks in respect of transactions of similar size, scope and nature, as mutually agreed upon by the Parties, in either case, payable upon the Closing of such Crosby Minority Transaction, time being '*of the essence*'.

(c) ***Transaction Qualifying Under Multiple Definitions / Transaction Fees on Multiple Transactions***:

   (i) If a single Transaction thereunder qualifies as more than one type of Transaction under the Transaction definitions set forth therein, then only the largest, single Transaction Fee calculable in connection with such individual Transaction shall be payable in connection therewith.

   (ii) Subject to both the preceding clause and the limitations set forth in the *provisos* below in this clause (ii), if there are multiple, discrete, separate Transactions thereunder involving one or all Debtors (whether Closed simultaneously or at different times), a separate Transaction Fee shall be payable in connection with each such separate Transaction regardless of whether it meets the same definition of any other Transaction being Closed.

(d) ***Break-up Fee***: Additionally, if, during the Term or the Tail Period, a Debtor or its securityholders enters into any Definitive Agreement for an M&A Transaction that is later terminated, and such Debtor or its securityholders receives any *Net Break-Up Proceeds* (as defined below), such Debtor will pay Raymond James a non-refundable cash fee (a "Break-up Fee") equal to the lesser of (a) thirty-five percent (35.0%) of all such Net Break-Up Proceeds promptly upon receipt thereof by such Debtor or its securityholders or (b) the amount of the M&A Transaction Fee that would have been payable to Raymond James under the Engagement Letter Agreement had the

13

terminated M&A Transaction closed. If, within six (6) months following Raymond James's receipt of a Break-Up Fee, an M&A Transaction Closes with an M&A Transaction Fee payable to Raymond James, and, in connection with consummation of such M&A Transaction, such Debtor returns or credits all or a portion of the Break-Up Proceeds against the proceeds of such M&A Transaction, Raymond James shall credit a pro rata portion of the Break-Up Fee against (but no more than) such M&A Transaction Fee. "Net Break-Up Proceeds" means any "break-up", "termination", or similar fee or payment including, without limitation, any judgment for damages or amount in settlement of any dispute as a result of such termination, in all cases net of unrecouped out-of-pocket expenses incurred by such Debtor in the collection of such termination-related Net Break-Up Proceeds.

22. Further, subject to the Engagement Letter Agreement, and regardless of whether a Transaction is consummated, the Debtors will reimburse Raymond James, upon the earlier of (a) thirty (30) days from the Debtors' receipt of an invoice from Raymond James or (b) the Closing of any Transaction, for all expenses (including, without limitation, the fees and disbursements of its outside legal counsel other than those arising with respect to the preparation of the Engagement Letter Agreement) reasonably incurred by Raymond James in connection with performing the Services pursuant to the Engagement Letter Agreement ("Expenses"). The Debtors will also bear all of their own costs incurred in connection with any Transaction, including, without limitation, the Debtors' legal and accounting fees and disbursements, the costs of reproducing any Client Materials, fees or charges from outside counsel (including special counsel, if any, engaged for drafting nondisclosure agreements with Interested Parties, whether engaged directly by the Debtors or through arrangements via Raymond James), and any due diligence data room costs.

23. The Debtors believe that the Fee Structure set forth in the Engagement Letter Agreement is reasonable. The Fee Structure appropriately reflects the nature of the services to be provided by Raymond James and the fee structures typically utilized by leading financial advisory and investment banking firms of similar stature to Raymond James for comparable engagements, both in-and-out-of-court. The Fee Structure is consistent with Raymond James's normal and

customary practices for engagements of this size and complexity that require the level and scope of services outlined herein. Moreover, the Fee Structure is reasonable in light of (a) industry practice, (b) market rates charged for comparable services both in-and-out of the chapter 11 context, (c) Raymond James's substantial experience with respect to financial advisory and investment banking services, and (d) the nature and scope of work to be performed by Raymond James in these Chapter 11 Cases.

24.     The Debtors and Raymond James negotiated the Fee Structure to function as, and be treated as, an interrelated and integrated unit corresponding to the services rendered by Raymond James, which Raymond James renders not in discrete parts but as a whole. It would be contrary to the intention of Raymond James and the Debtors for any isolated component of the Fee Structure to be treated as sufficient consideration for any isolated portion of Raymond James's services.

25.     Instead, the Debtors and Raymond James intend that Raymond James's services be considered as a whole, for which Raymond James is to be compensated by the Fee Structure in its entirety.

26.     In light of the foregoing, and given the numerous issues that Raymond James may be required to address in the performance of its services under the Engagement Letter Agreement, Raymond James's commitment to a variable level of time and effort necessary to address such issues as they arise, and the market prices for Raymond James's services for engagements of this nature both in- and out-of-court, the Debtors believe that the Fee Structure is fair, reasonable, and market-based under the standards set forth in section 328(a) of the Bankruptcy Code.

27.     Raymond James has agreed to accept compensation for its services in these Chapter 11 Cases as such amounts may be allowed by the Court. Raymond James understands that

any interim or final compensation and reimbursement of expenses remain subject to approval by the Court as provided under section 328(a) of the Bankruptcy Code.

28. In accordance with section 504 of the Bankruptcy Code, Raymond James has informed the Debtors that there is no agreement or understanding between Raymond James and any other entity, other than the members and employees of Raymond James, for the sharing of compensation received or to be received for services rendered in connection with these Chapter 11 Cases.

29. According to Raymond James's books and records, during the 90-day period prior to the Petition Date, Raymond James received approximately $250,000.00 from the Debtors for professional services performed and expenses incurred. This consisted of $200,000.00 for services and $50,000.00 for expenses. All $200,000.00 was earned and applied. Of the $50,000.00, $22,994.17 was applied to actual expenses incurred, leaving a retainer of $27,005.83. As of the Petition Date, no amounts were due or outstanding under the Engagement Letter Agreement.

### D. **Disinterestedness**

30. To the best of the Debtors' knowledge, information, and belief, and except to the extent disclosed herein and in the Richards Declaration, Raymond James: (a) is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code; (b) does not hold or represent an interest materially adverse to the Debtors, their creditors, and shareholders for the matters for which Raymond James is to be employed; and (c) has no connection to the Debtors, their creditors, shareholders, or related parties herein except as disclosed in the Richards Declaration.

31. As of the Petition Date, Raymond James did not hold a prepetition claim against the Debtors for fees or expenses related to services rendered in connection with the engagement.

32.     The Debtors' knowledge, information, and belief regarding Raymond James's disinterestedness as set forth in this Application are based on, and made in reliance upon, the Richards Declaration. To the extent that any new relevant facts or relationships bearing on the matters described herein during the period of Raymond James's retention are discovered or arise, Raymond James will use reasonable efforts to promptly file a supplemental declaration, as required by Bankruptcy Rule 2014(a).

### E.  No Duplication of Services

33.     The Services that Raymond James will provide to the Debtors are necessary to enable the Debtors to maximize the value of their estates. The Debtors believe that these Services will not duplicate the services that other professionals will be providing to the Debtors in these Cases.  Raymond James will use reasonable efforts to coordinate with the Debtors' other retained professionals to avoid the duplication of services.

### F.  Record Keeping Requirements

34.     It is not the general practice of investment banking firms, including Raymond James, to keep detailed time records similar to those customarily kept by attorneys. Raymond James does not ordinarily maintain contemporaneous time records in one-tenth (0.1) hour increments or provide or conform to a schedule of hourly rates for its professionals. Moreover, the Fee and Expense Structure does not rely on the amount of time spent by Raymond James, but instead is results-driven and will be determined by the ultimate success of Raymond James's efforts to successfully consummate a Transaction. Therefore, Raymond James respectfully requests that it be excused from compliance with such requirements, as otherwise required by Local Rules. Instead, notwithstanding that Raymond James does not charge for its services on an hourly basis, Raymond James will maintain time records in one-half (0.5) hour increments, setting forth, in a

17

summary format, a description of the services rendered and the professional rendering such services on behalf of the Debtors.

35. Raymond James will also maintain detailed records of any actual and necessary costs and expenses incurred in connection with the aforementioned services. Raymond James's applications for compensation and expense reimbursement will be paid by the Debtors pursuant to the terms of the Engagement Letter Agreement, in accordance with Local Rules and any applicable procedures and orders of the Court.

### G. **Indemnification**

36. The Debtors have agreed, among other things, to indemnify and to provide contribution and reimbursement to Raymond James and certain related parties in accordance with the indemnification provisions attached as Addendum A to the Engagement Letter Agreement (the "Indemnification Provisions").[5]

37. The Debtors and Raymond James believe that the Indemnification Provisions contained in the Engagement Letter Agreement are standard and customary for financial advisory engagements. That said, pursuant to the Proposed Order, the Debtors seek to qualify and limit the Indemnification Provisions as provided for therein.

38. The Debtors believe such provisions are customary and reasonable for Raymond James's engagement. *See, e.g., In re Red Lobster Management LLC*, Case No. 24-02486 (GER) (Bankr. M.D. Fla. June 14, 2024) (approving similar indemnification provisions); *In re Just One More Restaurant Corp.*, Case No. 19-01947 (CED) (Bankr. M.D. Fla. Dec. 27, 2019); *In re MBMG Holding, LLC*, Case No. 24-20576 (CLC) (Bankr. S.D. Fla. Nov. 7, 2024) (same); *In re Lordstown*

---

[5] To the extent there is any inconsistency between the summary of the indemnification provisions set forth in this Application and the indemnifications set forth in the Indemnification Provisions annexed to the Engagement Letter, the terms of such Indemnification Provisions and the Engagement Letter Agreement shall control.

*Motors Corp.*, Case No. 23-10831 (MFW) (Bankr. D. Del. July 25, 2023) (same); *In re Bouchard Transportation Co., Inc.*, Case No. 20-34682 (DRJ) (Bankr. S.D. Tex. Jan. 14, 2021) (same*); In re Mission Coal Co.*, Case No. 18-04177-TOM11 (Bankr. N.D. Ala. Nov. 30, 2018) (same). Unlike the market for other professionals that the Debtors may retain, such provisions are standard terms of the market for investment bankers. Raymond James and the Debtors believe that such provisions are comparable to those generally obtained by investment banking and financial advisory firms of similar stature to Raymond James and for comparable engagements, both in-and-out-of-court.

39. Moreover, the Indemnification Provisions were fully negotiated between the Debtors and Raymond James at arm's length. Nevertheless, the Debtors and Raymond James agreed to modify and limit the Indemnification Provisions as stated in the Proposed Order. Such Indemnification Provisions, as modified by the Proposed Order, reflect the qualifications and limits on such terms that are customary for investment bankers, such as Raymond James, in chapter 11 cases in this jurisdiction.

40. Accordingly, as part of this Application, the Debtors request that the Court approve the Indemnification Provisions as modified by the Proposed Order.

**BASIS FOR RELIEF**

41. The Debtors are requesting authority to retain and employ Raymond James as their investment banker pursuant to section 327(a) of the Bankruptcy Code, which provides that a debtor, subject to court approval,

> [May] employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor] in carrying out the [debtor]'s duties under this title.

11 U.S.C. § 327(a).

42. Bankruptcy Rule 2014(a) requires that an application for retention include:

> [S]pecific facts showing the necessity for the employment, the name of the [firm] to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the [firm's] connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee.

Fed. R. Bankr. Proc. 2014.

43. Section 328(a) of the Bankruptcy Code provides, in relevant part, that the debtor "with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis . . . ." 11 U.S.C. § 328(a). Accordingly, section 328(a) of the Bankruptcy Code permits the compensation of investment bankers on more flexible terms that reflect the nature of their services and market conditions. *See Donaldson Lufkin & Jenrett Sec. Corp. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.),* 123 F.3d 861 (5th Cir. 1997) (opining that section 328(a) of the Bankruptcy Code enables debtors to retain high quality professionals who would otherwise be unwilling to work for a bankruptcy estate without court approval of a compensation structure familiar to the professional).

44. The Court's approval of the Debtors' employment of Raymond James in accordance with the terms and conditions set forth herein and under the Engagement Letter Agreement is warranted.

45. First, the requirements of section 327 of the Bankruptcy Code are satisfied. Retaining Raymond James will help the Debtors to discharge their duties as debtor and debtor in possession. Specifically, Raymond James will assist and advise the Debtors with respect to transactions, which will maximize the value of the estate for the benefit of creditors. Raymond James has extensive experience and an excellent reputation in providing high-quality investment

20

banking and financial advisory services, both in-and-out-of-court. Raymond James is well qualified to provide its services to the Debtors in a cost- effective, efficient, and timely manner.

46.     Second, the Debtors believe that the Fee Structure is market-based, fair, and reasonable under the standards set forth in section 328(a) of the Bankruptcy Code. The Fee Structure reflects Raymond James's commitment to the variable level of time and effort necessary to perform the services to be provided, its particular expertise, and the market prices for its services for engagements of this nature both out of court and in the chapter 11 context.

47.     Indeed, Raymond James's industry and restructuring experience, its capital markets knowledge, financing skills, and mergers and acquisitions capabilities, some or all of which may be required by the Debtors during the term of Raymond James's engagement, were important factors in determining the Fee Structure. The ultimate benefit to the Debtors of Raymond James's services could not be measured merely by reference to the number of hours to be expended by Raymond James's professionals in the performance of such services. Moreover, the Fee Structure takes into consideration Raymond James's anticipation that it will need to provide a substantial commitment of professional time and effort to perform its duties under the Engagement Letter Agreement and in light of the fact that such commitment may foreclose other opportunities for Raymond James.  Further, the commitment required of Raymond James and its professionals to render services to the Debtors may vary substantially from week to week or month to month, creating "peak load" issues for the firm.

48.     Thus, because of Raymond James's expertise, commitment of resources to this engagement to the exclusion of other possible employment, and the time that Raymond James has devoted and will continue to devote to this engagement, the Debtors request that the Court approve the Fee Structure pursuant to section 328(a) of the Bankruptcy Code, and that the Court evaluate

Raymond James's final compensation and reimbursement of expenses in these Chapter 11 Cases under the standards of section 328(a) of the Bankruptcy Code, rather than under those of section 330 of the Bankruptcy Code, subject to Raymond James filing a final fee application seeking approval of the payment of its fees and expenses.

49. Third, the Indemnification Provisions are reasonable under the circumstances and reflect market conditions and accordingly should be approved under section 328 of the Bankruptcy Code. Courts in this jurisdiction have routinely approved similar provisions to the Indemnification Provisions in other chapter 11 cases.

50. For the foregoing reasons, this Court should grant the relief requested in this Application.

**CONCLUSION**

**WHEREFORE**, Crosby Marine Transportation, LLC, Crosby Tugs, L.L.C.; Crosby Dredging, LLC; and Bertucci Contracting Co., L.L.C. request that this Court enter the Proposed Order substantially approving this Application and the relief requested herein, and granting such other general and equitable relief to which they may be entitled to.

Dated: April 10, 2026

Respectfully submitted:

/s/Benjamin W. Kadden
Benjamin W. Kadden, La. Bar No. 29927
bkadden@lawla.com
Stewart F. Peck, La. Bar No. 10403
speck@lawla.com
Douglas S. Draper, La. Bar No. 5073
ddraper@lawla.com

Greta M. Brouphy, La. Bar No. 26216
gbrouphy@lawla.com
Coleman L. Torrans, La Bar No. 38917
ctorrans@lawla.com
**Lugenbuhl, Wheaton, Peck, Rankin & Hubbard (A Law Corporation)**
601 Poydras Street, Suite 2755
New Orleans, LA  70130
Telephone: (504) 568-1990
Fax: (504) 310-9195

***Proposed Counsel for Debtors and Debtors in Possession***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this Motion for Expedited Hearing is being served (a) on April 10, 2026 by electronic case filing for those parties receiving notice via the Court's Electronic Case Filing system; (b) by email or First Class U.S. Mail, postage prepaid, on all other parties requiring service under the Court's Order [ECF Doc. 15] granting the Debtors' Emergency Motion to Limit Notice [ECF Doc. 4], to be sent by Stretto, Inc. ("**Stretto**"); and (c) to those parties listed on Exhibit B to the Motion to be sent by Stretto. Stretto shall file a certificate of service to that effect once service is complete.

