**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In re:** | § | **CASE NO. 26-10678** |
| | § | **(JOINTLY ADMINISTERED)** |
| **CROSBY MARINE TRANSPORTATION,** | § | |
| **LLC,** | § | **CHAPTER 11** |
| | § | **COMPLEX CASE** |
| Debtors.[1] | § | |
| | § | **SECTION: A** |

**DEBTORS' EXPEDITED MOTION FOR AMENDMENT TO THE TERMS OF THE DEBTORS' DIP FACILITY**

> **EXPEDITED RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON APRIL 21, 2026 AT 11:00 A.M. AT THE UNITED STATES BANKRUPTCY COURT, 500 POYDRAS ST., COURTROOM B-709, NEW ORLEANS, LOUISIANA 70130. PARTIES IN INTEREST MAY PARTICIPATE IN THE HEARING (I) IN PERSON; (II) BY TELEPHONE ONLY (DIAL IN: 504.517.1385, ACCESS CODE: 129611); OR (III) BY TELEPHONE USING THE DIAL- IN NUMBER AND VIDEO USING HTTPS://GOTOMEET.ME/JUDGEGRABILL (MEETING CODE: "JUDGEGRABILL"). IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EXPEDITED CONSIDERATION IS NOT WARRANTED, YOU MUST FILE A WRITTEN RESPONSE ON OR BEFORE THE DEADLINE SET BY THE COURT, OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Crosby Marine Transportation, LLC ("*CMT*"), Crosby Tugs, L.L.C. ("*Crosby Tugs*"), Crosby Dredging, LLC ("*Crosby Dredging*") and Bertucci Contracting Company, L.L.C. ("*Bertucci*") as debtors and debtors-in-possession, (collectively, "*Debtors*") file this supplement (the "*Supplemental DIP Motion*") to the DIP Motion (as defined below) seeking, among other things, authorization and approval to amend the terms of the Debtors' DIP Facility (as defined

---

[1] An Order directing joint administration of the Chapter 11 bankruptcy case of Crosby Marine Transportation, LLC [No. 25-10678], as lead case, with the Chapter 11 bankruptcy cases of (i) Crosby Tugs, L.L.C. [No. 26-10679], (ii) Crosby Dredging, LLC [No. 26-10680], and (iii) Bertucci Contracting Company, L.L.C. [No. 26-10681], was entered on March 24, 2026, [No. 26-10678, ECF Doc. 9; No. 26- 10679, ECF Doc. 4; No. 26-10680, ECF Doc. 4, No. 26-10681, ECF Doc. 4].

below) to provide for (a) up to $17 million in incremental financing, which will be used in connection with, among other things, payment of operational expenses and professional fees during the pendency of the MCA Litigation and (b) payment of the Incremental Fees (as defined below). In support of this Supplemental DIP Motion, the Debtors aver as follows:

**PRELIMINARY STATEMENT**

1.      The Debtors and their professionals are, among other things, currently attending to the Debtors' ordinary course business, conducting marketing processes for the Debtors' businesses as going concerns, and engaging in discovery and preparation for the final hearing to approve the DIP Facility and the Debtors' use of cash collateral set for April 21, 2026 at 11:00 a.m. ("*Final Hearing*"). Deposition of the Debtor's Chief Restructuring Officer in connection with the DIP Motion, is being conducted tomorrow, on April 15, 2026, and is anticipated to take up the balance of the day.

