**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **CASE NO. 26-10678** |
| | § | |
| **CROSBY MARINE TRANSPORTATION, LLC,** | § | |
| | § | **Chapter 11** |
| | § | **COMPLEX CASE** |
| Debtors.[1] | § | |
| | § | **SECTION: A** |
| | § | |
| **CROSBY TUGS, L.L.C., CROSBY DREDGING, LLC, CROSBY MARINE TRANSPORTATION, LLC, AND BERTUCCI CONTRACTING COMPANY, L.L.C.** | § | **ADV. PROC. NO. 26-1018** |
| | § | |
| **PLAINTIFFS** | § | |
| | § | |
| **VS.** | § | |
| | § | |
| **MEGED FUNDING GROUP A/K/A MEGED FUNDING GROUP CORP ALLIANCE ENERGY SERVICES, LLC ARENA OFFSHORE CANTRELLE SERVICES LLC CANTIUM LLC CAJUN INDUSTRIES LLC CHAMPAGNE ENERGY & ENVIRONMENTAL SOLUTIONS CHEVRON PRODUCTION CO. CURTIN MARITIME ECOSERV, LLC ECOSERV ENVIRONMENTAL SERVICES, LLC GAC NORTH AMERICA INGRAM MARINE GROUP JOHN W STONE OIL DISTRIBUTOR LLC** | § | |

---

[1] An Order directing joint administration of the Chapter 11 bankruptcy case of Crosby Marine Transportation, LLC [No. 25-10678], as lead case, with the Chapter 11 bankruptcy cases of (i) Crosby Tugs, L.L.C. [No. 26-10679], (ii) Crosby Dredging, LLC [No. 26-10680], and (iii) Bertucci Contracting Company, L.L.C. [No. 26-10681], was entered on March 24, 2026, [No. 26-10678, ECF Doc. 9; No. 26- 10679, ECF Doc. 4; No. 26-10680, ECF Doc. 4, No. 26-10681, ECF Doc. 4].

| | |
|---|---|
| **KENOSIS OPERATING COMPANY** | § |
| **KEVIN GROS CONSULTING** | § |
| **LOOP LLC** | § |
| **LUHR CROSBY LLC** | § |
| **MODERN AMERICAN RECYCLING** | § |
| **MARSHLAND EQUIPMENT RENTALS** | § |
| **MCDONOUGH MARINE SERVICE** | § |
| **MORRISON OFFSHORE LLC** | § |
| **PATRIOT MARINE SERVICES** | § |
| **PORT OF IBERIA DISTRICT BOARD OF** | § |
| **COMMISSIONERS** | § |
| **ROSE CAY MARITIME LLC** | § |
| **SABINE NECHES NAVIGATION** | § |
| **DISTRICT** | § |
| **SPACE EXPLORATION TECHNOLOGIES** | § |
| **TALA ENVIRONMENTAL LLC** | § |
| **THOM-SEA BOAT BUILDERS** | § |
| **TK TOWING INC.** | § |
| **TPC GROUP LLC** | § |
| **TRITON DIVING SERVICES LLC** | § |
| **T&T MARINE SALVAGE INC.** | § |
| **VENTURE GLOBAL CALCASIEU PASS** | § |
| **LLC** | § |
| **WALTER OIL & GAS** | § |
| **WHITE FLEET DRILLING** | § |
| **HEEREMA MARINE CONTRACTORS** | § |
| **NEDERLAND, S.E.** | § |
| **AQUA CAPITAL LLC** | § |
| **BREEZE FUNDING** | § |
| **CELTIC ADVANCE** | § |
| **EN OD CAPITAL** | § |
| **ALO ADVANCE** | § |
| **CEDAR ADVANCE LLC** | § |
| **CLEARFUND SOLUTIONS, LLC** | § |
| **COLDWATER CAPITAL, LLC** | § |
| **COOPER INVESTMENTS, LLC** | § |
| **DEPENDENCE PLATINUM** | § |
| **FOREVER FUNDING LLC** | § |
| **FREEDOM FUNDING LLC** | § |
| **GALT FUNDING CO** | § |
| **INSIGHT CAPITAL LLC** | § |
| **LIBERTAS FUNDING, LLC** | § |
| **MOBY CAPITAL, LLC D/B/A MOBYCAP** | § |
| | § |

| | |
|---|---|
| **MYNT GOLD, LLC A/K/A MYNT ADVANCE** | § |
| **NOVAC EQUITIES LLC** | § |
| **ODK CAPITAL, LLC D/B/A ON DECK** | § |
| **ORACAP LLC** | § |
| **OVERTIME CAPITAL** | § |
| **PARKVIEW ADVANCE LLC** | § |
| **PINNACLE BUSINESS FUNDING LLC** | § |
| **RELIANCE FINANCIAL FL, LLC** | § |
| **ROCKET CAPITAL NY, LLC** | § |
| **SQ ADVANCE** | § |
| **SURGE FUNDING LLC** | § |
| **TRUE BUSINESS FUNDING LLC** | § |
| **WEB BANK C/O LIBERTAS FUNDING, LLC** | § |
| **WYNWOOD CAPITAL GROUP, LLC** | § |
| | § |
| **DEFENDANTS** | § |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants Meged Funding Group Corp. ("Meged"), Dependance Platinum FL, LLC ("Dependance"), and Reliance Financial FL, LLC ("Reliance") (collectively, "Defendants") respectfully submit this memorandum in support of their Motion for Summary Judgment. For the reasons explained below, the Court should enter summary judgment dismissing the Plaintiffs' Adversary Complaint (Dkt. 1) and the claims against Defendants with prejudice, at Plaintiffs' sole cost.

### I.     FACTUAL AND PROCEDURAL BACKGROUND

Defendants are in the business of purchasing accounts receivable from businesses. Between April and December of 2025, each of the Defendants engaged in separate transactions with Plaintiffs whereby they purchased certain accounts receivable from them.[2] Plaintiffs later

---

[2]     Exs. 1-5.

3

defaulted on their obligations under those agreements, and Defendants took steps to enforce their rights under the agreements.

Plaintiffs filed chapter 11 bankruptcy in March 2026. In this Adversary Proceeding, Plaintiffs/Debtors seek to recharacterize their sales of accounts receivable as loans. As explained in detail below, no material fact dispute exists that the Defendants' transactions with Debtors are "true sales," and, as a matter of law, no basis exists to recharacterize those sales as loans.

