**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO: 26-10678** |
| | § | **(JOINTLY ADMINISTERED)** |
| **CROSBY MARINE** | § | |
| **TRANSPORTATION, LLC,** | § | **CHAPTER 11** |
| | § | **COMPLEX CASE** |
| **DEBTORS.[1]** | § | |
| | § | **SECTION A** |

### ORDER

Upon the application (the "Application"), [ECF Doc. 195], of Crosby Marine Transportation, LLC, Crosby Tugs, LLC, Crosby Dredging, LLC, and Bertucci Contracting Co., L.L.C., as debtors and debtors-in-possession (collectively, the "Debtors"), for entry of an order (this "Order") (a) authorizing the employment and retention of Raymond James & Associates, Inc. ("Raymond James") to provide investment banking services, effective as of the Petition Date in accordance with the terms and conditions set forth in the 2nd Restated Engagement Letter,[2] attached hereto as **Exhibit A**, (b) approving the terms of Raymond James' employment and retention by the Debtors in these Chapter 11 Cases, including the fee and expense structure and the indemnification, contribution, reimbursement, and related provisions set forth in the 2nd Restated Engagement Letter, (c) modifying certain time-keeping requirements in connection with such employment and retention, and (d) granting related relief; and upon consideration of the Richards Declaration and the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core

---

[1]     An Order directing joint administration of the Chapter 11 bankruptcy case of Crosby Marine Transportation, LLC [No. 25-10678], as lead case, with the Chapter 11 bankruptcy cases of (i) Crosby Tugs, L.L.C. [No. 26-10679], (ii) Crosby Dredging, LLC [No. 26-10680], and (iii) Bertucci Contracting Company, L.L.C. [No. 26-10681], was entered on March 24, 2026, [No. 26-10678, ECF Doc. 9; No. 26-10679, ECF Doc. 4; No. 26-10680, ECF Doc. 4, No. 26-10681, ECF Doc. 4].

[2]     Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the 2nd Restated Engagement Letter.

proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having determined that it may enter a final order consistent with Article III of the United States Constitution; and this Court finding that the terms and conditions of Raymond James's employment, including the fee and expense structure and the indemnification, contribution, reimbursement, and related provisions in the 2nd Restated Engagement Letter and summarized in the Application, are reasonable under § 328(a) of the Bankruptcy Code; and this Court finding that Raymond James does not hold or represent interests materially adverse to the Debtors or their estates and is a "disinterested person" within the meaning of § 101(14) of the Bankruptcy Code; and it appearing that the retention of Raymond James is in the best interests of the Debtors, their estates, and their creditors; and this Court having reviewed the Application and having heard any statements in support of the relief requested therein at any hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Application and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefore, it is **HEREBY ORDERED THAT**:

1.      The Application is **APPROVED** in all respects as set forth herein.

2.      The Debtors are authorized, pursuant to §§ 327(a) and 328(a) of the Bankruptcy Code, effective as of the Petition Date, to employ and retain Raymond James as their investment banker in accordance with the terms and conditions set forth in the Application and the 2nd Restated Engagement Letter, subject to the terms of this Order.

3.      The terms of the 2nd Restated Engagement Letter, attached to the Order as **Exhibit A**, are approved in all respects except as limited or modified herein.

4.      All of Raymond James's compensation set forth in the 2nd Restated Engagement Letter, including, without limitation, the fee and expense structure and the indemnification,

contribution, reimbursement, and related provisions set forth therein, is approved pursuant to § 328(a) of the Bankruptcy Code and Raymond James shall be compensated and reimbursed pursuant to § 328(a) of the Bankruptcy Code in accordance with the terms of the 2nd Restated Engagement Letter, subject to the procedures set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable orders of this Court.

5. Raymond James shall file applications for allowance of compensation and reimbursement of expenses pursuant to and in accordance with the procedures set forth in §§ 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable orders of this Court; provided, however, that the fees and expenses payable to Raymond James pursuant to the 2nd Restated Engagement Letter shall be subject to review pursuant to the standards set forth in § 328(a) of the Bankruptcy Code and shall not be subject to the standard of review set forth in § 330 of the Bankruptcy Code; provided, further, that the Debtors are authorized to pay the Monthly Advisory Fees to Raymond James each month when required under the 2nd Restated Engagement Letter without a prior fee application.

6. Consistent with the *Final Order (I) Authorizing Postpetition Use Of Cash Collateral, (II) Granting Adequate Protection To Existing Secured Parties, (III) Modifying The Automatic Stay, And (IV) Granting Related Relief* (the "Final CCO"), [ECF Doc. 294], the Existing Secured Parties (as defined in the Final CCO) agree that the RJ Carveout (as defined in the Final CCO) shall be funded from proceeds from the sales of their vessel collateral and shall be used to pay only the Crosby Transaction Fees earned and the reimbursable expenses owed in connection the purchase price of any Crosby Transaction that includes the sale of such Existing Secured Party's collateral; provided, that, for the avoidance of doubt, any Crosby Transaction Fees earned by and reimbursable expenses owed to Raymond James may also be paid from the Specified Carve Out (as defined in the Final CCO), as ordered by the Court. Crosby Transaction Fees payable from

the RJ Carveout shall be allocated among the Existing Secured Parties on a pro rata basis based on the cash proceeds, credit bid and/or Assumed Crosby Indebtedness attributable to the applicable Existing Secured Party's collateral from each applicable Crosby Transaction. To the extent the RJ Carveout applies to a Crosby Transaction Fee calculated on Assumed Crosby Indebtedness, the RJ Carveout shall fund such fee only to the extent that the Assumed Crosby Indebtedness involves the assumption of debt of a Debtor owed to an Existing Secured Party of that Debtor and such Existing Secured Party has consented in writing, has not objected, or has objected and subsequently withdrawn such objection, to such assumption. The RJ Carveout shall not fund any Crosby Transaction Fee calculated on the assumption of any other contractual liabilities or debts. The portion of any such Crosby Transaction Fee attributable to a particular Existing Secured Party's assumed debt shall be pro-rated and payable solely by that Existing Secured Party. Notwithstanding anything herein or in the 2nd Restated Engagement Letter to the contrary, the RJ Carveout shall fund a Crosby Transaction Fee only to the extent that the aggregate of all Crosby Transactions involves the sale of fifty percent (50%) or more of the Operating Vessels of the Debtors.[3]

7.    Notwithstanding anything herein or in the 2nd Restated Engagement Letter to the contrary, if and to the extent that (i) these Chapter 11 cases have been converted to cases under Chapter 7 of the Bankruptcy Code; (ii) these Chapter 11 cases have been voluntarily dismissed; (iii) the applicable Existing Secured Party Collateral (as defined in the Final CCO) is abandoned by the Debtors pursuant to § 554 of the Bankruptcy Code or surrendered to the applicable Existing

---

[3]    For purposes of this Order, "Operating Vessels" means all vessels of the Debtors that are operating and being utilized by the Crosby Group to generate revenue as of the Auction, and in any event no later than September 14, 2026, excluding (a) vessels whose fair market value does not exceed their scrap value, (b) skiffs, flats, airboats, crew boats or other vessels that do not constitute an offshore vessel and (c) vessels that do not have a valid Certificate of Inspection issued by the United States Coast Guard. The number of Operating Vessels shall be determined as of the Auction, and in any event no later than September 14, 2026, and shall not be subject to adjustment thereafter.

Secured Party; (iv) the automatic stay no longer applies to such Existing Secured Party Collateral; or (v) an Existing Secured Party otherwise takes ownership of any Existing Secured Party Collateral without need for a Court order approving taking such ownership, Raymond James shall be entitled to a Crosby Transaction Fee in the agreed upon amount equal to two percent (2.0)% of the gross cash and non-cash consideration, including the amount of any credit bid(s), received by or on behalf of such Existing Secured Party from such sale to the extent that (x) such collateral is transferred to a party (or an affiliate thereof) that was identified as a potential purchaser by Raymond James to the Debtors during the Term and executed a Non-Disclosure Agreement with the Debtors in connection with the efforts of Raymond James, and (y) such transfer occurs within ninety (90) days of the occurrence of any of the foregoing events.

8. Notwithstanding anything herein or in the 2nd Restated Engagement Letter to the contrary, (i) Monthly Advisory Fees, (ii) Financing Fees, (iii) any Restructuring Fee, (iv) a Luhr-Crosby JV-Interest Transaction Fee, and (v) Expenses associated items (i)-(iv) of this paragraph 8, shall not be subject to or payable from the RJ Carveout, but shall be solely subject to and payable from the Specified Carve Out. Further, notwithstanding anything herein or in the 2nd Restated Engagement Letter to the contrary, no vessel or other Existing Secured Party Collateral shall be subject to more than one Transaction Fee payable from the RJ Carveout, including as between any Crosby Transaction Fee under paragraph 6 and any Crosby Transaction Fee under paragraph 7 of this Order.

9. The Debtors shall cause to be paid as a cost of a Transaction, and not solely out of proceeds thereof, and placed in escrow for the sole benefit of Raymond James at the time of consummation of any such Transaction(s), an amount equal to the Transaction Fee payable under the 2nd Restated Engagement Letter, together with Raymond James's expenses, pending the filing of and the Court's approval of any Raymond James fee application (other than as to monthly

Advisory Fees, which shall be paid prior to Court approval). Each Crosby Transaction Fee shall be earned upon consummation of each Crosby Transaction, and all cash proceeds of the Crosby Transactions shall be placed in escrow at closing of each respective Crosby Transaction. Upon the closing of all Crosby Transactions that result from the Auction (as defined in the Final CCO), (i) the aggregate Crosby Transaction Fee shall be calculated and remain in escrow pending court approval of a Raymond James fee application, (ii) proceeds of each Crosby Transaction shall be released to the Existing Secured Parties whose collateral was sold in such Crosby Transaction until the applicable Existing Secured Party is paid in full, and (iii) any remaining proceeds shall be distributed to the Debtors. Upon approval of any Raymond James fee application by the Bankruptcy Court, Raymond James shall be paid and/or may apply the amounts from the funds held in the escrow as and when awarded by the Court.

