**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In re:** | § | **CASE NO. 26-10678** |
| | § | **(JOINTLY ADMINISTERED)** |
| **CROSBY MARINE TRANSPORTATION,** | § | |
| **LLC,** | § | **CHAPTER 11** |
| | § | **COMPLEX CASE** |
| | § | |
| **Debtors.[1]** | § | |
| | § | **SECTION: A** |

**DEBTORS' REBUTTAL BRIEF REGARDING THE ENFORCEABILITY AND LEGAL EFFECT OF LUHR BROS. INC.'S RIGHT OF FIRST REFUSAL ON THE 11 U.S.C. § 363 SALE PROCESS APPROVED BY THE COURT**
**[Relates to ECF Docs. 648, 665, 677, & 678]**

Crosby Marine Transportation, LLC and the affiliated debtors and debtors in possession (collectively, the "**Debtors**") respectfully submit this rebuttal brief (the "**Rebuttal Brief**") in conformance with the Court's scheduling Order [ECF Doc. 648] ("**Scheduling Order**"). Pursuant to the Court's oral instruction at the hearing held on July 17, 2026 ("**Hearing**") and subsequent Scheduling Order, the Debtors and Luhr Bros., Inc. ("**Luhr Bros.**" and together with the Debtors, the "**Parties**") are subject to a substantially modified and expedited briefing and submission format, pursuant to which the Court will resolve the effect of the ROFR[2] contained in the Operating Agreement on the Debtors' court-approved sale process pursuant to section 363 of the Bankruptcy Code; summary judgment will be rendered pursuant to Federal Rule of Civil Procedure 56. For purposes of the parties' cross summary judgments only, the Debtors rely on, and accept as true, Luhr Bros.' "Statement of Undisputed Material Facts"; the Debtors further rely on the Declaration

---

[1] The Debtors are, in addition to Crosby Marine Transportation, LLC, Crosby Tugs, L.L.C. ("**Crosby Tugs**"); Crosby Dredging, LLC ("**Crosby Dredging**"); Bertucci Contracting Company, L.L.C. ("**Bertucci**"), Crosby Inshore Marine Services, LLC, Crosby Marine Repair, L.L.C., Crosby Offshore Marine Service, LLC, Kurt Crosby, LLC, Tala Marine, LLC, Webb Crosby, LLC, Crosby Inland Marine, LLC, Crosby Real Estate, LLC, Tala Real Estate, LLC, and Crosby Enterprises, L.L.C.

[2] Words capitalized and not defined herein are to be ascribed the meaning set forth in the Debtors' Opening Brief.

of Lawrence Perkins attached hereto as **Exhibit 1**. This Rebuttal Brief is filed in further support of the Debtors' request for a partial summary judgment in their favor [ECF Doc. 678 at 23] ("*Opening Brief*") and in rebuttal to Luhr Bros.' cross-motion for summary judgment ("*Luhr Motion*") [ECF Doc. 677]. The Parties seek opposite relief: Luhr Bros.' asks for a judgment subordinating the Court's Bidding Procedures Order and the Bidding Procedures to the Operating Agreement while the Debtors seek a judgment subordinating the Operating Agreement to the Court's Bidding Procedures Order and the Bidding Procedures. The Debtors respectfully ask that summary judgment be granted for them and against Luhr Bros.[3] In support, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1. Section 363 of the Bankruptcy Code exists to empower bankruptcy courts to conduct orderly, transparent, and competitive sale processes that maximize value for creditors. To accomplish that objective, Congress vested bankruptcy courts with sole authority to establish and enforce bidding procedures that encourage robust competition, promote finality, and maximize estate value. *See* 11 U.S.C. § 363(b); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Integrated Res., Inc.*, 147 B.R. 650, 656–59 (S.D.N.Y. 1992) (approving bidding procedures because they encourage bidding, promote a fair and orderly auction, enhance the integrity of the sale process, and maximize value for the estate).