*/s/Benjamin W. Kadden*
Benjamin W. Kadden

*[Remainder of this Page Left Intentionally Blank]*

23

**Exhibit A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In re:** | § | **CASE NO. 26-10678** |
| | § | **(JOINTLY ADMINISTERED)** |
| **CROSBY MARINE TRANSPORTATION,** | § | |
| **LLC,** | § | **CHAPTER 11** |
| | § | **COMPLEX CASE** |
| **Debtors.**[1] | § | |
| | § | **SECTION: A** |

**ORDER (I) AUTHORIZING THE EMPLOYMENT AND RETENTION OF RAYMOND JAMES & ASSOCIATES, INC. AS INVESTMENT BANKER FOR THE DEBTORS, EFFECTIVE AS OF THE PETITION DATE, (II) WAIVING CERTAIN REPORTING REQUIREMENTS, AND (III) GRANTING RELATED RELIEF**

Upon the application (the "Application") of Crosby Marine Transportation, LLC, Crosby Tugs, LLC, Crosby Dredging, LLC, and Bertucci Contracting Co., L.L.C., as debtors and debtors-in-possession (collectively, the "Debtors"), for entry of an order (this "Order") (a) authorizing the employment and retention of Raymond James & Associates, Inc. ("Raymond James") to provide investment banking services, effective as of the Petition Date (as defined herein) in accordance with the terms and conditions set forth in the Engagement Letter Agreement[2], attached hereto as Exhibit A1, (b) approving the terms of Raymond James' employment and retention by the Debtors in these Chapter 11 Cases, including the fee and expense structure and the indemnification, contribution, reimbursement, and related provisions set forth in the Engagement Letter Agreement, (c) modifying certain time-keeping requirements in connection with such employment and retention, and (d) granting related relief; and upon consideration of the Richards Declaration and

---

[1] An Order directing joint administration of the Chapter 11 bankruptcy case of Crosby Marine Transportation, LLC [No. 26-10678], as lead case, with the Chapter 11 bankruptcy cases of (i) Crosby Tugs, L.L.C. [No. 26-10679], (ii) Crosby Dredging, LLC [No. 26-10680], and (iii) Bertucci Contracting Company, L.L.C. [No. 26-10681], was entered on March 24, 2026, [No. 26-10678, ECF Doc. 9; No. 26- 10679, ECF Doc. 4; No. 26-10680, ECF Doc. 4, No. 26-10681, ECF Doc. 4].

[2] Capitalized terms used, but not otherwise defined herein, shall have the meaning given to them in the Engagement Letter Agreement.

1

the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having determined that it may enter a final order consistent with Article III of the United States Constitution; and this Court finding that the terms and conditions of Raymond James's employment, including but not limited to the Fee Structure and Indemnification Provisions set forth in the Engagement Letter Agreement and summarized in the Application, are reasonable under section 328(a) of the Bankruptcy Code; and this Court finding that Raymond James does not hold or represent interests materially adverse to the Debtors or their estates and is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code; and it appearing that the retention of Raymond James is in the best interests of the Debtors, their estates, and their creditors; and this Court having reviewed the Application and having heard any statements in support of the relief requested therein at any hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Application and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT**:

1.      The Application is GRANTED in all respects as set forth herein.

2.      The Debtors are authorized, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, effective as of the Petition Date, to employ and retain Raymond James as their investment banker in accordance with the terms and conditions set forth in the Application and the Engagement Letter Agreement, subject to the terms of this Order.

2

3. The terms of the Engagement Letter Agreement, attached to the Application as Exhibit A1, are approved in all respects except as limited or modified herein.

4. All of Raymond James's compensation set forth in the Engagement Letter Agreement, including, without limitation, the Fee and Expense Structure, is approved pursuant to section 328(a) of the Bankruptcy Code and Raymond James shall be compensated and reimbursed pursuant to section 328(a) of the Bankruptcy Code in accordance with the terms of the Engagement Letter Agreement, subject to the procedures set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable orders of this Court.

5. Raymond James shall file applications for allowance of compensation and reimbursement of expenses pursuant to and in accordance with the procedures set forth in sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable orders of this Court; provided, however, that the fees and expenses payable to Raymond James pursuant to the Engagement Letter Agreement shall be subject to review pursuant to the standards set forth in section 328(a) of the Bankruptcy Code and shall not be subject to the standard of review set forth in section 330 of the Bankruptcy Code; provided, further, that the Debtors are authorized to pay the monthly Advisory Fees to Raymond James each month when required under the Engagement Letter Agreement without a prior fee application.

6. The Debtors shall cause to be paid as a cost of a Transaction, and not solely out of proceeds thereof, and placed in escrow for the sole benefit of Raymond James at the time of consummation of any Transaction(s), the amount(s) of the Transaction Fee(s) and Raymond James's expenses pending the filing of and the Court's approval of any Raymond James fee application (other than as to monthly Advisory Fees, which shall be paid prior to Court approval), and upon approval of any such Raymond James fee application by the Bankruptcy Court, Raymond

James shall be paid and/or may apply the amount(s) from the funds held in the escrow as and when awarded by the Court.

7. Notwithstanding any provision to the contrary in this Order, the U.S. Trustee shall have the right to object to Raymond James's request for compensation and reimbursement based on the reasonableness standard provided in section 330 of the Bankruptcy Code, not section 328(a) of the Bankruptcy Code; provided, however, that "reasonableness" shall be evaluated by comparing (among other things) the fees payable in these Chapter 11 Cases to fees paid to comparable investment banking firms with similar experience and reputation offering comparable services in other chapter 11 cases and shall not be evaluated primarily on an hourly or length-of-case based criteria. Raymond James shall include in its fee applications, among other things, time records setting forth, in a summary format, a description of the services rendered by each professional, and the amount of time spent on each date by each such individual in rendering services on behalf of the Debtors in half-hour increments, but Raymond James shall not be required to provide or conform to any schedule of hourly rates.

8. The Indemnification Provisions set forth in the Engagement Letter Agreement are approved, subject during the pendency of these Chapter 11 Cases to the following:

(a) Subject to the provisions of subparagraphs (b) and (c) below, the Debtors are authorized to indemnify, contribute, or reimburse, and shall indemnify, contribute, or reimburse Raymond James for any claims arising from, related to, or in connection with services to be provided by Raymond James as specified in the Application, but not for any claim arising from, related to, or in connection with Raymond James's postpetition performance of any other services other than those in connection with the engagement, unless such postpetition services and the indemnification, contribution, or reimbursement therefor are approved by this Court;

(b) The Debtors shall have no obligation to indemnify Raymond James, or provide contribution or reimbursement to Raymond James, for any claim or expense that is either: (i) judicially determined (the determination having become final and non-appealable) to have arisen from Raymond James's gross negligence, willful misconduct, breach of fiduciary duty, if any, bad faith, or self-dealing; (ii) for a

4

contractual dispute in which the Debtors allege the breach of Raymond James's contractual obligations, unless this Court determines that indemnification, contribution, or reimbursement would be permissible pursuant to *In re United Artists Theatre Co.*, 315 F.3d 217 (3d Cir. 2003); or (iii) settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) above, but determined by this Court, after notice and a hearing pursuant to subparagraph (c) below, to be a claim or expense for which Raymond James should not receive indemnity, contribution, or reimbursement under the terms of the Engagement Letter Agreement as modified by this Order; and

(c) If, before the earlier of (i) the entry of an order confirming a chapter 11 plan in the cases (that order having become a final order no longer subject to appeal) and (ii) the entry of an order closing these Chapter 11 Cases, Raymond James believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution, or reimbursement obligations under the Engagement Letter Agreement (as modified by this Order), including, without limitation, the advancement of defense costs, Raymond James must file an application in this Court, and the Debtors may not pay any such amounts to Raymond James before the entry of an order by this Court approving the payment. This subparagraph (c) is intended only to specify the period of time under which this Court shall have jurisdiction over any request for fees and expenses by Raymond James for indemnification, contribution, or reimbursement, and not a provision limiting the duration of the Debtors' obligation to indemnify Raymond James. All parties in interest shall retain the right to object to any demand by Raymond James for indemnification, contribution, or reimbursement, and not as a provision limiting the duration of the Debtors' obligation to indemnify Raymond James.

9. In the event that during the pendency of these Chapter 11 Cases, Raymond James requests reimbursement for any attorneys' fees or expenses, the invoices and supporting time records from such attorneys shall be included in Raymond James's fee applications, and such invoices and time records shall be paid in compliance with the applicable Bankruptcy Rules, Local Rules, and standards of sections 330 and 331 of the Bankruptcy Code, without regard to whether such attorney has been retained under section 327 of the Bankruptcy Code and without regard to whether such attorney's services satisfy section 330(a)(3)(C) of the Bankruptcy Code. Notwithstanding the foregoing, Raymond James shall be reimbursed for legal fees incurred in connection with these Chapter 11 Cases only to the extent permitted under applicable law and the decisions of this Court.

10. Notwithstanding any provision in the Bankruptcy Rules to the contrary, this Order shall be immediately effective and enforceable upon its entry.

11. In the event of any inconsistency between the Engagement Letter Agreement, the Application, and this Order, this Order shall govern.

12. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order, and during the pendency of these Chapter 11 Cases, shall retain exclusive jurisdiction with respect to any proceedings arising from or related to the Engagement Letter Agreement.

Dated: April 10, 2026                              _/s/_____

## <u>Exhibit A1</u>

**Engagement Letter Agreement**

**RAYMOND JAMES**®

**CONFIDENTIAL**

February 2, 2026

Crosby Enterprises, L.L.C.
17751 Hwy 3235
Galliano, LA 70354
Attention: Kurt J. Crosby, Chief Executive Officer

Bertucci Contracting Company, L.L.C.
7 River Road
Jefferson, LA 70121
Attention: Nolan A. Simoneaux, Jr., Manager

Reference is made to: (1) that certain letter agreement dated September 30, 2024 between *Raymond James & Associates, Inc.* ("**Raymond James**") and *Crosby Enterprises, L.L.C.* ("**Crosby**"), pursuant to which Raymond James agreed to provide certain investment banking services in connection with a possible *'Transaction'*, as defined in such letter agreement; and (2) that certain letter agreement dated December 5, 2025 between Raymond James and *Bertucci Contracting Company, L.L.C.* (inclusive of Bertucci Contracting Co., Inc., "**Bertucci**" and alternatively with Crosby, each a "**Client**"), pursuant to which Raymond James agreed to provide certain investment banking services in connection with a possible *'Transaction'*, as defined in such letter agreement.

In consideration of the mutual promises and covenants between Raymond James and the Clients and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, this letter (this "**Restated Engagement Letter**"), dated and effective as of February 2, 2026 (the "**Effective Date**") hereby restates and amends the two aforementioned letter agreements in their entirety, as follows.

Each Client hereby agrees that all references below to such Client (including by its name, i.e., respectively, '*Crosby*' or '*Bertucci*') shall include the Crosby Related Parties set forth on Exhibit I hereto, Client SPEs (if any), and any Affiliates or Subsidiaries of each Client. Each Client further hereby agrees and acknowledges that (i) it shall be jointly and several liable for all liabilities and obligations of both Clients hereunder, and (ii) any obligations hereunder referenced as an obligation of "*the Clients*" may be fulfilled by either Client or both Clients, at their discretion, and any failure by one Client to fulfill any such obligation shall not relieve the other Client of its liability hereunder to fulfill such obligation.

Capitalized terms used but not defined elsewhere herein shall have the meanings assigned to them in Addendum B hereto.

1.     **Investment Banking Advisory Services** –

    (a)     ***Clients' Engagement of Raymond James; Services***: The Clients, from and after their respective *Engagement Commencement Dates* (as defined in Section 4 below) have engaged, and throughout the *Term* (as defined in Section 4 below) shall continue to engage, Raymond James as their sole and exclusive financial advisor regarding certain potential Transactions (as more fully defined in Addendum B hereto), in connection with which Raymond James has provided and shall continue to provide the following services, in each case to the extent reasonably requested by such Client (collectively, the "**Services**"):

        (i)     review and analyze the business, operations, properties and financial condition of, respectively, the Crosby Group and Luhr Crosby Enterprises, LLC ("**Luhr Crosby**");

        (ii)    as and if applicable, evaluate each Client's debt capacity and advise such Client generally on the following in connection with any potential Financing Transaction for such Client: (A) appropriate investment structuring alternatives, (B) an appropriate capital structure, and (C) available financings that meet the foregoing parameters;

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
February 2, 2026
Page 2

    (iii)   assist each Client in identifying Prospective Counterparties to a given Transaction that Raymond James, after consultation with such Client's management, believes meet certain industry, financial, and strategic criteria;

    (iv)   provide marketing and drafting input on Client Materials being prepared by each Client;

    (v)   within its area of expertise, advise on the business components of Transaction Documentation for each given Transaction;

    (vi)   with the prior written consent by each Client, contact Prospective Counterparties on such Client's behalf;

    (vii)   advise Crosby as to a potential Crosby Sale;

    (viii)   advise Bertucci as to potential Luhr-Crosby JV-Interest Transactions;

    (ix)   as and if applicable, advise each Client on tactics and strategies for negotiating with holders of securities, debt, and/or other interests and/or claims of such Client in connection with any potential Restructuring Transaction (collectively, "**Client Stakeholders**");

    (x)   advise each Client on the timing, nature and terms of any new Client securities, other considerations or other inducements to be offered to its Client Stakeholders in connection with any Restructuring Transaction;

    (xi)   assist and advise each Client generally on potential alternatives and strategies for any given Transaction;

    (xii)   participate in the meetings of each Client's Governing Authority as determined by such Client to be appropriate, and, upon request, provide periodic status reports and advice to such Governing Authority with respect to matters falling within the scope of Raymond James's engagement hereunder; *and*

    (xiii)   assist each Client in negotiating and structuring any given Transaction.

Each Client acknowledges and agrees that Raymond James may provide certain of its Services through affiliates of Raymond James. If a Client requests assistance in obtaining nondisclosure agreements from Prospective Counterparties, Raymond James will, as requested by such Client, coordinate such process, with such Client and its counsel being solely responsible for negotiating such nondisclosure agreements. Raymond James will not provide any legal, accounting, regulatory, appraisal or tax advice, nor will Raymond James render any formal opinion as to any Transaction. If a Client requests that Raymond James provide any services other than those expressly set out in this Section 1(a), the Parties will enter into a separate written agreement that will set forth the nature and scope of such services, appropriate compensation and other customary matters, as mutually agreed in writing between the Parties.

    (b)   ***Clients' Cooperation***: Each Client will, as Raymond James may request, provide the necessary assistance, participation, and information reasonably required at all steps and will cause its management to be reasonably available and furnish, and cause its management to furnish, Raymond James such information, data and cooperation relating to such Client and any potential or actual Transaction, as Raymond James may request, including, but not limited to, providing assistance, participation and cooperation in disseminating its Client Materials and participation in conference calls, meetings and other communications with Prospective Counterparties and their advisors and representatives. Further, each Client will be available, upon request, to answer reasonable inquiries from Prospective Counterparties.

**RAYMOND JAMES**®

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
February 2, 2026
Page 3

(c) **_Raymond James Exclusivity_**: The Parties acknowledge and agree that, during the Term, neither Client will directly negotiate or consummate any Transaction without Raymond James's knowledge or involvement.

(d) **_Clients' Sharing of All Third Party Inquiries_**: During the Term, each Client shall (i) promptly refer and disclose to Raymond James the identities of, contact information for, and all material communications regarding a potential Transaction with, any Prospective Counterparty not initially sourced by Raymond James, and (ii) provide Raymond James with the reasonably necessary assistance, participation, and information requested in connection with the Services.

(e) **_No Assurance of Transaction Consummation; No Obligation to Effect Transaction_**: Each Client expressly acknowledges that Raymond James does not guarantee, warrant or otherwise provide assurance that such Client will be able to consummate any Transaction or achieve any other result. This Restated Engagement Letter does not obligate either Client or Raymond James to enter into any Transaction Documentation or otherwise proceed with any Transaction.

(f) **_Limited Scope of Raymond James Client Beneficiary/Benefits_**: Without limiting the generality of any portion of this Section 1, each Client acknowledges and agrees that: (i) Raymond James is acting exclusively as the financial advisor to such Client and will take instructions only from such Client in connection with a Transaction involving such Client; (ii) Raymond James will not handle, custody or transmit any Client securities, Financing Proceeds, or Transaction Documentation between such Client and any Counterparty; (iii) Raymond James will not be acting on behalf of or taking directions from any Counterparty with respect to any Transaction; and (iv) such Client will use commercially reasonable efforts to cause the Definitive Agreement for a Transaction to include representations and warranties from the Counterparty(ies) thereto that Raymond James is working solely for and at the direction of such Client, with Raymond James being a third-party beneficiary of such representations and warranties.

(g) **_Client Materials_**: Each Client is solely responsible for the content and accuracy of its Client Materials that it authorizes for sharing with any third parties. Each Client will amend and supplement its Client Materials as required in order to include information concerning Raymond James and/or its activities hereunder with respect to a potential Transaction that is provided by Raymond James to such Client in writing expressly for inclusion in its Client Materials.

(h) **_Certain Financing Transaction Parameters_**:

 (i) Setting of Terms of Financing Transaction: The terms and conditions of any Financing Transaction will be determined by the applicable Client in consultation with Raymond James before such Financing Transaction is presented to Prospective Counterparties, subject to prevailing market conditions and the outcome of Raymond James's due diligence of such Client. The terms and conditions governing any Financing Transaction, including usual and customary indemnification provisions and closing conditions, will be set forth in the Definitive Agreement governing such Financing Transaction.