2.      In addition to the foregoing, the Debtors and the professionals are currently preparing for a two-day evidentiary hearing ("*MCA Hearing*") set to begin on Thursday, April 2026 in a related adversary proceeding, *Crosby Marine Transportation, LLC, et al. v. Meged Funding Group, et al.*, Adv. No. 26-01018 (the "*MCA Litigation*"). The Debtors commenced the MCA Litigation against parties who provided funding pursuant to putative agreements to purchase certain of the Debtors' accounts receivable—these merchant cash advance ("*MCA*") funders named as defendants in the MCA Litigation ("*MCA Defendants*") sent communications to the Debtors' customers demanding that they hold or deliver to them Crosby Tugs and Crosby Dredging's accounts receivable ("*Crosby Accounts Receivable*"). As a result, the Debtors' customers began withholding payment of the Crosby Accounts Receivable. In the MCA Litigation, as set forth in the Debtors' adversary complaint, the Debtors seek delivery from their customers of approximately $18,700,000 in Crosby Accounts Receivable to the extent matured in the ordinary

course, approximately $12,350,000 of which was past due at commencement of the MCA Litigation.

3. The Debtors anticipate prevailing in the MCA Litigation, but trial on an emergency basis imposes substantial additional costs on the estates and assuming the Debtors obtain a turnover order as requested, the Debtors may still suffer a liquidity shortfall during the delay between entry of an order for turnover and customer compliance with that order. An "upsize" of the DIP Facility is necessary to protect the Debtors' ongoing operations, give the Debtors a breathing spell, and allow the Debtors to refocus on maximizing value of the estate during these first critical weeks of the chapter 11 cases. Approval of the Supplemental DIP Motion will also allow for additional process in the MCA Litigation and potentially an efficient and consensual resolution with some or all of the MCA Defendants with input from the newly formed official committee of unsecured creditors ("**Committee**").

## RELIEF REQUESTED

4. By this Supplemental DIP Motion, the Debtors seek entry of a final order approving the DIP Motion (such order, the "***Final DIP Order***"),[2] authorizing the Debtors to, among other things, enter into and perform under the DIP Credit Agreement and the other DIP Documents, as amended by the following terms and conditions (collectively, the "***DIP Amendment***"):

a. the DIP Lender will provide Incremental New Money DIP Loans (as defined below) of up to $17,000,000, the proceeds of which shall be (i) used for the payment of certain professional fees and expenses and (ii) used for Operating Disbursements as defined in the Approved Budget;

b. the Incremental New Money DIP Loans shall be made available upon this Court's entry of the Final DIP Order and the parties' execution and delivery of the DIP Credit Agreement and the other DIP Documents, if any; and

---

[2] Except where otherwise specified, capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Final DIP Order, and if not defined therein, the DIP Motion or the Interim DIP Order, as applicable.

c.   in exchange for the Incremental New Money DIP Loans and related commitments, the Debtors shall pay (i) an Incremental Commitment Fee in an amount equal to 2.0% of the Incremental New Money DIP Amount (*i.e.*, $340,000), and (ii) an Incremental Exit Fee in an amount equal to 1.0% of the total DIP Commitments, as amended by the DIP Amendment (*i.e.*, $770,000).

## JURISDICTION AND VENUE

5.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

6.   The statutory basis for the relief requested herein are §§ 105(a), 362, 541, 542, 1107, and 1108 of chapter 11 of Title 11 of the United States Code ("***Bankruptcy Code***"), the Federal Rules of Bankruptcy Procedure ("***Bankruptcy Rules***"), the Local Bankruptcy Rules for the Eastern District of Louisiana (the "***Local Rules***"), and the Procedures for Complex Chapter 11 Cases Filed in the United States Bankruptcy Court for the Eastern District of Louisiana (the "***Complex Case Procedures***") established by General Order 2019-4, amended as of January 10, 2025.

## RELEVANT BACKGROUND

### A.  The Chapter 11 Cases

7.   On March 23, 2026, (the "***Petition Date***"), Debtors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "***Bankruptcy Cases***"). *See* 11 U.S.C. § 301. The Debtors continue to operate their businesses and manage their properties as debtors in possession, pursuant to sections 1107 and 1108 of title 11 of the Bankruptcy Code.