A.      **Meged Purchases Accounts Receivable from Debtors**

On April 22, 2025, Meged and Debtor Crosby Dredging, LLC ("Crosby Dredging") entered into a *Standard Merchant Cash Advance Agreement* (the "First MCAA"), whereby Meged purchased $16,002,000.00 in receivables (the "First Contract Receivables") from Crosby Dredging for a purchase price of $12,600,000.00. A copy of the First MCAA is attached as **Exhibit 1.**

On April 22, 2025, Meged and Crosby Dredging entered into another *Standard Merchant Cash Advance Agreement* (the "Second MCAA"), whereby Meged purchased $5,700,000.00 in receivables (the "Second Contract Receivables") from Crosby Dredging for a purchase price of $3,800,000.00. A copy of the Second MCAA is attached as **Exhibit 2.**

On May 12, 2025, Meged and Crosby Dredging entered into a third *Standard Merchant Cash Advance Agreement* (the "Third MCAA," and together with the First MCAA and the Second MCAA, the "Meged Agreements"), whereby Meged purchased $1,124,250.00 in receivables (the "Third Contract Receivables," and together with the First Contract Receivables and the Second Contract Receivables, the "Meged Purchased Receivables") from Crosby Dredging for a purchase price of $750,000.00. A copy of the Third MCAA is attached as **Exhibit 3.**

The operative provisions of the three Meged Agreements are substantially similar to each other, with certain differences specific to each transaction such as the dollar amount of

receivables purchased, the purchase price, and the estimated amounts to be remitted to Meged on account of the purchased receivables. *See generally* Exs. 1-3.

As a prophylactic measure, the Meged Agreements grant Meged a lien on Debtors' accounts and proceeds. Exs. 1-3 at ¶ 29. In June 2025, Meged filed UCC-1 financing statements to perfect its protective security interest in the Meged Purchased Receivables, which are attached as **Exhibit 6**. The Meged Purchased Receivables were supposed to be unencumbered, and Meged was supposed to have a first priority lien and right to payment on them. Exs. 1-3 at ¶ 29 ("Each Merchant agrees to execute any documents or take any action in connection with this Agreement as [Meged] deems necessary to perfect or maintain [Meged's] first priority security interest in the Collateral and the Cross-Collateral, including the execution of any account control agreements."). Meged's Purchased Receivables were also not supposed to be re-pledged. *See, e.g.,* Exs. 1-3 at ¶ 29 ("Each Merchant agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Cross-Collateral, as applicable….").

**B.**  **Dependance Purchases Future Receipts from Debtors**

On May 27, 2025, Dependance and Crosby Dredging, Crosby Tugs, and Crosby Enterprises entered into a *Sale of Future Receipts Agreement* (the "Dependance Agreement"), whereby Dependance purchased $2,070,000.00 in future receipts from sellers for a purchase price of $1,500,000.00 (the "Dependance Purchased Receivables"). A copy of the Dependance Agreement is attached as **Exhibit 4.**

As a prophylactic measure, the Dependance Agreement provides that, to the extent the Dependance Purchased Receivables include "accounts" or "payment intangibles" as those terms are defined by the UCC in the state where Debtors are located,[3] "then (i) the sale of such

---

[3]  Debtors are located in Louisiana per their filed schedules. Under the Dependance Agreement, "Future Receipts" is defined to include (among other things) "accounts and payment intangibles." Ex. 4 at p. 1

accounts or payment intangibles creates a security interest as defined in the UCC, (ii) this Agreement constitutes a security agreement under the UCC, and (iii) Buyer has all the rights of a secured party under the UCC with respect to such accounts or payment intangibles." Ex. 4 at ₱ 14(a). In June 2025, Dependance filed UCC-1 financing statements to perfect its protective security interest in the Dependance Purchased Receivables, which are attached as **Exhibit 7**. Under the Dependance Agreement, the Debtors were not supposed to pledge their future receipts to other parties without Dependance's consent. Ex. 4 at ₱ 14(a).

**C.      Reliance Purchases Future Receipts Receivable from Debtors**

On December 9, 2025, Reliance and Crosby Dredging, Crosby Tugs, and Crosby Enterprises entered into a *Sale of Future Receipts Agreement* (the "Reliance Agreement"), whereby Reliance purchased $749,500.00 in future receipts from sellers for a purchase price of $500,000.00 (the "Reliance Purchased Receivables," and together with the Meged Purchased Receivables and the Dependance Purchased Receivables, the "Purchased Receivables."). A copy of the Reliance Agreement is attached as **Exhibit 5.**

The Dependance and Reliance Agreements are substantially similar to each other, with certain differences specific to each transaction such as the dollar amount of receivables purchased, the purchase price, and the estimated amounts to be remitted to them on account of the purchased receivables. *See generally* Exs. 4-5.

As a prophylactic measure, and as with the Dependance Agreement, the Reliance Agreement provides that, to the extent the Reliance Purchased Receivables include "accounts" or "payment intangibles" as those terms are defined by the UCC in the state where Debtors are

---

("Purchase Information" box). Debtors' receivables fall within the definitions of those terms in the Louisiana UCC. La. Rev. Stat. § 10:9-109(a)(3) (applying this Chapter to sales of accounts and payment intangibles); *id*. at § 10:9-102(a)(2), (61) (definitions of "account" and "payment intangible," respectively).

located,[4] "then (i) the sale of such accounts or payment intangibles creates a security interest as defined in the UCC, (ii) this Agreement constitutes a security agreement under the UCC, and (iii) Buyer has all the rights of a secured party under the UCC with respect to such accounts or payment intangibles." Ex. 5 at ¶ 14(a). Under the Reliance Agreement, the Debtors were not supposed to pledge their future receipts to other parties without Reliance's consent. Ex. 5 at ¶ 14(a).

**D.      Debtors File Bankruptcy and File the Instant Adversary Proceeding**

On March 23, 2026, the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). *See* Record in case no. 26-10678. On April 3, 2026, the Debtors commenced the instant adversary proceeding, seeking (among other things) to recharacterize Defendants' purchases of receivables from Debtors as supposed "disguised loans." *See generally* Dkt. 1. Defendants timely answered and denied the operative allegations regarding recharacterization. *See generally*, Dkt. 154.

On April 17, 2026, the Court entered a scheduling order setting a deadline of May 15, 2026 for the parties to file motions for summary judgment. Dkt. 122. Defendants timely filed the instant Motion for Summary Judgment.

## II.      ARGUMENT AND AUTHORITIES

**A.      Summary Judgment Standard**

Federal Rule of Civil Procedure 56, made applicable by Federal Rule of Bankruptcy Procedure 7056, requires entry of summary judgment if the record shows "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." This standard is satisfied if the record, as a whole, "could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

---

[4]    *See* preceding fn.