10. The indemnification provisions set forth in the 2nd Restated Engagement Letter are approved, subject during the pendency of these Chapter 11 Cases to the following:

(a) Subject to the provisions of subparagraphs (b) and (c) below, the Debtors are authorized to indemnify, contribute, or reimburse, and shall indemnify, contribute, or reimburse Raymond James for any claims arising from, related to, or in connection with services to be provided by Raymond James as specified in the Application, but not for any claim arising from, related to, or in connection with Raymond James's postpetition performance of any other services other than those in connection with the engagement, unless such postpetition services and the indemnification, contribution, or reimbursement therefor are approved by this Court;

(b) The Debtors shall have no obligation to indemnify Raymond James, or provide contribution or reimbursement to Raymond James, for any claim or expense that is either: (i) judicially determined (the determination having become final and non-appealable) to have arisen from Raymond James's gross negligence, willful misconduct, breach of fiduciary duty, if any, bad faith, or self-dealing; (ii) for a contractual dispute in which the Debtors allege the breach of Raymond James's contractual obligations, unless this Court determines that indemnification, contribution, or reimbursement would be permissible pursuant to *In re United Artists Theatre Co.*, 315 F.3d 217 (3d Cir. 2003); or (iii) settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) above, but determined by this Court, after notice and a hearing pursuant to

subparagraph (c) below, to be a claim or expense for which Raymond James should not receive indemnity, contribution, or reimbursement under the terms of the 2nd Restated Engagement Letter; and

(c) If, before the earlier of (i) the entry of an order confirming a chapter 11 plan in the cases (that order having become a final order no longer subject to appeal) and (ii) the entry of an order closing these Chapter 11 Cases, Raymond James believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution, or reimbursement obligations under the 2nd Restated Engagement Letter, including, without limitation, the advancement of defense costs, Raymond James must file an application in this Court, and the Debtors may not pay any such amounts to Raymond James before the entry of an order by this Court approving the payment. This subparagraph (c) is intended only to specify the period of time under which this Court shall have jurisdiction over any request for fees and expenses by Raymond James for indemnification, contribution, or reimbursement, and not a provision limiting the duration of the Debtors' obligation to indemnify Raymond James. All parties in interest shall retain the right to object to any demand by Raymond James for indemnification, contribution, or reimbursement, and not as a provision limiting the duration of the Debtors' obligation to indemnify Raymond James.

11.   In the event that during the pendency of these Chapter 11 Cases, Raymond James requests reimbursement for any attorneys' fees or expenses, the invoices and supporting time records from such attorneys shall be included in Raymond James's fee applications, and such invoices and time records shall be paid in compliance with the applicable Bankruptcy Rules, Local Rules, and standards of §§ 330 and 331 of the Bankruptcy Code, without regard to whether such attorney has been retained under § 327 of the Bankruptcy Code and without regard to whether such attorney's services satisfy § 330(a)(3)(C) of the Bankruptcy Code.  Notwithstanding the foregoing, Raymond James shall be reimbursed for legal fees incurred in connection with these Chapter 11 Cases only to the extent permitted under applicable law and the decisions of this Court.

12.   Notwithstanding any provision in the Bankruptcy Rules to the contrary, this Order shall be immediately effective and enforceable upon its entry.

13.   In the event of any inconsistency between the 2nd Restated Engagement Letter, the Application, and this Order, this Order shall govern.

14.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order, and during the pendency of these Chapter 11 Cases, shall retain exclusive jurisdiction with respect to any proceedings arising from or related to the 2nd Restated Engagement Letter.

**IT IS FURTHER ORDERED** that the Debtors shall serve this Order by first-class U.S. Mail within three (3) days on all parties not receiving electronic notice through this Court's CM/ECF system pursuant to applicable Federal Rules of Bankruptcy Procedure, this Court's Local Rules, this Court's Complex Case Procedures, and any Order issued by this Court limiting notice and file a certificate of service into the record.

New Orleans, Louisiana, May 28, 2026.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT A

2nd Restated Engagement Letter

**RAYMOND JAMES**®

CONFIDENTIAL

May [●], 2026

Crosby Enterprises, L.L.C.
17751 Hwy 3235
Galliano, LA 70354
Attention: Kurt J. Crosby, Chief Executive Officer

Bertucci Contracting Company, L.L.C.
7 River Road
Jefferson, LA 70121
Attention: Nolan A. Simoneaux, Jr., Manager


Reference is made to: (1) that certain letter agreement dated September 30, 2024 between *Raymond James & Associates, Inc.* ("**Raymond James**") and *Crosby Enterprises, L.L.C.* ("**Crosby**"), pursuant to which Raymond James agreed to provide certain investment banking services in connection with a possible *'Transaction'*, as defined in such letter agreement; (2) that certain letter agreement dated December 5, 2025 between Raymond James and *Bertucci Contracting Company, L.L.C.* (inclusive of Bertucci Contracting Co., Inc., "**Bertucci**" and alternatively with Crosby, each a "**Client**"),and (3) that certain letter agreement dated as of February 2, 2026 between the Client and Raymond James which consolidated and restated the prior two letter agreements into a restated and amended letter (the "**Original Restated Engagement Letter**"), pursuant to which Raymond James agreed to provide certain investment banking services in connection with a possible *'Transaction'*, as defined in such letter agreement.

In consideration of the mutual promises and covenants between Raymond James and the Clients and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, this letter and all addenda attached hereto and incorporated by reference and made a part hereof (this "**2ⁿᵈ Restated Engagement Letter**"), dated and effective as of date set forth above (the "**Effective Date**") hereby restates and amends the Original Restated Engagement Letter in its entirety, as follows; *provided* that, notwithstanding the execution and delivery of this 2ⁿᵈ Restated Engagement Letter by the Parties, it shall not be effective and will not bind either Party unless and until it has been approved by the *Bankruptcy Court* (as defined in Section 1(i) below), according the terms of such Section 1(i), and in the event this 2nd Restated Engagement Letter is not approved by the Bankruptcy Court the Original Restated Engagement Letter shall remain in full force and effect.

Each Client hereby agrees that all references below to such Client (including by its name, i.e., respectively, '*Crosby*' or '*Bertucci*') shall include the Crosby Related Parties set forth on Exhibit I hereto, Client SPEs (if any), and any Affiliates or Subsidiaries of each Client. Each Client further hereby agrees and acknowledges that (i) it shall be jointly and several liable for all liabilities and obligations of both Clients hereunder, and (ii) any obligations hereunder referenced as an obligation of "*the Clients*" may be fulfilled by either Client or both Clients, at their discretion, and any failure by one Client to fulfill any such obligation shall not relieve the other Client of its liability hereunder to fulfill such obligation.

Capitalized terms used but not defined elsewhere herein shall have the meanings assigned to them in Addendum B hereto.

1.  **Investment Banking Advisory Services** –

    (a)  ***Clients' Engagement of Raymond James; Services***: The Clients, from and after their respective *Engagement Commencement Dates* (as defined in Section 4 below) have engaged, and throughout the *Term* (as defined in Section 4 below) shall continue to engage, Raymond James as their sole and exclusive financial advisor regarding certain potential Transactions (as more fully defined in Addendum B hereto), in connection with which Raymond James has provided and shall continue to provide the following services, in each case to the extent reasonably requested by such Client (collectively, the "**Services**"):

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
May [●], 2026
Page 2

(i) review and analyze the business, operations, properties and financial condition of, respectively, the Crosby Group and Luhr Crosby Enterprises, LLC ("**Luhr Crosby**");

(ii) as and if applicable, evaluate each Client's debt capacity and advise such Client generally on the following in connection with any potential Financing Transaction for such Client: (A) appropriate investment structuring alternatives, (B) an appropriate capital structure, and (C) available financings that meet the foregoing parameters;

(iii) assist each Client in identifying Prospective Counterparties to a given Transaction that Raymond James, after consultation with such Client's management, believes meet certain industry, financial, and strategic criteria;

(iv) provide marketing and drafting input on Client Materials being prepared by each Client;

(v) within its area of expertise, advise on the business components of Transaction Documentation for each given Transaction;

(vi) with the prior written consent by each Client, contact Prospective Counterparties on such Client's behalf;

(vii) advise Crosby as to a potential Crosby Transaction;

(viii) advise Bertucci as to potential Luhr-Crosby JV-Interest Transactions;

(ix) as and if applicable, advise each Client on tactics and strategies for negotiating with holders of securities, debt, and/or other interests and/or claims of such Client in connection with any potential Restructuring Transaction (collectively, "**Client Stakeholders**");

(x) advise each Client on the timing, nature and terms of any new Client securities, other considerations or other inducements to be offered to its Client Stakeholders in connection with any Restructuring Transaction;

(xi) assist and advise each Client generally on potential alternatives and strategies for any given Transaction;

(xii) participate in the meetings of each Client's Governing Authority as determined by such Client to be appropriate, and, upon request, provide periodic status reports and advice to such Governing Authority with respect to matters falling within the scope of Raymond James's engagement hereunder; *and*

(xiii) assist each Client in negotiating and structuring any given Transaction.

Each Client acknowledges and agrees that Raymond James may provide certain of its Services through affiliates of Raymond James. If a Client requests assistance in obtaining nondisclosure agreements from Prospective Counterparties, Raymond James will, as requested by such Client, coordinate such process, with such Client and its counsel being solely responsible for negotiating such nondisclosure agreements. Raymond James will not provide any legal, accounting, regulatory, appraisal or tax advice, nor will Raymond James render any formal opinion as to any Transaction. If a Client requests that Raymond James provide any services other than those expressly set out in this Section 1(a), the Parties will enter into a separate written agreement that will set forth the nature and scope of such services, appropriate compensation and other customary matters, as mutually agreed in writing between the Parties.

(b) ***Clients' Cooperation***: Each Client will, as Raymond James may request, provide the necessary assistance, participation, and information reasonably required at all steps and will cause its management to be reasonably available and furnish, and cause its management to furnish, Raymond James such information, data and cooperation relating to such Client and any potential or actual Transaction, as Raymond James may request, including, but not limited to, providing assistance,

**RAYMOND JAMES®**

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
May [●], 2026
Page 3

participation and cooperation in disseminating its Client Materials and participation in conference calls, meetings and other communications with Prospective Counterparties and their advisors and representatives. Further, each Client will be available, upon request, to answer reasonable inquiries from Prospective Counterparties.