2. Luhr Bros. asks this Court to relinquish that authority.

---

[3] The Debtors style their request for judgment as an "Opening Brief" while Luhr Bros. styles its filing as a "Motion" with a separate statement of facts. To the extent the Court's oral direction and Scheduling Order did not obviate the need for strict compliance with the Bankruptcy Local Rules regarding the form of a summary judgment motion, the form of the Debtors' request for relief in no way constrains the Court's ability to render judgment for or against either of the Parties since all were fairly warned that summary judgment may be granted against either party and there are no material issues of fact. *See British Caledonian Airways, Ltd. v. First State Bank,* 819 F.2d 593, 595-96 (5th Cir. 1987).

3.      Specifically, Luhr Bros. asks for a judgment generally "except[ing] Luhr Bros. from any bid procedures or obligations that are inconsistent with or in excess of its rights under the Operating Agreement" and specifically exempting Luhr Bros. from being "required to include Bid Protections or similar additional amounts to satisfy the Minimum Purchase Price requirement under Section VI(c) of the Bidding Procedures [ECF 665]." Luhr Mtn. at 16.

4.      There is no reasonable interpretation of the Operating Agreement that exempts Luhr Bros. from the Bidding Procedures or immunizes it from paying Bid Protections. Even if such a reading of the Operating Agreement was reasonable as a matter of pure contract interpretation, federal bankruptcy law preempts that result and precludes Luhr Bros. from converting a state law-derived right of first refusal into a blocking power to prevent the Debtors from using a stalking horse bidder, setting an auction floor, and encouraging a robust and competitive auction process. In other words, the federal interest in value maximization of estate assets trumps Luhr Bros.' pre-petition contractual right of first refusal with respect to the form and structure of a sale process conducted pursuant to section 363 of the Bankruptcy Code.

5.      The consequences extend well beyond this case. If a contract counterparty may invoke state-law rights to excuse compliance with court-approved bidding procedures, every bankruptcy auction becomes vulnerable to strategic delay, diminished competition, and uncertainty. Rational bidders will be reluctant to incur the substantial costs of diligence, financing, negotiation, and bid preparation if another party may simply appropriate the fruits of those efforts without assuming any of the corresponding obligations. Bankruptcy markets function only when bidders have confidence that the rules approved by the Court will govern every participant equally. That is precisely why bankruptcy courts routinely approve bidding procedures that preserve the

integrity of the auction process and maximize value for creditors. *See Integrated Resources*, 147 B.R. at 656–59.

6.     The Supreme Court has likewise emphasized that the Bankruptcy Code requires estate value to be exposed to genuine market competition—not captured through procedural advantage. *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457–58 (1999) (recognizing that market exposure serves as the appropriate mechanism for determining value and preventing favored parties from obtaining estate assets without competitive testing). Luhr Bros.' position would produce precisely the opposite result, allowing it to capture the benefit of a competitive sale process without participating in that process on the same terms as every other bidder.

7.     Nor may Luhr Bros. invoke state-law contract principles to displace this Court's authority under the Bankruptcy Code. While state law ordinarily defines contractual and property rights, those rights remain subject to federal bankruptcy law where necessary to effectuate Congress's objectives. *See Butner v. United States*, 440 U.S. 48, 55 (1979). Under the Supremacy Clause, federal bankruptcy law governs where state-law enforcement would conflict with or frustrate the administration of the Bankruptcy Code. U.S. Const. art. VI, cl. 2. Once these chapter 11 cases were commenced, the conduct of a section 363 sale became a matter of federal law committed to this Court's sound discretion. Luhr Bros. cannot elevate its alleged contractual rights above the Court-approved procedures that exist to ensure a competitive, orderly, and value-maximizing sale for the benefit of all creditors.

8.     The Court should reject Luhr Bros.' invitation to create an exception that appears nowhere in the Bankruptcy Code, nowhere in the Court's Bidding Procedures, and nowhere in the Operating Agreement.