 (ii) No Raymond James Capital Commitment: The execution of this Restated Engagement Letter does not constitute a commitment or obligation by Raymond James to purchase any securities of or interests in any Client or to extend or arrange any financing to any Client.

`

**RAYMOND JAMES**®

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
February 2, 2026
Page 4

(i) ***Potential Bankruptcy Matters***: In the event a Client becomes a debtor in a case under the Bankruptcy Code, such Client will file an application to retain Raymond James and use best efforts to have it heard at the "first day" or "second day" hearing. Such application will seek authorization from the bankruptcy court (the "**Bankruptcy Court**") having jurisdiction over any Chapter 11 case commenced by such Client (the "**Client Ch. 11 Case**") to retain Raymond James pursuant to (and subject to the standard of review of) Section 328(a) of the Bankruptcy Code, effective as of the date on which such Client files its bankruptcy case, in accordance with the terms hereof and Addendum A hereto and not subject to any other standard or review under Section 330 of the Bankruptcy Code. Such Client will supply Raymond James with a draft of such application and any proposed order authorizing Raymond James's retention sufficiently in advance of their filing to enable Raymond James and its counsel to review and comment thereon. Services to such Client under this Restated Engagement Letter will be subject to the entry of a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition (the "**Retention Order**") approving the retention of Raymond James and this Restated Engagement Letter under Section 328(a) of the Bankruptcy Code, and Raymond James will not be required to perform any services in such Client Ch. 11 Case pursuant to this Restated Engagement Letter until the entry of such Retention Order. In any event, such Retention Order must be acceptable to Raymond James in all respects. In addition, such Client must include, and must use reasonable efforts to obtain Bankruptcy Court approval of, a carveout from liens (including replacement liens) or administrative expense claims (superpriority or otherwise) in all financing or cash collateral orders to pay any Transaction Fee(s) or expenses of Raymond James prior to and ahead of any pre- or post-bankruptcy indebtedness in any circumstance. If such Retention Order or carveout is not obtained (or is later terminated or set aside for any reason), Raymond James may terminate this Restated Engagement Letter as it relates to such Client, and such Client will reimburse Raymond James for all professional fees and out of pocket expenses reasonably incurred prior to such date of termination, unless prohibited from doing so by applicable law and/or the Bankruptcy Court. If both Clients are part of the same Client Ch. 11 Case as part of the collective '*debtor*' thereof, the foregoing procedures shall be consolidated as if they related to a single client.

(j) ***Anti-Money Laundering (AML) and Customer Due Diligence (CDD) Compliance***: U.S. federal laws and regulations require Raymond James to collect certain identification elements and perform related screening (the "**AML/CDD Search Process**") before accepting an investment banking engagement. Accordingly, upon each Client's Engagement Commencement Date, such Client delivered to Raymond James a completed and signed form (the "**AML/CDD Form**"), together with all applicable supporting documentation requested in the Form. Each Client is responsible for promptly informing Raymond James of changes (if any) in the information provided to Raymond James in its AML/CDD Form.

2. **Fees** – In consideration of Raymond James's agreement to provide the Services, the Clients will pay Raymond James as set forth in this Section 2:

(a) ***Monthly Advisory Fees and Database Expense Amount***: Commencing upon the Effective Date and on the first business day of every month thereafter through the end of the Term for such Client, the Clients will pay Raymond James a non-refundable cash retainer of $100,000 (each a "**Monthly Advisory Fee**"). Fifty percent (50%) of the amount of the fourth and subsequent Monthly Advisory Fee payments received by Raymond James shall be credited (once, without duplication) against any *Transaction Fee* (as defined below) that is payable under this Restated Engagement Letter. Additionally, the Clients will pay Raymond James a flat expense charge of $1,000 on the Effective Date for Raymond James's access to electronic financial databases pertinent to this engagement.

**RAYMOND JAMES**®

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
February 2, 2026
Page 5

(b)   *Transaction Fees*: Subject to the qualifications and limitations of Section 2(c) below, if, during the Term or the Tail Period, either: (i) any Transaction Closes, or (ii) any Transaction Agreement is executed and delivered and the Transaction referred to therein subsequently Closes (regardless of when such Closing occurs), or (iii) in the case of a Restructuring Transaction, any amendment to or other changes in the instruments or terms pursuant to which any Existing Obligations were issued or entered into become effective, then the Clients will, subject to any applicable order by the Bankruptcy Court, pay Raymond James a non-refundable cash transaction fee, as a cost of such Transaction (a "**Transaction Fee**"), as follows, depending on the type of Transaction. For clarity, each Client and Raymond James acknowledge and agree that, in consideration of Raymond James's agreement to provide the Services for Transaction Fees that are contingent upon Closings or, in the case of a Restructuring Transaction, contractual alterations in Existing Obligations, Raymond James will be paid in accordance with and subject to the terms and conditions of this Section 2 regardless of whether a Client or Raymond James actually procured the Counterparty or any Transaction Documentation. During the Term and thereafter, each Client will promptly inform Raymond James of (as applicable) the signing of any Transaction Agreement with respect to which a Transaction Fee could be payable upon a Closing and the scheduling of any Closing at which a Transaction Fee would be payable.

**Financing Fee(s)**: Subject to the parameters set forth in the introductory paragraph of this Section 2(b) above, the Transaction Fee for a Financing Transaction for a given Client (each a "**Financing Fee**") will be as follows, in each case payable (i) upon any funding date, and (ii) in the case of a Financing Transaction that includes an uncommitted accordion or similar credit feature, upon the *earlier* of such Client's receipt of the Commitment for such credit facility or its funding, in all cases where the timing of each Financing Fee payment is '*of the essence*':

- Re-Financing Transactions: For any given Re-Financing Transaction for a given Client, the Financing Fee (a "**Re-Financing Fee**") shall be the *greater* of (A) $500,000 for the first such Re-Financing Transaction with an existing lender to such Client and $250,000 for any Re-Financing Transaction with each additional existing lender to such Client (each alternatively "**Minimum Re-Financing Fee**") or (B) the *sum* of (1) two percent (2.0%) of the Financing Proceeds of any Debt Instruments in such Re-Financing Transaction, and (2) five percent (5.0%) of the Financing Proceeds of any Client Equity in such Re-Financing Transaction (each a "**Proceeds Percentage Re-Financing Fee**"); provided, however, that, if there are multiple fundings and/or delivered Commitments for any given Re-Financing Transaction with an individual existing lender, the Minimum Financing Fee shall apply only to the first of such fundings and/or delivered Commitments with such existing lender, with the Re-Financing Fee for any subsequent fundings and/or delivered Commitments with such existing lender being calculated as the *difference* (but never less than zero) between (i) a Proceeds Percentage Re-Financing Fee calculated as if all fundings and/or delivered Commitments with such existing lender to such date were for a single funding and/or delivered Commitment less (ii) all Re-Financing Fees previously paid in connection with the re-financing of such existing lender to such Client (for clarity and the avoidance of doubt, each Re-Financing Transaction with an individual existing lender to such Client shall be considered a distinct and separate '*Re-Financing Transaction*' generating a separate Re-Financing Transaction Fee in connection therewith as provided above); and

- New Capital Financing Transactions: For any given New Capital Financing Transaction for a given Client, the Financing Fee (a "**New Capital Financing Fee**") shall be the *greater* of (A) $500,000 (the "**Minimum New Capital Financing Fee**") or (B) the *sum* of (1) two percent (2.0%) of the Financing Proceeds of any Debt Instruments in such New Capital Financing Transaction, *plus* (2) five percent (5.0%) of the Financing Proceeds of any Client Equity in such New Capital Financing Transaction (each a "**Proceeds Percentage New Capital Financing Fee**"); *provided* that, if there are multiple funding dates and/or delivered Commitments for one

`

**RAYMOND JAMES**®

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
February 2, 2026
Page 6

or more New Capital Financing Transactions for such Client, the Minimum New Capital Financing Fee shall apply only to the first of such fundings and/or delivered Commitments, with the New Capital Financing Fee for any subsequent funding and/or delivered Commitment being calculated as the *difference* (but never less than zero) between (i) a Proceeds Percentage New Capital Financing Fee calculated as if all fundings and/or delivered Commitments to such date were for a single funding and/or delivered Commitment *less* (ii) all New Capital Financing Fees previously paid for such Client.

**Restructuring Fee**: Subject to the parameters set forth in the introductory paragraph of this Section 2(b) above, the Transaction Fee for one or more Restructuring Transactions (a "**Restructuring Fee**") will be equal to $2,500,000 payable to Raymond James upon the *earlier* of (i) the Closing of such Restructuring Transaction or (ii) the date on which any amendment to or other changes in the instruments or terms pursuant to which any Existing Obligations were issued or entered into became effective (in each case, time being '*of the essence*').

**Crosby Sale Fee**: Subject to the parameters set forth in the introductory paragraph of this Section 2(b) above, the Transaction Fee for a Crosby Sale (a "**Crosby Sale Fee**") will be the greater of (i) $3,000,000 or (ii) an amount based upon the *Transaction Enterprise Value* of Crosby reflected by the financial terms of such Crosby Sale (as defined in Addendum C hereto, aka "**TEV**"), pursuant to the following schedule (a "**Crosby Sale Formula Transaction Fee**"), in either case, payable upon the Closing of such Crosby Sale, time being '*of the essence*':

| Transaction Enterprise Value | Crosby Sale Formula Transaction Fee |
| --- | --- |
| equal to or less than $275 million | 1.5% of TEV the "**Tier 1 Fee**") |
| greater than $275 million and less than or equal to $325 million | sum of (a) Tier 1 Fee plus (b) 3.0% of the incremental TEV in excess of $275 million and less than or equal to $325 million (such sum, the "**Tier 2 Fee**") |
| greater than $325 million | sum of (a) Tier 2 Fee plus (b) 5.0% of the incremental TEV in excess of $325 million |

**Luhr-Crosby JV-Interest Transaction Fee**: Subject to the parameters set forth in the introductory paragraph of this Section 2(b) above, the Transaction Fee for a Luhr-Crosby JV-Interest Transaction (an "**LC JV Transaction Fee**" and alternatively with a Crosby Sale Fee and a Crosby MT Fee, an "**M&A Transaction Fee**") will be an amount based upon the Transaction Enterprise Value of Luhr Crosby reflected by the financial terms of such Transaction, pursuant to the following schedule, payable upon the Closing thereof, time being '*of the essence*':

| Transaction Enterprise Value | LC JV Transaction Fee |
| --- | --- |
| equal to or less than $950 million | 1.0% of TEV the "**Tier 1 Fee**") |
| greater than $950 million and less than or equal to $1.1 billion | sum of (a) Tier 1 Fee plus (b) 3.0% of the incremental TEV in excess of $950 million and less than or equal to $1.1 billion (such sum, the "**Tier 2 Fee**") |
| greater than $1.1 billion | sum of (a) Tier 2 Fee plus (b) 3.75% of the incremental TEV in excess of $1.1 billion |

`

**RAYMOND JAMES**®

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
February 2, 2026
Page 7

**Crosby Minority Transaction Fee**: Subject to the parameters set forth in the introductory paragraph of this Section 2(b) above, the Transaction Fee for a Crosby Minority Transaction (a "**Crosby MT Fee**") will be the *greater* of (i) $2,500,000 *or* (ii) such amount as is customarily charged by bulge bracket U.S.-based investment banks in respect of transactions of similar size, scope and nature, as mutually agreed upon by the Parties, in either case, payable upon the Closing of such Crosby Minority Transaction, time being '*of the essence*'.

(c) *Transaction Qualifying Under Multiple Definitions / Transaction Fees on Multiple Transactions*:

(i) If a single Transaction hereunder qualifies as more than one type of Transaction under the Transaction definitions set forth herein, then only the largest, single Transaction Fee calculable in connection with such individual Transaction shall be payable in connection therewith.

(ii) Subject to both the preceding clause and the limitations set forth in the *provisos* below in this clause (ii), if there are multiple, discrete, separate Transactions hereunder involving one or both Clients (whether Closed simultaneously or at different times), a separate Transaction Fee shall be payable in connection with each such separate Transaction regardless of whether it meets the same definition of any other Transaction being Closed.

(d) *Break-up Fee*: Additionally, if, during the Term or the Tail Period, a Client or its securityholders enters into any Definitive Agreement for an M&A Transaction that is later terminated, and such Client or its securityholders receives any *Net Break-Up Proceeds* (as defined below), such Client will pay Raymond James a non-refundable cash fee (a "**Break-up Fee**") equal to the lesser of (a) thirty-five percent (35.0%) of all such Net Break-Up Proceeds promptly upon receipt thereof by such Client or its securityholders or (b) the amount of the M&A Transaction Fee that would have been payable to Raymond James under this Restated Engagement Letter had the terminated M&A Transaction closed. If, within six (6) months following Raymond James's receipt of a Break-Up Fee, an M&A Transaction Closes with an M&A Transaction Fee payable to Raymond James, and, in connection with consummation of such M&A Transaction, such Client returns or credits all or a portion of the Break-Up Proceeds against the proceeds of such M&A Transaction, Raymond James shall credit a pro rata portion of the Break-Up Fee against (but no more than) such M&A Transaction Fee. "**Net Break-Up Proceeds**" means any "break-up", "termination", or similar fee or payment including, without limitation, any judgment for damages or amount in settlement of any dispute as a result of such termination, in all cases net of unrecouped out-of-pocket expenses incurred by such Client in the collection of such termination-related Net Break-Up Proceeds.

3. **Reimbursement of Expenses; Clients' Professional Fees —**

Regardless of whether a Transaction is consummated, and subject to any applicable Order by the Bankruptcy Court, the Clients will reimburse Raymond James upon the *earlier* of (a) 30 days from the Clients' receipt of an invoice from Raymond James *or* (b) any Closing, for all documented expenses (including, without limitation, the fees and disbursements of its outside legal counsel other than those arising with respect to the preparation of this Restated Engagement Letter) reasonably incurred by Raymond James in connection with performing the Services pursuant to this Restated Engagement Letter ("**Expenses**").

Upon the execution of this Restated Engagement Letter, the Clients will deposit $25,000 against Raymond James's incurrence of Expenses hereunder (the "**Expenses Deposit**"), *provided* that, if actual Expenses incurred by Raymond James hereunder through the end of the Term are less than the Expenses Deposit, Raymond James shall promptly refund the unused portion of such Expenses Deposit.

Each Client will also bear all of its own costs it incurs in connection with any Transaction, including, without limitation, such Client's legal and accounting fees and disbursements, the costs of reproducing its Client Materials, fees or charges from outside counsel (including special counsel, if any, for drafting nondisclosure

**RAYMOND JAMES**®

Docusign Envelope ID: C16A9CD8-D196-481B-99AA-9F7DBCC22093

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
February 2, 2026
Page 8

agreements with Prospective Counterparties, whether engaged by a Client or through arrangements via Raymond James), and any due diligence data room costs.

Notwithstanding the foregoing, nothing in this Section 3 shall limit a Client's separate payment and reimbursement obligations set forth elsewhere in this Restated Engagement Letter (including pursuant to Sections 9(d) and (o) below and pursuant to Addendum A hereto).

4. **Term** — The term of this Restated Engagement Letter (the "**Term**") commenced for Crosby on September 30, 2024 (the "**Crosby Engagement Commencement Date**") and commenced for Bertucci on December 5, 2025 (the "**Bertucci Engagement Commencement Date**" and alternatively with the Crosby Engagement Commencement Date, each an "**Engagement Commencement Date**"), and the Term for each given Client will continue (and will not terminate, expire or be deemed completed) until terminated (a "**Termination**") by either Raymond James or such Client upon thirty (30) days' prior written notice delivered to the designated person(s) indicated in Section 9(i) below (with documentary or digital proof of receipt required, a "**Termination Notice**"). For clarity, (i) there shall never be any oral, constructive, implied or circumstantial form of termination of this Restated Engagement Letter or of Raymond James's engagement hereunder by either Client, and (ii) a Termination Notice must expressly refer to the termination of this Restated Engagement Letter with respect to such Client, and any instruction (written or oral) by such Client to Raymond James to cease any process for a specific Transaction for such Client or for all Transactions for such Client generally shall, absent a specific reference to the termination of this Restated Engagement Letter by such Client, not be construed as a Termination for such Client. All Sections and provisions of, and addenda, schedules and exhibits to, this Restated Engagement Letter, other than Section 1 and this Section 4, shall (to the extent applicable to implement the intention thereof) survive any Termination.