8.   On March 24, 2026, the Court entered an order [ECF Doc. 9] providing that the Bankruptcy Cases are to be consolidated for procedural purposes only and shall be jointly administered by the Court under, *In re Crosby Marine Transportation, LLC*, Case No. 26-10678.

9. On March 24, 2026, the Court entered an order [ECF Doc. 6] that the Complex Case Procedures shall apply to this case. The Complex Case Procedures are posted on the Court's website, https://www.laeb.uscourts.gov/.

10. Additional information regarding the circumstances leading to the commencement of the Bankruptcy Cases and information regarding the Debtors' business and capital structure is set forth in the *Non-Substantively Amended Declaration of Lawrence Perkins in Support of Debtors' Chapter 11 Petitions and First Day Relief* [ECF Doc. 45] (the "***First Day Declaration***").

### B. The DIP Motion and the MCA Litigation

11. On March 24, 2026, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing Debtors to (I) Obtain Postpetition Financing and (II) Use Cash Collateral, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (C) Granting Adequate Protection, (D) Modifying Automatic Stay, (E) Scheduling Final Hearing, and (F) Granting Related Relief* [ECF Doc. 29] (the "***DIP Motion***") seeking approval of a $60 million senior secured superpriority debtor-in-possession term loan facility (the "***DIP Facility***").

12. On March 25, 2026, the Court entered an interim order [ECF Doc. 65] (the "***Interim DIP Order***") approving the DIP Facility on an interim basis and authorizing the Debtors to, among other things, draw up to $40 million of the DIP Facility, comprising up to $10 million in New Money DIP Loans and up to $30 million under the Roll-Up DIP Loan. The Interim DIP Order also approved, on a final basis, certain fees payable to the DIP Lender under the DIP Facility, including the Commitment Fee (*i.e.*, an amount equal to 2.0% of the total DIP Commitments) and the Exit Fee (*i.e.*, an amount equal to 5.0% of the total DIP Commitments).

13. On April 3, 2026, the Debtors commenced the MCA Litigation.

14. On April 9, 2026, the Court conducted an initial status conference in the MCA Litigation and scheduled the MCA Hearing for April 16 and 17, 2026. Thereafter, the Debtors and their professionals engaged in discussions with the DIP Lender and its professionals, as well as certain other parties in interest, regarding potential strategies to address the Debtors' short-term liquidity needs while preserving the rights and interests of the MCA Defendants during the pendency of the MCA Litigation.

15. These negotiations resulted in the amendment to the DIP Facility proposed herein. With Incremental New Money DIP Loans and anticipated payments by certain of the Debtors' customers in accordance with consent orders for turnover entered by the Court, the Debtors anticipate having sufficient liquidity to avoid the necessity of conducting the MCA Hearing on an emergency basis and to allow for additional process with respect to the Debtors' requests for turnover relief.

16. Contemporaneously with the filing of this Supplemental DIP Motion, the Debtors are filing a motion to cancel the MCA Hearing and set a status conference to select new dates for the MCA Hearing and its accompanying deadlines.

17. As set forth herein and will be shown at the Final Hearing, the DIP Amendment is critical to the Debtors' efforts to maintain post-petition operations and maximize value for all stakeholders.

## SUMMARY TERMS OF THE DIP AMENDMENT

18. In accordance with Bankruptcy Rule 4001(b)–(d), the chart below summarizes material terms of the DIP Amendment.[3]

---

[3] The following summary of the terms of the Amendment is qualified entirely by the express terms of the referenced documents, including the DIP Credit Agreement and the Final DIP Order. If there are any inconsistencies between the summary below and such documents, the terms of such documents shall control. Capitalized terms used but