Summary judgment is thus mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Summary judgment is warranted here because Plaintiffs have the burden to establish grounds to recharacterize Defendants' purchases of accounts receivable as loans, and the evidence does not create a material fact dispute that any grounds for recharacterization exists. As such, the Purchased Receivables are not property of the Debtors' estates.

**B.**     **<u>Accounts Receivable Sold by a Debtor Prepetition Are Not Estate Property</u>**

Plaintiffs' claims against Defendants turn on whether Defendants' purchases of accounts receivables from Debtors are "true sales" (as Defendants maintain), or disguised loans (as Plaintiffs contend). Here, no material fact dispute exists that the transactions are anything other than "true sales" as a matter of law.

State law determines whether a debtor has a right or interest in specific property. *Butner v. United States*, 440 U.S. 48, 54 (1979); *In re R&J Pizza Corp*., No. 14-43066, 2014 WL 12973408 (Bank. E.D.N.Y. Oct. 13, 2014) (citing *Butner, supra*). The Meged Agreements are governed by New York law. Exs. 1-3 at ¶ 34. The Dependance and Reliance Agreements are governed by Florida law. Exs. 4-5 at ¶ 20(a).

Accounts receivables sold by a debtor prepetition are *not* estate property. *See, e.g., Dryden Advisory Grp., LLC v. Beneficial Mut. Sav. Bank (In re Dryden Advisory Grp., LLC)*, 534 B.R. 612, 626-27 (Bankr. M.D. Pa. 2015) (accounts receivable sold pre-petition do not constitute estate property); *see also In re Doctor's Hosp. of Hyde Park. Inc.*, 507 B.R. 558 (Bankr. N.D. Ill. 2013) (describing "true sale" determination as a question of state law and observing that if transfer is a true sale, the assets should not be considered assets of the bankruptcy estate).

As Plaintiffs seeking to recharacterize the agreements between themselves and Defendants as "disguised loans" rather than "true sales," it is Debtors' burden to establish that those agreements are loans rather than true sales.

**C.**     **Law Applicable to Recharacterization of a Sale as a Loan.**

       **1.**     **The Eight-Factor Recharacterization Test**

*R&J Pizza, supra,* involved a receivables purchase agreement which, like the Meged Agreements,[5] is governed by New York law. *R&J Pizza* is one of the leading cases on recharacterization under New York law. As that court explained,

> [] The Uniform Commercial Code does not provide rules for distinguishing between sales transactions and security transactions. *See* NY UCC § 9-318, Official Comment 2. The determination of whether the Purchase Agreements constitutes a sale or a secured transaction is accordingly left to the Courts. *See New Jersey Tractor Trailer Training, Inc.*, 2007 WL 2892956,*5 (Bankr. D.N.J. 2007).

> [] However, courts have developed a series of factors to be employed in determining whether assets transfers are "true sales" or transfers of collateral in connection with secured financing. *Id.*, at *7 (citing Aicher & Fellerhoff, Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor, 65 Ann. Bankr.L.J. 181 (1991)) [hereinafter, "AICHER & FELLERHOFF"]. The factors identified by various courts to find that a sale of receivables is in reality a loan are:

>     (1)    Language of the documents and conduct of the parties;
>     (2)    Recourse to the seller;
>     (3)    Seller's retention of servicing and commingling of proceeds;
>     (4)    Purchaser's failure to investigate the credit of the account debtor;
>     (5)    Seller's right to excess collections;
>     (6)    Purchaser's right to alter pricing terms;
>     (7)    Seller's retention of right to alter or compromise unilaterally the terms of the transferred assets; and
>     (8)    Seller's retention of right to repurchase assets.

---

[5]     Exs. 1-3 at ¶ 34.

*R&J Pizza Corp.*, 2014 WL 12973408 at \*2-3 (internal numbering omitted).[6] *See also*, *Cap Call, LLC v. Foster (In re Shoot the Moon, LLC)*, 635 B.R. 797, 813 (Bank. D. Mont. 2021) (citing AICHER & FELLERHOFF, and identifying the same eight recharacterization factors as applicable under either New York or Montana law).

The Dependance and Reliance Agreements are governed by Florida law.[7] However, bankruptcy courts applying Florida law to the issue of recharacterization use the same eight factors listed above to determine the parties' intent. *See, e.g.*, *In re JLK Constr., LLC*, Adv. No. 23-4030, 2024 WL 3681827, at \*4 (Bankr. W.D. Mo. Dec. 18, 2025) (applying Florida law and identifying the eight factors); *Official Cmt. of Unsecured Creditors v. EBF Partners, LLC* (*In re Cornerstone Tower Svcs., Inc.*), No. A17-4050, *2019* WL 127359, at \*4 (D. Neb. Jan. 3, 2019) (same).

### 2. Additional Recharacterization Factors

In addition to the eight factors discussed above, some courts have looked to additional factors in deciding whether a transaction is a loan versus a sale of future receivables, including: whether the agreement has a finite term,[8] whether it entitles the buyer to immediate repayment in event of default,[9] and whether the seller's bankruptcy constitutes an automatic

---

[6] Citing *New Jersey Tractor Trailer Training, supra;* AICHER & FELLERHOFF, *supra*, 65 Am. Bankr.L.J. at 186-194; Lupica, Revised Article 9, Securitization Transactions and the Bankruptcy Dynamic, 9 Am. Bankr.Inst. L.Rev. 287, n 49 (2001); *Fireman's Fund Ins. Cos. v. Grover (In re Woodson Co.),* 813 F.2d 266, 272 (9th Cir. 1987); *Bear v. Coben (In re Golden Plan of Cal., Inc.*), 829 F.2d 705.707, 710 (9th Cir. 1986)*;Major's Furniture Mart, Inc. v. Castle Credit Corp.* 602 F.2d 538, 542-44 (3d Cir. 1979); *In re Coronet Capital Co.*, 142 B.R. 78 (Bankr. S.D.N.Y. 1992); *In re Evergreen Valley Resort, Inc.,* 23 B.R. 659 (Bankr. D. Me. 1982); *First Nat'l Bank of Louisville v. Hurricane Elkhorn Coal Corp. II (In re Hurricane Elkhorn Coal Corp. II),* 19 B.R. 609 (Bankr. W.D. Ky. 1982); *Federated Dept. Stores, Inc. v. Comm'r,* 51 T.C. 500, 511 (1968), *aff'd,* 426 F.2d 417 (6th Cir. 1970).