(c) ***Raymond James Exclusivity***: The Parties acknowledge and agree that, during the Term, neither Client will directly negotiate or consummate any Transaction without Raymond James's knowledge or involvement.

(d) ***Clients' Sharing of All Third Party Inquiries***: During the Term, each Client shall (i) promptly refer and disclose to Raymond James the identities of, contact information for, and all material communications regarding a potential Transaction with, any Prospective Counterparty not initially sourced by Raymond James, and (ii) provide Raymond James with the reasonably necessary assistance, participation, and information requested in connection with the Services.

(e) ***No Assurance of Transaction Consummation; No Obligation to Effect Transaction***: Each Client expressly acknowledges that Raymond James does not guarantee, warrant or otherwise provide assurance that such Client will be able to consummate any Transaction or achieve any other result. This 2nd Restated Engagement Letter does not obligate either Client or Raymond James to enter into any Transaction Documentation or otherwise proceed with any Transaction.

(f) ***Limited Scope of Raymond James Client Beneficiary/Benefits***: Without limiting the generality of any portion of this Section 1, each Client acknowledges and agrees that: (i) Raymond James is acting exclusively as the financial advisor to such Client and will take instructions only from such Client in connection with a Transaction involving such Client; (ii) Raymond James will not handle, custody or transmit any Client securities, Financing Proceeds, or Transaction Documentation between such Client and any Counterparty; (iii) Raymond James will not be acting on behalf of or taking directions from any Counterparty with respect to any Transaction; and (iv) such Client will use commercially reasonable efforts to cause the Definitive Agreement for a Transaction to include representations and warranties from the Counterparty(ies) thereto that Raymond James is working solely for and at the direction of such Client, with Raymond James being a third-party beneficiary of such representations and warranties.

(g) ***Client Materials***: Each Client is solely responsible for the content and accuracy of its Client Materials that it authorizes for sharing with any third parties. Each Client will amend and supplement its Client Materials as required in order to include information concerning Raymond James and/or its activities hereunder with respect to a potential Transaction that is provided by Raymond James to such Client in writing expressly for inclusion in its Client Materials.

(h) ***Certain Financing Transaction Parameters***:

(i) Setting of Terms of Financing Transaction: The terms and conditions of any Financing Transaction will be determined by the applicable Client in consultation with Raymond James before such Financing Transaction is presented to Prospective Counterparties, subject to prevailing market conditions and the outcome of Raymond James's due diligence of such Client. The terms and conditions governing any Financing Transaction, including usual and customary indemnification provisions and closing conditions, will be set forth in the Definitive Agreement governing such Financing Transaction.

(ii) No Raymond James Capital Commitment: The execution of this 2nd Restated Engagement Letter does not constitute a commitment or obligation by Raymond James to purchase any securities of or interests in any Client or to extend or arrange any financing to any Client.

**RAYMOND JAMES®**

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
May [•], 2026
Page 4

    (i)    ***Bankruptcy Matters***:  On March 23, 2026, the Client entities (and certain of their affiliates) became debtors (collectively, the "**Client Debtors**") in a case under the Bankruptcy Code (Case No. 26-10678 (jointly administered), United States Bankruptcy Court for the Eastern District of Louisiana) (the "**Client Ch. 11 Case**") before the United States Bankruptcy Court for the Eastern District of Louisiana (the "**Bankruptcy Court**"). The Client Debtors hereby undertake to file an application to retain Raymond James and use best efforts to have it heard as promptly as practicable following the date hereof. Such applications will seek authorization from the Bankruptcy Court to retain Raymond James pursuant to (and subject to the standard of review of) Section 328(a) of the Bankruptcy Code, effective as of the date on which such Client files its bankruptcy case, in accordance with the terms hereof and Addendum A hereto and not subject to any other standard or review under Section 330 of the Bankruptcy Code. The Client Debtors will supply Raymond James with a draft of such application and any proposed order authorizing Raymond James's retention sufficiently in advance of their filing to enable Raymond James and its counsel to review and comment thereon. Services to the Client Debtors under this 2nd Restated Engagement Letter will be subject to the entry of a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition (the "**Retention Order**") approving the retention of Raymond James and this 2nd Restated Engagement Letter under Section 328(a) of the Bankruptcy Code, and Raymond James will not be required to perform any services in such Client Ch. 11 Case pursuant to this 2nd Restated Engagement Letter until the entry of such Retention Order. In any event, such Retention Order must be acceptable to Raymond James in all respects. In addition, such Client Debtors must include, and must use reasonable efforts to obtain Bankruptcy Court approval of, a carveout from liens (including replacement liens) or administrative expense claims (superpriority or otherwise) in all financing or cash collateral orders to pay any Transaction Fee(s) or expenses of Raymond James prior to and ahead of any pre- or post-bankruptcy indebtedness in any circumstance. If such Retention Order or carveout is not obtained (or is later terminated or set aside for any reason), Raymond James may terminate this 2nd Restated Engagement Letter as it relates to such Client Debtors, and such Client Debtors will reimburse Raymond James for all professional fees and out of pocket expenses reasonably incurred prior to such date of termination, unless prohibited from doing so by applicable law and/or the Bankruptcy Court. If all Client Debtors are part of the same Client Ch. 11 Case as part of the collective '*debtor*' thereof, the foregoing procedures shall be consolidated as if they related to a single client.

    (j)    ***Anti-Money Laundering (AML) and Customer Due Diligence (CDD) Compliance***: U.S. federal laws and regulations require Raymond James to collect certain identification elements and perform related screening (the "**AML/CDD Search Process**") before accepting an investment banking engagement. Accordingly, upon each Client's Engagement Commencement Date, such Client delivered to Raymond James a completed and signed form (the "**AML/CDD Form**"), together with all applicable supporting documentation requested in the Form. Each Client is responsible for promptly informing Raymond James of changes (if any) in the information provided to Raymond James in its AML/CDD Form.

2.    **Fees** – In consideration of Raymond James's agreement to provide the Services, the Clients will pay Raymond James as set forth in this Section 2:

    (a)    ***Monthly Advisory Fees and Database Expense Amount***: Commencing upon the Effective Date and on the first business day of every month thereafter through the end of the Term for such Client, the Clients will pay Raymond James a non-refundable cash retainer of $100,000 (each a "**Monthly Advisory Fee**"). Fifty percent (50%) of the amount of the fourth and each subsequent Monthly Advisory Fee payments received by Raymond James shall be credited (once, without duplication) against any *Transaction Fee* (as defined below) that is payable under this 2nd Restated Engagement Letter. Additionally, the Clients will pay Raymond James a flat expense charge of $1,000 on the Effective Date for Raymond James's access to electronic financial databases pertinent to this engagement.

**RAYMOND JAMES**®

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
May [•], 2026
Page 5

(b)    *Transaction Fees*: Subject to the qualifications and limitations of Section 2(c) below, if, during the Term or the Tail Period, either: (i) any Transaction Closes, or (ii) any Transaction Agreement is executed and delivered and the Transaction referred to therein subsequently Closes (regardless of when such Closing occurs), or (iii) in the case of a Restructuring Transaction, any amendment to or other changes in the instruments or terms pursuant to which any Existing Obligations were issued or entered into become effective, then the Clients will, subject to any applicable order by the Bankruptcy Court, pay Raymond James a non-refundable cash transaction fee, as a cost of such Transaction (a "**Transaction Fee**"), as follows, depending on the type of Transaction. For clarity, each Client and Raymond James acknowledge and agree that, in consideration of Raymond James's agreement to provide the Services for Transaction Fees that are contingent upon Closings or, in the case of a Restructuring Transaction, contractual alterations in Existing Obligations, Raymond James will be paid in accordance with and subject to the terms and conditions of this Section 2 regardless of whether a Client or Raymond James actually procured the Counterparty or any Transaction Documentation. During the Term and thereafter, each Client will promptly inform Raymond James of (as applicable) the signing of any Transaction Agreement with respect to which a Transaction Fee could be payable upon a Closing and the scheduling of any Closing at which a Transaction Fee would be payable.

**Financing Fee(s)**: Subject to the parameters set forth in the introductory paragraph of this Section 2(b) above, the Transaction Fee for a Financing Transaction for a given Client (each a "**Financing Fee**") will be as follows, in each case payable (i) upon any funding date, and (ii) in the case of a Financing Transaction that includes an uncommitted accordion or similar credit feature, upon the *earlier* of such Client's receipt of the Commitment for such credit facility *or* its funding, in all cases where the timing of each Financing Fee payment is '*of the essence*':

-    Re-Financing Transactions: For any given Re-Financing Transaction for a given Client, the Financing Fee (a "**Re-Financing Fee**") shall be the *greater* of (A) $500,000 for the first such Re-Financing Transaction with an existing lender to such Client and $250,000 for any Re-Financing Transaction with each additional existing lender to such Client (each alternatively "**Minimum Re-Financing Fee**") *or* (B) the *sum* of (1) two percent (2.0%) of the Financing Proceeds of any Debt Instruments in such Re-Financing Transaction, and (2) five percent (5.0%) of the Financing Proceeds of any Client Equity in such Re-Financing Transaction (each a "**Proceeds Percentage Re-Financing Fee**"); *provided*, *however*, that, if there are multiple fundings and/or delivered Commitments for any given Re-Financing Transaction with an individual existing lender, the Minimum Financing Fee shall apply only to the first of such fundings and/or delivered Commitments with such existing lender, with the Re-Financing Fee for any subsequent fundings and/or delivered Commitments with such existing lender being calculated as the *difference* (but never less than zero) between (i) a Proceeds Percentage Re-Financing Fee calculated as if all fundings and/or delivered Commitments with such existing lender to such date were for a single funding and/or delivered Commitment *less* (ii) all Re-Financing Fees previously paid in connection with the re-financing of such existing lender to such Client (for clarity and the avoidance of doubt, each Re-Financing Transaction with an individual existing lender to such Client shall be considered a distinct and separate '*Re-Financing Transaction*' generating a separate Re-Financing Transaction Fee in connection therewith as provided above); and

-    New Capital Financing Transactions: For any given New Capital Financing Transaction for a given Client, the Financing Fee (a "**New Capital Financing Fee**") shall be the *greater* of (A) $500,000 (the "**Minimum New Capital Financing Fee**") *or* (B) the *sum* of (1) two percent (2.0%) of the Financing Proceeds of any Debt Instruments in such New Capital Financing Transaction, *plus* (2) five percent (5.0%) of the Financing Proceeds of any Client Equity in such New Capital Financing Transaction (each a "**Proceeds Percentage New Capital Financing Fee**"); *provided* that, if there are multiple funding dates and/or delivered Commitments for one or more New Capital Financing Transactions for such Client, the Minimum New Capital

**RAYMOND JAMES**®

#11784907v1<LUGENBUHL> - Crosby - RJ 2nd Restated Engagement Letter - LWPRH 052726

Financing Fee shall apply only to the first of such fundings and/or delivered Commitments, with the New Capital Financing Fee for any subsequent funding and/or delivered Commitment being calculated as the *difference* (but never less than zero) between (i) a Proceeds Percentage New Capital Financing Fee calculated as if all fundings and/or delivered Commitments to such date were for a single funding and/or delivered Commitment *less* (ii) all New Capital Financing Fees previously paid for such Client.