**REBUTTAL ARGUMENT**

I. **Luhr Bros.' interpretation of the ROFR fails as a matter of state law contract principles: it cannot selectively ignore the current $70,000,000 Stalking Horse Bid by JMB and then exercise the ROFR at the Auction to take the Bertucci Membership Interest on terms other than what was agreed in the applicable Stalking Horse Agreement.**

9.         Luhr Bros. devotes substantial ink to the principle that the operating agreements of LLCs are generally enforceable as written under Delaware law. Luhr Mtn. at 4-5 & 12. The Debtors have never contested this point. Rather, the Debtors' position has consistently been that sections 363 and 365 of the Bankruptcy Code supersede general principles of state law as necessary to promote and protect the federal bankruptcy interest in maximizing estate value for the benefit of creditors. Regardless of supremacy principles, however, Luhr Bros.' interpretation of how the ROFR interacts with a section 363 sale process fails even as a matter of *pure contract law*.

10.         Luhr Bros. casts its interest as an "option to match any offer to purchase Bertucci's Membership Units and acquire those Membership Units at the same price that was offered by a third party." Luhr Mtn. at 3. As relief, Luhr Bros. now seeks, *inter alia*, a judgment declaring it "shall not be required to include Bid Protections or similar additional amounts to satisfy the Minimum Purchase Price requirement under Section VI(c) of the Bidding Procedures." Luhr Mtn. at 16. As counsel for Luhr Bros. put it at the Hearing, Luhr Bros.' primary concern is that it does not want to have to pay any Bid Protections authorized by the Court. Tr., July 17, 2026, 69:15-18 & 70:2-3 ("Luhr Bros. don't want to be disqualified and not be a qualified bidder because they won't agree to bid protections under the ROFR, they shouldn't have to pay.").

11.         As counsel for JMB pointed out on the record, however, if payment of bid protections was the true reason for Luhr Bros. initiating this contested matter, then its clear remedy is to step into the shoes of JMB and serve as an alternate Stalking Horse Bidder:

> If . . . the Luhrs are so concerned about paying a breakup fee, they can submit a competing stalking horse bid. They could have done that before. They could have submitted a stalking horse. They haven't. They still can do that. . . . I want to be clear for the record that JMB is designated as the stalking horse. There was no one else that would do that at a floor. And without a breakup fee, there's no floor.

Tr., July 17, 2026, 70:20-25, 71:1-2.

12. Indeed, this is all that the ROFR allows as an option right. As discussed in the Debtors' opening brief, the Notice of Intent with the appended MIPA filed and served on July 14, 2026 provides all four elements of a "Selling Member's Notice"[4], in requisite "reasonable detail" in accordance with the Operating Agreement's Section 10.07(a): (i) the identity of the interests to be sold (the entire 49.99% interest, consisting of 29,999,999 Series C Units); (ii) the consideration offered ($70 million); (iii) the "other material terms and conditions of the Transfer (including any conditions precedent, required representations and warranties, covenants and indemnification provisions)"; and (iv) the "Proposed Closing Date" (determinable according to the MIPA's Section 2.05 with an "Outside Date" of September 30, 2026, MIPA § 7.01(a)).

13. Service of the Notice of Intent and MIPA triggered "an option for fifteen (15) days after receipt of such Selling Member's Notice described in Section 10.07(a) to elect to purchase and/or receive their pro rata share of the Offered Units *upon the same terms and conditions stated in the Selling Member's Notice.*" Op. Agmt. 10.07(b) (emphasis added). The "terms and conditions" of JMB's offer to Bertucci are contained within the 28 pages of the MIPA. The critical terms of the MIPA establishing it as a stalking horse agreement and not a run of the mine purchase

---

[4] The Notice of Intent was properly served. Section 10.07(a) requires "written notice . . . of such offer to the Company," meaning Luhr Crosby, LLC. Counsel for Luhr Crosby, Mr. William Steffes, filed a "Notice of Appearance and Request for Notices" on behalf of Luhr Crosby on April 8, 2026 at ECF Doc. 174 "requesting service of all papers and notices" be served to him via email at bsteffes@steffeslaw.com, which the Notice of Intent was through the Court's CM/ECF system. Section 10.07(a) requires Luhr Crosby's Board to then forward the Selling Member's Notice to the non-selling Members. In any case, the Notice of Intent was also served directly on Luhr Bros. through its counsel of record, Mr. David Rubin (David.Rubin@butlersnow.com) through the Court's CM/ECF system.