5. **Indemnification** — In consideration of Raymond James signing this Restated Engagement Letter and agreeing to perform Services pursuant to this Restated Engagement Letter, each Client will perform the indemnification obligations set forth in Addendum A hereto (which is hereby incorporated into this Restated Engagement Letter and made a part hereof). The *RJ Parties* (as defined in Addendum A hereto) and their respective successors and assigns are, as to this Section 5 and Addendum A, intended third-party beneficiaries and may directly enforce their rights under this Restated Engagement Letter (including any addenda or schedules attached hereto) against such Client, any other person or entity that falls within the definition of such Client herein and/or their respective successors and assigns.

6. **Securities Matters** – Neither the offer or sale, pursuant to any Transaction, of any instrument defined as a "security" under Section 2(a)(1) of the Securities Act of 1933, as amended (the "**Securities Act**"), has been or will be registered by a Client with the U.S. Securities and Exchange Commission. Any such securities are to be offered for sale, and sold in reliance upon, the exemption from registration requirements provided by Section 4(a)(2) of the Securities Act and applicable regulations under the Securities Act. Each Client will be responsible for any and all compliance with the securities laws applicable to it, including Section 4(a)(2) of the Securities Act and, unless otherwise agreed in writing, all state securities ("blue sky") laws. Each Client will conduct any offering or sale of its securities in compliance with the securities laws applicable to it, including Section 4(a)(2) the Securities Act, and such Client will file all appropriate notices of such offering with any applicable governmental or regulatory body. Raymond James agrees to cooperate with counsel to such Client in that regard.

7. **Confidentiality** – Raymond James agrees to use all confidential and proprietary information provided to it by or on behalf of a Client hereunder ("**Confidential Information**") solely for the purpose of providing the Services to such Client that are the subject of this Restated Engagement Letter and negotiating the terms thereof and to treat all such information confidentially; *provided*, *however*, that nothing herein will prevent Raymond James from (a) sharing such information with its directors, officers, employees, attorneys, representatives or potential financing parties, which includes any Affiliate or other entity that Raymond

`

**RAYMOND JAMES**®

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
February 2, 2026
Page 9

James may in good faith propose to such Client or a potential Transaction counterparty as a potential financing source with respect to any potential Transaction with or involving such Client, or (b) disclosing such information pursuant to the order of any court or administrative agency, or pursuant to the order or request from any regulatory body with jurisdiction over Raymond James. Notwithstanding the foregoing, such confidential and proprietary information does not include any information: (i) that was already in the possession of Raymond James or any or its representatives, or was available to Raymond James or any of its representatives on a non-confidential basis, prior to the disclosure to Raymond James or such representatives; (ii) obtained by Raymond James or any of its representatives from a third party which, insofar as is known by Raymond James or such representatives, is not subject to any prohibition against disclosure; (iii) which was or is independently developed by Raymond James or any of its representatives without violating any confidentiality obligation under this Section 7; or (iv) which was or becomes generally available to the public through no breach of this Section 7 by Raymond James. Upon written request by a Client, Raymond James will destroy or return all copies of Confidential Information of such Client. Such return or destruction shall not include, however, any metadata that may remain on Raymond James's computer equipment after deletion of applicable files, records, and data formats. Notwithstanding the foregoing, Raymond James may retain a Client's Confidential Information as needed to satisfy the requirements of any law, rule or regulation or as part of an automated electronic archive, backup and/or recovery system. The provisions of this Section 7 will automatically terminate 1 year following the earlier of the completion of the Transaction for such Client or any Termination hereof related to such Client. This Restated Engagement Letter supersedes any other agreement regarding confidentiality that may have been previously entered into between a Client and Raymond James.

8. **Publicity** – Following the Closing or public announcement or disclosure thereof in any initial press release or other similar announcement by a Client regarding such Transaction, Raymond James will have the right, at its expense, to publicize Raymond James's role as investment banking advisor to such Client with respect to such Transaction (including in customary "tombstone" announcements or other advertisements in financial and other newspapers and journals and marketing materials, "**RJ Publicity**"), and such Client agrees that Raymond James may use such Client's logo or other identifying marks in any such RJ Publicity; *provided* that such Client's prior written consent, in its sole and absolute discretion, will be required for any component of RJ Publicity that was not in the public domain prior thereto.

9. **Miscellaneous** –

   (a) ***Governing Law; Arbitration; Jury Trial Waiver***: This Restated Engagement Letter and all claims or causes of action (whether in contract, tort or statute) that may be based upon, arise out of, or relate to (i) this Restated Engagement Letter, (ii) the negotiation, execution or performance of this Restated Engagement Letter (including any claim or cause of action based upon, arising out of or related to any representation, warranty or covenant made in, or in connection with, this Restated Engagement Letter or as an inducement to enter into this Restated Engagement Letter), or (iii) the nature of the relationship of the Parties, shall be governed by, construed and enforced in accordance with, the internal laws of the State of New York (including its statutes of limitations), without regard to conflicts of laws principles of New York or of any other jurisdiction that would require the application of the laws of another jurisdiction; *provided* that, in instances where New York law conflicts with the Federal Arbitration Act (the "**FAA**"), the FAA shall govern.

   Except as expressly set forth in Addendum A attached to this Restated Engagement Letter or in the last subparagraph of this Section 9(a), all claims arising out of the interpretation, application or enforcement, or otherwise relating to the subject matter, of this Restated Engagement Letter, including, without limitation, any breach of this Restated Engagement Letter, will be settled by final and binding arbitration administered by the American Arbitration Association (the "**AAA**") in accordance with the then-prevailing AAA Commercial Rules before a panel of three (3) arbitrators selected by Raymond

`

**RAYMOND JAMES**®

Docusign Envelope ID: C16A9CD8-D196-4B4B-99AA-9F7DBCC22093

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
February 2, 2026
Page 10

James and the applicable Client, with all arbitration hearings to be held in New York County, New York. The decision of the arbitrators will be binding on Raymond James and such Client and may be entered and enforced in any court of competent jurisdiction by either. The arbitration will be pursued and brought to conclusion *quam celerrime*.

Except as set forth in the last subparagraph of this Section 9(a), any court action to enforce or interpret either any arbitration matters or Addendum A shall be submitted to the exclusive jurisdiction of the Commercial Division, New York County, New York State Supreme Court (the "**Commercial Division**"), and to the application of the Commercial Division's accelerated procedures; *provided* that, if such action does not meet the requirements to be heard in the Commercial Division, such action shall be brought exclusively either in the courts of (i) the State of New York, County of New York, or (ii) if it has or can acquire jurisdiction, in the United States District Court for the Southern District of New York, and each Party irrevocably submits to the exclusive jurisdiction of each such court in any such action, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of any such action will be heard and determined only in any such court, and agrees not to bring any such action in any other court, and the applicable Parties agree that (x) either or both of them may file a copy of this subparagraph with any court as written evidence of the knowing, voluntary, and bargained agreement between such Parties to irrevocably waive any objections to venue or to convenience of forum, and (y) process in any action may be served on either applicable Party anywhere in the world.

TO THE EXTENT PERMITTED BY LAW, EACH OF RAYMOND JAMES AND EACH CLIENT VOLUNTARILY AND IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF THIS AGREEMENT, THE ENGAGEMENT OF RAYMOND JAMES PURSUANT TO, OR THE PERFORMANCE BY RAYMOND JAMES OF, THE SERVICES.

NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, AND SUBJECT TO THE FILING OF A CLIENT CH. 11 CASE AND THE ENTRY OF A RETENTION ORDER BY THE BANKRUPTCY COURT WITH RESPECT TO RAYMOND JAMES, THIS SECTION 9(A) SHALL BE SUBJECT IN ALL RESPECTS TO THE TERMS OF THE BANKRUPTCY COURT'S RETENTION ORDER, THE UNITED STATES BANKRUPTCY CODE, AND ANY APPLICABLE LAW.

Notwithstanding anything in this Agreement, in the event the Company becomes a debtor in a case under the Bankruptcy Code, each Party irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court for all claims arising out of the interpretation, application or enforcement, or otherwise relating to the subject matter, of this Agreement.

(b) ***Reliance on Client Information***: Each Client recognizes and confirms that Raymond James, in the performance of the Services: (i) may rely upon such information received from such Client, Counterparties or their respective advisors, without independent verification by Raymond James; and (ii) does not assume responsibility for the accuracy or completeness of any publicly available information or such information received from such Client, Counterparties or their respective advisors, whether or not Raymond James makes an independent verification of such information, and does not have any obligation to conduct any evaluation or appraisal of the assets or liabilities of such Client or any other party; and (iii) will assume that any financial projections or forecasts (including cost savings or synergies) that may be furnished to or discussed with such Client or its representatives have been reasonably prepared and reflect the best then currently available estimates and judgments of such Client's management.

**RAYMOND JAMES**®

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
February 2, 2026
Page 11

(c) ***Confidentiality / Non-Disclosure of RJ Materials***: All analyses, reports, and related materials (the "**RJ Materials**") that Raymond James will provide under this Restated Engagement Letter are proprietary to Raymond James and for the exclusive use of the applicable Client's Governing Authority for the sole purpose of evaluating a potential Transaction. Without the prior written consent of Raymond James, a such Client may not disclose any RJ Materials other than (i) to its management and Governing Authority, (ii) to its attorneys and other professional advisors in respect of a potential Transaction, or (iii) as required under Applicable Law (*provided* that, to the extent permitted under Applicable Law, such Client provides Raymond James with reasonable prior written notice of such disclosure under Applicable Law so that Raymond James may, in its sole discretion, seek a protective order or other relief from such disclosure).

(d) ***Reimbursement of Proceedings Expenses***: If Raymond James is legally required or requested by a Client or its counsel to render services in any pending or threatened proceeding to which Raymond James is not a party (including, but not limited to, producing documents, answering interrogatories or providing testimony), such Client will pay Raymond James's then current hourly rates for the persons involved for the time expended in rendering such services, including, but not limited to, time for meetings, conferences, preparation and travel, and all related reasonable out-of-pocket expenses (including, without limitation, the reasonable fees and expenses of Raymond James's outside legal counsel incurred in connection with such services).

(e) ***RJ as Comprehensive Financial Institution***: Each Client acknowledges and agrees that Raymond James and its parent company and Affiliated entities are a comprehensive, international financial services firm involved in a wide range of commercial banking, investment banking and other activities (including investment management, corporate finance and securities issuing, trading and research) for their own account and otherwise. Raymond James and its Affiliates may have interests that differ from such Client's interests. Raymond James and its Affiliates have no duty to disclose to such Client, or use for such Client's benefit, any information acquired in the course of providing services to any other party, engaging in any transaction or carrying on any other businesses. Raymond James's employees, officers, partners and Affiliates may at any time own such Client's securities or those of any other entity involved in any transaction contemplated by this Restated Engagement Letter. Raymond James recognizes its obligations under applicable securities laws in connection with the purchase and sale of such securities. The Client further acknowledges that, (i) prior to the Effective Date and in the ordinary course of business, Raymond James investment banking personnel (which may include investment banking personnel providing services to a Client under this Restated Engagement Letter) may have from time to time held discussions with and provided information to a party which thereafter becomes categorized as a "*Prospective Counterparty*" or "*Counterparty*" hereunder regarding various market and strategic matters (including a potential transaction with such Client), and (ii) such information and the content of such discussions between Raymond James and such party may be used or relied upon by such party (in its subsequent status as a "*Prospective Counterparty*" or "*Counterparty*" hereunder) in connection with its determinations in respect of a Transaction with such Client.

(f) ***Binding on Successors and Assigns***: This Restated Engagement Letter (including any addenda or schedules attached to this Restated Engagement Letter) is binding upon and inures to the benefit of Raymond James and each Client and their respective successors and permitted assigns. Without limiting the generality of the foregoing, following any Closing of a Crosby Sale for a Client, such Client's obligations under this Restated Engagement Letter (including without limitation Addendum A hereto) will become the obligations of any successor entity resulting from such Crosby Sale.

(g) ***Restrictions on Client Assignment***: Each Client agrees not to assign or delegate this Restated Engagement Letter in whole or in part without Raymond James's prior written consent, and any attempted assignment or delegation without such prior written consent will be voidable at Raymond James's sole and absolute discretion.

**RAYMOND JAMES**®

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
February 2, 2026
Page 12

(h) ***Entire Agreement***: This Restated Engagement Letter (and any addenda or schedules attached to this Restated Engagement Letter) constitutes the entire agreement between Raymond James and each Client regarding the subject matter of this Restated Engagement Letter and supersedes any prior agreements or understandings, written or oral, between them. Any modification or amendment to this Restated Engagement Letter or any waiver of any rights or remedies by Raymond James or a Client must be set forth in writing, fully executed by both Raymond James and such Client.

(i) ***Notices***: Any notice called for hereunder shall be sent to the respective Parties as follows: if to Crosby Enterprises, L.L.C.: 17751 Hwy 3235, Galliano, LA 70354; Attn: Kurt J. Crosby, Chief Executive Officer and Farrel Trosclair, Chief Financial Officer; email: kurt@crosbytugs.com and ftrosclair@crosbytugs.com; if to Bertucci: 7 River Road, Jefferson, LA 70121; Attn: Nolan A. Simoneaux, Jr., Manager; email: nsimoneaux@luhr.com; and Client's counsel, Benjamin W. Kadden, bkadden@lawla.com; and if to Raymond James: Raymond James & Associates, Inc.; 320 Park Avenue, 12th Floor, New York, NY 10022; Attn: General Counsel, Investment Banking; email: GEIBLegal@raymondjames.com.

(j) ***No Fiduciary; Independent Contractor***: Each Client acknowledges and agrees that Raymond James has been engaged solely as an investment banking advisor to such Client with respect to a possible Transaction, and no fiduciary, agency or similar relationship has been created in respect of any Transaction or the Services provided to such Client or any other party, regardless of whether Raymond James or any of its Affiliates has advised or is advising such Client on any other matters. In connection with this engagement, Raymond James is acting as an independent contractor, with the only rights and obligations between Raymond James and each Client as set forth in this Restated Engagement Letter. The Services provided by Raymond James are solely for the benefit of each Client and are not intended to, nor will they be deemed or construed to, create any duty toward or confer any rights upon any persons or entities not a Party (including, without limitation, securityholders (in their capacities as such), employees or creditors of a Client or any Counterparty) as against Raymond James or its Affiliates or their respective directors, officers, agents and employees.

(k) ***Duly Authorized; No Client Conflicts***: Each Client hereby represents to Raymond James, and Raymond James hereby represents to each Client, that (i) the execution and delivery of this Restated Engagement Letter and the performance by such Party of its obligations hereunder have been duly and validly authorized by such Party, and (ii) this Restated Engagement Letter has been duly executed and delivered by such Party and constitutes the valid and legally binding agreement of such Party, enforceable against such Party in accordance with its terms. Each Client further represents and warrants to Raymond James that (x) neither the entry into this Restated Engagement Letter nor the consummation of any Transaction shall trigger the payment of a fee by such Client to any third party and (y) such Client is not a party to or bound by agreement, understanding or arrangement with any other person which would prevent such Client's ability to enter into this Restated Engagement Letter or perform its obligations hereunder.

(l) ***Construction; Severance***: This Restated Engagement Letter has been reviewed by the signatories hereto and their counsel. There will be no construction of any provision against any Party because such provision was drafted by such Party, and the Parties waive any statute or rule of law to such effect. If any provision of this Restated Engagement Letter is determined by a court or arbitration panel having jurisdiction to be unenforceable to any extent, the rest of that provision (if applicable) and the balance of this Restated Engagement Letter will remain enforceable to the fullest extent permitted by law.

(m) ***"Written" Notice Deliverable by Email***: Any reference herein to a notice, consent, communication, approval or the like being "*in writing*" or "*written*" shall include delivery via email unless expressly required otherwise.

**RAYMOND JAMES**®

Docusign Envelope ID: C16A9CD8-D196-481B-99AA-9F7DBCC22093

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
February 2, 2026
Page 13

(n)  *U.S. Currency Requirement*: All amounts payable under this Restated Engagement Letter are denominated in U.S. dollars and will be paid in U.S. dollars via wire transfer of immediately available funds in accordance with instructions set forth in Raymond James's invoice. All amounts payable under this Restated Engagement Letter will be paid without set-off and without deduction for any withholding, value-added or other similar taxes, charges, fees or assessments. Where any such amounts are calculated or incurred by reference to a currency other than U.S. dollars, those amounts will be converted into U.S. dollars at the prevailing mid-market exchange rate on the payment date according to XE (http://www.xe.com), or if such date is not a business day, the first business day prior to the relevant payment date.

(o)  *Collection Costs*: Without limiting any other provision of this Restated Engagement Letter, in the event any amount, including, but not limited to, the Transaction Fee(s), is not paid in full to Raymond James when due and payable hereunder, then cash interest calculated at the pre-judgment contract breach interest rate under New York law (as set forth in NY CPLR §§5001(a) and 5004) will be due, earned and fully payable on any such unpaid amount at the time such amount is due and continuing until such time as such amount is paid in full. Each Client will reimburse Raymond James for any and all costs Raymond James may incur in collection efforts regarding all amounts payable under this Restated Engagement Letter, including, but not limited to, reasonable attorney's fees and costs of collection.