| Provision | Summary |
|---|---|
| **DIP Amendment** | As contemplated in the DIP Motion and under the DIP Term Sheet and the Interim DIP Order, the parties will enter into a DIP Credit Agreement, which collectively with the other DIP Documents, will include substantially the same terms and conditions set forth the DIP Term Sheet and the Interim DIP Order, except to the extent such terms and conditions are amended, modified, or supplemented by the DIP Amendment. |
| | The DIP Amendment and all definitive documentation related thereto must be acceptable to the DIP Lender and the Borrowers. |
| **Incremental New Money DIP Amount** | The DIP Lender commits to fund additional loans under the DIP Facility in an incremental principal amount of $17,000,000 (such amount, the "Incremental New Money DIP Amount") for DIP Commitments in an aggregate principal amount of $77,000,000. |
| **Incremental New Money DIP Loans** | The incremental loans under the DIP Amendment in the amount of up to the Incremental New Money DIP Amount (such loans, the "Incremental New Money DIP Loans") are subject to the terms of the DIP Documents and shall be used solely in accordance with the Approved Budget and the DIP Documents. |
| **Incremental Fees** | Under the DIP Amendment, the DIP Lender has agreed to increase the aggregate DIP Commitments and the Borrowers have agreed to increase the existing Exit Fee. Accordingly, under the DIP Amendment, the Borrowers shall pay to the DIP Lender (a) an incremental amount under the existing Commitment Fee equal to 2.0% of the Incremental New Money DIP Amount (*i.e.*, $340,000) (the "***Incremental Commitment Fee***") and (b) an incremental exit fee equal to 1.0% of the total amount of the DIP Commitments, as amended by the DIP Amendment (*i.e.*, $770,000) (the "***Incremental Exit Fee***" and together, the "***Incremental Fees***"). |
| | The Incremental Fees shall be fully earned, non-refundable, and allowed upon entry of the Final DIP Order, and shall be paid in accordance with the DIP Credit Agreement. The DIP Lender's commitments in respect of the Incremental New Money DIP Amount and the Incremental New Money DIP Loans automatically terminate if the Incremental Fees are not fully earned, non-refundable, and allowed on a final basis upon entry of the Final DIP Order. |

---

not otherwise defined in this summary chart shall have the meanings ascribed to them in the DIP Credit Agreement, the Final DIP Order, or the other DIP Documents, as applicable.

| Provision | Summary |
|---|---|
| **Priority and Security** | The Borrowers' obligations under the DIP Amendment constitute DIP Obligations and are secured by the DIP Liens, DIP Superpriority Claims, and all other claims, rights, and terms applicable to the DIP Obligations under the Interim DIP Order, Final DIP Order, and the other DIP Documents. |

19.     The DIP Amendment is the product of good-faith, arm's-length negotiations among the Debtors and the DIP Lender, each of which was represented by experienced counsel and financial advisors.  The Debtors and their advisors actively negotiated the terms and provisions of the DIP Amendment, including on material terms of the proposed financing, ultimately resulting in the deal that will be embodied in the DIP Credit Agreement, which will be filed with the Court in the coming days.

20.     The Debtors respectfully submit that the foregoing material terms are appropriate and necessary components of the agreement with the DIP Lender regarding the DIP Amendment. Granting the Debtors' requested relief is critical to the continued operation of their respective businesses, the consummation of ongoing sale processes, and the orderly, efficient administration of the Bankruptcy Cases.

## THE DEBTORS' NEED FOR POSTPETITION FINANCING

21.     The Bankruptcy Cases are not even one month old; yet, the Debtors continue to face several challenges, including, among others, the timely collection of the Crosby Accounts Receivable.

22.     As set forth in the Debtors' Complaint, before the Petition Date, some or all of the MCA Defendants made daily and/or weekly draws of funds out of Crosby Tugs and Crosby Dredging's operating accounts.  The MCA Defendants, in the aggregate, collected the amount of the MCA funding advanced to the Crosby Debtors, *plus* more than $20 million in additional cash.

Around this same time, weekly wire transfers initiated by the MCA Defendants were approaching $900,000 per week, far more than the Debtors could afford to pay.