[7] Exs. 4-5 at ¶ 20(a).

[8] *Anadrill Directional Svcs., Inc. v. Capybara Capital, LLC (In re Anadrill Directional Svcs., Inc.)*, Adv. No. 25-3036, 2026 WL 305023, at \*8 (Bank. S.D. Tex. Feb. 3, 2026) (applying New York law to determine whether transactions was usurious loan or sale); *In re McKenzie Contracting LLC,* No. 24-bk-01255, 2024 WL 3508375, at \*2 (Bankr. M.D. Fla. July 19, 2024).

[9] *Anadrill Directional Svcs., Inc., supra* at \*8.

default.[10] Each of those factors, according to some authorities, may be indicative of a loan rather than a sale.

Plaintiffs' Adversary Complaint identifies eight factors, but they are slightly different than those discussed above. Many of Plaintiffs' factors, however, overlap with, or fall within the rubric of, the factors already described above. Dkt. 1 at ⁋ 45. For example, Plaintiffs' listed factors include whether an agreement has a finite term, and whether the buyer has a right to immediate payment in event of default. *Id.* (Plfs.' third and fourth factors).

Plaintiffs also cite the existence of a personal guaranty and a security interest in the merchant's assets as additional factors, *id.* (Plfs.' fifth and sixth factors); those items are types of "recourse" the buyer may have in event of seller's breach (the second *R&J Pizza* factor). Likewise, Plaintiffs list the absence of a reconciliation provision as a factor, *id.*, which is subsumed by the fifth *R&J Pizza* factor (right to excess collections). And, Plaintiffs' eighth factor (lack of restrictions on merchant's use of proceeds) is analogous to the third *R&J Pizza* factor (seller's retention of servicing and commingling of proceeds). Plaintiffs also identify as a factor whether there is an automatic default (*ipso facto*) clause in event of bankruptcy. *Id.*

No single factor or combination of factors is dispositive. *In re Shoot the Moon*, 635 B.R. at 813. Instead, courts consider the totality of the circumstances. *Id.* "The case law focuses on the economics of the transaction and which party bears the risk of non-collection from the account debtor [the seller's customers] in determining whether a sale of accounts is a true sale or a secured transaction." *R&J Pizza, supra* at *3.

Notably, virtually all of the potentially-relevant factors gleaned from the various sources are discernable from the "four corners" of the agreement between the buyer and seller.

---

[10] *Id.*

And under both New York and Florida law, where a contract is clear and unambiguous, a court must determine the intent of the parties solely from the language of the written agreement. *Greenfield v. Philles Recs., Inc.*, 780 N.E.2d 166, 179 (2002) ( "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."); *Crawford v. Barker*, 64 So. 3d 1246, 1255 (Fla. 2011) ("Where the terms of a contract are clear and unambiguous, the parties' intent must be gleaned from the four corners of the document.")

As such, because the agreements here are unambiguous, the presence or absence of most of the factors can be determined by the Court by reading the agreements, without the need for extrinsic evidence. The only factor that is not apparent from the face of the contract is fourth *R&J Pizza* factor, whether the seller investigated the account debtor. That factor is addressed in the Ludmir and Miller Declarations submitted herewith.

3. **The Eight Factors Overwhelmingly Support that the Agreements Are Sales**

Each of the eight factors is discussed in turn below, followed by an application of the additional factors identified by Plaintiffs and some authorities.

a. **The first factor – the language of the documents – indicates a true sale**

The language of the documents strongly supports a finding that the agreements are true sales. The Meged Agreements each contain substantially similar terms and conditions, which provide, *inter alia*, that the transactions constitute *sales of receivables and not loans*:

> *Merchant(s) hereby sell, assign, and transfer to [Meged] (making [Meged] the absolute owner)* in consideration of the funds provided specified above, all of each Merchant's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or other third party payors (the "Receivables", defined as all payments made by cash, check, credit or debit card, electronic transfer, or other form of monetary payment in the ordinary course of each merchant's business), for the payment of each Merchant's sale of goods or services until the amount specified above (the "Receivables Purchased Amount") has been delivered by Merchant(s) to [Meged]. Each

> Merchant hereby acknowledges that until the Receivables Purchased Amount has been received in full by [Meged], *each Merchant's Receivables, up to the balance of the Receivables Purchased Amount, are the property of [Meged] and not the property of any Merchant*. Each Merchant agrees that it is a fiduciary for [Meged] and that each Merchant will hold Receivables in trust for [Meged] in its capacity as a fiduciary for [Meged].

Exs. 1-3 at ¶ 1 (emphases added). Indeed, the agreements expressly state that the transactions are *not* loans:

> Each Merchant and [Meged] agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such *Purchase Price is not intended to be, nor shall it be construed as a loan from [Meged] to any Merchant*. [Meged] is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in [Meged] not receiving the Receivables Purchased Amount.

Exs. 1-3 at ¶ 14 (emphasis added).

Similarly, the Dependance and Reliance Agreements provide that *the transactions are sales of receivables and not loans*. Exs. 4-5 at ⁋ 1 ("Seller hereby sells and assigns to Buyer, without recourse, the Purchased Amount of Future Receipts described above."); *id*. at ⁋ 6 ("**6. <u>Nonrecourse Sale of Future Receipts (THIS IS NOT A LOAN)</u>**. Seller is selling a portion of future revenue stream to Buyer at a discount, *not borrowing money from Buyer."*) (italics added; boldface in original); *id*. at ⁋ 14(a) ("The sale of Future Receipts pursuant to this Agreement shall constitute and shall be construed and treated for all purposes as a *true and complete sale from Seller to Buyer*, conveying good title to Future Receipts free and clear of any liens and encumbrances ….") (emphasis added). "By this Agreement, Seller transfers to Buyer full and complete ownership of the Purchased Amount and *Seller retains no legal or equitable interest therein*." Exs. 4-5 at ⁋ 6 (emphasis added).

With respect to the conduct of the parties, Defendants anticipate that Plaintiffs may point to Meged's website as supposed evidence that the transactions are disguised loans rather than true sales. For example, Plaintiffs' Adversary Complaint includes an excerpt and quotes from

Meged's website. *See* Dkt. 1 at ₱₱ 49-50. However, no materials from Meged's website were incorporated into its agreements with Debtors. Instead, the Meged Agreements include merger/integration clauses that confirm no website materials (or anything else not included in the written agreements) form any part of the parties' agreements. Exs. 1-3 at ₱ 51 ("This Agreement, inclusive of all addenda, if any executed simultaneously herewith constitutes the full understanding of the parties to the transaction herein and may not be amended, modified, or canceled except in writing signed by all parties."); *see also* Exs. 4-5 at ₱ 23 (merger/integration clauses in Dependance and Reliance Agreements). The website materials are, accordingly, irrelevant and do not create a material fact dispute as to whether the language of the agreements support recharacterization.