**Restructuring Fee**: Subject to the parameters set forth in the introductory paragraph of this Section 2(b) above, the Transaction Fee for a Restructuring Transaction (a "**Restructuring Fee**") will be equal to $2,500,000 payable to Raymond James upon the Bankruptcy Court's approval of such Restructuring Transaction (time being '*of the essence*'); *provided* that if the total fees paid to Raymond James hereunder in connection with a Crosby Transaction and/or an LC JV Transaction exceed (i) $4.5 million, the Restructuring Fee will be reduced by 50%, or (ii) $7.5 million, the Restructuring Fee will be eliminated altogether.

**Crosby Transactions Fees**: Subject to the parameters set forth in the introductory paragraph of this Section 2(b) above, the Transaction Fee for any Crosby Transaction (a "**Crosby Transaction Fee**") will be the greater of (i) $2,500,000 in the aggregate for any and all Crosby Transactions or (ii) an amount equal to 1.5% of the aggregate Crosby Transaction Proceeds received by the Client in connection with each and all such Crosby Transactions, in either case, payable upon the Closing of the applicable Crosby Transactions, time being '*of the essence*'. For clarity, the functional application of the foregoing provisions governing Crosby Transaction Fees mean that, (A) upon the Closing of the first Crosby Transaction, the Crosby Transaction Fee payable to Raymond James will be either $2,500,000 or, if the Crosby Transaction Proceeds exceed $166,666,666, 1.5% thereof, and (B) if the Crosby Transaction Fee paid to Raymond James on the first Crosby Transaction is $2,500,000, then Crosby Transaction Fees on subsequent Crosby Transactions will be due and payable only if and when the Crosby Transaction Proceeds on all Crosby Transactions exceed $166,666,666, at which point in time the additional Crosby Transaction Fees payable to Raymond James will be 1.5% of aggregate Crosby Transaction Proceeds in excess of $166,666,666. As a further example, in the event that the consideration for all Crosby Transactions consists of a credit bid by secured lenders and the aggregate Assumed Crosby Indebtedness is less than $166,666,666, the Crosby Transaction Fees payable to Raymond James shall equal $2,500,000.

**Luhr-Crosby JV-Interest Transaction Fee**: Subject to the parameters set forth in the introductory paragraph of this Section 2(b) above, the Transaction Fee for a Luhr-Crosby JV-Interest Transaction (an "**LC JV Transaction Fee**"") will be an amount calculated pursuant to the following schedule based upon the Transaction Enterprise Value of the Client's imputed 49.99% interest in Luhr Crosby (the "**Crosby Share of LC JV TEV**") reflected by the financial terms of such Luhr-Crosby JV-Interest Transaction, payable upon the Closing thereof, time being '*of the essence*':

| Crosby Share of LC JV TEV | LC JV Transaction Fee |
| --- | --- |
| equal to or less than $175 million | 2.0% of Crosby Share of LC JV TEV the "**Tier 1 Fee**") |
| greater than $175 million and less than or equal to $250 million | sum of (a) Tier 1 Fee plus (b) 3.0% of the incremental Crosby Share of LC JV TEV in excess of $175 million and less than or equal to $250 million (such sum, the "**Tier 2 Fee**") |
| greater than $250 million | sum of (a) Tier 2 Fee plus (b) 5.0% of the incremental Crosby Share of LC JV TEV in excess of $250 million |

**RAYMOND JAMES**®

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
May [●], 2026
Page 7

(c) *Transaction Qualifying Under Multiple Definitions / Transaction Fees on Multiple Transactions*:

(i) If a single Transaction hereunder qualifies as more than one type of Transaction under the Transaction definitions set forth herein, then only the largest, single Transaction Fee calculable in connection with such individual Transaction shall be payable in connection therewith.

(ii) Subject to both the preceding clause and the limitations set forth in the *provisos* below in this clause (ii), if there are multiple, discrete, separate Transactions hereunder involving one or both Clients (whether Closed simultaneously or at different times), a separate Transaction Fee shall be payable in connection with each such separate Transaction regardless of whether it meets the same definition of any other Transaction being Closed.

3. **Reimbursement of Expenses**; **Clients' Professional Fees —**

Regardless of whether a Transaction is consummated, and subject to any applicable Order by the Bankruptcy Court, the Clients will reimburse Raymond James upon the *earlier* of (a) 30 days from the Clients' receipt of an invoice from Raymond James *or* (b) any Closing, for all documented expenses (including, without limitation, the fees and disbursements of its outside legal counsel other than those arising with respect to the preparation of this 2nd Restated Engagement Letter) reasonably incurred by Raymond James in connection with performing the Services pursuant to this 2nd Restated Engagement Letter ("**Expenses**").

Upon the execution of this 2nd Restated Engagement Letter, the Clients will deposit $25,000 against Raymond James's incurrence of Expenses hereunder (the "**Expenses Deposit**"), *provided* that, if actual Expenses incurred by Raymond James hereunder through the end of the Term are less than the Expenses Deposit, Raymond James shall promptly refund the unused portion of such Expenses Deposit.

Each Client will also bear all of its own costs it incurs in connection with any Transaction, including, without limitation, such Client's legal and accounting fees and disbursements, the costs of reproducing its Client Materials, fees or charges from outside counsel (including special counsel, if any, for drafting nondisclosure agreements with Prospective Counterparties, whether engaged by a Client or through arrangements via Raymond James), and any due diligence data room costs.

Notwithstanding the foregoing, nothing in this Section 3 shall limit a Client's separate payment and reimbursement obligations set forth elsewhere in this 2nd Restated Engagement Letter (including pursuant to Sections 9(d) and (o) below and pursuant to Addendum A hereto).

4. **Term** — The term of this 2nd Restated Engagement Letter (the "**Term**") commenced for Crosby on September 30, 2024 (the "**Crosby Engagement Commencement Date**") and commenced for Bertucci on December 5, 2025 (the "**Bertucci Engagement Commencement Date**" and alternatively with the Crosby Engagement Commencement Date, each an "**Engagement Commencement Date**"), and the Term for each given Client will continue (and will not terminate, expire or be deemed completed) until terminated (a "**Termination**") by either Raymond James or such Client upon thirty (30) days' prior written notice delivered to the designated person(s) indicated in Section 9(i) below (with documentary or digital proof of receipt required, a "**Termination Notice**"). For clarity, (i) there shall never be any oral, constructive, implied or circumstantial form of termination of this 2nd Restated Engagement Letter or of Raymond James's engagement hereunder by either Client, and (ii) a Termination Notice must expressly refer to the termination of this 2nd Restated Engagement Letter with respect to such Client, and any instruction (written or oral) by such Client to Raymond James to cease any process for a specific Transaction for such Client or for all Transactions for such Client generally shall, absent a specific reference to the termination of this 2nd Restated Engagement Letter by such Client, not be construed as a Termination for such Client. All Sections and provisions of, and addenda, schedules and exhibits to, this 2nd Restated Engagement Letter, other than Section 1 and this Section 4, shall (to the extent applicable to implement the intention thereof) survive any Termination.

**RAYMOND JAMES®**

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
May [•], 2026
Page 8

5.  **Indemnification** — In consideration of Raymond James signing this 2nd Restated Engagement Letter and agreeing to perform Services pursuant to this 2nd Restated Engagement Letter, each Client will perform the indemnification obligations set forth in Addendum A hereto (which is hereby incorporated into this 2nd Restated Engagement Letter and made a part hereof). The *RJ Parties* (as defined in Addendum A hereto) and their respective successors and assigns are, as to this Section 5 and Addendum A, intended third-party beneficiaries and may directly enforce their rights under this 2nd Restated Engagement Letter (including any addenda or schedules attached hereto) against such Client, any other person or entity that falls within the definition of such Client herein and/or their respective successors and assigns.

6.  **Securities Matters** – Neither the offer or sale, pursuant to any Transaction, of any instrument defined as a "security" under Section 2(a)(1) of the Securities Act of 1933, as amended (the "**Securities Act**"), has been or will be registered by a Client with the U.S. Securities and Exchange Commission. Any such securities are to be offered for sale, and sold in reliance upon, the exemption from registration requirements provided by Section 4(a)(2) of the Securities Act and applicable regulations under the Securities Act. Each Client will be responsible for any and all compliance with the securities laws applicable to it, including Section 4(a)(2) of the Securities Act and, unless otherwise agreed in writing, all state securities ("blue sky") laws. Each Client will conduct any offering or sale of its securities in compliance with the securities laws applicable to it, including Section 4(a)(2) the Securities Act, and such Client will file all appropriate notices of such offering with any applicable governmental or regulatory body. Raymond James agrees to cooperate with counsel to such Client in that regard.