6

agreement are contained within its Article VII. Pursuant to section 7.01, the MIPA may be terminated in a number of events, including if the "Bankruptcy Court enters an order approving an Alternative Transaction or a sale of any of the Acquired Interests to a person other than Buyer." MIPA § 7.01.

14. The MIPA further provides:

In consideration of Buyer and its Affiliates having expended considerable time and expense in connection with this Agreement and the negotiation thereof, and the identification and quantification of assets to be included in the Acquired Interests, and to compensate Buyer as a stalking-horse bidder, upon the occurrence of a Fee Event, Seller shall pay (or cause to be paid) to Buyer in cash (i) a break-up fee equal to $2,100,000 (the "Break-Up Fee"), representing three percent (3%) of the Purchase Price and (ii) the aggregate amount of all reasonable and documented out-of-pocket costs, expenses and fees incurred by Buyer and its Affiliates and owed to third parties in connection with evaluating, negotiating, documenting and performing the Contemplated Transaction, including fees, costs and expenses of any financial advisors, outside legal counsel, accountants, experts and consultants retained by Buyer or its Affiliates (in an amount not to exceed $700,000 (representing one percent (1.0%) of the Purchase Price)) (together with the Break-Up Fee, the "Bid Protections"). The Bid Protections shall be paid within seven (7) Business Days of the occurrence of a Fee Event

* * *

Seller acknowledges that (A) the Bid Protections are an integral part of the Contemplated Transaction; (B) in the absence of Seller's obligation to pay the Bid Protections, Buyer would not have entered into this Agreement; (C) the entry of Buyer into this Agreement is beneficial to Seller because it will enhance Seller's ability to maximize the value of its assets for the benefit of its creditors; and (D) the Bid Protections are reasonable in relation to Buyer's efforts and lost opportunities resulting from the Contemplated Transaction.

MIPA § 7.01(b).

15. But for the Bid Protections, JMB would not be willing to offer a $70,000,000 purchase price for the Bertucci Membership Interest while being subject to being outbid at the Auction. And Bertucci would not be willing to pay the Bid Protections without the benefit of a $70,000,000 floor at the Auction, which the parties explicitly acknowledged "enhanc[es] Seller's ability to maximize the value of the assets for the benefit of its creditors." MIPA § 7.01(b).

16. Luhr Bros. describes its ROFR as a right to "match"[5] the bare $70,000,000 stalking horse purchase price without either acting as a stalking horse itself or paying for the Bid Protections payable to JMB under the terms of the MIPA. There is no good faith way to read the Operating Agreement as granting such a right. Nowhere does the ROFR state the non-selling Member can obtain assignment of the interest by offering the cash value of the purchase price set forth in the Selling Member's Notice. The ROFR's text provides it is an option to "purchase and/or elect to receive their pro rata share of the Offered Units upon the same terms and conditions stated in the [Notice of Intent and MIPA]." Op. Agmt. § 10.07(b).

17. Luhr Bros. cannot choose what "terms and conditions" it will agree to in exercising the option. It is all or nothing. The ROFR, at most, permits Luhr Bros. to step into the shoes of JMB under the MIPA (subject to change of non-material changes and modifications to sections personal to JMB, e.g. credit bid rights) and serve as an alternate Stalking Horse Bidder. But what the Debtors cannot permit, and the ROFR does not allow, is for Luhr Bros. to elect the purchase price and leave behind the other material consideration afforded the estates: namely, entering into a competitive auction for the Bertucci Membership Interest with a set floor. This would deprive Bertucci of the full benefit of bargain embedded in the terms and conditions of the MIPA it negotiated with JMB.

18. Nor does the Operating Agreement allow Luhr Bros. to hold open its ROFR option until the Auction, as it argues in its brief. "[T]he Luhr Members shall have an option for fifteen (15) days after receipt of such Selling Member's Notice." Op. Agmt. § 10.07(b). The Operating Agreement further provides:

---

[5] Luhr Bros. uses this formulation at the top of its brief, Luhr Mtn. at 2, and again, Luhr Mtn. at 3, and again, Luhr Mtn. at 7, and again, Luhr Mtn. at 8, and again, Luhr Mtn. at 10, and again, Luhr Mtn. at 12.