(p)  *Record-Keeping Compliance*: In order to comply with its books and records requirements under applicable securities laws, rules and regulations (including (FINRA rules), Raymond James may, subject to compliance with Applicable Law, capture and retain copies of written communications with or by a Client (including mail, emails, texts or similar electronic communications, or documentation of meetings). Each Client agrees that Raymond James may deliver copies of such written communications to any court or competent authority. Raymond James will keep or cause to be kept records in relation to the Services provided under these terms of business in accordance with Applicable Law.

This Restated Engagement Letter may be executed in one or more counterparts and delivered by electronic transmission, with each counterpart being an original and all together constituting one and the same instrument.

**RAYMOND JAMES & ASSOCIATES, INC.**

Signed by:

By: *Geoffrey Richards*
——3D90A96FA984491...
Geoffrey Richards, Sr. Managing Director –
Investment Banking

**ACCEPTED & AGREED TO:**

**CROSBY ENTERPRISES, L.L.C.**

DocuSigned by:

By: *kurt Crosby*
——0D00FA2D95AB441...
Kurt J. Crosby, Chief Executive Officer

**BERTUCCI CONTRACTING COMPANY, L.L.C.**

Signed by:

By: *Nolan Simoneaux*
——14701DD5BC0402...
Nolan A. Simoneaux, Jr., Manager

**RAYMOND JAMES**®

Docusign Envelope ID: C16A9CD8-D196-481B-99AA-9F7DBCC22093

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
February 2, 2026
Page 14

## EXHIBIT I

### CROSBY RELATED PARTIES

| CROSBY SUBSIDIARIES | CROSBY NON-SUBSIDIARY AFFILIATES |
|---|---|
| A & C Barges, LLC | Allie T., L.L.C. |
| Aaron Joseph, LLC | Bertucci Contracting Co., Inc. |
| Crosby Boat Co., LLC | Bertucci Contracting Company, L.L.C. |
| Crosby Boat Rentals, LLC | Crosby Holdings, L.L.C. |
| Crosby Dredging, L.L.C. | Crosby Marine Repair, L.L.C. |
| Crosby Inland Marine, LLC | Crosby Machinery, L.L.C. |
| Crosby Inshore Marine Service, LLC | Crosby Real Estate, L.L.C. |
| Crosby Marine Towing, LLC | Crosby Group, L. L. C. |
| Crosby Marine Transportation, LLC | Crosby Marine Mexico |
| Crosby Offshore Marine Service, LLC | Crosby Investors, L.L.C. |
| Crosby Towboats, LLC | Crosby Investors, II, L.L.C. |
| Crosby Tugs, LLC | Offshore Rig Moving, L. L. C. |
| Crosby & Son Towing, LLC | Tala Barge Co., L.L.C. |
| Kurt Crosby, LLC | Tala Real Estate, L.L.C. |
| Nine Mi Mooring Service, LLC | Tala Solutions, L.L.C. |
| Paddy Crosby, LLC | Tala Marine, L.L.C. |
| Susan Marie, LLC | Tala Air Logistics, L.L.C. |
| Tara Crosby, LLC | |
| Vinton Crosby, LLC | |
| Webb Crosby, LLC | |

Docusign Envelope ID: C16A9CD8-D196-481B-99AA-9F7DBCC22093

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
February 2, 2026
Page 15

## ADDENDUM A

### CLIENT INDEMNIFICATION OF RAYMOND JAMES

Each **Client** will be jointly and severally liable and obligated to indemnify, defend and hold harmless ***Raymond James & Associates, Inc.*** and ***Raymond James Financial, Inc.*** (together, "**Raymond James**") and their respective Affiliates, collectively with their and their Affiliates' respective officers, directors, managers, members, partners, securityholders, employees and agents, and each person, if any, who controls Raymond James or any of its Affiliates within the meaning of the U.S. Securities Act of 1933, as amended, or the U.S. Securities Exchange Act of 1934, as amended (collectively, including Raymond James, the "**RJ Parties**" and each individually, an "**RJ Party**"), from and against any and all (a) claims, actions (including securityholder claims or actions, derivative or otherwise), demands, investigations and proceedings, whether or not such claim, action or proceeding is threatened, established, initiated or brought by, or on behalf of, either Client or by any other party, and whether or not any RJ Party is a party (collectively, "**Proceedings**"), and (b) losses, claims, judgments, penalties, fines, charges, damages, taxes, including the fees and expenses of legal counsel to the RJ Parties, and other liabilities of any kind or nature (collectively, "**Losses**") that such RJ Party may suffer or incur that arise out of or in connection with this Restated Engagement Letter, the Services provided under this Restated Engagement Letter, or the exercise of Raymond James's rights under either this Restated Engagement Letter (including enforcing the terms of this Addendum A) or any transaction referred to in this Restated Engagement Letter (each, an "**Indemnified Claim**"), except solely to the extent that any such Indemnified Claim is found, in a final, unappealable judgment by a court with competent jurisdiction hereunder (a "**Final Judgment**"), to have resulted primarily as a direct and proximate cause from said RJ Party's willful misconduct or gross negligence (other than an action or failure to act undertaken or refrained from being undertaken at the written or express request of or with the written or express consent of a Client) (an "**Excluded Act**").

No RJ Party will have any liability to either Client, its securityholders, officers, directors/managers or creditors (collectively, including such Client, "**Client Parties**"), or any other person, by reason of or in connection with this Restated Engagement Letter, the Services, or the exercise of Raymond James's rights under either this Restated Engagement Letter or any transaction referred to in, or arising out of the transactions contemplated by, this Restated Engagement Letter, whether such loss arises under any statute, common law, contract, tort or otherwise, except solely to the extent that any such losses or liability to any Client Parties or other persons is found in a Final Judgment to have resulted primarily as a direct and proximate cause from said RJ Party's Excluded Act. Further, nothing in this Restated Engagement Letter will be construed as rendering Raymond James or any other RJ Party liable, under any circumstances and under any theory of law, to any Client Party or any other person for any indirect, incidental, special, consequential or punitive damages even if Raymond James or any other RJ Party have been advised as to the possibility thereof.

Raymond James or another applicable RJ Party will promptly notify the Clients in writing if an RJ Party receives written notice of any Indemnified Claim (*provided* that no failure or delay by Raymond James or such other RJ Party to so notify a Client will relieve either Client from its obligations under this Addendum A, except as and solely to the extent that such failure or delay actually and materially prejudiced a Client). Upon receipt of any such notice from Raymond James or other RJ Party, a Client may, upon delivery of written notice to Raymond James, assume the full defense of such Indemnified Claim (a "**Client Defense Election**"), including the employment of counsel reasonably satisfactory to such RJ Party and the payment of the fees and expenses of such counsel, other than with respect to any Indemnified Claim (x) brought by either Client or (y) any and all Proceedings before any regulatory bodies and/or authorities involving Raymond James ("**RJ Regulatory Proceedings**"). Following a Client Defense Election, while such RJ Party may employ its own counsel and participate in the defense of such Indemnified Claim, the Clients will not be required to pay the fees and expenses of such counsel unless the Clients have failed to assume the defense and promptly defend such Indemnified Claim using counsel reasonably satisfactory to such RJ Party, or such RJ Party is advised by counsel that a conflict of interest exists or may exist which makes representation of both either Client and such RJ Party by common counsel inappropriate due to differing interests between them.

If for any reason the foregoing indemnity is unavailable to an RJ Party or is insufficient to fully hold any RJ Party harmless, the Clients will contribute to the amount paid or payable by such RJ Party as a result of such unavailability or insufficiency in such proportion as is appropriate to reflect the relative benefits received by and fault of the Clients on the one hand, and the relative benefits received by and fault of the RJ Party on the other hand, as well as any relevant equitable considerations. Notwithstanding anything in this Addendum A to the contrary, the aggregate contribution of all of the RJ Parties for all Indemnified Claims will not exceed the amount of the fees actually received by Raymond James pursuant to this Restated Engagement Letter. The Clients will reimburse each RJ Party for all documented out-of-pocket expenses incurred in connection with an Indemnified Claim as they are incurred; *provided* that, if any such reimbursement is for expenses relating to a Loss that is found in a Final Judgment to have resulted primarily as a direct and proximate cause from said RJ Party's Excluded Act, such RJ Party will promptly repay such reimbursed amount to the applicable Client.

The Client will not settle, compromise or consent to judgment, or participate in or otherwise facilitate any such settlement, compromise or consent, with respect to any Indemnified Claim without the prior written consent of Raymond James or, if applicable another RJ Party involved in such Indemnified Claim, unless (i) there is no admission of wrongdoing, negligence or improper activity of any kind of or by the applicable RJ Party(ies) in such settlement, compromise or consent, and (ii) there is an unconditional release of all RJ Parties from all liability on claims that are the subject matter of or arise out of such Indemnified Claim, *provided, however*, that, notwithstanding the foregoing, the Clients may not control or facilitate any settlement, compromise or consent with respect to any and all RJ Regulatory Proceedings. Raymond James will not settle, compromise or consent to judgment, or participate in or otherwise facilitate any such settlement, compromise or consent, with respect to any Indemnified Claim without the prior written consent of a Client (which shall not be unreasonably withheld, delayed or conditioned).

The agreements and obligations set forth in this Addendum A will be in addition to any other rights, remedies or indemnification as to which any RJ Party may have or be entitled at common law or otherwise, will survive any termination of this Restated Engagement Letter or completion of Services under this Restated Engagement Letter.

`

**RAYMOND JAMES**®

Docusign Envelope ID: C16A9CD8-D196-481B-99AA-9F7DBCC22093

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
February 2, 2026
Page 16

## ADDENDUM B

### DEFINITIONS

For purposes of this Restated Engagement Letter, capitalized terms not defined in the enumerated *Sections* above shall having the following meanings:

"**Affiliate**" means, as to any applicable person or entity, any person or entity that exists now or after the Effective Date which, directly or indirectly, controls, is under common control with, or is controlled by, the applicable person or entity.

"**Applicable Law**" means any applicable statutes, laws, ordinances, rules, regulations, supervisory guidance, codes, orders, common laws, judgments, authorizations, consents, practices or other requirements of any federal, state, local or foreign or political subdivision thereof, including the federal Telephone Consumer Protection Act of 1991 (47 U.S.C. § 227), as amended, and, if applicable, the Canada Anti-SPAM Legislation (S.C. 2010, c. 23), or any regulatory agency (including any self-regulatory organization) with jurisdiction over any Party hereto, or any arbitrator, court or tribunal of competent jurisdiction.

"**Client SPE**" means any special purpose entity formed or used by a Client or any of its Subsidiaries to implement a Transaction hereunder.

"**Client Subsidiary**" means any entity that, directly or indirectly, is owned (50% or more) or otherwise controlled by a Client.

"**Crosby Group**" means Crosby Enterprises, L.L.C. and any one or more of the Crosby Related Parties set forth on Exhibit I hereto.

"**Crosby Minority Transaction**" means any transaction or series or combination of related transactions outside of the ordinary course of business, other than a Financing Transaction or a Restructuring Transaction, with any Counterparty or Counterparty's securityholders or Affiliates, directly or indirectly effecting: a transfer of the type described as a '*Crosby Sale*' but involving less than 50% of both the voting control and the consolidated FMV of the Crosby Group's equity, assets, business, revenue and/or income.

"**Crosby Sale**" means any transaction or series or combination of related transactions outside of the ordinary course of business directly or indirectly effecting: (a) a merger, reverse merger, consolidation, or other business combination transaction(s) involving 50% or more in the aggregate of the Crosby Group, and/or (b) a sale, transfer, disposition, recapitalization, restructuring, joint venture, or similar transaction that transfers either (i) 50% or more or more in the aggregate, or an otherwise controlling portion in the aggregate, of the equity of the Crosby Group, or (ii) 50% or more in the aggregate of the consolidated fair market value of the assets, business, revenue or income of the Crosby Group (collectively), in each case to one or one or more Counterparties (including, without limitation, existing creditors, employees, Affiliates and/or securityholders, and/or by one or more persons or entities acting together with a Counterparty pursuant to a written agreement or otherwise).

"**Commitment**" means a Counterparty's written contractual commitment to fund Debt Instruments and/or any other transaction out-of-the-ordinary-course to advance material debt fundings to a Client, in each case at or after an initial Closing.

"**Client Equity**" means any outstanding or newly-issued capital equity securities of a Client, including without limitation: common equity, convertible preferred equity, and equity-linked securities, as well options, warrants and other rights related to the potential issuance of capital equity securities, or any securities convertible into such capital equity securities.

**RAYMOND JAMES®**

Docusign Envelope ID: C16A9CD8-D196-481B-99AA-9F7DBCC22093

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
February 2, 2026
Page 17

"**Client Materials**" means materials made available to Raymond James and/or Prospective Counterparties relating to a Client, its businesses, financial condition, results of operations, prospects and other matters material to its operations (which may include a confidential information memorandum, data room materials, management presentation materials, and other materials concerning such Client).

"**Counterparty**" means any person that participates, directly or indirectly, as an investor, lender or purchaser in any Transaction.

"**Closing**" or "**Closes**" means any initial and subsequent closings (i.e., funding events) of any Transaction.

"**Debt Instruments**" means any instruments, documentation and/or Client securities for loans or credit facilities for or on behalf of a Client from any third party, including, without limitation: promissory notes (secured, whether first lien or second lien; unsecured; senior or junior); non-convertible preferred equity; mezzanine debt; sale-lease back financing; uni-tranche financing; bank debt financing; or Client debt securities (whether to raise funds, to refinance, amend or exchange outstanding securities or debt, or any combination thereof).

"**Definitive Agreement**" means, collectively, any definitive written agreement governing a Transaction and, if and as applicable, any ancillary agreements and documents to such Transaction (such as: a stock or assets purchase agreement; a P&S agreement; purchase or subscription agreement(s); binding commitment letter(s); escrow agreement(s); indemnification(s); etc.).

"**Effective Date**" means February 2, 2026.

"**Financing Proceeds**" means (1) the total of all gross cash or non-cash proceeds in any form (including, but not limited to, cash or securities of any other party to a Financing Transaction, including the exercise price of any options or warrants received by or contributed to the applicable Client) received by such Client and/or any of its selling securityholders at the initial and any Closing of any Financing Transaction, plus (2) in the case of a Financing Transaction involving Debt Instruments, the full amount of any binding Commitments delivered at or prior to a Closing (not just the amount actually drawn or available at such Closing), in each case before the deduction of any fees (including any *Transaction Fees*, as defined in Section 2(b) above), expenses (including any *Expenses*, as defined in Section 3 above) or other costs.  If such proceeds are not in the form of cash then, for the purpose of calculating the Financing Proceeds, such non-cash consideration shall be valued at its then FMV. For the avoidance of doubt, "*Financing Proceeds*" will include any subsequent increase in Financing Proceeds received by or committed to such Client in an initial or secondary Financing Transaction, during the Term and the Tail Period, whether pursuant to an amendment and/or any accordion, a replacement credit facility, or otherwise, in which any Counterparty participates.

"**Financing Transaction**" means any of the following transactions, arrangements or undertakings (or series or combination of related transactions, arrangements or undertakings) outside of the ordinary course of business other than an M&A Transaction, directly or indirectly effecting: (i) the issuance of Debt Instruments or Client Equity; (ii) royalty arrangements, profit sharing and other similar financing transactions; *and/or* (iii) such other financing of any type committed to complete any other Transaction; in each case for or on behalf of such Client (whether to raise funds, refinance outstanding Client securities or exchange Client securities or any combination thereof); *provided* that any such transaction must involve the receipt by such Client of new consideration as opposed to the restructuring, renegotiation, forgiveness, or exchange with or by the holder of any outstanding Debt Instruments or Client Equity (which, for clarity, would fall under the definition of a Restructuring Transaction).

"**FMV**" means the fair market value of a given asset as determined either according to the terms set forth in the Definitive Agreement governing a Transaction, or, in the absence of such guidance therein, as set by the reasonable written agreement of the Parties based on the financial terms of such Transaction.

**RAYMOND JAMES**®

Docusign Envelope ID: C16A9CD8-D196-481B-99AA-0F7DBCC22093

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
February 2, 2026
Page 18

"**Governing Authority**" of a Client means, alternatively, such Client's governing board, or persons or committee performing in a similar governing capacity.