23. To conserve cash, the Debtors withdrew the ability of the MCA Defendants to draft on the Debtors' accounts. Soon after, certain of the MCA Defendants sent letters to the Debtors' customers demanding that such customers pay any Crosby invoices directly to the applicable MCA Defendants instead of the Debtors. The Debtors and Hancock Whitney (then the Debtors' prepetition senior lender) worked together to send customers their own letters, which directed them to pay Crosby invoices into a segregated Hancock Whitney account instead. As a result of, among other things, customer confusion regarding the competing demands, many customers chose to withhold payment and, as a result, worsened the Debtors' liquidity crisis.

24. The Bankruptcy Cases were filed, in part, to alleviate that crisis through, among other things, the DIP Facility provided by the DIP Lender and the prosecution of the MCA Litigation.

25. As the Debtors discussed during the April 9 hearing, the Debtors estimate that, as of April 20, 2026, they will have *de minimis* cash on hand after accounting for accrued payroll and obligations, and, without access to additional liquidity, will be unable to satisfy critical operational obligations on or around April 23, 2026. The Debtors' current budget, which has been shared with the Committee, and has been carefully developed and evaluated by the Debtors' financial advisor and investment banker, and will be filed with the Court before the hearing to consider this Supplemental DIP Motion.

26. Simply put, immediate and irreparable harm will be caused to the Debtors and their estates if immediate supplemental liquidity is not obtained. Therefore, the Debtors have a critical need to access Incremental New Money DIP Amount while the majority of the Crosby Accounts

Receivable remains frozen in the hands of the Debtors' customers so that the Debtors can continue the efforts already expended in the Bankruptcy Cases, continue the transition into bankruptcy in an orderly fashion, and effectuate value-maximizing sale transactions for the Debtors' various assets and businesses. The terms of the DIP Amendment, taken as a whole, are fair, reasonable, and are the most favorable terms currently available to the Debtors under the circumstances.

## THE DIP AMENDMENT SHOULD BE APPROVED

**I.      The Debtors Should Be Authorized to Obtain the Incremental New Money DIP Loans through the DIP Amendment and the other DIP Documents.**

27.      Here, the Debtors are not seeking entry into a new DIP facility. Instead, the Debtors seek to "upsize" to their existing DIP Facility, substantially on the same terms provided under the original DIP Term Sheet and the Interim DIP Order, subject to the modifications set forth herein and in the DIP Credit Agreement. Pursuant to the Interim DIP Order, the Court has already found that, with respect to the DIP Facility and the DIP Documents, the Debtors have satisfied the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances. The Debtors hereby incorporate by reference the arguments and support set forth in the DIP Motion.

**A.      Entering into the DIP Amendment Is a Sound Exercise of Business Judgment.**

28.      The Debtors' determination to move forward with the DIP Amendment is a sound exercise of their business judgment following an arm's-length process and careful evaluation of their alternatives. Specifically, and in the face of severely limited cash on hand, and potential costly, time-consuming litigation with the MCA Defendants on an emergency basis, the Debtors require additional financing to unlock needed liquidity, fund ongoing sale processes, and pay the costs of administration. Accordingly, the Debtors negotiated the DIP Amendment and the other DIP Documents, including the DIP Credit Agreement, with the DIP Lender in good faith, at arm's

length, and with the assistance of their advisors. The Debtors believe that they have obtained the best financing available under the current circumstances in an amount sufficient to fund operations and the costs of the Bankruptcy Cases, and on reasonable terms. Accordingly, the Court should authorize the Debtors' entry into the DIP Amendment, as incorporated into the DIP Credit Agreement, the Final DIP Order, and the other DIP Documents, as a reasonable exercise of the Debtors' business judgment.