While the parties' intent can and should be determined from the four corners of the agreement under applicable law, each of the Defendant's intent was to buy receivables and not to loan money to Debtors. Ludmir Decl. at ₱ 11; Miller Decl. at ₱₱ 14, 16. Further, the Defendants' conduct was consistent with that intent. Ludmir Decl. at ₱ 12; Miller Decl. at ₱₱ 15, 17.

For the reasons explained above, the language of the agreements and the parties conduct supports a true sale and does not support recharacterization as a loan.

**b.      The second factor – whether buyer has recourse – supports a true sale**

The second factor is the extent to which the buyer has recourse, or other sources of recovery, if the seller fails to collect and remit the receivables purchased by the buyer. This is arguably the most important factor as it is most closely tied to the central question of which party bears the risk of non-collection of the receivables. *See R&J Pizza, supra* at *3 (identifying risk of non-collection as the focus of recharacterization caselaw). This factor favors a sale.

**(1)      Defendants assumed the risk that receivables would be uncollectible**

Defendants expressly assumed the risk that receivables would be uncollectible. This factor strongly supports a true sale. The events of default identified in the Meged Agreements do *not* include Debtors' cessation of operations or inability to collect receivables. *See* Exs. 1-3 at ‖ 30 (listing events of default, which do not include bankruptcy or inability to collect receivables). Indeed, Meged expressly accepted the risk that Debtors would fail to collect receivables due to bankruptcy or for some other reason:

> [Meged] is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in [Meged] not receiving the Receivables Purchased Amount. Any Merchant going bankrupt, going out of business, or experiencing a slowdown in business or a delay in collecting Receivables will not on its own without anything more be considered a breach of this Agreement.

Exs. 1-3 at ‖ 14.

Similarly, Dependance and Reliance likewise assumed the risk that Debtors would be unable to collect future receipts:

> Buyer assumes the risk Future Receipts may be remitted more slowly than Buyer may have anticipated or projected because Seller's business has slowed down, and the risk that the full Purchased Amount may never be remitted because Seller's business goes bankrupt or Seller otherwise ceased operations in the ordinary course of business. Buyer is buying the Purchased Amount knowing the risks that Seller's business may slow down or fail, and Buyer assumes these risks …."

Exs. 4-5 at ‖ 6.

As in *R&J Pizza*, Defendants effectively have no recourse against the Debtors if they were to cease operations and the receivables were to become uncollectible. *See R&J Pizza, supra* at \*4. That risk was expressly assumed by each of the Defendants, and strongly supports a finding that they bear the risk of non-collection.

**(2)    The personal guaranties give Defendants little protection from the risk of non-collection**

The fact that agreements are personally guaranteed by Debtors' principal, Mr. Kurt Crosby, does not tilt the second factor (recourse) against a sale. In his guaranty, Mr. Crosby

"guarantees each Merchant's performance of all of the representations, warranties, and covenants made by each Merchant to [Meged] in the [Meged Agreements]." *See* Guarantees (attachments to Exs. 1-3) at ¶ G1. The guarantees included in the Dependance and Reliance Agreements are likewise directed to whether the Debtors breached their obligations under those agreements, and *not* to whether or when they will collect receivables. Exs. 4-5 at ¶ 30.

In other words, the guarantor is *not* guaranteeing that Debtors *will collect* their receivables, or *when* they will do so. Neither the Debtors nor the guarantor promise the receivables will be collected or when they will be collected. The limited guarantee, which is effective only in the event of the principal obligor's breach of its representations, warranties, and covenants, does not give the buyer sufficient recourse to negate a true sale. In *R&J Pizza, supra* at *4, a personal guaranty was "effective only upon a certain limited circumstances, including misrepresentation of fact, a termination of the credit card processor before [buyer] receives the Purchased Amount, or a sale by Debtor of substantially all of its assets without notice to [buyer]." The *R&J Pizza* court found that guaranty was insufficient to constitute recourse for non-collection from the Merchant. *Id*. The same conclusion should be reached here based on the limited guarantees found in Debtors' agreements with Defendants.

### (3) The security interests give Defendants little protection from the risk of non-collection

Likewise, the fact that the agreements grant security interests in accounts to Defendants does not give them sufficient "recourse" to tilt that factor against a sale. The Meged Agreements grant Meged a security interest in Debtors' accounts, and not in their other assets. *see* Exs. 1-3 at ¶ 29. Likewise, the Dependance and Reliance Agreements grant them security interests only to the extent that Debtors' future receipts include "accounts" or "payment intangibles" as defined by the UCC, in which event they will have the rights of secured parties with respect to that

collateral. Exs. 4-5 at ⸗ 14(a). These limited security interests are directed to the future receivables or receipts purchased by Defendants.

Moreover, the value of Defendants' security interests is limited given that their positions are (apparently) junior to that of the prepetition lender/DIP lender. Notably, with respect to Meged, the Debtors were supposed to provide it with a "first priority" security interest,[11] while it appears the Debtors knew prepetition that they were giving Hancock Whitney a more senior lien position in the same collateral.[12]

> **(4)**      **The totality of Meged's recourse in the event of default does not support recharacterization of the Meged Agreements**

The totality of Meged's recourse in the event of default are listed in paragraph 16 of the Meged Agreement.[13] The complete text of those protections is included in the footnote

---

[11]    Exs. 1-3 at ¶ 29.

[12]    Dkt. 29 in case no. 26-10678, at ⸗⸗ 23, 26 (Debtors' contention that "[a]ny liens in favor of the MCA Parties in receivables and inventory is inferior to the lien against the Debtors' receivables securing the Hancock Whitney Facility" in the prepetition amount of over $29 million, and identifying JMB as successor to Hancock Whitney as the holder the first lien position in receivables).