7.  **Confidentiality** – Raymond James agrees to use all confidential and proprietary information provided to it by or on behalf of a Client hereunder ("**Confidential Information**") solely for the purpose of providing the Services to such Client that are the subject of this 2nd Restated Engagement Letter and negotiating the terms thereof and to treat all such information confidentially; *provided*, *however*, that nothing herein will prevent Raymond James from (a) sharing such information with its directors, officers, employees, attorneys, representatives or potential financing parties, which includes any Affiliate or other entity that Raymond James may in good faith propose to such Client or a potential Transaction counterparty as a potential financing source with respect to any potential Transaction with or involving such Client, or (b) disclosing such information pursuant to the order of any court or administrative agency, or pursuant to the order or request from any regulatory body with jurisdiction over Raymond James. Notwithstanding the foregoing, such confidential and proprietary information does not include any information: (i) that was already in the possession of Raymond James or any or its representatives, or was available to Raymond James or any of its representatives on a non-confidential basis, prior to the disclosure to Raymond James or such representatives; (ii) obtained by Raymond James or any of its representatives from a third party which, insofar as is known by Raymond James or such representatives, is not subject to any prohibition against disclosure; (iii) which was or is independently developed by Raymond James or any of its representatives without violating any confidentiality obligation under this Section 7; or (iv) which was or becomes generally available to the public through no breach of this Section 7 by Raymond James. Upon written request by a Client, Raymond James will destroy or return all copies of Confidential Information of such Client. Such return or destruction shall not include, however, any metadata that may remain on Raymond James's computer equipment after deletion of applicable files, records, and data formats. Notwithstanding the foregoing, Raymond James may retain a Client's Confidential Information as needed to satisfy the requirements of any law, rule or regulation or as part of an automated electronic archive, backup and/or recovery system. The provisions of this Section 7 will automatically terminate 1 year following the earlier of the completion of the Transaction for such Client or any Termination hereof related to such Client. This 2nd Restated Engagement Letter supersedes any other agreement regarding confidentiality that may have been previously entered into between a Client and Raymond James.

8.  **Publicity** – Following the Closing or public announcement or disclosure thereof in any initial press release or other similar announcement by a Client regarding such Transaction, Raymond James will have the right,

**RAYMOND JAMES®**

#11784907v1<LUGENBUHL> - Crosby - RJ 2nd Restated Engagement Letter - LWPRH 052726

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
May [●], 2026
Page 9

at its expense, to publicize Raymond James's role as investment banking advisor to such Client with respect to such Transaction (including in customary "tombstone" announcements or other advertisements in financial and other newspapers and journals and marketing materials, "**RJ Publicity**"), and such Client agrees that Raymond James may use such Client's logo or other identifying marks in any such RJ Publicity; *provided* that such Client's prior written consent, in its sole and absolute discretion, will be required for any component of RJ Publicity that was not in the public domain prior thereto.

9.  **Miscellaneous** –

  (a)  *Governing Law; Arbitration; Jury Trial Waiver*:  This 2nd Restated Engagement Letter and all claims or causes of action (whether in contract, tort or statute) that may be based upon, arise out of, or relate to (i) this 2nd Restated Engagement Letter, (ii) the negotiation, execution or performance of this 2nd Restated Engagement Letter (including any claim or cause of action based upon, arising out of or related to any representation, warranty or covenant made in, or in connection with, this 2nd Restated Engagement Letter or as an inducement to enter into this 2nd Restated Engagement Letter), or (iii) the nature of the relationship of the Parties, shall be governed by, construed and enforced in accordance with, the internal laws of the State of New York (including its statutes of limitations), without regard to conflicts of laws principles of New York or of any other jurisdiction that would require the application of the laws of another jurisdiction; *provided* that, in instances where New York law conflicts with the Federal Arbitration Act (the "**FAA**"), the FAA shall govern.

  Each Party irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court for all claims arising out of the interpretation, application or enforcement, or otherwise relating to the subject matter, of this Agreement.

  TO THE EXTENT PERMITTED BY LAW, EACH OF RAYMOND JAMES AND EACH CLIENT VOLUNTARILY AND IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF THIS AGREEMENT, THE ENGAGEMENT OF RAYMOND JAMES PURSUANT TO, OR THE PERFORMANCE BY RAYMOND JAMES OF, THE SERVICES.

  NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, AND SUBJECT TO THE FILING OF A CLIENT CH. 11 CASE AND THE ENTRY OF A RETENTION ORDER BY THE BANKRUPTCY COURT WITH RESPECT TO RAYMOND JAMES, THIS SECTION 9(A) SHALL BE SUBJECT IN ALL RESPECTS TO THE TERMS OF THE BANKRUPTCY COURT'S RETENTION ORDER, THE UNITED STATES BANKRUPTCY CODE, AND ANY APPLICABLE LAW.

  (b)  *Reliance on Client Information*: Each Client recognizes and confirms that Raymond James, in the performance of the Services: (i) may rely upon such information received from such Client, Counterparties or their respective advisors, without independent verification by Raymond James; and (ii) does not assume responsibility for the accuracy or completeness of any publicly available information or such information received from such Client, Counterparties or their respective advisors, whether or not Raymond James makes an independent verification of such information, and does not have any obligation to conduct any evaluation or appraisal of the assets or liabilities of such Client or any other party; and (iii) will assume that any financial projections or forecasts (including cost savings or synergies) that may be furnished to or discussed with such Client or its representatives have been reasonably prepared and reflect the best then currently available estimates and judgments of such Client's management.

  (c)  *Confidentiality / Non-Disclosure of RJ Materials*: All analyses, reports, and related materials (the "**RJ Materials**") that Raymond James will provide under this 2nd Restated Engagement Letter are proprietary to Raymond James and for the exclusive use of the applicable Client's Governing Authority

**RAYMOND JAMES**®

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
May [●], 2026
Page 10

for the sole purpose of evaluating a potential Transaction. Without the prior written consent of Raymond James, a such Client may not disclose any RJ Materials other than (i) to its management and Governing Authority, (ii) to its attorneys and other professional advisors in respect of a potential Transaction, or (iii) as required under Applicable Law (*provided* that, to the extent permitted under Applicable Law, such Client provides Raymond James with reasonable prior written notice of such disclosure under Applicable Law so that Raymond James may, in its sole discretion, seek a protective order or other relief from such disclosure).

(d) ***Reimbursement of Proceedings Expenses***: If Raymond James is legally required or requested by a Client or its counsel to render services in any pending or threatened proceeding to which Raymond James is not a party (including, but not limited to, producing documents, answering interrogatories or providing testimony), such Client will pay Raymond James's then current hourly rates for the persons involved for the time expended in rendering such services, including, but not limited to, time for meetings, conferences, preparation and travel, and all related reasonable out-of-pocket expenses (including, without limitation, the reasonable fees and expenses of Raymond James's outside legal counsel incurred in connection with such services).

(e) ***RJ as Comprehensive Financial Institution***: Each Client acknowledges and agrees that Raymond James and its parent company and Affiliated entities are a comprehensive, international financial services firm involved in a wide range of commercial banking, investment banking and other activities (including investment management, corporate finance and securities issuing, trading and research) for their own account and otherwise. Raymond James and its Affiliates may have interests that differ from such Client's interests. Raymond James and its Affiliates have no duty to disclose to such Client, or use for such Client's benefit, any information acquired in the course of providing services to any other party, engaging in any transaction or carrying on any other businesses. Raymond James's employees, officers, partners and Affiliates may at any time own such Client's securities or those of any other entity involved in any transaction contemplated by this 2nd Restated Engagement Letter. Raymond James recognizes its obligations under applicable securities laws in connection with the purchase and sale of such securities. The Client further acknowledges that, (i) prior to the Effective Date and in the ordinary course of business, Raymond James investment banking personnel (which may include investment banking personnel providing services to a Client under this 2nd Restated Engagement Letter) may have from time to time held discussions with and provided information to a party which thereafter becomes categorized as a "*Prospective Counterparty*" or "*Counterparty*" hereunder regarding various market and strategic matters (including a potential transaction with such Client), and (ii) such information and the content of such discussions between Raymond James and such party may be used or relied upon by such party (in its subsequent status as a "*Prospective Counterparty*" or "*Counterparty*" hereunder) in connection with its determinations in respect of a Transaction with such Client.

(f) ***Binding on Successors and Assigns***: This 2nd Restated Engagement Letter (including any addenda or schedules attached to this 2nd Restated Engagement Letter) is binding upon and inures to the benefit of Raymond James and each Client and their respective successors and permitted assigns.

(g) ***Restrictions on Client Assignment***: Each Client agrees not to assign or delegate this 2nd Restated Engagement Letter in whole or in part without Raymond James's prior written consent, and any attempted assignment or delegation without such prior written consent will be voidable at Raymond James's sole and absolute discretion.

(h) ***Entire Agreement***: This 2nd Restated Engagement Letter (and any addenda or schedules attached to this 2nd Restated Engagement Letter) constitutes the entire agreement between Raymond James and each Client regarding the subject matter of this 2nd Restated Engagement Letter and supersedes any prior agreements or understandings, written or oral, between them. Any modification or amendment to

**RAYMOND JAMES**®

#11784907v1<LUGENBUHL> - Crosby - RJ 2nd Restated Engagement Letter - LWPRH 052726

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
May [●], 2026
Page 11

(i)   *Notices*: Any notice called for hereunder shall be sent to the respective Parties as follows: if to Crosby Enterprises, L.L.C.: 17751 Hwy 3235, Galliano, LA 70354; Attn: Kurt J. Crosby, Chief Executive Officer and Farrel Trosclair, Chief Financial Officer; email: kurt@crosbytugs.com and ftrosclair@crosbytugs.com; if to Bertucci: 7 River Road, Jefferson, LA 70121; Attn: Nolan A. Simoneaux, Jr., Manager; email: nsimoneaux@luhr.com; and Client's counsel, Benjamin W. Kadden, bkadden@lawla.com; and if to Raymond James: Raymond James & Associates, Inc.; 320 Park Avenue, 12th Floor, New York, NY 10022; Attn: General Counsel, Investment Banking; email: GEIBLegal@raymondjames.com.

(j)   *No Fiduciary; Independent Contractor*: Each Client acknowledges and agrees that Raymond James has been engaged solely as an investment banking advisor to such Client with respect to a possible Transaction, and no fiduciary, agency or similar relationship has been created in respect of any Transaction or the Services provided to such Client or any other party, regardless of whether Raymond James or any of its Affiliates has advised or is advising such Client on any other matters. In connection with this engagement, Raymond James is acting as an independent contractor, with the only rights and obligations between Raymond James and each Client as set forth in this 2nd Restated Engagement Letter. The Services provided by Raymond James are solely for the benefit of each Client and are not intended to, nor will they be deemed or construed to, create any duty toward or confer any rights upon any persons or entities not a Party (including, without limitation, securityholders (in their capacities as such), employees or creditors of a Client or any Counterparty) as against Raymond James or its Affiliates or their respective directors, officers, agents and employees.