> [I]f the Members other than the Selling Member and/or the Company allow their option periods to lapse without notifying the Selling Member of an intention to exercise this right of first refusal within their applicable option periods provided for in this Section 10.07, consent to the Transfer shall be presumed, the right of first refusal with respect to the Offered Units shall terminate, and the Selling Member shall be entitled to consummate the proposed Transfer of its Units, *provided* that such Transfer is (i) on substantially the same terms as the Selling Member's Notice and (ii) consummated within forty-five (45) days of the expiration of the Company's option period pursuant to Section 10.07(b) or (c), as applicable.

Op. Agmt. § 10.07(d).

19. The effect of this language is inescapable. Since the Notice of Intent and MIPA were filed and served on Luhr Crosby and Luhr Bros. through counsel of record on July 14, 2026, the ROFR option self-terminates with respect to the proposed Stalking Horse Agreement with JMB on July 29, 2026 (which is also the Outside Stalking Horse Designation Date). If Luhr Bros. does not agree to be Stalking Horse Bidder on the substantial terms set forth in the MIPA on July 29, 2026, its ROFR is void purely as a matter of contract and Delaware law. *Morris v. Delmarva Real Est. Holdings, LLC*, No. CV 2022-1211-MTZ, 2024 WL 413512, at *7 (Del. Ch. Feb. 5, 2024) ("If an option lapses, the option becomes void, and all rights under the contract, along with any consideration given, are forfeit.") (citation and internal quotations omitted). Luhr Bros. cannot deploy its ROFR to avoid paying for the Bid Protections if it did not render the benefit (an auction floor) that is the corresponding consideration to Bertucci.

20. This Court should hold that Luhr Bros.' sole right under the ROFR is to step into the shoes of JMB as Stalking Horse Bidder on July 29, 2026. Luhr Bros. cannot sit on its option, let it lapse, and then deploy its expired option to obtain a leg up at the Auction to deny the Debtors the full benefit of a bargain Luhr Bros. could have entered but chose not to.

21. Judge Jernigan's *Genesis Healthcare, Inc.*, No. BR 25-80185-SGJ-11, 2026 WL 2065679 (Bankr. N.D. Tex. July 14, 2026) is directly on point. There, like here, the ROFR provision required a written "Offering Notice" with "no magic form specified," *id.* at *10. There,

like here, the court entered a sale procedures order; and asset purchase agreements between the Debtors and stalking horse bidders were filed which "provided the purchase price and other terms of the proposed sale" to the stalking horse bidders. *Id.* Judge Jernigan wrote:

> On balance, the court concludes that the Debtors substantially complied with Section 5.2.1 of the Partnership Agreement and tendered to Madison an "Offering Notice" pursuant to that section—i.e., a written notice with the terms and conditions of the proposed sale of the Bowie Partnership Interests—first as proposed by the First Stalking Horse, then the Replacement Stalking Horse, and ultimately the Buyer (WSSH)—and Madison had the opportunity to respond, in accordance with Section 5.2.2 of the Purchase Agreement. While Madison filed three objections along the way during the process—purporting to preserve its rights, including the ROFR, the court cannot conclude that this was tantamount to Madison notifying the Debtors "in writing, within thirty (30) days following the date of the receipt of the Offering Notice, of Madison's election either (i) to accept the sale offer ... or (ii) to decline the sale offer," as contemplated by Section 5.2.2 of the Partnership Agreement. Thus, Madison should be deemed to have declined the opportunity to match, and the Bowie Debtors have the right to proceed with a sale of the Bowie Partnership Interest to the Buyer (WSSH), pursuant to Section 5.2.4 of the Partnership Agreement.

*Id.* at *11.

22.     The facts here and in *Genesis* are materially the same; the only difference is the moment that the issue has been raised. Here, the Court has opportunity to preemptively determine as a matter of contract that the ROFR will be void unless Luhr Bros. elects to step into the terms of the MIPA on July 29, 2026.