"**Luhr-Crosby JV-Interest Transaction**" or "**LC JV Transaction**" means any transaction or series or combination of related transactions outside of the ordinary course of business directly or indirectly effecting: (a) a merger, reverse merger, consolidation, or other business combination transaction(s) pursuant to which a majority of Bertucci's 49.99% interest in Luhr Crosby is to be directly or indirectly sold to (including, for the avoidance of doubt, by a sale of Bertucci), or combined with, one or more Counterparties, and/or (b) sale, transfer, disposition, recapitalization, restructuring, joint venture, or other transaction or series or combination of transactions that, directly or indirectly, has the effect of transferring (i) a majority of Bertucci's 49.99% membership interest in the equity of Luhr Crosby or (ii) a majority of Bertucci's indirect 49.99% interest in the consolidated fair market value of the assets, business, revenue or income represented by Bertucci's 49.99% membership interest in Luhr Crosby to one or more Counterparties.

"**M&A Transaction**" means, alternatively, a Crosby Sale, a Crosby Minority Transaction, and an LC JV Transaction.

"**NDA**" means an agreement concerning the non-disclosure and confidentiality of designated information.

"**New Capital Financing Transaction**" means a Financing Transaction other than a Re-Financing Transaction that raises new capital for any purpose (e.g., a DIP financing; additional liquidity; etc.).

"**Prospective Counterparty**" means any person that is contemplated as a potential Counterparty.

"**Re-Financing Transaction**" means a Financing Transaction involving one of more Counterparties funding the re-financing of one or more existing lenders to a Client. For clarity, each Re-Financing Transaction with an individual existing lender to such Client shall be considered a distinct and separate '*Re-Financing Transaction*' generating a separate Re-Financing Transaction Fee in connection therewith.

"**Restructuring Transaction**" means any transaction (or series or combination of related transactions) outside of the ordinary course of business other than an M&A Transaction or a Financing Transaction that, directly or indirectly, constitutes a recapitalization, reorganization, restructuring, sale or transfer of such Client's existing and potential debt obligations and/or preferred equity (including, without limitation, bank debt, bond debt, trade claims, lease obligations (both on and off balance sheet), partnership interests, membership interests, unfunded pension and retiree medical liabilities, tax claims, litigation claims and other liabilities (collectively, "**Existing Obligations**")), in each case which may be effected, without limitation, through any of the following: a solicitation of waivers and consents from the holders of Existing Obligations; the amendment or renegotiation of terms, conditions or covenants, rescheduling of maturities, change in interest rates, repurchase, settlement, cancellation or forgiveness of Existing Obligations; the conversion of Existing Obligations into equity; an exchange offer involving new securities in exchange for Existing Obligations; or other similar transaction or series of transactions.

"**Tail Period**" means the twelve (12) months following any termination of this Restated Engagement Letter.

"**Transaction**" means any Business Combination Transaction, Financing Transaction, LC JV Transaction, or Restructuring Transaction.

"**Transaction Documentation**" means any of the following: (i) any Commitment letter or subscription agreement signed by a Prospective Counterparty; or (ii) when executed by both a Prospective Counterparty and a Client, (A) a letter of intent, term sheet or similar documentation setting forth certain key potential financial terms of a Transaction; or (B) any Definitive Agreement.

**RAYMOND JAMES**®

Docusign Envelope ID: C16A9CD8-D196-481B-99AA-9F7DBCC22093

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
February 2, 2026
Page 19

## ADDENDUM C

### CALCULATION OF TRANSACTION ENTERPRISE VALUE

"**Transaction Enterprise Value**" or "**TEV**" for a Crosby Sale means the value of 100% of the Crosby Group's operations as a going-concern, as reflected by the financial terms of the Crosby Sale as set forth in the governing Transaction Documentation regardless of how or where Crosby or its securityholders directs the distribution of Crosby Sale proceeds, calculated as the sum of the following components, as each is defined in this Addendum B (without duplication):

  (a) Equity/Asset Consideration, <u>divided by</u> the percentage of the Crosby Group transferred in such Crosby Sale; <u>plus</u>

  (b) Assumed Crosby Indebtedness; <u>plus</u>

  (c) Diverted Payments.

"**Transaction Enterprise Value**" or "**TEV**" for an LC JV Transaction means the value of 100% of Luhr Crosby's operations as a going-concern, as reflected by the financial terms of the LC JV Transaction as set forth in the governing Transaction Documentation regardless of how or where Bertucci or its securityholders directs the distribution of LC JV Transaction proceeds, calculated as the sum of the following components, as each is defined in this Addendum B (without duplication):

  (a) Equity/Asset Consideration, divided by the percentage of the equity interests in Luhr Crosby held by all Luhr Crosby equityholders in the aggregate transferred by Bertucci (directly or indirectly, including, for the avoidance of doubt, by the acquisition of Bertucci) in such LC JV Transaction (by way of example, in the event Bertucci transfers its entire 49.99% equity interest in Luhr Crosby for $500,000,000 of Equity/ Asset Consideration, such amount shall be $1,000,200,040 ($500,000,000/.4999)); <u>plus</u>

  (b) Assumed Luhr Crosby Indebtedness; <u>plus</u>

  (c) Diverted Payments.

TEV in any M&A Transaction will not be reduced by the Transaction Fee or any other costs or expenses of the applicable Client paid or payable in connection with such Transaction. If any Transaction Documentation provides that the Transaction Fee or any other Client costs or expenses of the type designated above that are paid or payable in connection with such Transaction are deducted from the purchase price, then such fees, costs or expenses will be added back to TEV for purposes of calculating the M&A Transaction Fee.

There will be no adjustment to TEV (increase or decrease) in any M&A Transaction to the extent there is any adjustment (increase or decrease) at or after Closing of Transaction proceeds provided for in the Definitive Agreement resulting from any correction or "true-up" (increase or decrease) at or after Closing of, respectively, the estimated or final measures as of the Closing of working capital, cash or similar financial measure.

*Valuing and Payment of TEV Components*: For calculation of any M&A Transaction Fee and payment purposes, the components of TEV for such M&A Transaction will be valued, and the portions of any M&A Transaction Fee derived therefrom paid, as follows:

  (i) All items comprising TEV other than those described in <u>clauses (ii)</u> and <u>(iii)</u> below will be valued at their respective face values, and that portion of the M&A Transaction Fee attributable thereto shall be paid at Closing.

  (ii) Non-Cash Consideration will be valued at its FMV thereof as determined at or shortly before the Closing by the mutual written agreement of the applicable Client and Raymond James, and that portion of the M&A Transaction Fee attributable thereto shall be paid at Closing according to the financial parameters set forth in the Definitive Agreement; <u>provided</u>, <u>however</u>, that (x) the value of Non-Cash Consideration in the form of publicly traded equity securities (including over-the-counter) will be valued at the 20-trading day average as of the last trading day prior to the delivery thereof, and (y) the value of Non-Cash Consideration in the form of debt instruments shall be the face value thereof plus accrued interest.

**RAYMOND JAMES**®

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
February 2, 2026
Page 20

(iii) At the applicable Client's discretion, Contingent Post-Closing Consideration will be valued *either*: (i) at or shortly before the Closing at its present value based on a base case of projections developed by such Client in connection with the negotiations with the acquiror regarding the inclusion of Contingent Post-Closing Consideration, applying such discount rate as is mutually agreed upon in writing by the applicable Client and Raymond James, and that portion of the M&A Transaction Fee attributable thereto shall be paid at such Closing; *or* (ii) at its face value when delivered in cash to such Client and/or its equityholders, and that portion of the M&A Transaction Fee attributable thereto shall be paid simultaneously therewith.

**Primary Definitions of Transaction Enterprise Value (not alphabetically listed)**:

"**Equity/Asset Consideration**" means the sum of all amounts paid or payable (directly or indirectly, to the applicable Client and/or its holders of Equity-Equivalents, in connection with a consummated M&A Transaction) in consideration for (a) in the case of a Crosby Sale, the Equity-Equivalents, assets, business, revenues and/or income of the Crosby Group, and (b) in the case of an LC JV Transaction, the Equity-Equivalents, assets, business, revenues and/or income of Luhr Crosby, in each case consisting of the following (as defined below), *in each case without duplication*: (i) Cash Consideration; (ii) Non-Cash Consideration; (iii) Transaction Proceeds Distributions; and (iv) Contingent Post-Closing Consideration.

"**Assumed Crosby Indebtedness**" means any balance sheet liability of the Crosby Group as of the date of Closing representing an obligation for future cash payments *other than* any (A) trade payable that is either current or less than ninety (90) days past due, or (B) operating lease designated as a capitalized lease under Accounting Standards Codification 842 (ASC 842), in each case to the extent such balance sheet liability *either*: (i) is expressly assumed by the acquiror in an structured as a sale of assets, (ii) remains an obligation of the Crosby Group at the time of the Closing of the Crosby Sale structured in any other way, *or* (iii) is repaid, defeased or extinguished from the proceeds paid by the acquiror in connection with or anticipation of such Crosby Sale rather than from the unrestricted cash on the Crosby Group's balance sheets prior to Closing (i.e., cash that is legally and contractually available for either reduction of indebtedness or distribution to Crosby Group securityholders, in each case without any adverse impact on TEV).

"**Assumed Luhr Crosby Indebtedness**" in an LC JV Transaction means any balance sheet liability of Luhr Crosby as of the date of Closing representing an obligation for future cash payments *other than* any (A) trade payable that is either current or less than ninety (90) days past due, or (B) operating lease designated as a capitalized lease under Accounting Standards Codification 842 (ASC 842), in each case to the extent such balance sheet liability *either*: (i) is expressly assumed by the acquiror in an structured as a sale of assets, (ii) remains an obligation of Luhr Crosby at the time of Closing of an LC JV Transaction structured in any other way, *or* (iii) is repaid, defeased or extinguished from the proceeds paid by the acquiror in connection with or anticipation of an LC JV Transaction rather than from the unrestricted cash on Luhr Crosby's balance sheet prior to Closing (i.e., cash that is legally and contractually available for either reduction of indebtedness or distribution to Luhr Crosby's securityholders, in each case without any adverse impact on TEV).

"**Diverted Payments**" means amounts delivered to any stakeholder of, as applicable, the Crosby Group in connection with a Crosby Sale or Luhr Crosby in connection with an LC JV Transaction, in each case under arrangements established by the applicable entity before or at Closing in contemplation of a potential M&A Transaction consisting of retention, change of control, and/or similar bonus or payment arrangements.

**Sub-Definitions of Transaction Enterprise Value**:

"**Cash Consideration**" means transaction consideration delivered at Closing in the form of cash or cash equivalents (which, for clarity, includes Escrowed Funds, if any), as well as the aggregate value of any deferred or installment purchase price payments, regardless of when delivered.

Docusign Envelope ID: C16A9CD8-D196-481B-99AA-9F7DBCC22093

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
February 2, 2026
Page 21

"**Contingent Post-Closing Consideration**" means transaction consideration in the form of post-Closing payments contractually contingent upon future operational performance or conditions other than the mere passage of time (e.g., earn-outs; etc., but excluding Escrowed Funds).

"**Equity-Equivalents**" in a Crosby Sale means any of the following (whether or not vested): (a) any form or class of capital stock of any member of the Crosby Group (including without limitation convertible securities); (b) any options, warrants, or other rights to acquire capital stock of any member of the Crosby Group; and (c) any in-the-money phantom equity or profit interests plans of any member of the Crosby Group.

"**Equity-Equivalents**" in an LC JV Transaction means any of the following (whether or not vested): (a) any form or class of Luhr Crosby capital stock (including without limitation convertible securities); (b) any Luhr Crosby options, warrants, or other rights to acquire capital stock; and (c) any in-the-money Luhr Crosby phantom equity or profit interests plans.

"**Escrowed Funds**" means transaction consideration placed in escrow at Closing (and/or otherwise subject to a holdback) to secure (in whole or part) obligations of, as applicable, the Crosby Group and/or its respective securityholders in connection with a Crosby Sale or Luhr Crosby and/or its securityholders in connection with an LC JV Transaction, in each case under the Definitive Agreement governing such M&A Transaction.

"**Non-Cash Consideration**" means non-cash transaction consideration delivered at Closing to, as applicable, of any member of the Crosby Group and/or its stakeholders in connection with a Crosby Sale or Luhr Crosby and/or its stakeholders in connection with an LC JV Transaction, in each case by or on behalf of a Counterparty, including without limitation in the form of: (i) securities; (ii) debt instruments (including without limitation '*seller notes*'); (iii) real or personal property; and (iv) contractual arrangements, other than those governing Contingent Post-Closing Consideration or Cash Consideration.

"**Transaction Proceeds Distributions**" means transaction proceeds not otherwise accounted for under other TEV components that are distributed to applicable stakeholders in the form of dividends, capital distributions, redemptions, cash-outs, or partial or liquidating distributions resulting from distributions to holders of Equity-Equivalents in connection with an M&A Transaction effected other than through a direct purchase and sale of such Equity-Equivalents.

**<u>Exhibit B</u>**

**Richards Declaration**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In re:** | § | **CASE NO. 26-10678** |
| | § | **(JOINTLY ADMINISTERED)** |
| **CROSBY MARINE TRANSPORTATION,** | § | |
| **LLC,** | § | **CHAPTER 11** |
| | § | **COMPLEX CASE** |
| **Debtors.**[1] | § | |
| | § | **SECTION: A** |

**DECLARATION OF GEOFFREY RICHARDS IN SUPPORT OF THE DEBTORS'
APPLICATION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE
EMPLOYMENT AND RETENTION OF RAYMOND JAMES & ASSOCIATES, INC. AS
INVESTMENT BANKER FOR THE DEBTORS, EFFECTIVE AS OF THE PETITION
DATE, (II) WAIVING CERTAIN REPORTING REQUIREMENTS,
AND (III) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Geoffrey Richards, hereby declare under penalty of perjury

that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am a Senior Managing Director and Head of the Capital Structure Advisory Group

at Raymond James & Associates, Inc. ("Raymond James"), which has its principal office at 880

Carillon Parkway, St. Petersburg, Florida 33716.

2.      I am authorized to make this declaration on behalf of Raymond James in support

of the *Debtors' Application for Entry an Order (I) Authorizing the Employment and Retention of*

*Raymond James & Associates, Inc. as Investment Banker for the Debtors, Effective as of the*

*Petition Date, (II) Waiving Certain Reporting Requirements, and (III) Granting Related Relief* (the

"Application").[2]  Unless otherwise stated in this declaration, I have personal knowledge of the

facts set forth herein or provide this declaration based upon information provided to me by other

---

[1] An Order directing joint administration of the Chapter 11 bankruptcy case of Crosby Marine Transportation, LLC [No. 26-10678], as lead case, with the Chapter 11 bankruptcy cases of (i) Crosby Tugs, L.L.C. [No. 26-10679], (ii) Crosby Dredging, LLC [No. 26-10680], and (iii) Bertucci Contracting Company, L.L.C. [No. 26-10681], was entered on March 24, 2026, [No. 26-10678, ECF Doc. 9; No. 26-10679, ECF Doc. 4; No. 26-10680, ECF Doc. 4, No. 26-10681, ECF Doc. 4].

[2] Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the Application.

1

Raymond James professionals[3].

3. Raymond James's professionals have considerable expertise and experience in providing investment banking services to financially distressed companies and to creditors, purchasers, bondholders, and other constituencies in chapter 11 as well as in out-of-court proceedings. Representative engagements that investment bankers at Raymond James have led in prior chapter 11 cases and restructurings include: *American Eagle Energy Corporation*, Case No. 15-15073 (KHT) (Bankr. D. Colo.); *American IronHorse Motorcycles, Inc.*, Case No. 08- 40926 (RFN) (Bankr. N.D. Tex.); *ATLS Acquisition, LLC*, Case No. 13-10262 (LSS) (Bankr. D. Del.); *BI-LO, LLC*, Case No. 09-02140 (HB) (Bankr. D.S.C.); *Bluestem Brands, Inc.*, Case No. 20-10566 (MFW) (Bankr. D. Del.); *Buccaneer Energy*, Case No. 14-60041 (CML) (Bankr. S.D. Tex.); *Calpine Corporation*, Case No. 05-60200 (CGM) (Bankr. S.D.N.Y.); *CB Holding Corp.*, Case No. 10- 13683 (MFW) (Bankr. D. Del.); *CCNG Energy Partners, LP*, Case No. 15-70136 (TMD) (Bankr. W.D. Tex.); *Clarus Therapeutics Holdings, Inc.*, Case No. 22-10845 (MFW) (Bankr. D. Del.); *Color Spot Holdings, Inc.*, Case No. 18-11272 (LSS) (Bankr. D. Del.); *Dakota Plains Holdings, Inc.*, Case No. 16-43711 (MER) (Bankr. D. Minn.); *Diamond Glass Companies, Inc.*, Case No. 08-10601 (CSS) (Bankr. D. Del.); *Gateway Ethanol, L.L.C.*, Case No. 08-22579 (DLS) (Bankr. D. Kan.); *GIORDANO'S LLC*, Case No. 11-06146 (ERW) (Bankr. N.D. Ill.); *Gritstone Bio Inc.*, Case No. 24-12305 (KBO) (Bankr. D. Del.); *Gulf Fleet Holdings, Inc.*, Case No. 10- 50713 (JWK) (Bankr. W.D. La.); *Halt Medical, Inc.*, Case No. 17-10810 (LSS) (Bankr. D. Del.); *Hipcricket, Inc.*, Case No. 15-10104 (LSS) (Bankr. D. Del.); *HMX Acquisition Corp.*, Case No. 12-14300 (MEW) (Bankr. S.D.N.Y.); *Hooper Holmes, Inc.*, Case No. 18-23302 (RDD) (Bankr. S.D.N.Y.); *International Garden Products, Inc.*, Case No. 10- 13207 (KJC) (Bankr. D. Del.); *Just*

---

[3] Certain of the disclosures herein relate to matters within the personal knowledge of other professionals at Raymond James and are based on information provided by them.