**B.      The Debtors Should Be Authorized to Obtain the DIP Amendment on a Secured and Superpriority Basis.**

29.      Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security. *See* 11 U.S.C. § 364. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to section 364(b) of the Bankruptcy Code, a court may authorize a debtor to obtain credit or to incur debt, the repayment of which is entitled to superpriority administrative expense status, or is secured by a senior lien on unencumbered property, or a junior lien on encumbered property, or a combination of the foregoing. *See* 11 U.S.C. § 364. In addition, pursuant to section 364(d) of the Bankruptcy Code, a court may authorize a debtor to obtain postpetition credit secured by a lien that is equal or senior in priority to existing liens on encumbered property (*i.e.*, a "priming" lien) when a debtor is unable to obtain credit on other terms and the interests of existing lienholders are adequately protected, or if the existing lienholders consent to such priming.

30.      As set forth in the DIP Motion and related filings, the Debtors have not been able to obtain unsecured credit or alternative DIP financing on better terms than those reflected in the DIP Credit Agreement and the DIP Amendment, and there are no better offers available to the Debtors or before the Court at this time. Moreover, the DIP Amendment is critical to the Bankruptcy

Cases. As discussed, the Debtors estimate that, as of April 20, 2026, they will have *de minimis* cash on hand after accounting for accrued payroll and obligations, and, without access to additional liquidity, will be unable to satisfy critical operational obligations on or around April 23, 2026. In the absence of the DIP Amendment, the Debtors anticipate critically low liquidity levels, threatening the ongoing sale processes and, more importantly, their ability to pay their employees and vendors and to continue operations. The DIP Amendment has been sized to provide the Debtors with liquidity and to fund amounts needed while the MCA Litigation remains pending and the Crosby Accounts Receivable frozen in the hands of customers, continue the sale processes, continue operating their businesses, and satisfy wage-and-salary obligations for their employees during the Bankruptcy Cases.

31. In light of the foregoing, and as was authorized under the Interim DIP Order, the Debtors propose that the obligations under the DIP Amendment constitute DIP Obligations and therefore are secured by the DIP Liens, DIP Superpriority Claims, and all other claims, rights, and terms applicable to the DIP Obligations under the Final DIP Order and the other DIP Documents. Therefore, the approval of the DIP Amendment is consistent with the Final DIP Order and governed by both sections 364(c) and 364(d) of the Bankruptcy Code.

## EXPEDITED CONSIDERATION

32. The Debtors, herein and by separate motion, request expedited consideration of this Supplemental DIP Motion. As described herein, the Debtors believe that immediate relief is necessary to avoid irreparable harm to the Debtors and their estates.

## REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS

33. To the extent that any aspect of the relief sought herein constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy Rule

6004(h). As described above, the relief that the Debtors request in this Supplemental DIP Motion is immediately necessary given the Debtors' lack of liquidity and exigent circumstances. The Debtors respectfully request that this Court waive the notice requirements imposed by Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## **RESERVATION OF RIGHTS**

34. Nothing contained herein or any action taken pursuant to relief requested is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim or interest under applicable law or nonbankruptcy law; (c) a promise or requirement to pay any claim; (d) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (e) a request for or granting of approval for assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; or (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute such claim.

*[Remainder of page intentionally left blank.]*

**WHEREFORE**, the Debtors request the entry of the Final DIP Order and such other further relief as is just.

Dated: April 14, 2026

Respectfully submitted:

*/s/Benjamin W. Kadden*
Benjamin W. Kadden, La. Bar No. 29927
bkadden@lawla.com
Stewart F. Peck, La. Bar No. 10403
speck@lawla.com
Douglas S. Draper, La. Bar No. 5073
ddraper@lawla.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@lawla.com
Coleman L. Torrans, La Bar No. 38917
ctorrans@lawla.com
**Lugenbuhl, Wheaton, Peck, Rankin & Hubbard (A Law Corporation)**
601 Poydras Street, Suite 2755
New Orleans, LA  70130
Telephone: (504) 568-1990
Fax: (504) 310-9195

*Proposed Counsel for Debtors and Debtors in Possession*