[13]    Paragraph 16 of the MCAAs reads as follows:

> 16. **Protections Against Default.** The following Protections 1 through 6 may be invoked by [Meged], immediately and without notice to any Merchant if any Event of Default listed in Section 30 has occurred.
>
> Protection 1: The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately.
>
> Protection 2. [Meged] may enforce the provisions of the Guarantee against Guarantor.
>
> Protection 3. [Meged] may enforce its security interest in the Collateral identified in Section 29.
>
> Protection 4. [Meged] may proceed to protect and enforce its rights and remedies by litigation or arbitration.
>
> Protection 5. [Meged] may debit any Merchant's depository accounts wherever situated by means of ACH debit or electronic or facsimile signature on a computer-generated check drawn on any Merchant's bank account or otherwise, in an amount consistent with the terms of this Agreement.
>
> Protection 6. [Meged] will have the right, without waiving any of its rights and remedies and without notice to any Merchant and/or Guarantor, to notify each Merchant's credit card and/or check processor and account debtor(s) of the sale of Receivables hereunder and to direct such credit

below. Importantly, those protections only apply in event of Merchant's default, which does *not* include its inability to collect, or delay in collecting, its receivables. In any event, Meged's protections, singly or collectively, do *not* rise to the level of recourse to the buyer required to support recharacterization of a sale as a disguised loan.

Meged's protections are very similar to the protections possessed by the receivables buyer in *Official Committee of Unsecured Creditors v. LG Funding, LLC (In re Cornerstone Tower Services, Inc.),* No. 16-40787, 2018 WL 6199131, at *7 (Bankr. D. Neb. Nov. 9, 2018), *aff'd*, 2019 WL 127359 (D. Neb. Jan. 3, 2019). In *Cornerstone*, the buyer (like Meged) had several protections in event of default, including acceleration, enforcement of personal guaranties and security interests, and the right to initiate litigation and to direct the seller's credit card processor to divert receipts to the buyer.[14] *Id.* In addition, the buyer in *Cornerstone* also required the seller to sign a

---

card processor and account debtor(s) to make payment to [Meged] of all or any portion of the amounts received by such credit card processor and account debtor(s) on behalf of each Merchant….

[14]    The buyer's protections in *Cornerstone* were:

Protection 1: The full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately.

Protection 2. [Buyer] may enforce the provisions of the Personal Guarantee of Performance against the Guarantor(s).

Protection 3. [Seller] shall, upon execution of this Agreement, deliver to LG an executed confession of judgment in favor of [Buyer] in the amount of the Purchase Amount stated in the Agreement. Upon breach of any provision in this paragraph 1.11, [Buyer] may enter that confession of judgment as a judgment with the Clerk of the Court and execute thereon.

Protection 4. [Buyer] may enforce its security interest in the Collateral identified in the Security Agreement herein.

Protection 5. [Buyer] may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, in which [Buyer] shall recover judgment against [seller], [seller] shall be liable for all of [Buyer]'s costs of lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

Protection 6. [Seller] shall, upon execution of this Agreement, deliver to [Buyer]an executed assignment of lease of [Seller's] premises in favor of [Buyer]. Upon breach of any provision in this paragraph 1.11. [Buyer] may exercise its rights under such assignment of lease.

confession to judgment – which Defendants did not do here. *Id*. The *Cornerstone* court nonetheless found all of these protections were insufficient to warrant reclassifying the transaction as a loan rather than a sale. *Id*. at *8.

Similarly, in *R&J Pizza*, the court concluded a transaction was a "true sale" where the parties' agreement described it as a sale; the buyer had limited recourse against the debtor if debtor was unable to collect is accounts receivable; the debtor had no right to repurchase the accounts it sold; the seller was required to authorize its credit card processor to send buyer's share of payments directly to buyer; and the buyer had no right to alter the terms of the purchase. 2014 WL 12973408 at **4-6. All of those considerations apply to Defendants here.

The same conclusion should be reached here as in *R&J Pizza*: Meged's protections (and its recourse) do not rise to a level sufficient to protect it from a real risk that it will be unable to receive the benefit of purchased receivables.

### (5) The totality of Dependance's and Reliance's recourse in the event of default does not support recharacterization of their agreements

Like Meged, Dependance and Reliance have no recourse to hold of Debtors in breach due to Debtors' mere inability to collect, or delay in collecting, receipts. Dependance and Reliance instead expressly assumed those risks. Exs. 4-5 at ⁋ 6. Their remedies in event of Debtors' breach, listed in paragraph 15 of their agreements, consist of: increasing the percent of receivables

---

Protection 7. [Buyer] may debit [Seller's] depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on [Seller's] bank account or otherwise, in an amount consistent with the Specified Percentage or Specific Daily Amount.

Protection 8. [Buyer] shall have the right, without waiving any of its rights and remedies and without notice to [Seller] and/or Guarantor(s), to notify [Seller's] credit card processor of the sale of Receipts hereunder and to direct such credit card processor to make payment to [Buyer]of all or any portion of the amounts received by such credit card processor on behalf of [Seller].

*Cornerstone, supra* at **7-8.

collected that must be remitted, accelerating the purchased amount, enforcing the guaranty, assessing costs, and debiting seller's accounts. *Id*. at ⁋ 15. Those protections are similar to those the *Cornerstone* court found did *not* amount to sufficient recourse to tilt that factor against a sale.

Moreover, and more importantly and like Meged, Dependance and Reliance can only invoke their remedies if Debtors breach their agreements, but Debtors do *not* breach their agreements by merely failing to collect receivables or experiencing a delay in collecting receivables. The risks of those events are borne by Defendants.

Accordingly, the Court should find the "recourse" factor does not favor recharacterization as to any of the Defendants.

### c.    The third factor — seller's retention of servicing and commingling of proceeds — also favors a true sale

The third factor is whether the merchant retained the ability to service the accounts receivable and commingle the portion of payments received that are the property of the account buyer with the merchant's operating funds. The seller's ability to continue to service the accounts, especially where it is permitted to commingle account proceeds that belong to the buyer with the seller's operating funds, is suggestive of a loan. *See* AICHER & FELLERHOFF at 191.

Here, the Meged Agreements require Merchant to appoint a bank acceptable to Meged to receive electronic payments on behalf of Merchant. Exs. 1-3 at ¶ 5. The Merchant must also authorize the amount owed to Meged to be deducted from the funds that would otherwise be remitted to Merchant, and to instead be remitted directly to Meged. *Id*. This provision effectively strips Debtors of the ability to commingle the portion of payments made to them to which Meged is entitled (*i.e*., an estimate based on the agreed-upon 13%, subject to true-up/reconciliation) with the Debtors' operating funds.