(k)   *Duly Authorized; No Client Conflicts*: Each Client hereby represents to Raymond James, and Raymond James hereby represents to each Client, that (i) the execution and delivery of this 2nd Restated Engagement Letter and the performance by such Party of its obligations hereunder have been duly and validly authorized by such Party, and (ii) this 2nd Restated Engagement Letter has been duly executed and delivered by such Party and constitutes the valid and legally binding agreement of such Party, enforceable against such Party in accordance with its terms. Each Client further represents and warrants to Raymond James that (x) neither the entry into this 2nd Restated Engagement Letter nor the consummation of any Transaction shall trigger the payment of a fee by such Client to any third party and (y) such Client is not a party to or bound by agreement, understanding or arrangement with any other person which would prevent such Client's ability to enter into this 2nd Restated Engagement Letter or perform its obligations hereunder.

(l)   *Construction; Severance*: This 2nd Restated Engagement Letter has been reviewed by the signatories hereto and their counsel. There will be no construction of any provision against any Party because such provision was drafted by such Party, and the Parties waive any statute or rule of law to such effect. If any provision of this 2nd Restated Engagement Letter is determined by a court or arbitration panel having jurisdiction to be unenforceable to any extent, the rest of that provision (if applicable) and the balance of this 2nd Restated Engagement Letter will remain enforceable to the fullest extent permitted by law.

(m)   *"Written" Notice Deliverable by Email*: Any reference herein to a notice, consent, communication, approval or the like being "*in writing*" or "*written*" shall include delivery via email unless expressly required otherwise.

(n)   *U.S. Currency Requirement*: All amounts payable under this 2nd Restated Engagement Letter are denominated in U.S. dollars and will be paid in U.S. dollars via wire transfer of immediately available funds in accordance with instructions set forth in Raymond James's invoice. All amounts payable under this 2nd Restated Engagement Letter will be paid without set-off and without deduction for any

**RAYMOND JAMES**®

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
May [●], 2026
Page 12

withholding, value-added or other similar taxes, charges, fees or assessments. Where any such amounts are calculated or incurred by reference to a currency other than U.S. dollars, those amounts will be converted into U.S. dollars at the prevailing mid-market exchange rate on the payment date according to XE (http://www.xe.com), or if such date is not a business day, the first business day prior to the relevant payment date.

(o) *Collection Costs*: Without limiting any other provision of this 2nd Restated Engagement Letter, in the event any amount, including, but not limited to, the Transaction Fee(s), is not paid in full to Raymond James when due and payable hereunder, then cash interest calculated at the pre-judgment contract breach interest rate under New York law (as set forth in NY CPLR §§5001(a) and 5004) will be due, earned and fully payable on any such unpaid amount at the time such amount is due and continuing until such time as such amount is paid in full. Each Client will reimburse Raymond James for any and all costs Raymond James may incur in collection efforts regarding all amounts payable under this 2nd Restated Engagement Letter, including, but not limited to, reasonable attorney's fees and costs of collection.

(p) *Record-Keeping Compliance*: In order to comply with its books and records requirements under applicable securities laws, rules and regulations (including (FINRA rules), Raymond James may, subject to compliance with Applicable Law, capture and retain copies of written communications with or by a Client (including mail, emails, texts or similar electronic communications, or documentation of meetings). Each Client agrees that Raymond James may deliver copies of such written communications to any court or competent authority. Raymond James will keep or cause to be kept records in relation to the Services provided under these terms of business in accordance with Applicable Law.

This 2nd Restated Engagement Letter may be executed in one or more counterparts and delivered by electronic transmission, with each counterpart being an original and all together constituting one and the same instrument.

**RAYMOND JAMES & ASSOCIATES, INC.**

By: _____
    Geoffrey Richards, Sr. Managing Director –
    Investment Banking

**ACCEPTED & AGREED TO:**

**CROSBY ENTERPRISES, L.L.C.**

By: _____
    Kurt J. Crosby, Chief Executive Officer

**BERTUCCI CONTRACTING COMPANY, L.L.C.**

By: _____
    Nolan A. Simoneaux, Jr., Manager

**RAYMOND JAMES**®

#11784907v1<LUGENBUHL> - Crosby - RJ 2nd Restated Engagement Letter - LWPRH 052726

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
May [●], 2026
Page 13

## EXHIBIT I

### CROSBY RELATED PARTIES

| CROSBY SUBSIDIARIES | CROSBY NON-SUBSIDIARY AFFILIATES |
|---|---|
| A & C Barges, LLC | Allie T., L.L.C. |
| Aaron Joseph, LLC | Bertucci Contracting Co., Inc. |
| Crosby Boat Co., LLC | Bertucci Contracting Company, L.L.C. |
| Crosby Boat Rentals, LLC | Crosby Holdings, L.L.C. |
| Crosby Dredging, L.L.C. | Crosby Marine Repair, L.L.C. |
| Crosby Inland Marine, LLC | Crosby Machinery, L.L.C. |
| Crosby Inshore Marine Service, LLC | Crosby Real Estate, L.L.C. |
| Crosby Marine Towing, LLC | Crosby Group, L. L. C. |
| Crosby Marine Transportation, LLC | Crosby Marine Mexico |
| Crosby Offshore Marine Service, LLC | Crosby Investors, L.L.C. |
| Crosby Towboats, LLC | Crosby Investors, II, L.L.C. |
| Crosby Tugs, LLC | Offshore Rig Moving, L. L. C. |
| Crosby & Son Towing, LLC | Tala Barge Co., L.L.C. |
| Kurt Crosby, LLC | Tala Real Estate, L.L.C. |
| Nine Mi Mooring Service, LLC | Tala Solutions, L.L.C. |
| Paddy Crosby, LLC | Tala Marine, L.L.C. |
| Susan Marie, LLC | Tala Air Logistics, L.L.C. |
| Tara Crosby, LLC | |
| Vinton Crosby, LLC | |
| Webb Crosby, LLC | |

**RAYMOND JAMES**®

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
May [●], 2026
Page 14

# ADDENDUM A

## CLIENT INDEMNIFICATION OF RAYMOND JAMES

Each **Client** will be jointly and severally liable and obligated to indemnify, defend and hold harmless ***Raymond James & Associates, Inc.*** and ***Raymond James Financial, Inc.*** (together, "**Raymond James**") and their respective Affiliates, collectively with their and their Affiliates' respective officers, directors, managers, members, partners, securityholders, employees and agents, and each person, if any, who controls Raymond James or any of its Affiliates within the meaning of the U.S. Securities Act of 1933, as amended, or the U.S. Securities Exchange Act of 1934, as amended (collectively, including Raymond James, the "**RJ Parties**" and each individually, an "**RJ Party**"), from and against any and all (a) claims, actions (including securityholder claims or actions, derivative or otherwise), demands, investigations and proceedings, whether or not such claim, action or proceeding is threatened, established, initiated or brought by, or on behalf of, either Client or by any other party, and whether or not any RJ Party is a party (collectively, "**Proceedings**"), and (b) losses, claims, judgments, penalties, fines, charges, damages, taxes, including the fees and expenses of legal counsel to the RJ Parties, and other liabilities of any kind or nature (collectively, "**Losses**") that such RJ Party may suffer or incur that arise out of or in connection with this 2nd Restated Engagement Letter, the Services provided under this 2nd Restated Engagement Letter, or the exercise of Raymond James's rights under either this 2nd Restated Engagement Letter (including enforcing the terms of this Addendum A) or any transaction referred to in this 2nd Restated Engagement Letter (each, an "**Indemnified Claim**"), except solely to the extent that any such Indemnified Claim is found, in a final, unappealable judgment by a court with competent jurisdiction hereunder (a "**Final Judgment**"), to have resulted primarily as a direct and proximate cause from said RJ Party's willful misconduct or gross negligence (other than an action or failure to act undertaken or refrained from being undertaken at the written or express request of or with the written or express consent of a Client) (an "**Excluded Act**").

No RJ Party will have any liability to either Client, its securityholders, officers, directors/managers or creditors (collectively, including such Client, "**Client Parties**"), or any other person, by reason of or in connection with this 2nd Restated Engagement Letter, the Services, or the exercise of Raymond James's rights under either this 2nd Restated Engagement Letter or any transaction referred to in, or arising out of the transactions contemplated by, this 2nd Restated Engagement Letter, whether such loss arises under any statute, common law, contract, tort or otherwise, except solely to the extent that any such losses or liability to any Client Parties or other persons is found in a Final Judgment to have resulted primarily as a direct and proximate cause from said RJ Party's Excluded Act. Further, nothing in this 2nd Restated Engagement Letter will be construed as rendering Raymond James or any other RJ Party liable, under any circumstances and under any theory of law, to any Client Party or any other person for any indirect, incidental, special, consequential or punitive damages even if Raymond James or any other RJ Party have been advised as to the possibility thereof.

Raymond James or another applicable RJ Party will promptly notify the Clients in writing if an RJ Party receives written notice of any Indemnified Claim (*provided* that no failure or delay by Raymond James or such other RJ Party to so notify a Client will relieve either Client from its obligations under this Addendum A, except as and solely to the extent that such failure or delay actually and materially prejudiced a Client). Upon receipt of any such notice from Raymond James or other RJ Party, a Client may, upon delivery of written notice to Raymond James, assume the full defense of such Indemnified Claim (a "**Client Defense Election**"), including the employment of counsel reasonably satisfactory to such RJ Party and the payment of the fees and expenses of such counsel, other than with respect to any Indemnified Claim (x) brought by either Client or (y) any and all Proceedings before any regulatory bodies and/or authorities involving Raymond James ("**RJ Regulatory Proceedings**"). Following a Client Defense Election, while such RJ Party may employ its own counsel and participate in the defense of such Indemnified Claim, the Clients will not be required to pay the fees and expenses of such counsel unless the Clients have failed to assume the defense and promptly defend such Indemnified Claim using counsel reasonably satisfactory to such RJ Party, or such RJ Party is advised by counsel that a conflict of interest exists or may exist which makes representation of both either Client and such RJ Party by common counsel inappropriate due to differing interests between them.