23.     Notably, if Luhr Bros. agreed to serve as the Stalking Horse Bidder subject to the terms and conditions agreed between the Debtors and JMB, its professed concerns over Bid Protections are moot. That Luhr Bros. has not done so confirms that its motivation is not to protect a vested property interest, it is to use an unsupportable characterization of the ROFR to scare away competitors, chill bidding, and obtain the Bertucci Membership Interest at a below-market price. Neither the Operating Agreement nor Delaware law support this. The Bankruptcy Code does not condone it.

10

**II. Luhr Bros. cannot use its state-law ROFR to manipulate or constrain the section 363 sale process.**

24.     Even if Luhr Bros.' interpretation of the Operating Agreement had merit under applicable Delaware law, the relief it seeks is still foreclosed by applicable federal law; specifically, sections 363 and 365 of the Bankruptcy Code and the Supremacy Clause. The Debtors cite ample authority in their Opening Brief demonstrating that rights of first refusal are unenforceable to the extent they interfere with a section 363 sale process. *See Genesis*, 2026 WL 2065679 at *12-13; *In re Chicago Investments, LLC*, 470 B.R. 32, 89–91 (Bankr. D. Mass. 2012); *In re Adelphia Commc'ns Corp.*, 359 B.R. 65, 86 (Bankr. S.D.N.Y. 2007); *In re Mr. Grocer, Inc.*, 77 B.R. 349, 352–53 (Bankr. D.N.H. 1987).

25.     Luhr Bros. ignores these authorities, except for *Genesis*, which it attempts to distinguish. One, Luhr Bros. says, *Genesis* is different because there the ROFR holder did not attend the auctions after being given notice of stalking horse bids that included the subject property and, here, no auction has occurred, so Luhr Bros. has had no occasion to appear. As discussed above, the difference is purely temporal—the ROFR issue has been teed up for Court resolution pre-auction not post-sale. This is no basis for distinguishing *Genesis*.

26.     Two, Luhr Bros. says the Bertucci Membership Interest is an asset that "may be valued and bid on alone." Luhr Mtn. at 10-11. That is no materially distinguishing fact. First, while it is true that the Bertucci Membership Interest is subject to a separate bid, it is also subject to a potential WholeCo bid, inclusive of all the Debtors' combined assets, and the Debtors have received explicit interest for this form of transaction. And in *Genesis* the auctions were similarly "set up where Piecemeal Bids would be considered." *Genesis*, 2026 WL 2065679 at *13. Second, Luhr Bros. misses the point—the *Genesis* court employed 365(f) to render the right of first refusal unenforceable because it was persuaded by the reasoning of the *Mr. Grocer* and *Adelphia*

11

decisions. Those courts observed that a right of first refusal should be nullified as a restriction on assignment pursuant to section 365(f) where it "could chill bidding because potential purchasers could make the initial effort to submit a bid only to have the right-holder match that bid without making a higher or better offer." *Id.* (citing *Mr. Grocer*, 77 B.R. at 353–54).

27.     That concern could not be more real here. The Debtors determined in their business judgment that the best opportunity to maximize the value of the Bertucci Membership Interest was to obtain a Stalking Horse Bid setting a floor at an auction. The Bertucci Membership Interest is not a tract of land or a strip mall lease. It is a 49.99% interest in one of the largest marine construction firms in the nation. Apprising the value of the Bertucci Membership Interest (which in the opinion of the Debtors and their advisors is much greater than $70 million) requires substantial upfront investment in the form of research, diligence, and advisory costs. Accordingly, the Debtors determined it to be in the best interests of the estates to "spen[d] a comparatively small amount of its money to guarantee a minimum auction price." *Matter of Bouchard Transportation Co., Inc.*, 74 F.4th 743, 752 (5th Cir. 2023). Included in the benefit of the bargain of the Stalking Horse Agreement with JMB (the MIPA) is that the Bid Protections force the next responding bidder to bid in an amount sufficient to cover the cost of those Bid Protections. *Id.*

28.     Luhr Bros.' formulation of the ROFR as granting immunity from paying Court-authorized Bid Protections immediately hamstrings the Debtors' sale process by negating the benefits of obtaining a Stalking Horse Bid, transferring costs of Bid Protections from the Successful Bidder onto the estates, and depressing value by giving Luhr Bros. an advantage in a sale process for which there is no contractual justification.