2

*One More Restaurant Corp.*, Case No. 19-01947 (FMD) (Bankr. M.D. Fla.); *KeyLime Cove Waterpark, Inc.*, Case No. 09-14418 (KJC) (Bankr. D. Del.); *Loehmann's, Inc.*, Case No. 99-01138 (JHW) (Bankr. D. Del.); *LVI Intermediate Holdings, Inc.*, Case No. 20-11413 (KBO) (Bankr. D. Del.); *Max & Erma's, Inc.*, Case No. 09-27807 (JAD) (Bankr. W.D. Pa.); *National Envelope Corporation*, Case No. 10-11891 (BLS) (Bankr. D. Del.); *Personal Communication Devices, LLC*, Case No. 13-74303 (AST) (Bankr. E.D.N.Y.); *Phoenix Payment Systems, Inc.*, Case No. 14-11848 (MFW) (Bankr. D. Del.); *PLx Pharma, Inc.*, Case No. 23-10456 (MFW) (Bankr. D. Del.); *Proteus Digital Health, Inc.*, Case No. 20-11580 (BLS) (Bankr. D. Del.); *Quanergy Systems, Inc.*, Case No. 22-11305 (CTG) (Bankr. D. Del.); *Renew Energy, LLC*, Case No. 09-10491 (RDM) (Bankr. W.D. Wis.); *Response Genetics, Inc.*, Case No. 15-11663 (LSS) (Bankr. D. Del.); *Robbins Bros. Corporation*, Case No. 09-10708 (PJW) (Bankr. D. Del.); *Santa Fe Gold Corporation*, Case No. 15-11761 (MFW) (Bankr. D. Del.); *SynCardia Systems, Inc.*, Case No. 16-11599 (MFW) (Bankr. D. Del.); *SP Newsprint Holding LLC*, Case No. 11-13649 (CSS) (Bankr. D. Del.); and *Teligent, Inc.*, Case No. 21-11332 (BLS) (Bankr. D. Del.).

4. In addition, I have taught the class "Corporate Restructuring" at Northwestern Pritzker School of Law as an adjunct professor since 2001.

5. Raymond James also has a dedicated transportation investment banking group (the "Transportation Group") that provides a full range of advisory and capital raising solutions to companies and investors in the transportation sector. Investment bankers in the Transportation Group at Raymond James have led more than 200 completed equity, debt, M&A, and restructuring transactions covering various subsectors, including, without limitation, aviation, logistics, trucking, rail, marine, transportation leasing, and infrastructure. The Group has formed deep ties with senior executives and private equity firms in the marine sector while showing an

3

understanding of the business challenges and opportunities that clients' companies face and is well-positioned to provide expert advisory services to the Debtors in these Cases.

6. Raymond James's professionals have become acquainted with the Debtors' business, capital structure and related matters. Accordingly, Raymond James has relevant experience and expertise regarding the Debtors that will assist Raymond James in providing effective and efficient services in these Chapter 11 Cases and thus is well qualified to provide the services required by the Debtors.

7. In connection with its proposed retention by the Debtors in these Chapter 11 Cases, Raymond James obtained from the Debtors or their representatives the names of individuals and entities that may be parties in interest in the Debtors' Chapter 11 Cases (the "Potential Parties in Interest"), which parties are listed on **Schedule 1** annexed hereto. Raymond James then compared the names of the Potential Parties in Interest with the names of entities that have entered into investment banking engagement agreements with Raymond James in the last three years. To the extent that this inquiry revealed that any of the Potential Parties in Interest (or their apparent affiliates or entities that Raymond James believes to be affiliates, as the case may be) entered into any such engagement agreements with Raymond James within the last three years, such parties are set forth in **Schedule 2** annexed hereto.

8. To the best of my knowledge and belief, Raymond James's representation of each entity listed on **Schedule 2** (or their apparent affiliates or entities that Raymond James believes to be affiliates, as the case may be) was or is only on matters that are unrelated to the Debtors and these Chapter 11 Cases, except as stated herein. Other than as listed on **Schedule 2**, I am unaware of any investment banking engagements of Raymond James by the Potential Parties in Interest within the last three years.

9. Given the size of the firm and the breadth of Raymond James's client base, it is possible that Raymond James may now or in the future be retained by one or more of the Potential Parties in Interest in unrelated matters without my knowledge. To the extent that Raymond James discovers any, or enters into any new, material relationship with Potential Parties in Interest relating to the Debtors or these Chapter 11 Cases, it will supplement this declaration.

10. In addition to the parties listed on **Schedule 1**, Raymond James or its affiliates may also represent, or may have represented, affiliates, equity holders, creditors or sponsors of Potential Parties in Interest, and may have worked with, continue to work with, have or had mutual clients with, been represented by or advised certain accounting and law firms that are Potential Parties in Interest (and, in the case of law firms, may have entered into engagement agreements in which the law firm was named as client although the work was performed for a mutual client of the applicable law firm). Raymond James may also represent, or may have represented in the past, committees or groups of lenders or creditors in connection with certain restructuring or refinancing engagements, which committees or groups include, or included, entities that are Potential Parties in Interest. Certain of the Potential Parties in Interest may also be vendors or have other non-investment banking relationships with Raymond James.

11. As a global investment and financial services firm, Raymond James and certain of its affiliates may be involved in arbitration or litigation in the ordinary course of business with some Potential Parties in Interest and may have in the past represented, and may currently represent and likely will represent, creditors of the Debtors in connection with matters unrelated to the Debtors and these Chapter 11 Cases. Except as otherwise disclosed in connection with this Application, at this time, Raymond James is not aware of any other adverse interest or other connection it has with the Debtors, their creditors, the Office of the United States Trustee for the

Eastern District of Louisiana, or any Potential Parties in Interest herein in the matters upon which Raymond James is to be retained.

12.     Although Raymond James has researched the Potential Parties in Interest list, the Debtors may have customers, creditors, competitors, and other parties with whom they maintain business relationships that are not included as Potential Parties in Interest and with whom Raymond James may maintain business relationships. Although it is possible that employees of certain affiliates may assist Raymond James in connection with Raymond James's engagement, as only Raymond James is being retained by the Debtors, Raymond James has researched only the electronic client files and records of Raymond James, not of all of its affiliates, to determine connections with any Potential Parties in Interest.

13.     As of the date hereof, Raymond James and its affiliates have approximately 7,500 financial advisors worldwide. It is possible that Raymond James and its affiliates and certain of their respective directors, officers, and employees may have had in the past, may currently have, or may in the future have connections to (i) the Debtors, (ii) Potential Parties in Interest in the Debtors' Chapter 11 Cases, or (iii) funds or other investment vehicles that may own debt or securities of the Debtors or other Potential Parties in Interest.

14.     In the 90 days prior to the Petition Date, the Debtors paid Raymond James a total of $200,000.00 in fees and $50,000.00 as reimbursement for Raymond James's estimated and actual expenses. Of the $50,000.00, $22,994.17 was applied to actual expenses incurred, leaving a retainer of $27,005.83. As of the Petition Date, Raymond James does not hold a prepetition claim against the Debtors for services rendered or expenses incurred.

15.     Other than as disclosed herein, Raymond James has no relationship with the Debtors of which I am aware after due inquiry.

6

16.     Based upon the foregoing, except as otherwise set forth herein, to the best of my knowledge, information, and belief, Raymond James (i) is not a creditor, equity security holder or an insider of the Debtors and (ii) is not or was not, within two years before the Petition Date, a director, officer, or employee of the Debtors. For the reasons set forth above, Raymond James believes that it is disinterested as defined in the Bankruptcy Code and does not hold or represent any interest materially adverse to the Debtors' estates.

17.     No agreement or understanding exists between Raymond James and any other person, other than as permitted by section 504 of the Bankruptcy Code, to share compensation received for services rendered in connection with these Chapter 11 Cases.

18.     The foregoing constitutes the statement of Raymond James pursuant to Bankruptcy Rule 2014(a).

Dated: April 10, 2026                    /s/ Geoffrey Richards
                                         Geoffrey Richards
                                         Senior Managing Director
                                         Raymond James & Associates, Inc.

7

**Schedule 1**

**Potential Parties in Interest**

1. **OFFICE OF THE UNITED STATES TRUSTEE FOR THE EASTERN DISTRICT OF LOUISIANA**

**AMANDA GEORGE**
Office of the U.S. Trustee
400 Poydras St. Ste 2110
New Orleans, LA 70130
Amanda.B.George@usdoj.gov

2. **DEBTORS**

**CROSBY DREDGING, LLC**
17771 Highway 3235
Galliano, LA 70354

**CROSBY TUGS, LLC**
17771 Highway 3235
Galliano, LA 70354

**CROSBY MARINE TRANSPORTATION, LLC**
17771 Highway 3235
Galliano, LA 70354

**BERTUCCI CONTRACTING**
17771 Highway 3235
Galliano, LA 70354

3. **COUNSEL FOR THE DEBTORS**

**LUGENBUHL, WHEATON, PECK, RANKIN & HUBBARD (A Law Corporation)**
Benjamin W. Kadden
Stewart F. Peck
Douglas S. Draper
Greta M. Brouphy
Coleman L. Torrans
601 Poydras Street, Suite 2755
New Orleans, LA 70130
Telephone: (504) 568-1990
Fax: (504) 310-9195
bkadden@lawla.com

speck@lawla.com
ddraper@lawla.com
gbrouphy@lawla.com
ctorrans@lawla.com

**LISKOW & LEWIS, APLC**
Michael D. Rubenstein
1001 Fannin Street, Suite 1800
Houston, TX 77002
mdrubenstein@liskow.com

**4.** **PRE-PETITION AND POST-PETITION LENDERS**

**ALO ADVANCE**
100 Biscayne Blvd., Ste 2303
Miami, FL 33132

**ARBA CREDIT INVESTORS III, L.P.**
Henry A. King
John A. Cangelosi
Ryan M. Ginn
King & Jurgens, LLC
201 St. Charles Avenue, 45th Floor,
New Orleans, LA 70170
hking@kingjurgens.com
jcangelosi@kingjurgens.com
rginn@kingjurgens.com

**ATLANTIC UNION EQUIPMENT FINANCE, INC.,**
2475 Northwinds Pkwy., Suite 330
Alpharetta, GA 30009

**AQUA CAPITAL, LLC**
600 Summer St., Ste. 204
Stamford, CT 06901

And

Samuel Ollunga
41 Madison Avenue, 31st Floor
New York, NY 10010

**BANK OF AMERICA LEASING & CAPITAL, LLC**
Attn: Deborah Johnson
2059 Northlake Parkway, 3rd Floor,
Tucker, GA 30084

9

**BLESSY MARINE SERVICES, INC**
Joseph A. Caneco
Fishman Haygood, LLP
201 St. Charles Avenue, Suite 4600
New Orleans, LA 70170
jcaneco@fishmanhaygood.com

**BREEZE FUNDING**
163 Avenida Del Mar
San Clemente, CA 92672

**CEDAR ADVANCE, LLC**
5401 Collins Avenue CU-9A
Miami Beach, FL 33132

**CELTIC ADVANCE**
251 Little Falls Drive
Wilmington, DE 19808

And

Rickin Desai Law
167 Madison Avenue, Suite 205, #3008
New York, NY 10016

**CITIZENS ASSET FINANCE, A DIVISION OF CITIZENS BANK N.A.,**
71 South Wacker Drive, 29th Floor,
Chicago, Illinois 60606

And

Rick M. Shelby
Kelly Hart Pitre
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Rick.shelby@kellyhart.com

**CITY NATIONAL BANK OF FLORIDA, C/O BCICAPITAL, INC.,**
Attn: Elizabeth Perkins
390 North Orange Avenue, Suite 100
Orlando, Florida 32801

And

Patrick K. Cameron, Esq.

10

Baker Donelson, Bearman, Caldwell & Berkowitz, PC,
100 Light Street
Baltimore, Maryland 21202

And

Matthew C. Guy
Adams & Reese
701 Poydras Street, Suite 4500
New Orleans, LA 70139

And

Alexandra D. Blye
Donald R. Kirk
Carlton Fields, P.A
525 Okeechobee Blvd., Ste. 1200
33401, Suite 1200
West Palm Beach, FL 33401
ablye@carltonfieds.com
dkirk@carltonfields.com

**CLEARFUND SOLUTIONS, LLC**
99 Wall Street, 2613
New York, NY 10005

**COLDWATER CAPITAL, LLC**
109 South Spring Street, Floor 1
Brooklyn, NY 11249

**COOPER INVESTMENTS, LLC**
600 Summer St., Ste. 204
Stamford, CT 06901

And

Samuel Ollunga
41 Madison Avenue, 31st Floor
New York, NY 10010

**DEPENDENCE PLATINUM**
Corporation Cretions Network Inc
801 US Highway 1
North Palm Beach, FL 33408

And

11

Logan Fahrenkopf
Epstein & Fahrenkopf, LLP
205 Hudson Street, Floor 7
New York, NY 10013

**ELGA ONE, LLC-SERIES III**
221 Waukegan Road, Suite 100
Attn: Brian Trebels
Northfield, IL 60093-2755

And

Daniel C. Rodgers, Esq.,
Baker Donelson, Berman, Caldwell & Berkowitz, PC
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170

**EN OD CAPITAL**
1202 Avenue U, Ste. 115
Brooklyn, NY 11229

And

Issac Akerman
Madeb Law, PLLC
1202 Avenue U #1287
Brooklyn, NY 11229

**EQUIPMENT LEASING GROUP OF AMERICA, LLC**
Edward H. Arnold, III
Joseph Patrick Briggett
Baker Donelson Bearman Caldwell Berkowit
201 St. Charles Avenue, Ste 3600
New Orleans, LA 70170
harnold@bakerdonelson.com
jbriggett@bakerdonelson.com

**FOREVER FUNDING, LLC**
Registered Agents Inc
2839 Main Street, Suite 100
Glastonbury, CT 06033

And

Gene Rosen
Gene Rosen's Law Firm

12

200 Garden City Plaza, Suite 405
Garden City, NY 11530

**FREEDOM FUNDING, LLC**
600 Summer St., Suite 204
Stamford, CT 06901

And

Samuel Ollunga
41 Madison Avenue, 31st Floor
New York, NY 10010

**GALT FUNDING CO**
600 Summer St., Suite 204
Stamford, CT 06901

And

Samuel Ollunga
41 Madison Avenue, 31st Floor
New York, NY 10010

**HANCOCK WHITNEY BANK**
7910 Main Street
Houma, LA 70360
Attn: Tommy D. Pitre

**HELIX ENERGY SOLUTIONS GROUP, INC.**
Paul J. Goodwine
Lindsey M. Johnson
Looper Goodwine, P.C.
650 Poydras Street, Suite 2400
New Orleans, LA 70130
pgoodwine@loopergoodwine.com
ljohnson@loopergoodwine.com

**INSIGHT CAPITAL, LLC**
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

And

Roderick Woods, P.C.
800 Third Ave., Fifth Floor

13

New York, NY 10022

**JMB CAPITAL PARTNERS LENDING, LLC**
Mark A. Mintz
James A. Copeland
Jones Walker LLP
201 St. Charles Avenue, Suite 5100
New Orleans, LA 70170
mminttz@joneswalker.com

And

James A. Copeland
Francisco Vazquez
Robert Hirsh
Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY 10019
james.copeland@nortonrosefulbright.com
Francisco.vazquez@nortonrosefulbright.com
Robert.hirsh@nortonrosefulbright.com

**J.J. ASTOR & CO.**
26 S Rio Grande Street, #2072
Attn: Michael Pope, CEO
Salt Lake City, Utah 84101

And

Elliot S. Weiss, Esq.
Barton LLP,
711 Third Avenue, 14th Floor
New York, NY 70017

Alexander J. Degiulio
Chaffe McCall
2300 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-2300

And

David J. Messina, Esq.
Fernand L. Laudumiey, IV, Esq.
Chaffe McCall, LLP
2300 Energy Centre, 110 Poydras St.