Similarly, the Dependance and Reliance Agreements require Debtors to authorize the buyers to debit the Periodic Amount (*i.e.*, estimates based on the agreed-upon percentages, subject to true-up/reconciliation) from Authorized Accounts designated to receive payments from Debtors' customers. Exs. 4-5 at p. 1 (under "Purchase Information" heading). Debtors are also required to instruct their credit card processor to deposit receipts into the Authorized Accounts, and Debtors agree (among other things) not to revoke the buyers' right to debit the Authorized Accounts. Exs. 4-5 at ⁋ 13(a). As with the Meged Agreement, the Dependance and Reliance Agreements therefore preclude Debtors from commingling the portion of receipts that belong to the buyers with Debtors' operating funds.

The third factor (whether commingling exists) thus militates in favor of a sale and against a loan.

### d. The fourth factor – buyer's investigation of debtor's accounts – favors a true sale

The fourth factor is whether the buyer performed an independent investigation of the account debtors in connection with the transaction. Where the buyer fails to undertake such an investigation, that indicates the parties may have intended a secured loan rather than a sale. *See* AICHER & FELLERHOFF at 192. This factor is the only one that appears to require the Court to look outside the "four corners" of the parties' agreements.

Defendants are submitting the Declarations of Moshe Ludmir (the "Ludmir Declaration") and Aryeh Miller (the "Miller Declaration") to address this factor. The Ludmir Declaration confirms that Meged, in connection with its transactions with Debtors, performed an independent investigation regarding (among other things) the collectability of the Debtors' accounts receivable. Ludmir Decl. at ⁋⁋ 8-9. The Miler Declaration confirms the same for Dependance and Reliance. Miller Decl. at ⁋⁋ 8-11.

This fourth factor therefore supports upholding the transactions as sales.

### e. The fifth factor – whether the seller retained the right to excess collections – supports a sale

The fifth factor is whether the seller retained the right to excess collections. In other words, if the buyer only purchased a percentage of accounts receivable, does the seller have to right to any surplus. If the seller is able to retain excess any collections over and above the predetermined portion that it sold, that is indicative of a sale. *See* AICHER & FELLERHOFF at 192.

This factor can also be approached in terms of whether there is a right of reconciliation, *i.e.*, whether the agreement provides a mechanism to ensure the buyer only receives the portion of receivables to which it is entitled, with the seller entitled to any surplus. *See In re McKenzie Contracting LLC,* No. 24-bk-01255, 2024 WL 3508375, at *2 (Bankr. M.D. Fla. July 19, 2024) (reconciliation allows "adjustment of the amounts taken out of seller's account based on its cash flow (or lack thereof). If [seller] is doing poorly, [it] will pay less, and will receive a refund of anything taken by [buyer] exceeding the specified percentage …."). The *McKenzie Contracting* court also noted that, if the buyer has the ability to nullify reconciliation by describing it as an optional courtesy, that could suggest the transaction is a disguised loan. *Id*. at *3.

Here, the agreements entitle Defendants to only a fixed percentage of Merchant's future collected receivables or receipts. Exs. 1-5 at p. 1 ("Specified Percentage" boxes). Specifically, Meged is only entitled to 13%; Dependance to 2.73%; and Reliance to 2.45%. *Id*.

Defendants' agreements also each provide an estimate of what the specified percentage is expected to equate to in terms of a dollar amount. The Meged Agreements provide that dollar estimate in the "Initial Estimated Payment" section of the first page, and explain that amount is an approximation based upon the agreed-upon percentage Exs. 1-3 at p. 1 ("Initial Estimated Payment" row) and ₱ 3 ("Estimated Payments" section). The Dependance and Reliance

Agreements similarly provide an estimated "Periodic Amount" and explain that amount was determined based on the agreed-upon percentages and a review of past revenue. Exs. 4-5 at p. 1 ("Periodic Amount" and "How we calculated the Periodic Amount" boxes).

Each agreement includes a two-way reconciliation provision (*i.e.*, either party may request reconciliation) to ensure Defendants only receive their Specified Percentage; if not, the amount is trued-up by reconciliation (which may be initiated by Merchant) to ensure Defendants only receive their agreed-upon percentages. Exs. 1-3 at ¶ 4; Exs. 4-5 at ℙ 4.

None of the agreements characterize reconciliation as optional on the part of buyers, or a mere courtesy, which they are free to extend to or withhold from Debtors. Instead, the agreements make it clear that Debtors have the right to reconciliation, and they may invoke that right simply by sending an email to the buyer. Exs. 1-3 at ℙ 4; Exs. 4-5 at ℙ 4(a). Meged must complete its reconciliation within two business days, and reduce its estimated payment to be consistent with the Specified Percentage if necessary. Exs. 1-3 at ℙ 4. Dependance and Reliance must complete their reconciliations within three calendar days, and if the reconciliation shows that they collected more than their respective agreed-upon percentage, they must decrease the Periodic Amount. Exs. 4-5 at ℙ 4(c)-(d).

For these reasons, the fifth factor (excess collections/reconciliation) is contrary to recharacterization of the sales as loans.

### f. The sixth factor – whether the buyer has the right to unilaterally alter pricing terms – does not support recharacterizing the sale as a loan

The sixth factor is whether the buyer has the right to unilaterally alter pricing terms. Where the buyer has such a right, that is an indicia of a loan rather than a sale. *See* AICHER & FELLERHOFF at 193 (citing *Major's Furniture Mart, Inc. v. Castle Credit Corp., Inc.*, 602 F.2d 538 (3rd Cir. 1979)). In *Major's Furniture Mart, supra*, a receivables buyer had purported to

unilaterally change the terms of a purchase and sale agreement to instead treat it as a line of credit for up to $80,0000 with a variable interest rate. That court found this unilateral act "makes it obvious that [the purported buyer] treated the transaction as a line of credit … i.e., a loan situation. Were this a true sale … it would not have been able to impose these new conditions by fiat." *Id.* at 546; *see also In re Cornerstone*, 2019 WL 127359, at *5 (finding that this factor supported a true sale where "nothing in the agreement [gave the buyer] the authority to unilaterally change the purchase price").

Here, nothing in the Defendants' agreements with Debtors gives Defendants the right to unilaterally alter the purchase price or other terms. Instead, each of the agreements requires any modification to be in writing and signed by *both* parties. Exs. 1-3 at ¶ 47; Exs. 4-5 at ℙ 16. Further, the Ludmir and Miller Declarations establish that the Defendants did not unilaterally alter the terms of the parties' agreements. Ludmir Decl. at ℙ 10; Miller Decl. at ℙℙ 12-13.