If for any reason the foregoing indemnity is unavailable to an RJ Party or is insufficient to fully hold any RJ Party harmless, the Clients will contribute to the amount paid or payable by such RJ Party as a result of such unavailability or insufficiency in such proportion as is appropriate to reflect the relative benefits received by and fault of the Clients on the one hand,

**RAYMOND JAMES**®

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
May [●], 2026
Page 15

and the relative benefits received by and fault of the RJ Party on the other hand, as well as any relevant equitable considerations. Notwithstanding anything in this Addendum A to the contrary, the aggregate contribution of all of the RJ Parties for all Indemnified Claims will not exceed the amount of the fees actually received by Raymond James pursuant to this 2nd Restated Engagement Letter. The Clients will reimburse each RJ Party for all documented out-of-pocket expenses incurred in connection with an Indemnified Claim as they are incurred; *provided* that, if any such reimbursement is for expenses relating to a Loss that is found in a Final Judgment to have resulted primarily as a direct and proximate cause from said RJ Party's Excluded Act, such RJ Party will promptly repay such reimbursed amount to the applicable Client.

The Client will not settle, compromise or consent to judgment, or participate in or otherwise facilitate any such settlement, compromise or consent, with respect to any Indemnified Claim without the prior written consent of Raymond James or, if applicable another RJ Party involved in such Indemnified Claim, unless (i) there is no admission of wrongdoing, negligence or improper activity of any kind of or by the applicable RJ Party(ies) in such settlement, compromise or consent, and (ii) there is an unconditional release of all RJ Parties from all liability on claims that are the subject matter of or arise out of such Indemnified Claim, *provided, however*, that, notwithstanding the foregoing, the Clients may not control or facilitate any settlement, compromise or consent with respect to any and all RJ Regulatory Proceedings. Raymond James will not settle, compromise or consent to judgment, or participate in or otherwise facilitate any such settlement, compromise or consent, with respect to any Indemnified Claim without the prior written consent of a Client (which shall not be unreasonably withheld, delayed or conditioned).

The agreements and obligations set forth in this Addendum A will be in addition to any other rights, remedies or indemnification as to which any RJ Party may have or be entitled at common law or otherwise, will survive any termination of this 2nd Restated Engagement Letter or completion of Services under this 2nd Restated Engagement Letter.

**RAYMOND JAMES®**

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
May [●], 2026
Page 16

## ADDENDUM B

### DEFINITIONS

For purposes of this 2nd Restated Engagement Letter, capitalized terms not defined in the enumerated *Sections* above shall have the following meanings:

"**Affiliate**" means, as to any applicable person or entity, any person or entity that exists now or after the Effective Date which, directly or indirectly, controls, is under common control with, or is controlled by, the applicable person or entity.

"**Applicable Law**" means any applicable statutes, laws, ordinances, rules, regulations, supervisory guidance, codes, orders, common laws, judgments, authorizations, consents, practices or other requirements of any federal, state, local or foreign or political subdivision thereof, including the federal Telephone Consumer Protection Act of 1991 (47 U.S.C. § 227), as amended, and, if applicable, the Canada Anti-SPAM Legislation (S.C. 2010, c. 23), or any regulatory agency (including any self-regulatory organization) with jurisdiction over any Party hereto, or any arbitrator, court or tribunal of competent jurisdiction.

"**Assumed Crosby Indebtedness**" means any Crosby Group obligation for future cash payments that is either: (i) expressly assumed by the acquiror, or (ii) repaid, defeased or extinguished from the proceeds paid by such acquiror in connection with or anticipation of such Crosby Transaction; *provided*, *however*, that 'Assumed Crosby Indebtedness' shall not include any obligation satisfied, discharged, or credited through a credit bid by any existing secured creditor of the Crosby Group (or any of its affiliates) in connection with such Crosby Transaction; *provided*, *further*, that for the avoidance of doubt, this exclusion applies only to the dollar amount of secured indebtedness actually satisfied by the credit bid on the particular vessel sold as a result of the closing of the specific Crosby Transaction. No obligation that constitutes Assumed Crosby Indebtedness shall be included in Crosby Transaction Proceeds more than once so as to be duplicative.

"**Client Equity**" means any outstanding or newly-issued capital equity securities of a Client, including without limitation: common equity, convertible preferred equity, and equity-linked securities, as well options, warrants and other rights related to the potential issuance of capital equity securities, or any securities convertible into such capital equity securities.

"**Client Materials**" means materials made available to Raymond James and/or Prospective Counterparties relating to a Client, its businesses, financial condition, results of operations, prospects and other matters material to its operations (which may include a confidential information memorandum, data room materials, management presentation materials, and other materials concerning such Client).

"**Client SPE**" means any special purpose entity formed or used by a Client or any of its Subsidiaries to implement a Transaction hereunder.

"**Client Subsidiary**" means any entity that, directly or indirectly, is owned (50% or more) or otherwise controlled by a Client.

"**Closing**" or "**Closes**" means any initial and subsequent closings (i.e., funding events) of any Transaction.

"**Commitment**" means a Counterparty's written contractual commitment to fund Debt Instruments and/or any other transaction out-of-the-ordinary-course to advance material debt fundings to a Client, in each case at or after an initial Closing.

"**Counterparty**" means any person that participates, directly or indirectly, as an investor, lender or purchaser in any Transaction.

**RAYMOND JAMES**®

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
May [•], 2026
Page 17

"**Crosby Group**" means Crosby Enterprises, L.L.C. and any one or more of the Crosby Related Parties set forth on Exhibit I hereto.

"**Crosby Transaction**" means any transaction or series or combination of related transactions outside of the ordinary course of business that, directly or indirectly, effects any disposition of (i) a material portion of the assets owned and operated by the Crosby Group in connection with the operation of Crosby Tugs, LLC ("**Crosby Tugs**") (a "**Tugs Going Concern Transaction**"), (ii) a material portion of the assets owned and operated by the Crosby Group in connection with the operation of Crosby Dredging, LLC ("**Crosby Dredging**") (a "**Dredging Going Concern Transaction**"), (iii) a material portion of the assets owned and operated by the Crosby Group in connection with the operation of Crosby Tugs and Crosby Dredging (a "**Tugs/Dredging Going Concern Transaction**"), or (iv) a material portion of the operable vessels owned and operated by the Crosby Group ("**Material Vessel Transaction**"), to one or one or more Counterparties (including, without limitation, existing creditors, employees, Affiliates and/or securityholders, and/or by one or more persons or entities acting together with a Counterparty pursuant to a written agreement or otherwise). For clarity, it is the Parties' expectation that there may be one or more Crosby Transactions in the form of a Tugs Going Concern Transaction, a Dredging Going Concern Transaction, a Tugs/Dredging Going Concern Transaction, and/or a Material Vessel Transaction.

"**Crosby Transaction Proceeds**" means the sum of (1) the total of all gross cash or non-cash proceeds in any form (including, but not limited to, the dollar amount of any credit bid, as well as cash or securities of any other party to a Crosby Transaction) received by such Client at the Closing of such Crosby Transaction, plus (2) the amount of any Assumed Crosby Indebtedness (if any) that is part of such Crosby Transaction, in each case before the deduction of any fees (including any *Transaction Fees*, as defined in Section 2(b) above), expenses (including any *Expenses*, as defined in Section 3 above) or other costs; *provided* that, for clarity, Crosby Transaction Proceeds shall expressly exclude any proceeds received by the Client from the sale of assets (i) effected through a separate broker other than Raymond James for which a separate broker fee is earned and paid; and (ii) to a purchaser (or any affiliate of such purchaser) not previously identified to the Debtors by Raymond James during the Term. If any of the proceeds or any Assumed Crosby Indebtedness in a Crosby Transaction are not in the form of cash then, for the purpose of calculating Crosby Transaction Proceeds, such non-cash consideration shall be valued at its then FMV (with a credit bid valued at the dollar amount of such credit bid).

"**Debt Instruments**" means any instruments, documentation and/or Client securities for loans or credit facilities for or on behalf of a Client from any third party, including, without limitation: promissory notes (secured, whether first lien or second lien; unsecured; senior or junior); non-convertible preferred equity; mezzanine debt; sale-lease back financing; uni-tranche financing; bank debt financing; or Client debt securities (whether to raise funds, to refinance, amend or exchange outstanding securities or debt, or any combination thereof).

"**Definitive Agreement**" means, collectively, any definitive written agreement governing a Transaction and, if and as applicable, any ancillary agreements and documents to such Transaction (such as: a stock or assets purchase agreement; a P&S agreement; purchase or subscription agreement(s); binding commitment letter(s); escrow agreement(s); indemnification(s); etc.).

"**Effective Date**" means February 2, 2026.

"**Financing Proceeds**" means (1) the total of all gross cash or non-cash proceeds in any form (including, but not limited to, cash or securities of any other party to a Financing Transaction, including the exercise price of any options or warrants received by or contributed to the applicable Client) received by such Client and/or any of its selling securityholders at the initial and any Closing of any Financing Transaction, plus (2) in the case of a Financing Transaction involving Debt Instruments, the full amount of any binding Commitments delivered at or prior to a Closing (not just the amount actually drawn or available at such Closing), in each case before the deduction of any fees (including any *Transaction Fees*, as defined in Section 2(b) above), expenses (including any *Expenses*, as defined in Section 3 above) or other costs. If such proceeds are not in the form of cash then, for

**RAYMOND JAMES**®

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
May [●], 2026
Page 18

the purpose of calculating the Financing Proceeds, such non-cash consideration shall be valued at its then FMV. For the avoidance of doubt, "*Financing Proceeds*" will include any subsequent increase in Financing Proceeds received by or committed to such Client in an initial or secondary Financing Transaction, during the Term and the Tail Period, whether pursuant to an amendment and/or any accordion, a replacement credit facility, or otherwise, in which any Counterparty participates.

"**Financing Transaction**" means any of the following transactions, arrangements or undertakings (or series or combination of related transactions, arrangements or undertakings) outside of the ordinary course of business other than a Crosby Transaction or an LC JV Transaction, directly or indirectly effecting any of the following (including for the avoidance of doubt any debtor-in-possession facility): (i) the issuance of Debt Instruments or Client Equity; (ii) royalty arrangements, profit sharing and other similar financing transactions; *and/or* (iii) such other financing of any type committed to complete any other Transaction; in each case for or on behalf of such Client (whether to raise funds, refinance outstanding Client securities or exchange Client securities or any combination thereof); *provided* that any such transaction must involve the receipt by such Client of new consideration as opposed to the restructuring, renegotiation, forgiveness, or exchange with or by the holder of any outstanding Debt Instruments or Client Equity (which, for clarity, would fall under the definition of a Restructuring Transaction).