29.     None of Luhr Bros.' cited authorities contradict the sound application of law and fact in *Genesis*. In none of the cases cited was the court asked to consider how enforcing a right of

first refusal would impact a complicated multi-asset sale process subject to bidding procedures and bid protections. *See In re Cap. Acquisitions & Mgmt. Corp.*, 341 B.R. 632, 636 (Bankr. N.D. Ill. 2006); *In re IT Grp., Inc., Co.*, 302 B.R. 483, 488 (D. Del. 2003); *Matter of Wauka, Inc.*, 39 B.R. 734, 737 (Bankr. N.D. Ga. 1984). And the *IT Group* court did not question the reasoning of *Mr. Grocer*, it was merely "not persuaded that enforcing the right of first refusal in this case would hamper the Debtors' ability to assign the property or foreclose the estate from realizing the full value of the Debtors' interest." *In re IT Grp., Inc., Co.*, 302 B.R. 483, 488 (D. Del. 2003).

30. Here, Luhr Bros. is attempting to use its ROFR as a blocking power to prevent the Debtors from obtaining the incumbent benefits of a Stalking Horse Bid; section 363 and 365 do not allow for a restriction on assignment to depress fair market value in this way to obtain personal benefit at the expense of the estates and creditors.[6]

## CONCLUSION

31. Luhr Bros.' formulation of the ROFR is unsupported by the Operating Agreement and foreclosed by superseding federal bankruptcy law, since it would impermissibly restrict the assignment of the Bertucci Membership Interest and the Operating Agreement and prevent the Debtors from obtaining the full value of a critical asset that is being marketed and sold pursuant to the heavily negotiated Bidding Procedures approved by the Court.

The Debtors respectfully request that the Court enter a judgment: (i) declaring Luhr Bros. to be subject to the Bidding Procedures and the Bidding Procedures Order in their entirety, Section

---

[6] Luhr Bros. devotes the last section of its Motion to arguing the ROFR is (i) not an executory contract and (ii) regardless of the outcome of (i), it is unhelpful to the "Debtors' efforts to eliminate the ROFR." Luhr Bros.' point here is not clear. To the extent its argument is simply a reiteration of prior argument that sections 365(f) and 363 do not grant the Court authority to deem the ROFR unenforceable as a constraint on the sale process, Luhr Bros. is wrong for the reasons set forth above and in *Genesis*. To the extent Luhr Bros.' argument is that the Debtors cannot assign the Bertucci Membership Interest or the Operating Agreement without the ROFR being intact and binding on the *buyer*, that issue is not before the Court, and the Debtors reserve all rights. As it currently stands, the Debtors have proposed to sell their Assets on an "As-Is" basis and have not moved to reject the Operating Agreement.

10.07 of the Operating Agreement notwithstanding, and (ii) granting such other and further relief

to the Debtors as is just and proper.

Respectfully submitted:

*/s/ Benjamin W. Kadden*
Benjamin W. Kadden, La. Bar No. 29927
bkadden@lawla.com
Stewart F. Peck, La. Bar No. 10403
speck@lawla.com
Douglas S. Draper, La. Bar No. 5073
ddraper@lawla.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@lawla.com
Coleman L. Torrans, La Bar No. 38917
ctorrans@lawla.com
**Lugenbuhl, Wheaton, Peck, Rankin & Hubbard (A Law Corporation)**
601 Poydras Street, Suite 2755
New Orleans, LA  70130
Telephone: (504) 568-1990
Fax: (504) 310-9195
***Counsel for Debtors and Debtors in Possession***

## Certificate of Service

I certify that a true copy of the foregoing, with its appended exhibits, was served on counsel of record who have electronically appeared in the above-captioned case through the Court's CM/ECF system.

Date: July 24, 2026

*/s/Benjamin W. Kadden*
Benjamin W. Kadden