14

New Orleans, LA 70163
messina@chaffe.com
laudumiey@chaffe.com


**KOMPASS KAPITAL FUNDING, LLC**
Attn: John P. Minnis, Chief Executive Officer
9800 Metcalf Avenue, Suite 120
Overland Park, Kansas 66212

And

Aaron B. Greenbaum
Pusateri, Johnston, Guillot & Greenbaum, LLC
1100 Poydras Street, Suite 2250
New Orleans, LA 70163
Aaron.greenbaum@pjgglaw.com

And

Christopher F. Hamilton
Spencer Fane
201 N. Franklin St., Ste. 2150
Tampa, FL 33602
chamilton@spencerfane.com

And

Andrea M. Chase
Spencer Fane, LLP
1000 Walnut St., Suite 1400
Kansas City, MO 64106
achase@spencerfane.com

**LIBERTAS FUNDING, LLC**
411 West Putnam Avenue, Suite 220
Greenwich, CT 06830

**LUHR BROS, INC.**
David S. Rubin
Butler Snow, LLP
445 N. Blvd., Suite 300
Baton Rouge, LA 70821
David.rubin@butlersnow.com

And

15

James J. Niemeier
McGrath North Mullin & Kratz, PC LLO
1601 Dodge Street, Ste. 3700
Omaha, NE 68102
jniemeier@mcgrathnorth.com

**MEGED FUNDING GROUP**
Vcorp Services, LLC
108 W. 13th Street, Ste. 100
Brick, NY 19801

And

Logan Fahrenkopf
Epstein & Fahrenkopf, LLP
205 Hudson Street, Floor 7
New York, NY 10013

**MC BANK & TRUST COMPANY**
P.O. Drawer 2000,
1201 Brashear Avenue
Morgan City, LA 70380

**MICHAEL WARNER**
A.Brooke Watford Altazan
Abigail W. Mock
Stewart Robbins Brown & Altazan, LLC
301 Main Street, Suite 1640
Baton Rouge. LA 70801
baltazan@stewartrobbins.com
amock@stewartrobbins.com

**MOBY CAP LLC**
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

And

Steven Zakharyayev
10 W 37th Street, Floor 10
New York, NY 10018

**MYNT ADVANCE**
7901 4th Street N, Suite 300
St. Petersburg, FL 33702

16

**NOVAC EQUITIES LLC**
United States Corporation Agents, Inc
500 Post Road East, 2nd Floor
Westport, CT 06880

And

Samuel Ollunga
41 Madison Avenue, 31st Floor
New York, NY 10010

**ON DECK**
4700 W. Daybreak Pkwy., Suite 200
South Jordan, UT 84009

**ORACAP, LLC**
Harvard Business Services, Inc
16192 Coastal Hwy
Lewes, DE 19958

**OVERTIME CAPITAL**
One World Trade Center
285 Fulton St., Suite 850
New York, NY 10007

**PARKVIEW ADVANCE**
600 Summer St
Stamford, CT 06901

**PINNACLE BUSINESS FUNDING, LLC**
1202 Avenue U, Ste 1115
Brooklyn, NY 11229

**PNC BANK, N.A.**
Richard A. Aguilar
Mark J. Chaney
Adams and Reese LLP
701 Poydras Street, 45th Floor
New Orleans, LA 70139
richard.aguilar@arlaw.com
mark.chaney@arlaw.com

and

Regina Strango Kelborn
Lawrence R. Thomas
Gregory F. Vizza

17

Blank Rome, LLP
1201 N. Market Street, Suite 800
Wilmington, DE 19801
Regina.kelbon@blankrome.com
Lorenzo.thomas@blankrome.com
Gregory.vizza@blankrome.com


**PNC EQUIPMENT FINANCE, LLC**
David Verlizzo
655 Business Center Drive, Suite 250
Horsham, Pennsylvania 19044

And

Patrick K. Cameron, Esquire,
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC,
100 Light Street
Baltimore, Maryland 21202

And

John E. Lucian
Blank Rome
One Logan Square
130 North 18th Street
Philadelphia, Pennsylvania 19103

And

Richard A. Aguilar
Mark J. Chaney
Adams and Reese LLP
701 Poydras Street, 45th Floor
New Orleans, LA 70139
richard.aguilar@arlaw.com
mark.chaney@arlaw.com


**POST ROAD EQUIPMENT FINANCE SPV, LLC F/K/A ENCINA EQUIPMENT FINANCE SPV, LLC**
Katie Branch
1221 Post Road East, Suite 201
Westport, CT 06880

And

18

Raymond T. Waid,
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, LA 70139

**REGIONS COMMERCIAL EQUIPMENT FINANCE, LLC**
Jimmy Sively
1900 5th Avenue North, Suite 2400
Birmingham, AL 35203

**RELIANCE FINANCIAL FL, LLC**
Corporation Cretions Network Inc
801 US Highway 1
North Palm Beach, FL 33408

And

Logan Fahrenkopf
Epstein & Fahrenkopf, LLP
205 Hudson Street, Floor 7
New York, NY 10013

**ROCKET CAPITAL NY, LLC**
1250 E. Hallandale Beach Blvd., Suite 505
Hallandale Beach, FL 33009

**SOUTH LAFOURCHE BANK & TRUST COMPANY**
Main Office: 13226 West Main
P.O. Box 489
Larose, LA 70373

**SQ ADVANCE**
Registered Agents Inc
7901 4th Street, Suite 300
St. Petersburg, FL 33702

And

Issac Akerman
Madeb Law, PLLC
1202 Avenue U #1287
Brooklyn, NY 11229

**STATE BANK & TRUST COMPANY**
Cut off Branch
14828 West Main

19

Cut Off, LA 70345

**SURGE FUNDING, LLC**
HYS Tax and Accounting Firm, Inc
103 Chester Ave
Brooklyn, NY 11218

And

Samuel Ollunga
41 Madison Avenue, 31st Floor
New York, NY 10010

**TRUE BUSINESS FUNDING**
Interstate Agent Services LLC
8 Carroll Dr.
Suffern, NY 10901

**WEB BANK**
c/o Liberatas Fundng LLC
411 West Putnam Avenue, Suite 220
Greenwich, CT 06830

**WYNWOOD CAPITAL GROUP**
20200 W. Dixie Highway
Miami, FL 33180

**6.    DEBTORS' CONSOLIDATED THIRTY (30) LARGEST UNSECURED CREDITORS**

**AFS/IBEX FINANCIAL SERVICE INC**
PO BOX 650786
DALLAS, TX
75265-0786

**BNA MARINE SERV**
PO BOX 150
MORGAN CITY, LA
70381

**C-PORT / STONE LLC**
P. O. BOX 674554
DALLAS, TX
75267-4554

**CANAL BARGE CO., INC. LOCKBOX**

20

P. O. BOX 919290
DALLAS, TX
75391-9290

**CATHERINE MARINE SERVICE**
P.O. BOX 2052
HOUMA, LA 70361

**CGBM 100**
P.O. BOX 2283
KENNER, LA 70063

And

Tristian Manthey
Cherie Dessauer Nobles
Fishman Haygood, L.L.P.
201 St. Charles Ave., 46th Floor
New Orleans, La 70170
tmanthey@fishmanhaygood.com
cnobles@fishmanhaygood.com

**DELATA360**
P.O. BOX 737514
DALLAS, TX
75373-7514

**DIESEL SOURCE, INC.**
P.O. BOX 8014
HOUMA, LA 70361

**ELITE DIESEL PERFORMANCE**
221 NORTH HOLLYWOOD RD.
HOUMA, LA 70364

**EXTREME WELDING SERVICE, LLC**
18367 HWY 3235
GALLIANO, LA 70354

**FIELD SERVICE HYDRAULICS**
40364 ABBY JAMES ROAD
PRAIRIEVILLE, LA 70769

**GRAY & COMPANY, INC.**
P.O. BOX 6202
METAIRIE, LA 70009-6202

**GREEN COUNTRY ROOFTOPS & RESTORATION**
1420 HELIOS AVE
METAIRIE, LA 70005

**HERCULES WIRE ROPE & SLING CO.**
3404 TROTTER
COURT HOUMA, LA
70363-5480

**HYDROTERRA TECHNOLOGIES, LLC**
1129 HUVAL LANE
BREAUX BRIDGE, LA 70517
KENTWOOD SPRINGS
PO BOX 660579
DALLAS, LA 75266-0579

**KENTWOOD SPRINGS**
P.O. Box 660579
Dallas, TX 75266-0579

**KIRBY INLAND MARINE, INC**
55 WAUGH DRIVE, 8TH FLOOR
ATTN:MARIA TAVARES-ACCOUNTING
HOUSTON, TX 77007

**MARSHLAND EQUIPMENT RENTALS**
9545 WARD LINE ROAD
BELL CITY, LA 70630

**MASSE CONTRACTING INC.**
P.O. BOX 1256
RACELAND, LA 70394

**NUCOR SKYLINE STEEL, INC.**
24771 NETWORK PLACE
CHICAGO, IL
60673-1247

**REBSTOCK SUPPLY COMPANY**
18708 WEST MAIN
GALLIANO, LA 70354

**RETIF OIL & FUEL LLC**
1840 JUTLAND DRIVE
HARVEY, LA 70058

**SEA ROPES LLC**

22

PO BOX 384
BELLE CHASE, LA 70037

**SOUTHERN CRANE & HYDRAULICS, INC.**
P.O. BOX 39
BOURG, LA 70769
SOUTHWEST SHIPYARD L.P.
DEPT 116
P.O. BOX 4458
HOUSTON, TX 77210-4458

**SOUTHWEST SHIPYARD L.P**.
Dept. 116 P.O. Box 4458
Houston, TX 77210-4458

**SPI/MOBILE PULLEY WORKS INC.**
P. O. BOX 50010
MOBILE, AL 36605

**THOMA SEA MARINE CONSTRUCTORS**
P.O. BOX 399
BOURG, LA 70343

**VACCO MARINE, INC.**
P.O. BOX 8032
HOUMA, LA 70361

**7.      PARTIES WHO HAVE APPEARED AND REQUESTED NOTICE**

**AARON J. GUIDRY TRUST**
c/o Albert Derbes, IV, Esq
3027 Ridgelake Dr.
Metairie, LA 70002-4924
AJDIV@DERBESLAW.COM

And
Yvette A. D'Aunoy
Middleberg Riddle Group
909 Poydras St., Ste. 1400
New Orleans, LA 70112
Via CM/ECF ydaunoy@midrid.com

And
Eric J Derbes
The Derbes Law Firm, LLC
3027 Ridgelake Dr.

23

Metairie, LA 70002
Via CM/ECFederbes@derbeslaw.com

**AARON J. GUIDRY**
c/o Albert Derbes, IV, Esq
3027 Ridgelake Dr.
Metairie, LA 70002-4924
Via CM/ECF AJDIV@DERBESLAW.COM

And

Yvette A. D'Aunoy
Middleberg Riddle Group
909 Poydras St., Ste. 1400
New Orleans, LA 70112
Via CM/ECF ydaunoy@midrid.com

**LAUREN M. GUIDRY, TRUST**
c/o Albert Derbes, IV, Esq
3027 Ridgelake Dr.
Metairie, LA 70002-4924
Via CM/ECF AJDIV@DERBESLAW.COM

And
Yvette A. D'Aunoy
Middleberg Riddle Group
909 Poydras St., Ste. 1400
New Orleans, LA 70112
Via CM/ECF ydaunoy@midrid.com

And

Eric J Derbes
The Derbes Law Firm, LLC
3027 Ridgelake Dr.
Metairie, LA 70002
Via CM/ECFederbes@derbeslaw.com

**LAUREN GUIDRY LEYRER**
c/o Albert Derbes, IV, Esq
3027 Ridgelake Dr.
Metairie, LA 70002-4924
Via CM/ECF AJDIV@DERBESLAW.COM

And
Yvette A. D'Aunoy

24

Middleberg Riddle Group
909 Poydras St., Ste. 1400
New Orleans, LA 70112
Via CM/ECF ydaunoy@midrid.com

And
Eric J Derbes
The Derbes Law Firm, LLC
3027 Ridgelake Dr.
Metairie, LA 70002
Via CM/ECFederbes@derbeslaw.com

**PADDY CROSBY**
c/o Albert Derbes, IV, Esq
3027 Ridgelake Dr.
Metairie, LA 70002-4924
Via CM/ECF AJDIV@DERBESLAW.COM

And
Yvette A. D'Aunoy
Middleberg Riddle Group
909 Poydras St., Ste. 1400
New Orleans, LA 70112
Via CM/ECF ydaunoy@midrid.com

And
Eric J Derbes
The Derbes Law Firm, LLC
3027 Ridgelake Dr.
Metairie, LA 70002
Via CM/ECFederbes@derbeslaw.com

**T & T SALVAGE LLC**
Robert P. Vining
Schouest, Bamdas, Soshea, & BenMaier PLLC
1001 McKinney St., Suite 1400
Houston, TX 77002
rvining@sbsblaw.com

**XENOS MARINE, LLC**
Robert P. Vining
Schouest, Bamdas, Soshea, & BenMaier PLLC
1001 McKinney St., Suite 1400
Houston, TX 77002
rvining@sbsblaw.com

**8.**     **ALL APPLICABLE GOVERNMENTAL AGENCIES**

**CAMERON PARISH TAX COLLECTOR**
124 Recreation Center Lane
P.O. Box 1250
Camerson, LA 70631

**STATE OF LA – DEPT OF REVENUE**
617 North Third Street
Baton Rouge, LA 70802-5432

**LOUISIANA DEPARTMENT OF REVENUE**
PO Box 66658
Baton Rouge, LA 70896-6658

And

**FLORENCE BONACCORSO-SAENZ**
Senior Bankruptcy Counsel
Litigation Division
Louisiana Department of Revenue
617 North Third Street, Office 780
Baton Rouge, LA 70802

**LAFOURCHE PARISH SHERIFF'S OFFICE**
P.O. Box 5608
Thibodaux, LA 70302
**LOUISIANA WORKFORCE COMMISSION**
UI Tax and Adjudications
Attn: Bankruptcy Unit
PO Box 44127
Baton Rouge, LA 70804-4127

**STATE OF LA ATTORNEY GENERAL CIVIL DIV**
Chris Lento
PO Box 94005
Baton Rouge, LA 70804-9005

**GLENN K. SCHREIBER**
Assistant United States Attorney
Eastern District of Louisiana
650 Poydras St Ste 1600
New Orleans, LA 70130
Glenn.schreiber@usdoj.gov

**US ATTORNEY FOR ED LA BANKRUPTCY**
650 Poydras St Ste 1600

26

New Orleans, LA 70130-7212

**INTERNAL REVENUE SERVICE**
P.O. Box 7346
Philadelphia, PA 19101-7346

**US DEPARTMENT OF JUSTICE**
Attorney General
950 Pennsylvania Ave NW
Washington, DC 20530

**UNITED STATES ATTORNEY'S OFFICE**
650 Poydras Street, Suite 1600
New Orleans, LA 70130

**STATE OF LOUISIANA ATTORNEY GENERAL**
Attn: Bankruptcy Department
PO Box 94095
Baton Rouge, LA 70804-4095

**PLAQUEMINES PARISH SHERIFF**
8022 Highway 23 Ste 302
Belle Chasse, LA 70037-2402

**PLAQUEMINES PARISH ASSESSOR OFFICE**
106 Ave G
Belle Chasse, LA 70037-2710

**PLAQUEMINES PARISH SALES TAX DIVISION**
333 F. Edward Hebert Blvd., Bldg. 102, Suite 345
Belle Chasse, LA 70037

**ST. MARY PARISH TAX COLLECTOR**
1455 Railroad Ave.
Morgan City, LA 70380

**TERREBONNE PARISH SHERIFF'S OFFICE**
Sheriff Timoth Soignet
P.O. Box 1990
3441 West Park Ave.
Gray, LA 70359

27

## Schedule 2

### Representations of Parties in Interest

Raymond James & Associates, Inc. is the sole Raymond James entity proposed to be retained by the Debtors in these Chapter 11 Cases. Accordingly, only the connections of Raymond James & Associates, Inc. are directly relevant for purposes of the Debtors' application to employ Raymond James. In an abundance of caution and in the interest of full transparency, however, the disclosures set forth herein also describe certain relationships involving Raymond James & Associates, Inc.'s affiliates. Except as otherwise expressly noted, all such disclosures relate to matters unrelated to the Debtors, the Debtors' affiliates, or these Chapter 11 Cases. For all disclosures concerning relationships where capital was deployed or funds are held by Raymond James and its affiliates, such capital represents less than 1% of the assets under management thereof. For all disclosures concerning relationships where the named person or entity is a vendor of Raymond James and its affiliates, such person or entity is not a critical vendor. A "professional" relationship means one where Raymond James was working as a professional alongside or against the other noted professional. A "business" relationship means one where Raymond James was engaged by the person or entity noted.