This factor thus favors a true sale.

g.      **The seventh factor – whether the seller retained the right to alter or compromise the terms of the transferred assets – is either neutral or disfavors recharacterization**

The seventh factor is whether the seller retained the right to alter or compromise the terms of the transferred assets. This factor is based on a 1985 case from the District of Oklahoma, *Northern Trust Co. v. Federal Deposit Insurance Corp.*, 619 F. Supp. 1340 (D. Okla. 1985). *See* AICHER & FELLERHOFF at 193 (citing *Northern Trust, supra*). *Northern Trust* involved a unique fact pattern, in which Penn Square Bank had sold pro rata "participation interests" in a note to other banks, including Northern Trust. The court found the participation agreements between the banks provided for Penn Square to act as "holding and collecting agent" for Northern Trust's pro rata interest, while reserving for Penn Square "all rights" concerning the release of collateral, authority to consent to assignment, and discretion to enforce the note. The court

24

determined that the participation agreement did not transfer ownership of the loan from Penn Square to Northern Trust under that set of circumstances. 619 F. Supp. at 1345.

Here, this factor appears neutral because it has little or nothing to do with the facts present here. For one thing, the agreements here do not give Merchant the right to release the collateral granted to Defendants. And, as noted above, neither party has the right to unilaterally alter the terms of the parties' agreements; instead, modifications may only be made in a writing signed by both sides. Exs. 1-3 at ¶ 47; Exs. 4-5 at ₽ 16. If anything, this factor cuts *against* recharacterization, because nothing in the agreements gives the Merchant the right to alter the terms of the transferred receivables. *See generally* Exs. 1-5.

### h. The eighth factor – whether seller retained the right to repurchase – favors a sale

The eighth and final *R&J Pizza*/AICHER & FELLERHOFF factor is whether the seller retained the right to repurchase the assets. The Meged Agreements do *not* provide for a right of Merchant to repurchase the receivables from Meged. *See generally*, Exs. 1-3. Likewise, the Dependance and Reliance Agreements expressly state that Debtors have *no right* to repurchase the receivables. Exs. 4-5 at ₽ 6 ("Seller acknowledges that it has no right to repurchase the Purchased Amount from Buyer.").

The eighth and final factor therefore favors a finding of a true sale.

### 4. The Additional Factors Also Support a Sale

### a. The additional factor of whether the term or duration is limited favors a sale

Plaintiffs and some authorities suggest that whether an agreement has a finite term is an additional factor indicative of a loan rather than a sale. *See Mckenzie Contracting*, 2024 WL 3508375 at *3 ("[A]n indefinite term of receiving a fixed percentage of actual receipts may suggest that the buyer has assumed the risk associated with the receivables not being collectible.").

Here, the Meged Agreements specify they are for an "indefinite" term. Exs. 1-3 at ℙ 6. The Dependance and Reliance Agreements are likewise for open-ended, rather than finite, terms. Exs. 4-5 at ℙ 6 ("There is no interest rate or payment schedule *and no time period* during which the Purchased Amount must be collected by Buyer.") (emphasis added).

This additional factor cuts against recharacterization of the sales as loans.

### b. The additional factor of whether bankruptcy is an automatic default favors a sale

Another additional factor that Plaintiffs and some authorities cite is whether an agreement includes a clause to the effect that a bankruptcy filing by the seller constitutes an automatic default. *See Mckenzie Contracting*, 2024 WL 3508375 at *3 (where a seller's "bankruptcy triggers a default, this factor would weigh in favor of finding the agreement to be a loan …."). This is also called an *ipso facto* clause.

Here, Defendants' agreements do *not* list a bankruptcy filing by the merchant as an event of default. *See* Exs. 1-3 at ℙ 30 (listing events of default); *see generally* Exs. 4-5 (nowhere identifying merchant's bankruptcy filing as constituting a default or breach of the agreement).

This additional factor thus cuts against recharacterization of the sales as loans.

### c. The additional factor of a right to accelerate arguably supports recharacterization

The final additional factor that Plaintiffs and some authorities recognize is whether an agreement includes an acceleration clause, which accelerates the seller's obligation to deliver purchased receivables to the buyer immediately (rather than over time as and when the receivables are received). Here, the agreements include acceleration provisions, but only as a remedy for a default or breach by the Debtors. *See* Exs. 1-3 at ℙ 16 (Protection 1); Exs. 4-5 at ℙ 15(b). As noted, however, the Debtors' mere inability to collect receivables, their delay in collecting receivables, or a bankruptcy filing by them, do *not* constitute defaults or breaches of the agreements. The

acceleration clauses only apply in event of a breach or default under the agreements (*e.g.*, where seller breached a representation and warranty).

No single factor is dispositive, and one or two factors that arguably support recharacterization does not outweigh the numerous factors that are contrary to recharacterization. Notably, under the agreement in *Cornerstone*, the buyer had (among many other remedies) a right to accelerate the entire amount due in event of default. That court nonetheless declined to recharacterize the sale as a loan. *Cornerstone Tower Svcs, Inc.*, 2018 WL 6199131, at \*\*7-8. This Court should likewise decline to find the acceleration provisions here dispositive, and decline to recharacterize the agreements as loans.

## III.     CONCLUSION

As a matter of law, Plaintiffs cannot carry their burden to show that the purchase and sale transactions between Debtors, on the one hand, and Meged, Dependance, and Reliance, on the other, should be recharacterized from sales to loans. The relevant factors, almost all of which are discernable from the face of the agreements, overwhelmingly disfavor recharacterization. Because the prepetition transactions between Defendants and Debtors are "true sales," they cannot and should not be recharacterized as loans. It follows that the Purchased Accounts are *not* estate property. Summary judgment in favor of these Defendants should be granted dismissing Plaintiffs' Adversary Complaint with prejudice.

27

Dated: May 15, 2026

Respectfully submitted,

**STONE PIGMAN WALTHER WITTMANN L.L.C.**

By: _____ */s/ Andrew D. Mendez*
Andrew D. Mendez (La. Bar No. 26686)
Bryant S. York (La. Bar No. 34165)
909 Poydras Street, Suite 3150
New Orleans, Louisiana 70112
Telephone: (504) 581-3200
Facsimile: (504) 581-3361
Email: amendez@stonepigman.com
byork@stonepigman.com

*Attorneys for Defendants Meged Funding Group,*
*Dependance Platinum FL, LLC, and Reliance Financial*
*FL, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2026, I electronically filed the foregoing with the Court by using the Court's CM/ECF system thereby serving all registered users in this matter.

_____ */s/ Andrew D. Mendez*