"**FMV**" means the fair market value of a given asset as determined either according to the terms set forth in the Definitive Agreement governing a Transaction, or, in the absence of such guidance therein, as set by the reasonable written agreement of the Parties based on the financial terms of such Transaction.

"**Governing Authority**" of a Client means, alternatively, such Client's governing board, or persons or committee performing in a similar governing capacity.

"**Luhr-Crosby JV-Interest Transaction**" or "**LC JV Transaction**" means any transaction or series or combination of related transactions outside of the ordinary course of business directly or indirectly effecting: (a) a merger, reverse merger, consolidation, or other business combination transaction(s) pursuant to which a majority of Bertucci's 49.99% interest in Luhr Crosby is to be directly or indirectly sold to (including, for the avoidance of doubt, by a sale of Bertucci), or combined with, one or more Counterparties, and/or (b) sale, transfer, disposition, recapitalization, restructuring, joint venture, or other transaction or series or combination of transactions that, directly or indirectly, has the effect of transferring (i) a majority of Bertucci's 49.99% membership interest in the equity of Luhr Crosby or (ii) a majority of Bertucci's indirect 49.99% interest in the consolidated fair market value of the assets, business, revenue or income represented by Bertucci's 49.99% membership interest in Luhr Crosby to one or more Counterparties.

"**NDA**" means an agreement concerning the non-disclosure and confidentiality of designated information.

"**New Capital Financing Transaction**" means a Financing Transaction other than a Re-Financing Transaction that raises new capital for any purpose (e.g., a DIP financing; additional liquidity; etc.).

"**Non-Restructuring Transaction**" means any Transaction other than a Restructuring Transaction.

"**Prospective Counterparty**" means any person that is contemplated as a potential Counterparty.

"**Re-Financing Transaction**" means a Financing Transaction involving one of more Counterparties funding the re-financing of one or more existing lenders to a Client. For clarity, each Re-Financing Transaction with an individual existing lender to such Client shall be considered a distinct and separate 'Re-Financing Transaction' generating a separate Re-Financing Transaction Fee in connection therewith.

"**Restructuring Transaction**" means any transaction (or series or combination of related transactions) outside of the ordinary course of business other than a Non-Restructuring Transaction that, directly or indirectly, constitutes

**RAYMOND JAMES**®

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
May [●], 2026
Page 19

and/or implements either (i) a confirmed Chapter 11 plan of reorganization or (ii) a confirmed Chapter 11 plan of liquidation that effectuates one or more of the Crosby Transaction or the LC JV Transaction.

"**Tail Period**" means the twelve (12) months following any termination of this 2nd Restated Engagement Letter.

"**Transaction**" means any Crosby Transaction, Financing Transaction, LC JV Transaction, or Restructuring Transaction.

"**Transaction Documentation**" means any of the following: (i) any Commitment letter or subscription agreement signed by a Prospective Counterparty; or (ii) when executed by both a Prospective Counterparty and a Client, (A) a letter of intent, term sheet or similar documentation setting forth certain key potential financial terms of a Transaction; or (B) any Definitive Agreement.

*[remainder of page intentionally blank]*

**RAYMOND JAMES**®

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
May [•], 2026
Page 20

## ADDENDUM C

### CALCULATION OF CROSBY SHARE OF LC JV TEV

"**Crosby Share of LC JV TEV**" for an LC JV Transaction means the value 49.99% of Luhr Crosby's operations as a going-concern, as reflected by the financial terms of the LC JV Transaction as set forth in the governing Transaction Documentation regardless of how or where Bertucci or its securityholders directs the distribution of LC JV Transaction proceeds, calculated as the sum of the following components, as each is defined in this Addendum B (without duplication):

 (a) Equity/Asset Consideration allocable to the 49.99% equity interests in Luhr Crosby held by Bertucci (directly or indirectly, including, for the avoidance of doubt, by the acquisition of Bertucci) in such LC JV Transaction; plus

 (b) Assumed Luhr Crosby Indebtedness.

The Crosby Share of LC JV TEV in any LC JV Transaction will not be reduced by the Transaction Fee or any other costs or expenses of the applicable Client paid or payable in connection with such Transaction.

There will be no adjustment to the Crosby Share of LC JV TEV (increase or decrease) in any LC JV Transaction to the extent there is any adjustment (increase or decrease) at or after Closing of Transaction proceeds provided for in the Definitive Agreement resulting from any correction or "true-up" (increase or decrease) at or after Closing of, respectively, the estimated or final measures as of the Closing of working capital, cash or similar financial measure.

*Valuing and Payment of TEV Components*: For calculation of any LC JV Transaction Fee and payment purposes, the components of the Crosby Share of LC JV TEV for such LC JV Transaction will be valued, and the portions of any LC JV Transaction Fee derived therefrom paid, as follows:

 (i) All items comprising the Crosby Share of LC JV TEV other than those described in clauses (ii) and (iii) below will be valued at their respective face values, and that portion of the LC JV Transaction Fee attributable thereto shall be paid at Closing.

 (ii) Non-Cash Consideration will be valued at its FMV thereof as determined at or shortly before the Closing by the mutual written agreement of the applicable Client and Raymond James, and that portion of the LC JV Transaction Fee attributable thereto shall be paid at Closing according to the financial parameters set forth in the Definitive Agreement; *provided*, *however*, that (x) the value of Non-Cash Consideration in the form of publicly traded equity securities (including over-the-counter) will be valued at the 20-trading day average as of the last trading day prior to the delivery thereof, and (y) the value of Non-Cash Consideration in the form of debt instruments shall be the face value thereof plus accrued interest.

 (iii) At the applicable Client's discretion, Contingent Post-Closing Consideration will be valued *either*: (i) at or shortly before the Closing at its present value based on a base case of projections developed by such Client in connection with the negotiations with the acquiror regarding the inclusion of Contingent Post-Closing Consideration, applying such discount rate as is mutually agreed upon in writing by the applicable Client and Raymond James, and that portion of the LC JV Transaction Fee attributable thereto shall be paid at such Closing; *or* (ii) at its face value when delivered in cash to such Client and/or its equityholders, and that portion of the LC JV Transaction Fee attributable thereto shall be paid simultaneously therewith.

**Primary Definitions of Transaction Enterprise Value (not alphabetically listed)**:

"**Equity/Asset Consideration**" means the sum of all amounts paid or payable (directly or indirectly, to the applicable Client and/or its holders of Equity-Equivalents, in connection with a consummated LC JV Transaction)

**RAYMOND JAMES**®

#11784907v1<LUGENBUHL> - Crosby - RJ 2nd Restated Engagement Letter - LWPRH 052726

Crosby Enterprises, L.L.C.
Bertucci Contracting Company, L.L.C.
May [●], 2026
Page 21

in consideration for the Equity-Equivalents, assets, business, revenues and/or income of Luhr Crosby consisting of the following (as defined below), *in each case without duplication*: (i) Cash Consideration; (ii) Non-Cash Consideration; (iii) Transaction Proceeds Distributions; and (iv) Contingent Post-Closing Consideration.

"**Assumed Luhr Crosby Indebtedness**" in an LC JV Transaction means any balance sheet liability of Luhr Crosby as of the date of Closing representing an obligation for future cash payments *other than* any (A) trade payable that is either current or less than ninety (90) days past due, or (B) operating lease designated as a capitalized lease under Accounting Standards Codification 842 (ASC 842), in each case to the extent such balance sheet liability *either*: (i) is expressly assumed by the acquiror in an structured as a sale of assets, (ii) remains an obligation of Luhr Crosby at the time of Closing of an LC JV Transaction structured in any other way, *or* (iii) is repaid, defeased or extinguished from the proceeds paid by the acquiror in connection with or anticipation of an LC JV Transaction rather than from the unrestricted cash on Luhr Crosby's balance sheet prior to Closing (i.e., cash that is legally and contractually available for either reduction of indebtedness or distribution to Luhr Crosby's securityholders, in each case without any adverse impact on the Crosby Share of LC JV TEV).

**Sub-Definitions of Transaction Enterprise Value**:

"**Cash Consideration**" means transaction consideration delivered at Closing in the form of cash or cash equivalents (which, for clarity, includes Escrowed Funds, if any), as well as the aggregate value of any deferred or installment purchase price payments, regardless of when delivered.

"**Contingent Post-Closing Consideration**" means transaction consideration in the form of post-Closing payments contractually contingent upon future operational performance or conditions other than the mere passage of time (e.g., earn-outs; etc., but excluding Escrowed Funds).

"**Equity-Equivalents**" in an LC JV Transaction means any of the following (whether or not vested): (a) any form or class of Luhr Crosby capital stock (including without limitation convertible securities); (b) any Luhr Crosby options, warrants, or other rights to acquire capital stock; and (c) any in-the-money Luhr Crosby phantom equity or profit interests plans.

"**Escrowed Funds**" means transaction consideration placed in escrow at Closing (and/or otherwise subject to a holdback) to secure (in whole or part) obligations of Luhr Crosby and/or its securityholders under the Definitive Agreement governing such LC JV Transaction.

"**Non-Cash Consideration**" means non-cash transaction consideration delivered at Closing to Luhr Crosby and/or its stakeholders by or on behalf of a Counterparty, including without limitation in the form of: (i) securities; (ii) debt instruments (including without limitation '*seller notes*'); (iii) real or personal property; and (iv) contractual arrangements, other than those governing Contingent Post-Closing Consideration or Cash Consideration.

"**Transaction Proceeds Distributions**" means transaction proceeds not otherwise accounted for under other components of the Crosby Share of LC JV TEV that are distributed to applicable stakeholders in the form of dividends, capital distributions, redemptions, cash-outs, or partial or liquidating distributions resulting from distributions to holders of Equity-Equivalents in connection with an LC JV Transaction effected other than through a direct purchase and sale of such Equity-Equivalents.

*[remainder of page intentionally blank]*

